| | |
|---|---|
| Marc Van Der Hout, Cal. Bar No. 80778 | Sadaf M. Doost, Cal. Bar No. 346104 |
| Johnny Sinodis, Cal. Bar No. 290402 | Baher A. Azmy, *pro hac vice* motion pending |
| Van Der Hout LLP | Katherine Gallagher, *pro hac vice* motion pending |
| 360 Post Street, Suite 800 | Maria C. LaHood, *pro hac vice* motion pending |
| San Francisco CA 94108 | Astha Sharma Pokharel, *pro hac vice* motion pending |
| (415) 981-3000 | Samah Sisay, *pro hac vice* motion pending |
| ndca@vblaw.com | Pamela C. Spees, *pro hac vice* motion pending |

Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,<br><br>Defendants. | Case No.: 3:23-cv-5829<br><br>**COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

PARTIES ........................................................................................................... 7

JURISDICTION AND VENUE ......................................................................... 14

DIVISIONAL ASSIGNMENT ........................................................................... 15

FACTUAL BACKGROUND .............................................................................. 15

   I.    ISRAEL'S PROLONGED OCCUPATION OF PALESTINE AND BLOCKADE OF GAZA ARE HISTORIC PRECURSORS THAT HAVE ENABLED THE CONDITIONS FOR THE PRESENTLY DEVELOPING GENOCIDE. ................................................. 15

     A.   The Historical Policy and Practice of Seizure of Palestinian Land and Dispossession of the Palestinian People .................................................................................. 15

     B.   Israel's Occupation and Blockade of Gaza ...................................................... 18

   II.    EVIDENCE OF ISRAEL'S EMERGING GENOCIDE AGAINST PALESTINIANS IN GAZA ................................................................................................................ 24

     A.   Israeli Officials Escalate Military Assault, Announcing Campaign of Erasure and Destruction of Palestinians in Gaza. ................................................................. 25

     B.   Israeli Officials Expand Calls for Collective Punishment of "Human Animals," Implement Use of Starvation and Dehydration as a Weapon of Warfare. .......... 26

     C.   Threatening to Eliminate Palestinians, Israel Advances Genocide Through Continued Siege Blocking All Essential Necessities, Widescale Bombing, Use of Chemical Weapons, and Forced Evacuation Orders. ........................................... 27

     D.   Israel's Deliberate Targeting of Hospitals and Disruption of Life-Saving Services, Despite Warnings of Fatalities to Newborns in Incubators, ICU Patients, Thousands of Pregnant People, and Others. ....................................................... 35

     E.   Israel Imposes Near-Total Blackout on Palestinians in Gaza and Advances Ground Incursion, Increasing Death Toll to 8,000. ......................................................... 37

     F.   Israeli Forces Intensify Deliberate Targeting of Densely-Populated Civilian Centers and Shelters; Bomb Refugee Camps, Schools, Critical Infrastructure, and Hospitals Treating and Sheltering Tens of Thousands of People. ....................................... 39

     G.   As Israel Continues Its Campaign of Genocidal Acts Against Palestinians, the Palestinian Death Toll Rises to 11,078. .......................................................... 43

   III.   UNITED STATES' FAILURE TO EXERCISE ITS INFLUENCE OVER ISRAEL TO PREVENT GENOCIDE AND ITS COMPLICITY IN GENOCIDE ..................................... 44

     A.   The United States' Historically Close Relationship with and Influence over Israel. ........... 44

B.    Israel Announces Genocidal Assault on and Siege of Gaza; Defendants Express their Unconditional Support and Begin Close Coordination with Israeli Officials. ........................... 46

C.    Defendants Pledge and Provide Military Financial Assistance and Equipment for Israel's Assault on Gaza. ................................................................................................... 48

D.    Calls for a Ceasefire Grow and Officials Within Administration Urge Defendants to Reconsider Military Assistance to Israel. .................................................................... 51

E.    Defendants Refuse to Call for a Ceasefire, Veto UN Resolutions Calling for "Humanitarian Pauses" to Israel's Bombardment, and Intensify their Coordination with, and Unconditional Military Support for, Israel's Assault on Gaza. ........................................... 53

F.    Despite Staggering Civilian Casualties and Unlivable Conditions Imposed in Gaza, Defendants Reject Calls for Ceasefire or Limits on Israeli Use of U.S. Military Assistance, Admit to Influencing and "Guiding" Israeli Military Strategy, and Refuse to Even Monitor U.S. Weapon Use and the Unfolding Genocide in Gaza. ......................................... 57

IV.    THERE EXISTS AN ABSOLUTE PROHIBITION ON GENOCIDE AND A CORRESPONDING DUTY TO PREVENT GENOCIDE UNDER CUSTOMARY INTERNATIONAL LAW, WHICH IS PART OF FEDERAL COMMON LAW. ...................... 62

A.    Elements of Genocide ................................................................ 65

B.    The Duty to Prevent Genocide ........................................................ 69

C.    Complicity in Genocide ................................................................ 71

D.    Early Warnings: United Nations' Framework for Analysis for the Prevention of Genocide and Other Atrocity Crimes ........................................................ 72

CLAIMS FOR RELIEF ........................................................................... 73

GENOCIDE: ALLEGATIONS COMMON TO ALL CLAIMS ........................................ 73

Customary International law and Jus Cogens Prohibitions ........................... 73

Specific Intent to Destroy in Whole or in Part a National, Ethnical, Racial or Religious Group ................................................................................ 75

Killing Members of the Group ..................................................... 75

Deliberately Inflicting on the Group Conditions of Life Calculated to Bring About its Physical Destruction in Whole or in Part ........................................... 76

Causing Serious Bodily or Mental Harm to Members of the Group ..................... 77

CLAIM I: VIOLATION OF THE DUTY TO PREVENT GENOCIDE ........................ 79

CLAIM II: COMPLICITY IN GENOCIDE ........................................... 81

PRAYER FOR RELIEF ........................................................................ 84

**INTRODUCTION**

1.     This case is brought on behalf of Palestinian human rights organizations and individuals to enforce what is perhaps the most basic and important legal, and moral, obligation in the world – the obligation to prevent genocide, the destruction of a people. This duty is enshrined in the 1948 Genocide Convention, to which the United States, Israel and Palestine have all acceded, and it is judicially enforceable as a peremptory norm of customary international law. Plaintiffs seek an order of this Court requiring that the President of the United States, the Secretary of State, and the Secretary of Defense adhere to their duty to prevent, and not further, the unfolding genocide of Palestinian people in Gaza. If the legal responsibility to prevent an unfolding genocide is to mean anything – indeed, if the rule of law is to signify anything – courts must have a role and responsibility to enforce these foundational international law principles. The lives of so many more people are at stake.

2.     For the past five weeks the world has watched the Palestinian people of Gaza, half of whom are children, be subjected to an unrelenting and unprecedented bombing campaign unleashed by the Israeli military – a campaign that is both overwhelming in its destructive scale and seemingly indiscriminate in its devastation of Gazan life, infrastructure and the basic human conditions of livelihood. The bombings have leveled critical civilian infrastructure – approximately a third in northern Gaza alone has been damaged or destroyed – taking in its destruction numerous hospitals, schools and universities, United Nations safe havens as well as all the elementary attributes necessary for the existence of civilian life, including water, fuel, medicine and food.

3.     This military bombardment has killed over 11,000 Palestinian civilians, more than 4,500 of them children, as well as entire families, numerous journalists and UN workers. The number of casualties has not been updated since November 10 following the collapse of services and communications at hospitals in Northern Gaza. The bombardment has left many hundreds or thousands more civilians suffocating and suffering under rubble; it has forced the displacement of

approximately 1.6 million persons, including in a manner likely designed to prevent their return to their homes. This bombardment has been accompanied by a total siege of Gaza, depriving Palestinians in Gaza the conditions of life necessary for human survival: food, water, medicine, fuel, and electricity.

4.      This unfolding genocide of the Palestinian people in Gaza has so far been made possible because of the unconditional support given by the named official-capacity defendants in this case, President Joseph Biden, Secretary of State Antony Blinken and Secretary of Defense Lloyd Austin, constituting a breach of U.S. responsibilities under customary international law, as codified in the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277, to prevent, and not further, genocide.

5.      Genocide, the gravest of crimes under international law, defined in the Genocide Convention and implemented in U.S. domestic law at 18 U.S.C. § 1091 upon ratification, constitutes certain acts "committed with the intent to destroy in whole *or in part* a national ethnical, racial or religious group as such" by, among other things: (i) killing members of the group, (ii) deliberating inflicting upon the group conditions of life calculated to bring about its physical destruction in whole *or in part*; and (iii) causing serious bodily or mental harm. For the past 38 days, the world has watched senior Israeli officials use dehumanizing language in connection with their expressed intent to destroy and displace Palestinians in Gaza while imposing an unrelenting siege, and intentionally depriving Palestinians the conditions of life necessary for human survival. The Israeli military has dropped an estimated 25,000 tons of explosives on Palestinians in Gaza – the approximate explosive power of two nuclear bombs.

6.      The United States has been obligated, from the time it learned of the specter of a genocide of the Palestinian people, to exercise its clear and considerable influence on Israel to prevent this grave crime from unfolding. The President and the Secretaries of State and Defense have not only

been failing to uphold the country's obligation to prevent a genocide, but have enabled the conditions for its development by providing unconditional military and diplomatic support – disavowing any constraint or "red lines" on Israel's military campaign even in the face of numerous Israeli governmental statements reflecting a genocidal intent. Defendants have refused to even initiate internal processes to assess whether there is a genocide unfolding in Gaza, or to monitor how U.S. weapons are used there.

7.      The attacks by Hamas on October 7, including unlawful direct attacks against civilians, killed approximately 1,200 civilians and soldiers, and led to the taking of approximately 240 civilian hostages and military captives who are still held in Gaza. Targeting civilians violates international law. Still, under foundational legal principles that Plaintiffs invoke, even attacks that result in atrocity crimes can never justify, as a matter of law or morality, the form of lethal collective punishment and destruction against the Palestinian population that is unfolding, nor do those attacks obviate the United States' corresponding duty to prevent its continuation.

8.      Plaintiffs Defense for Children International - Palestine ("DCIP") and Al-Haq (collectively "Organizational Plaintiffs") are Palestinian nongovernmental human rights organizations dedicated to preserving and promoting the human rights of Palestinian people across the Occupied Palestinian Territory, including Gaza. They are joined by individual Plaintiffs Ahmed Abu Artema, Mohammed Ahmed Abu Rokbeh and Dr. Omar Al-Najjar, each of whom reside in Gaza and have surviving family members there, where they have been subjected to a suffocating siege, coupled with near-continuous Israeli bombardment that killed six members of Mr. Abu Artema's family, including his son, five members of Dr. Al-Najjar's family and ten members of Mr. Abu Rokbeh's family and displaced them all. They are also joined by Plaintiffs Mohammad Herzallah, A.N., Laila Elhaddad, Waeil Elbhassi, and Bassim Elkarra: all are U.S. citizens of Palestinian origin and current residents of the United States, who have family members that have been subjected to repeated Israeli bombing

strikes, have fled their homes in search of elusive safety to escape the bombing and who remain precariously vulnerable to Israel's continuous bombardment, and its continued withholding of critical life-supporting necessities including water, food, fuel and electricity.

9.     Collectively, the Palestinian Organizational Plaintiffs and Individual Plaintiffs bring this action pursuant to the Court's federal question jurisdiction to hear claims brought under customary international law as part of federal common law, against the federal official-capacity defendants. Plaintiffs seek declaratory relief and an injunction requiring the United States to fulfill its international law duty to prevent and cease being complicit – through unconditional financial and diplomatic support – in the unfolding genocide in Gaza.

10.     Evidence of Israeli government officials' specific intent to undertake and persist in undertaking such genocidal acts is significant and overt, and sits on top of a longer history of Israeli dispossession and killing of Palestinians in Gaza as well as the West Bank. This evidence pronounced by senior Israeli officials, including the Prime Minister, the President and the Minister of Defense, belies any legitimate claim to "self-defense." Indeed, this evidence – that Israel also fails to distinguish between a civilian population and armed groups – reflects the kind of dehumanizing and totalizing rhetoric that genocide scholars and historians, including those opining in this action, recognize typically precede, accompany and continue to fuel genocidal acts. It is designed to characterize victims as deserving of destruction, humiliation and dispossession and correspondingly unworthy of elementary principles of humanity and foundational principles of international law.

11.     Those statements of intent – when combined with the total siege, destruction, and killing on the ground – reveal evidence of an unfolding crime of genocide. The statements, more thoroughly described below, include: On October 7, Prime Minister Benjamin Netanyahu ordered 2.2 million Palestinians in Gaza to "***get out now***" as "[Israel] will be everywhere and with all our might." Two days later, the Israeli Defense Minister announced, "I have ordered a complete siege on the Gaza

Strip. ***There will be no electricity, no food, no fuel***, everything is closed" and "We are fighting ***human animals*** and we are acting accordingly." The next day, the Israeli Major General who heads the Coordinator of Government Activities in the Territories ("COGAT") echoed him, stating, "***Human animals*** must be treated as such. There will be no electricity and no water [in Gaza], there will ***only be destruction***. You wanted hell, you will get hell." On October 10, the Israel Defense Forces spokesperson announced dropping "hundreds of tons of bombs," as "the ***emphasis is on damage*** and not on accuracy."

12.     On October 12, when the Israeli military ordered the more than one million Palestinians in northern Gaza to "evacuate" to southern Gaza within 24 hours, the Minister of Energy and Infrastructure said, "Humanitarian aid to Gaza? No electrical switch will be turned on, no water hydrant will be opened and no fuel truck will enter until the Israeli abductees are returned home." He later said "They will not receive a drop of water or a single battery ***until they leave the world***." On October 13, Israeli President Isaac Herzog announced: "It is an entire nation out there that is responsible. It is not true this rhetoric about civilians not being aware, not involved. It's absolutely not true." Israeli Defense Minister Gallant stated: "Gaza won't return to what it was before. ***We will eliminate everything***." On October 15, as Israeli airstrikes killed over 2,670 Palestinian civilians, including 724 children, Prime Minister Netanyahu stated that Israeli soldiers "understand the scope of the mission" and stand ready "to defeat the bloodthirsty monsters who have risen against [Israel] to destroy us."

13.     On October 29, as the number of people killed by Israel in Gaza rose to 8,000, Prime Minister Netanyahu invoked the story of Amalek in the Bible to justify Israel's assault on Gaza, stating, "You must remember what Amalek has done to you, says our Holy Bible, and we do remember, and we are fighting." In the Bible, God commands the extermination of Amalekite men,

women, children, and animals, and this commandment has been described by one scholar as "divinely mandated genocide."

14.     Immediately after the Hamas attacks and the launch of the Israeli assault on Gaza, President Biden offered "unwavering" support for Israel's military campaign, which he and administration officials have consistently repeated even as mass civilian casualties escalated, Gaza was sealed and basic necessities for life cut, alongside Israeli genocidal rhetoric. On October 15, for example, Secretary of State Blinken unconditionally pronounced that "We will stand with [Israel] today, tomorrow, and every day, and we're doing that in word and also in deed." U.S. National Security Council Coordinator John Kirby has repeatedly and publicly proclaimed that there would be no "red lines" to American moral, political or military support to Israel. That support also came by repeatedly vetoing UN resolutions calling for a ceasefire in Gaza, ignoring warnings from UN experts of a "grave risk of genocide" on the Palestinian people in Gaza, the high-profile resignation of the director of the New York office of the United Nations High Commissioner of Human Rights who described what is happening in Gaza as a "textbook case of genocide," and the resignation of a senior State Department official who acknowledged that U.S. weapons were being used to "massacre civilians in Gaza."

15.     That U.S. support also takes significant material form. Since October 7, the United States has provided Israel with expedited and unconditional military financial assistance, equipment, and personnel to support and further its assault on Gaza, which comes on top of access to the existing stockpile of U.S. weapons already in Israel, estimated to be worth up to $4.4 billion. U.S. munitions and equipment are being delivered on a near daily basis. The combat aircraft and munitions killing Palestinians in the Gaza Strip are predominantly American-made and Israel's ability to use U.S. military assistance funding to purchase weapons from Israeli companies means that U.S.-funded Israeli weapons are also killing Palestinians in Gaza. And Defendants intend to provide even more

military assistance: since October 7, they have requested from Congress $14.1 billion to support Israel's military, and have approved the sale of $320 million worth of military equipment to Israel to manufacture precision bomb kits.

16.     After World War II and the horror of the Holocaust, the United States was among the world's leaders in developing universal norms designed to protect civilians and peoples from being targeted because of their ethnicity, nationality, race or religion. Despite having condemned other genocidal campaigns, including by intervening in proceedings in the International Court of Justice to affirm the customary international law obligation to prevent genocide, the United States has now chosen to set aside those norms – and the international humanitarian order they were designed to preserve – while the Israeli government is undertaking genocidal acts that have already killed more than 11,000 Palestinians in Gaza, forcibly displaced hundreds of thousands, and produced such deprivation and suffering in Gaza that it is functionally uninhabitable.

17.     The Court must hold these United States Defendants, including the President of the United States, to their obligations under the law to prevent the unfolding crime of genocide, and cease providing support for it. In the face of continuing death and destruction of their people, these Plaintiffs and the 2.2 million Palestinians they stand for, half of whom are children, have no other choice but to seek the relief of law from this court.

## PARTIES

18.     **Defense for Children International - Palestine** (DCIP) is an independent non-governmental organization, founded in 1991, that is dedicated to defending the rights of Palestinian children. DCIP is based in Ramallah, with offices and staff throughout the occupied West Bank, including East Jerusalem, and in the Gaza Strip. DCIP investigates, documents, and exposes grave human rights violations against children; provides legal aid and counseling to children in urgent need; works to hold Israeli and Palestinian authorities accountable to international law; promotes child

empowerment and child participation through community mobilization programs; and advocates at the international and national levels to advance access to justice and protection for children.

19.     DCIP members and staff have been subjected to indiscriminate bombardment and displacement from the Israeli assaults, which have damaged property and threatened the lives and well-being of staff; they are also are unable to carry out their roles and responsibilities due to lack of freedom of movement, lack of telecommunications access including from repeated blackout and risk of death or serious injury. Defendants have frustrated DCIP's mission and forced DCIP to divert significant capacity, attention, and resources away from its core programs to facilitate and strategize the survival of its staff, members, and the broader civilian population. DCIP has had to shift focus from its broader child protection and empowerment programming to escalate monitoring and documentation efforts and directly engage the international community to help facilitate immediate child protection interventions to prevent the further commission of genocide against the Palestinian population.

20.     **Al-Haq** is an independent Palestinian non-governmental human rights organization based in Ramallah, West Bank. Established in 1979 to protect and promote human rights and the rule of law in the Occupied Palestinian Territory (OPT), the organization has special consultative status with the United Nations Economic and Social Council. Al-Haq documents violations of the individual and collective rights of Palestinians in the OPT, irrespective of the identity of the perpetrator, and seeks to end such breaches by way of advocacy before national and international mechanisms and by holding the violators accountable. Defendants have frustrated Al-Haq's mission and forced Al-Haq to divert significant capacity, attention, and resources away from its core programs to facilitate and strategize the survival of its staff, members, and the broader civilian population.

21.     Members of Al-Haq and its staff have been subjected to indiscriminate bombardment and displacement themselves, and their relatives have been killed. And, due to Israel's military

offensive and total siege on the Palestinian population of the Gaza Strip, Al-Haq completely restructured the work of its core departments, merging them with two organizations in Gaza, to meet the emergency response. Al-Haq shifted focus from its broader programming to issue near daily advocacy reports and statements to the international community urging immediate intervention to prevent the further commission of genocide against the Palestinian population. All projects that Al-Haq had been working on were suspended, and core resources directed to the emergency response, putting the organization at risk of breaching its immediate project commitments to donors. As the conflict entered its ninth day, the intensity of the bombing along with the widespread and systematic attacks on infrastructure across the Gaza Strip, meant that the joint emergency field team in Gaza could no longer respond to the violations. Due to the intense and relentless nature of the hostilities, this is the first time in Al-Haq's history that it has been unable to document human rights atrocities in Gaza. Communication blackouts in Gaza have made communications with staff on the ground and partner organizations difficult, if not impossible, to maintain.

22.     Plaintiff **Ahmed Abu Artema** is a Palestinian writer, a poet and a peace activist. Mr. Abu Artema's family are refugees in Gaza; his grandfather is from Ramla, in the center of what is now Israel. Mr. Abu Artema and his family live in the area that Israeli authorities instructed civilians from the North to go to for safety. On October 24, 2023, Mr. Abu Artema was in the living room at his father's house with three of his four children and several other relatives when an Israeli airstrike hit their home. His son, Abdallah, 12 years and 10 months old, was killed by the blast. Ahmad and his two children Mohammad, 11, and Batool, 8, suffered second degree burns, and are still being treated in the hospital. His fourth son, Abdelrahman, 9 years old, was not injured because he had been standing in the long line at the bakery to get bread and had been there for five hours when the strike hit the family's home. Other relatives who died were his 8 year old niece Joud, his 85-year old aunt Fatema, his cousin (Fatema's daughter) Fawziyah who was in her 40s, his aunt Khayriya, 65 years old, and his

stepmother Intisar. His neighbor Hamad was also killed in the same blast. His three sisters and remaining relatives were all also injured, one of them critically. Due to the ongoing siege, inability to access basic necessities including food and water and the constant airstrikes, Mr. Abu Artema fears for the life of his remaining children and his remaining family.

23.     Plaintiff **Dr. Omar Al-Najjar** is a 24-year old intern physician at the Nasser Medical Complex in Khan Yunis City in Gaza. He is Palestinian and was born and raised in Khuza'a, a border village east of Khan Yunis City. Khan Yunis is far south of the evacuation zone boundary announced by Israel. Almost all of Dr. Al-Najjar's family are refugees who live in Gaza. On October 8, Dr. Al-Najjar, together with his parents and siblings, left his family home in Khuza'a in response to artillery shelling and direct threats from the Israeli military. His family home was later partially destroyed. On October 10, Israeli bombing killed 5 members of his extended family, although they had also fled Khuza'a. Dr. Al-Najjar is at Nasser Medical Complex 24 hours a day, where he hears constant bombings nearby and fears for his life, and where he treats people, mostly women and children, with severe bodily injuries caused by Israel's bombings. Since October 7, at the Nasser Medical Complex, he has witnessed at least two medical colleagues and many of their family members die as a result of injuries. Since October 7, Dr. Al-Najjar and his family have had severe difficulty getting basic necessities for their survival, including food, water, and electricity.

24.     Plaintiff **Mohammed Ahmed Abu Rokbeh** is a Palestinian born in Jabalia, Gaza and is a field researcher at DCIP. He lives in the Tal Al-Zaatar neighborhood, east of Jabalia in the northern Gaza Strip. Mr. Abu Rokbeh fears for his life and the lives of his family. Mr. Abu Rokbeh, his wife, and four children live together on the fourth floor of a five-story residential building owned by his parents. Mr. Abu Rokbeh's parents and siblings live in the rest of the building, which houses a total of 27 people. On October 11, 2023, Israeli warplanes bombed Mr. Abu Rokbeh's neighbors' house, killing everyone inside. Mr. Abu Rokbeh's home was partially damaged, with windows and doors

destroyed due to the strength of the bombing. Israeli warplanes dropped evacuation orders in Mr. Abu Rokbeh's area, but he had nowhere to go. Mr. Abu Rokbeh and his family have moved several times over the course of the last weeks, seeking refuge from place to place, sometimes multiple times in a single day, eventually returning home in the North on October 13, just as the Israeli warplanes dropped evacuation order leaflets ordering the evacuation of northern Gaza. On October 17, Mr. Abu Rokbeh and his family finally decided to flee to the southern part of Gaza. On October 23, 2023, after finding shelter for his family in a home in the South, an Israeli warplane bombed a nearby residential building 50 feet away causing significant damage to the building he is staying in. Mr. Abu Rokbeh remains fearful for his life and the lives of his family in Gaza. His family is limited to one meal a day and has limited access to drinking water. On November 8, an Israeli strike killed ten members of Mr. Abu Rokbeh's family. He does not have reliable access to the phone or internet. Mr. Abu Rokbeh does not know if his home is still standing.

25.     Plaintiff **Waeil Elbhassi** is a United States citizen of Palestinian origin, and resident of San Ramon, California. Mr. Buhaissi has relatives and extended family in Gaza, primarily in Deir El Balah and Khan Yunis. On October 12, an Israeli airstrike killed his cousin Mohamed, Mohamed's son Hamdan, 33, and Hamdan's 1-year-old daughter Nour. They were standing near their home in the Central Gaza Strip. The same strike killed 14 members of their neighbor's family. On October 19, his cousin's son Samer, 26, was killed during an airstrike on the mosque where he was praying. Samer's body is still under the rubble. Elbhassi is worried for the remaining members of his family who are still in Gaza, who are unable to access basic necessities such as food and water, and who are at risk of losing their life

26.     Plaintiff **Mohammad Herzallah** is a United States citizen of Palestinian origin, and resident of Fairfield, California. Since October 7, 2023, Israel has killed 7 members of Mr. Herzallah's extended family, including a 4-year-old. Mr. Herzallah is in regular communication with his extended

family, including his young niece. She sent him frequent videos on WhatsApp to let him know she is still alive, and to urge him to try to do something to stop the genocide against her people. Recently, she had to flee her family home in the north of Gaza towards the south, and informed him that she is no longer able to send him video messages because the host family is fearful of retaliation as individuals who post on social media are believed to be targeted by Israeli airstrikes. Mr. Herzallah is fearful for his remaining relatives, who are unable to access basic necessities such as food and water, and who are at risk of losing their life

27.     Plaintiff **A.N.**[1] is a United States citizen of Palestinian origin, residing in Massachusetts with his wife and children, who was born and raised in Gaza and is registered as a Gaza resident in Israel's population registry. Mr. A.N's family were forcibly displaced in 1948 from their home in the northern village of Asdod, and have been refugees in Gaza since. Mr. A.N.'s parents, four sisters and three brothers and all of their children are in Gaza. On October 27, Mr. A.N's father and cousin were injured by an Israeli airstrike that hit the mosque where they were praying. Mr. A.N's family have remained together in the family home, where they host more than 120 members of their extended family who have fled the northern Gaza strip. Since Israel's military attack on Gaza, they have not had adequate food or water. They have resorted to drinking boiled sea water or contaminated tap water. Mr. A.N. has not been able to communicate with them regularly since the bombing and total siege began. Mr. A.N's parents both rely on medication that they have had difficulty accessing and he does not know if they still have any left. Mr. A.N's mother has kidney stones, and due to the lack of clean water available in Gaza she has been hospitalized. Mr. A.N. is very fearful for his parents and siblings and their families' lives and health.

28.     Plaintiff **Laila Elhaddad** is a United States citizen of Palestinian origin, and a resident of Clarkesville, Maryland. She has previously lived in Gaza City. Ms. Elhaddad is a journalist, policy

---

[1]        Plaintiff A.N. is concurrently filing a motion for leave to file under a pseudonym.

analyst, and an award-winning author. Ms. Elhaddad's uncles, aunts, and cousins are all in Gaza City and Khan Yunis. Ms. Elhaddad fears for the lives of her relatives. Her relatives in Gaza City started fleeing to the southern part of the Gaza Strip as instructed by the Israeli military, but they were unable to make it there. The roads were congested as thousands of people fled, they had nowhere to go, and the sight of thousands of other Gazans walking with all their belongings reminded them of what their parents and grandparents experienced during the Nakba in 1948. Her cousins wrote to her on October 13, "We have decided to stay in Gaza City and die in dignity." That family has now relocated on three occasions seeking safety within the city. They are currently being hosted by friends, and they report to Ms. Elhaddad that they are completely besieged. On November 11, they wrote to Ms. Elhaddad telling her that they have run out of drinking water and cannot safely leave their home to find any. On November 2, 2023, an Israeli strike killed Ms. Elhaddad's aunt, three adult cousins and her cousin's wife, and critically injured another cousin, while they were in their home in Gaza City. Ms. Elhaddad is extremely worried about her remaining family in Gaza.

29.     Plaintiff **Basim Elkarra** is a United States citizen of Palestinian origin, and lives in Sacramento, California. Mr. Elkarra's extended family is in the southern Gaza Strip. Israel has killed more than 60 members of Mr. Elkarra's extended family since October 7. Mr. Elkarra's cousin's son and grandson were killed in an airstrike on October 23. On November 6, his maternal aunt's four-story home, which housed her whole family, was fully destroyed by an airstrike. Some of Mr. Elkarra's cousins report that they are making the difficult decision to split their children up between the two parents, to increase the chances that some survive if one group gets hit by an airstrike. They say that food and water have been difficult to find. Mr. Elkarra was last in Gaza in 2005, but has remained in frequent communication with his relatives there. Since the assault began, before Mr. Elkarra goes to bed in California, he checks on his family in Gaza when they should be waking up to see if they are

still alive. Mr. Elkarra is very worried about his remaining relatives in Gaza, and fears that they might be killed or injured by Israeli forces.

30.     **Defendant Joseph Biden** is President of the United States. As President, he is Commander-in-Chief of the U.S. armed forces and serves as Chair of the National Security Council, which is the President's chief forum and mechanism for decision-making and inter-agency coordination as it relates to national security and foreign policy. President Biden is sued in his official capacity.

31.     **Defendant Antony Blinken** is the Secretary of State. As Secretary of State, he is the President's chief foreign affairs adviser, and carries out the President's foreign policies through the State Department. He is also responsible for administering U.S. foreign affairs negotiations. In his capacity as Secretary of State, Defendant Blinken is also a statutory member of the National Security Council. Secretary Blinken is sued in his official capacity.

32.     **Defendant Lloyd James Austin** is the Secretary of Defense. As Secretary of Defense, he enjoys ultimate authority and control over the Department of Defense and its U.S. armed forces worldwide, including, but not limited to, the U.S. Army, Navy, Air Force, combatant commands, and specific-purpose defense agencies and field activities. In his capacity as Secretary of Defense, Defendant Austin is also a statutory member of the National Security Council. Secretary Austin is sued in his official capacity.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1350 over claims arising under customary international law, which is part of federal common law, including those codified in the Genocide Convention and Genocide Convention Implementation Act, 18 U.S.C. § 1091. Jurisdiction is also proper pursuant to 28 U.S.C. § 2201 *et seq*. (Declaratory Judgment Act).

34.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e)(1) as this case is brought against United States officials acting in their official capacity, and Plaintiff Waeil Elbhassi resides in this judicial district.

## DIVISIONAL ASSIGNMENT

35.     Because Plaintiff Elbhassi resides in San Ramon in Contra Costa County, this case should be assigned to the San Francisco/Oakland Division of this Court.

## FACTUAL BACKGROUND

**I.   ISRAEL'S PROLONGED OCCUPATION OF PALESTINE AND BLOCKADE OF GAZA ARE HISTORIC PRECURSORS THAT HAVE ENABLED THE CONDITIONS FOR THE PRESENTLY DEVELOPING GENOCIDE.**

**A. The Historical Policy and Practice of Seizure of Palestinian Land and Dispossession of the Palestinian People.**

36.     The current Israeli government's campaign of mass killings, imposition of a closure and total siege, and displacement of Palestinians is resonant of the foundational tragedy in Palestinian identity and memory – the 1948 Nakba, or catastrophe. Even a brief depiction of this history elucidates the force of the Israeli government's present statements of genocidal intent and the intergenerational trauma and terror they impose on Palestinian people, and in particular, on Gaza's majority refugee population.

37.     Between 1947-1949, carrying out sentiments reflected in future Prime Minister David Ben Gurion's 1937 letter to his son that "we must expel the Arabs and take their places," Zionist militias forced the displacement of 85% of the Palestinian population, destroyed 531 villages across Palestine, killed approximately 15,000 Palestinians and violently forced the expulsion of 750,000 Palestinians from their ancestral homes, rendering them refugees. In one particularly devastating massacre in Deir Yassin in 1948, the Lehi unit of the Zionist armed forces killed more than 100 Palestinians, including children.

38.     Indeed, a great number of refugees from the 1948 Nakba were displaced to Gaza, where now 2/3 of the current population is refugees. Later, in the 1967 Six Day War, Israel occupied the West Bank, including East Jerusalem, and the Gaza Strip, which resulted in the expulsion of 145,000 registered Palestinian refugees for the second time in 19 years. Reflecting a goal of its expropriation of Palestinian territory for Israeli possession, former Defense Minister Moshe Dayan stated in 1969 that "We came to this country which was already populated by Arabs and we are establishing . . . a Jewish state. . . There is not one place built in this country that did not have a former Arab population."

39.     As well-documented by numerous human rights groups, Israel state practice and policy of prolonged military occupation and annexation has reflected a steady, incremental process of forcibly removing Palestinians and concentrating them into enclaves, while transferring its own Israeli civilian population into occupied territory, in violation of Article 49 of the 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention"), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. Palestinian protests over their dispossession and denial of fundamental rights and dignity, including the right to self-determination, including in the First Intifada from 1987-1993, the Second Intifada from 2000-2005 and in subsequent protests of military assaults on Palestinian territory in the 2010s, have been met with military repression, excessive force, killings, arbitrary detention and collective punishment by the Israeli military and state security forces, including police.

40.     Consistently, these campaigns have been accompanied by dehumanizing statements by Israeli officials that signal an intention to displace, if not destroy, the Palestinian people, as a group, as reflected in a 1983 statement of Israeli Army Chief of Staff, who proclaimed that "When we have settled the land, all the Arabs will be able to do is scurry around like drugged roaches in a bottle." The forcible displacement of the Palestinian people for the benefit of the Israeli population has prompted Israeli historians such as Ilan Pappé to warn of an "incremental genocide" of Palestinians.

41.     Prime Minister Netanyahu, now at the helm of the Israeli "war cabinet," has for years been engaged in racist, dehumanizing rhetoric toward Palestinians (though he refuses to call them Palestinian, as this would give legitimacy to their claims to a homeland, and defaults to his ethno-nationalistic worldview in referring to them derisively as "Arabs"). In just one example, in 2016, he referred to Palestinians as "wild beasts" when announcing a plan to build a massive border wall to isolate Palestinians.

42.     In 2018, the Knesset acted to enshrine Jewish supremacy, apartheid and Palestinian dispossession into law when it passed a "Basic Law" that formally declared Israel the "nation-state of the Jewish People." Also referred to as the Nation-State Law, it established that "the right to exercise national self-determination" in Israel is "unique to the Jewish people," and established "Jewish settlement as a national value," requiring that the state "labor to encourage and promote its establishment and development." It also established Hebrew as the official language, relegating Arabic to a lesser "special status." The law thus explicitly excluded the 1.96 million Palestinian citizens of Israel from full citizenship and targeted Palestinians for more forced displacement.

43.     And, two months before the current assault, Prime Minister Netanyahu pronounced – in front of the United Nations – his vision that the entirety of Palestine would become exclusively Israeli. On September 22, 2023, Netanyahu held up a map before the UN General Assembly titled "Israel in 1948," which excluded *any* representation of Palestinians. He then held up a map titled "The New Middle East," which also eliminated any depiction of Palestinian territory, thereby connecting the historical erasure of Palestinians to a future state policy that completely eliminates Palestinians. This is the vision of the current leader of Israel.

44.     As described in greater detail below, since the October 7 attacks, Israeli officials have increasingly echoed past and present calls for the erasure, expulsion, dehumanization, persecution, and

ultimately, genocide of Palestinians. They did so often with implicit and explicit reference to the Nakba.

**B. Israel's Occupation and Blockade of Gaza**

45. Since 1967, Gaza and the West Bank, including East Jerusalem, have been under military occupation by Israel. While Israel withdrew its ground forces and settlers from Gaza in 2005, its occupation there did not end: Israel has continued to maintain effective control over Gaza.[2] Likewise, the recognition of the State of Palestine as a non-member observer State in the United Nations does not affect Palestine's status as occupied territory.

46. As the Occupying Power, Israel is required under the 1907 Hague Regulations, Convention Respecting the Laws and Customs of War on Land (Hague, Annex IV) ("Hague Regulations"), Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539, the Fourth Geneva Convention and customary international law to ensure the overall safety of the population under occupation, sufficient hygiene and public health standards, the provision of food and medical care, among other obligations. Forcible transfer, collective punishment, measures of intimidation, and reprisals against the protected population or their property are prohibited.

47. In 2007, Israel instituted a land, sea, and air closure of Gaza in a demonstration of its continued effective control. For the past sixteen years, Palestinians in Gaza, approximately half of whom are children and have only known life under closure, have been subjected to this blockade and the ensuing denial of fundamental rights. Israel has further subjected the Palestinian population to five large-scale military assaults and incursions since the closure was imposed. *See infra* ¶¶ 54-55.

---

[2] *See, e.g., What does the law say about the responsibilities of the Occupying Power in the occupied Palestinian territory?*, Int'l Comm. of the Red Cross (Mar. 28, 2023), https://www.icrc.org/en/document/ihl-occupying-power-responsibilities-occupied-palestinian-territories ("The ICRC considers Gaza to remain occupied territory on the basis that Israel still exercises key elements of authority over the strip, including over its borders (airspace, sea and land – at the exception of the border with Egypt)"). *See infra* note 4.

48.     When Israel instituted the closure, it declared Gaza – with its then-population of approximately 1.4 million people – "hostile territory" and the population an "enemy entity."

49.     Israel's closure policy severely restricts the movement of goods and people in and out of Gaza, and has resulted in a denial of fundamental rights, including the right to freedom of movement; life and physical security; adequate standard of living, including adequate food, water, and housing; health; education and work; family; and self-determination.[3]

50.     Because of Israel's closure of Gaza, it has been described as an "open-air prison."

51.     As a result of this closure and exacerbated by repeated military assaults which have resulted in extensive destruction of civilian infrastructure (e.g., power plants, water infrastructure and sanitation facilities), Palestinians in Gaza have suffered from severe shortages of food, and deterioration of Gaza's critical infrastructure, including safe drinking water, electricity, and essential medical services and medicine.

52.     Preceding Israel's complete siege on all food, water, and electricity in Gaza in October 2023, 63 percent of the population was reported food insecure, with 82 percent unable to refrigerate food, and 95 percent unable to access clean water. In 2021, human rights organizations reported that 97 percent of Gaza's water was rendered contaminated. This is in large part due to Israel's restrictions on electricity, which obstruct the operation of water wells, and seawater desalination and sewage treatment plants.

53.     Israeli authorities regularly subject Palestinians, particularly in Gaza, to multiple forms of collective punishment, including sustained military campaigns. These campaigns, including the

---

[3]     *See* Palestinian Human Rights Organizations & Victims Communication to the International Criminal Court Pursuant to Article 15 of the Rome Statute Requesting Investigation and Prosecution of the Illegal Closure of the Gaza Strip: Persecution and Other Inhumane Acts Perpetrated against the Civilian Population as Crimes Against Humanity (Nov. 2016), https://ccrjustice.org/sites/default/files/attach/2016/11/GAZA%20CLOSURE%20FOR%20ICC%20November%2022%202016.pdf.

ongoing military assault on Gaza, have each resulted in the mass killings of Palestinian civilians, including children.

54.     Over the course of the 16-year closure, and prior to the current military attack, Israel carried out at least five mass military attacks on the Palestinian civilian population in Gaza:

(1) On December 27, 2008, Israel launched a 22-day military assault, known as "Operation Cast Lead." Israeli forces killed around 1,400 Palestinians, the majority of whom were civilians, including over 300 children, over 100 women, and over 100 elderly. In the aftermath of the assault, a UN-appointed fact finding mission found that Israel had committed war crimes and crimes against humanity.

(2) Between November 14 and November 21, 2012, Israel carried out an 8-day campaign, known as "Operation Pillar of Defense," launching over 1,500 air strikes and killing at least 174 Palestinians – the majority of which were civilians including 33 children and 13 women.

(3) Between July 8 and August 26, 2014, Israel carried out a 50-day military assault against Palestinians in Gaza, which killed 2,251 Palestinians, including 551 children and 299 women. At least 11,231 Palestinians were injured, including 3,540 women and 3,436 children. As a result of these injuries, about one-third of them suffer from life-long disabilities.

(4) Beginning in March 2018, Palestinians in Gaza organized weekly, non-violent mass demonstrations demanding the right of return for the millions of Palestinian refugees who were forcibly expelled by Israel, and demanding an end to Israel's then-11-year-long illegal blockade. Israel deployed tanks, military vehicles, and soldiers, and ordered soldiers, including snipers, to "shoot anyone within several hundred [meters] of the fence." Israeli forces' use of live ammunition during these demonstrations killed at least 180 protesters, and according to OCHA, Israeli forces injured 23,000 others within the context of these demonstrations.

(5) Between May 10-21, 2021, Israel again escalated military violence against Palestinians in Gaza after protests erupted across occupied Palestine and elsewhere in response to the forced removal of Palestinians from their homes in Sheikh Jarrah, Jerusalem and restrictions in access to Al-Aqsa mosque during Ramadan. As a result, 261 Palestinians were killed in Gaza, including 67 children and 41 women. More than 85% of Palestinians killed during this escalation were killed by air-launched explosive weapons.

55.     Through these military assaults even before October 7, 2023, Israel has killed at least 4,269 Palestinians, including 1,025 children, as well as journalists, medical workers, and unarmed protestors, injured tens of thousands, with widespread destruction to civilian housing units and, repeatedly across successive military assaults, critical civilian infrastructure including medical facilities, health clinics and educational facilities. As successive United Nations fact-finding missions

and commissions of inquiry have found, Israel's military assaults on Gaza are evidence of its continued effective control.[4]

56.     Israel's sustained military hostilities and assaults against Palestinians, even when alleged to be "self-defense," breach fundamental principles of international law. As the Occupying power, Israel cannot both exercise control over territory it occupies (the occupied Palestinian territory, including Gaza) and simultaneously militarily attack that territory on the claim that it is "foreign" or imputable to a "foreign State." Article 51 of the U.N. Charter, which sets the confines for the invocation and use of self-defense by States, is inapplicable when the threat originates from a territory over which Israel exercises control. *See Legal Consequences of Construction of a Wall in Occupied Palestinian Territory*, Advisory Opinion, 2004 I.C.J. 136, ¶¶ 78, 139 (July 9).

57.     More broadly, the International Court of Justice ("ICJ") has been clear that self-defense under Article 51 of the U.N. Charter is "subject to certain constraints . . . inherent in the very concept of self-defense." It found that the right of self-defense must be subjected to "the conditions of necessity and proportionality [as] a rule of customary international law." *See Legality of Threat or Use of Nuclear Weapons*, Advisory Opinion, 1996 I.C.J. 226, ¶¶ 40-41 (July 8). *See also Prosecutor v. Kordić & Čerkez*, Case No. IT-95-14/2, Trial Judgement, ¶ 452 (Int'l Crim. Trib. for the Former Yugoslavia

---

[4]     *See* Report of the United Nations Fact Finding Mission on the Gaza Conflict ("Goldstone Report"), ¶ 276, 12th Sess., Agenda Item 7 (Sept. 25, 2009), U.N. Doc. A/HRC/12/48; Report of the Detailed Findings of the UN Independent International Commission of Inquiry established pursuant to Human Rights Council Resolution S-21/1 ("2014 Assault Commission of Inquiry"), ¶ 30, 29th Sess., Agenda Item 7 (June 22, 2015), U.N. Doc. A/HRC/29/CRP.4; Report of the Detailed Findings of the UN Independent International Commission of Inquiry on the 2018 Protests in the Occupied Palestinian Territory ("Great March of Return Commission of Inquiry"), ¶ 67, 40th Sess., Agenda Item 7 (Mar. 18, 2019), U.N. Doc. A/HRC/40/CRP.2; Report of the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, ¶¶ 15-19, 50th Sess., Agenda Item 2 (May 9, 2022), U.N. Doc. A/HRC/50/21. Israel also controls Gaza's airspace, maritime areas, telecommunications, water, electricity, sewage networks, population registry, monetary market and customs. *See* A/HRC/50/21, ¶16.

Feb. 26, 2001) (emphasizing that under customary international law "military operations in self-defense do not provide a justification for serious violations of international humanitarian law").

58.     Furthermore, Israel and often members of the international community use the term "Hamas" without explanation or apparent limitations. Hamas (an acronym for "Islamic Resistance Movement") is a political party, serving as de facto governing authority in the Gaza Strip, where it fulfills administrative governmental functions, such as running schools, the health sector, social affairs, policing, and security. The civil servants who carry out such administrative functions are civilians; separately, military groups associated with Hamas, such as the al Qassam Brigade, carried out the October 7 attacks. However, as recognized under IHL, applicable to the international armed conflict (occupation), a clear distinction must be drawn between the political wings and the military wings of all organizations or groups. As such, a clear distinction must be drawn between those members of Hamas who are carrying out solely civilian functions, who must never be targeted, and those members who participate in armed resistance or directly participate in hostilities, who must comply with IHL, including the prohibition on targeting civilians, and can be directly targeted under, but only in accordance with, IHL. Moreover, civilians in Gaza must be granted the full protections of international humanitarian law, irrespective of political affiliation.

59.     On October 7, 2023, the military wing of Hamas launched a series of attacks outside Gaza including direct attacks against civilians in predominantly residential areas, which killed approximately 1,200 Israeli civilians and soldiers, and took approximately 240 civilian hostages and military captives back into Gaza. The killing and abduction of civilians are serious crimes under international law. These unlawful attacks cannot, however, justify the campaign against Palestinians in Gaza as a policy of collective punishment, direct targeting and attack, and corresponding international law violations of war crimes, crimes against humanity and, ultimately, genocide.

60.     Israel has also steadily subjected Palestinians in the West Bank including East Jerusalem, which has also been under military occupation since 1967, to systematic dispossession and displacement, killings, and collective punishment.

61.     The Israeli policy of annexation in the West Bank has been marked by a steady, incremental process of forcibly removing Palestinians and concentrating them into enclaves, while transferring its own Israeli civilian population into occupied territory, in violation of Article 49 of the Fourth Geneva Convention. Israel has seized approximately 250,000 acres of occupied Palestinian land to be used for the exclusive use of Jewish (but not Palestinian) Israeli citizens. Human rights organizations, journalists and United Nations bodies have extensively documented the combination of administrative measures, discriminatory land regime and dispossession of land and resources, mass detention, as well as state and settler violence over the past decades. In response to Palestinian protest and uprisings to these intolerable conditions, the Israeli military has responded with massive military repression, excessive force, killings and collective punishment

62.     In 2023 alone, several Palestinian communities in the occupied West Bank were forcibly displaced at alarming rates.

63.     Between October 7 and November 12 2023, attacks on Palestinians in the occupied West Bank have been surging, with at least 172 Palestinians killed, 2,586 injured and at least 1,149 forcibly displaced from their homes. Israeli soldiers have filmed themselves abusing, torturing and humiliating Palestinians in the West Bank. Israeli settlers have killed at least eight Palestinians since October 7, and injured 74 others. Israeli authorities have distributed hundreds of assault rifles to Israeli settlers, and have sought 24,000 assault rifles from the United States to be distributed to Israeli police as well as civilians. Israeli forces and settlers, accompanied by the military or wearing reserve uniforms, have raided Palestinian villages at night and given them ultimatums to leave within 24 hours or be killed, that they would do to them what they did to Gaza. Israeli settlers and Israeli forces have

also cut off Palestinian communities from vital resources like water and electricity, and stolen their vehicles, making their lives unlivable.

64.     In the villages in the Masafer Yatta area alone in the Southern West Bank, these assaults on the Palestinian population are escalating at rapid speed: On October 20, in the village of Maktal Msalam, armed settlers wearing military uniforms assaulted the head of the resident family and ordered him to move his family by the next day. Three army jeeps followed and threatened to shoot the family if they did not leave. The family moved that night. On October 23, all the families of the community of 'Atiriya left after several settler attacks, culminating in a nighttime threat to harm their families if they did not leave within 24 hours. On October 28, Israeli settlers, some of whom were wearing army uniforms, ransacked homes, cut off access to the water supply of the villages of Tuba and Tha'la. Armed Israeli settlers, along with Israeli soldiers, reportedly threatened Palestinians in the village of Khirbet Zanuta, giving them a 24-hour ultimatum to leave and telling them that if they failed to leave, they will do to them what they're doing to Gaza, including killing them and destroying their homes. The next day, all 150 residents of the village packed their belongings and left, out of fear for their lives. That evening, on October 28, Israel soldiers and settlers made the same threats to the village of Susiya. On October 29, the community of A'nizan was also forcibly displaced due to intimidation by settlers and soldiers. On October 30, settlers torched a home in the village of Tuba, and dozens of settlers attacked the communities of Kh. a-Safai a-Tahta, and cut power cables to a home.

65.     These threats are accompanied by calls for forcible transfer and deportation. Leaflets have been distributed across the West Bank, particularly in the areas near the border with Jordan, telling Palestinian communities to move to Jordan.

## II.   EVIDENCE OF ISRAEL'S EMERGING GENOCIDE AGAINST PALESTINIANS IN GAZA

66.     On October 7, after Hamas's attacks, Israel launched its most recent, and already deadliest, assault on Gaza and the 2.2 million Palestinians there. Since then, Israeli officials have made

statements evidencing an intent to destroy the Palestinian population in Gaza in whole or in part, of which nearly half is children, including by creating conditions of life calculated to bring about the population's destruction (in whole or in part). Senior Israeli officials, including the Prime Minister, the President and the Minister of Defense, have used dehumanizing language including referring to Palestinians as "human animals," and referred to the entire Palestinian population of Gaza, without distinction between civilians and those directly participating in hostilities, as "the enemy" or "terrorists," who need to "leave the world." These statements of intent have been accompanied by affirmative acts to advance a genocide against the Palestinian people: mass killings and targeting of civilian infrastructure, systemic collective punishment, forced expulsion, use of chemical weapons of warfare, and deprivation of the most basic necessities of life.

### A. Israeli Officials Escalate Military Assault, Announcing Campaign of Erasure and Destruction of Palestinians in Gaza.

67.  On October 7, Israeli Prime Minister Benjamin Netanyahu stated: "The enemy will pay an unprecedented price," signaling the acts of genocide to follow, and directed at the Palestinian population of Gaza as a whole and without distinction from Hamas militants. He ordered the more than two million Palestinians in Gaza to "get out now" despite the fact that they have nowhere to go due to Israel-imposed closures, threatening that "[Israel] will be everywhere and with all our might."

68.  In addition to Netanyahu's announcement of an unprecedented military assault and the mass forced expulsion of Gaza's civilians, Israel's Energy Minister Israel Katz announced an order cutting off all electricity to the entire Gaza Strip. Signaling the intention of meting out catastrophic damage, he said, "What was will not be."

69.  Language calling for the elimination of large segments of Palestinians from Gaza was echoed by elected officials. Ariel Kallner, a Member of the Knesset and Prime Minister Benjamin Netanyahu's Likud, stated: "Right now, one goal: Nakba! A Nakba that will overshadow the Nakba

of 48. Nakba in Gaza and Nakba to anyone who dares to join!" Israeli Member of the Knesset Haim Katz stated: "We need to deal a blow that hasn't been seen in 50 years and take down Gaza."

70.     Immediately following these statements, Israeli forces launched airstrikes targeting and destroying houses and multi-story buildings with residential units in Gaza.

71.     Within the first day, Israel had killed at least 232 Palestinians, injured almost 1,700 others, and displaced at least 20,000.

**B. Israeli Officials Expand Calls for Collective Punishment of "Human Animals," Implement Use of Starvation and Dehydration as a Weapon of Warfare.**

72.     On October 9, Israeli Minister of Defense Yoav Gallant referred to the Palestinian population in Gaza as "human animals" and expanded on previous calls for collective punishment through conditions that would cause serious physical harm, if not death, to Palestinians in Gaza. He announced: "I have ordered a complete siege on the Gaza Strip. There will be no electricity, no food, no fuel, everything is closed," and "We are fighting human animals and we are acting accordingly." As reported by the UN, the Minister also threatened to "bomb those attempting to provide humanitarian aid to the Gaza Strip."

73.     That same day, Israel bombed the Rafah crossing at the Gaza-Egyptian border, damaging the crossing and blockading Palestinians – from movement or supplies – in Gaza.

74.     On October 10, Israel Defense Forces (IDF) spokesperson Daniel Hagari announced that the Israeli military had already dropped "hundreds of tons of bombs," adding that "the emphasis is on damage and not on accuracy." Israeli Major General Ghassan Alian, the head of the Coordinator of Government Activities in the Territories ("COGAT"), explicitly stated the intention to destroy Palestinian life in Gaza: "Human animals must be treated as such. There will be no electricity and no water [in Gaza], there will only be destruction. You wanted hell, you will get hell."

75.     Not only did Israel continue to maintain the complete siege – including of water – on Palestinians, but it also damaged infrastructure which exacerbated the consequences of the siege: the

UN warned that 400,000 Palestinians in Gaza did not have running water due to the damage sustained by Israeli airstrikes and actions.

76.     By October 10, the death toll rose to 830, including at least 140 children. At least 4,250 Palestinians had been injured.

77.     Israel's attacks increasingly targeted and killed healthcare workers and journalists. Specifically, by October 10, seven journalists were killed and the World Health Organization documented 37 attacks on the healthcare workers and facilities, killing 6 healthcare workers and injuring 8 others.

**C.  Threatening to Eliminate Palestinians, Israel Advances Genocide Through Continued Siege Blocking All Essential Necessities, Widescale Bombing, Use of Chemical Weapons, and Forced Evacuation Orders.**

78.     On October 11, as the death toll rose to at least 1,100, including at least 326 children, IDF spokesperson Lieutenant Colonel Jonathan Conricus reported that the 300,000 reservists, as well as "infantry, armored soldiers, artillery corps and many other soldiers from the reserves," were "close to the Gaza Strip," threatening a ground invasion into the 25 mile-long stretch of land.

79.     That day, Israeli forces intentionally targeted Palestinian Red Crescent Society ("PCRS") medical teams, killing at least four paramedics in less than half an hour despite the fact that there had been prior coordination with the PRCS.

80.     Also that day, Israel used white phosphorus in densely populated areas across Gaza, in direct violation of international law. White phosphorus – a chemical weapon which ignites after exposure to atmospheric oxygen – causes severe burns, sometimes to the bone, and is often fatal even if exposed on only 10 percent of a human body.[5] Even exposure to *fragments* of white

---

[5]     *Questions and Answers on Israel's Use of White Phosphorus in Gaza and Lebanon*, Hum. Rts. Watch (Oct. 12, 2023), https://www.hrw.org/news/2023/10/12/questions-and-answers-israels-use-white-phosphorus-gaza-and-lebanon ("Human Rights Watch verified videos taken in Lebanon and Gaza on October 10 and 11, 2023, respectively, showing multiple airbursts of artillery-fired white

phosphorus, which can enter one's bloodstream, can lead to organ failure. Wounds, when re-exposed to oxygen after removal of dressings, can reignite.

81.     It was also on October 11 that Gaza's sole power plant shut down after its fuel ran out under Israel's siege over the entire Strip, resulting in the loss of electricity for over 2 million Palestinians, except for those who had smaller generators.

82.     Israel's shutdown of Gaza's electricity was particularly devastating for injured civilians who had survived Israeli airstrikes and were in hospitals. The spokesperson for the Palestinian Ministry of Health in Gaza warned that life-saving machines in hospitals were running on generators and would "soon stop working," causing mass Palestinian injuries and deaths.

83.     On October 12, the Israeli military ordered the entire population of northern Gaza – over one million people including UN staff and civilians sheltered in UN facilities – to "evacuate" to southern Gaza within 24 hours, an order that spread terror and sought to effectuate forcible transfer.



*Israel orders expulsion of 1.1 million Palestinians in north Gaza in 24 hours as ground invasion looms*, Mada Masr (Oct. 13, 2023), https://www.madamasr.com/en/2023/10/13/news/u/israel-

---

phosphorus over the Gaza City port and two rural locations along the Israel-Lebanon border, and interviewed two people who described an attack in Gaza.").

orders-expulsion-of-1-1-million-palestinians-in-north-gaza-in-24-hours-as-ground-invasion-looms-2/.

84.     Israeli Minister of Energy and Infrastructure Israel Katz, after Israel's previous threats to bomb aid trucks from Egypt at least two days prior, affirmed Israel's continued blockade of humanitarian assistance, with disregard for the serious bodily harm such action would cause to all Palestinians, including the risk of death. Katz stated, "Humanitarian aid to Gaza? No electrical switch will be turned on, no water hydrant will be opened and no fuel truck will enter until the Israeli abductees are returned home. Humanitarianism for humanitarianism. And no one will preach us morality [*sic*]."

85.     In addition to announcing the complete siege of water, food, and electricity, Israeli airstrikes targeted civilian infrastructure, further exacerbating the humanitarian catastrophe.

86.     For example, as of October 12, Israeli forces hit seven water and sewage facilities which more than one million people rely on, and over 2,500 housing units had become uninhabitable due to severe damage or destruction.

87.     Israel maintained its cessation of any and all humanitarian aid into Gaza for 10 more days, even as 200 aid trucks carrying 3,000 tons of humanitarian aid awaited at or near Egypt's Rafah crossing border for days. It was not until October 21 that Israel agreed to permit the first aid convoy to enter Gaza, but only allowed 20 trucks to enter the southern part of Gaza. This failed to meet the urgent needs of the population even under pre-October 7 standards when "about 500 trucks a day were crossing into Gaza."

88.     Further, on October 12 alone, Israeli forces killed 250 people, including 44 members of the Shebab family – 16 of whom were children between the ages of 2 and 14. Ambulances, including medical personnel, were targeted and killed during humanitarian missions to evacuate Palestinians.

89.     Within 24 hours, 338,000 Palestinians had been displaced across the Gaza Strip. 88 schools were struck by Israeli strikes, including 18 UNRWA schools and 70 Palestinian Authority schools.

90.     It was also on October 12 that the Israeli Air Force announced it had dropped an estimated 6,000 bombs on Gaza since the start of the escalations on October 7, killing at least 1,537 Palestinians, 500 of whom were children, and injuring 6,612.

91.     On October 13, Israeli President Isaac Herzog announced: "It is an entire nation out there that is responsible. It is not true this rhetoric about civilians not being aware, not involved. It's absolutely not true." Israel's infantry released their first official account of ground raids into Gaza, with Israeli Prime Minister Netanyahu declaring: "We are striking our enemies with unprecedented might . . . I emphasise that *this is only the beginning*."

92.     On October 13, civilians evacuating from north Gaza to the south were killed on a road identified as a "safe route."

93.     In the aftermath of one such incident, Al-Haq/Forensic Architecture Investigation Unit and the BBC geolocated the site of an October 13 strike by aerial photos and social media posts, revealing that at least 12 people, including women and children, were killed while traveling on Salah-al-Din Road, one of the two roads that the Israeli army had previously identified as a "safe route" south.

94.     That same day, journalists in Gaza reported that Israeli forces "targeted ambulances, cars, and buses" of people seeking safety. Many Palestinians thereafter feared heeding the Israeli evacuation orders, deemed them a "trick" especially after the designated safe route was bombed, and did not relocate.

95.     Additionally, on October 13, Israeli Minister of Energy and Infrastructure Israel Katz declared: "All the civilian population in [G]aza is ordered to leave immediately. We will win. They

will not receive a drop of water or a single battery *until they leave the world*." Later, an official document dated October 13 from the Israeli Ministry of Intelligence was leaked that assessed various options for the fate of Palestinians in the Gaza Strip in the context of Israel's attack; it ultimately recommended the forcible and permanent transfer of all Palestinians from Gaza and into Egypt.

96.     Current and previous Israeli government officials voiced acceptance of, if not support for, the suffering it would cause the Palestinian population as a whole. For example, IDF spokesperson Lt. Col. Conricus stated, "We will not allow anything into the Gaza [S]trip that supports the fighting ability of Hamas. If it comes to the price of inconvenience for the population, so be it.'"

97.     Meanwhile, on the same day, the Israeli army issued evacuation orders to 23 hospitals in northern Gaza, which human rights and humanitarian organizations warned would result in the utter collapse of Gaza's healthcare system, describing it as a "death sentence" issued to those suffering from serious injuries or illnesses.

98.     The views of Israeli officials that Palestinians are not human and should be destroyed were promoted by the 95-year old Israeli army reservist Ezra Yachin, who was reportedly called for his reserve duty to "boost morale" ahead of any ground incursions. While dressed in military fatigues, he declared in a clip widely circulated on social media, speaking to other soldiers in statements aimed at inciting others to act:

> Be triumphant and finish them off and don't leave anyone behind. Erase the memory of them. *Erase them, their families, mothers and children. These animals can no longer live.* . . . Every Jew with a weapon should go out and kill them. If you have an Arab neighbour, don't wait, go to his home and shoot him. . . . We want to invade, not like before, *we want to enter and destroy what's in front of us, and destroy houses, then destroy the one after it.* With all of our forces, complete destruction, enter and destroy. As you can see, we will witness things we've never dreamed of. *Let them drop bombs on them and erase them.*" (emphases added).

Yachin was a member of the Zionist Lehi unit, which in April 1948 was involved in the Deir Yassin massacre where Zionist militias killed more than 100 Palestinians including children.

99. That same day, Israeli Defense Minister Gallant stated: "*Gaza won't return to what it was before. We will eliminate everything*. If it doesn't take one day, it will take a week. It will take weeks or even months. We will reach all places."

100. On October 14, Israeli Minister Gideon Sa'ar, who was newly appointed by Prime Minister Netanyahu to the country's emergency war cabinet, stated in an interview on Israel's Channel 12 News that the Gaza Strip "must be smaller at the end of the war" and, evincing both intention and no fear in announcing that intention to the international community, that "we must make the end of our campaign clear to everyone around us."

101. It was further reported on October 14 that Tzipi Navon, a close adviser and office manager for Prime Minister Netanyahu's wife, Sara Netanyahu, publicly called on Israel to torture Palestinians in Gaza: "We keep saying to flatten Gaza, flatten Gaza, and I think that's not enough . . . It won't calm the storm of emotions, it won't dull the intensity of the rage and pain that can't find an outlet for them." She proposed that "*the people of Gaza should be captured and tortured 'one-by-one' by pulling out their nails and skinning them alive*" and that men's genitals should be cut off, fried, and fed to the captured.

102. By October 14, Israeli forces had killed at least 2,370 Palestinians including at least 721 children and 390 women.

103. On that day, Euro-Med Human Rights Monitor reported that Israel was killing at least 14 Palestinians every hour. Israel had annihilated 45 Palestinian family lines by killing all the living generations of those families and, according to the Gaza Health Ministry, wiping them entirely from the Gaza Civil Registry.

104.    On October 15, as Israeli airstrikes killed over 2,670 Palestinians, including 724 children, Prime Minister Netanyahu stated that the entire nation is behind Israel's soldiers, who "understand the scope of the mission" and stand ready "to defeat the bloodthirsty monsters who have risen against [Israel] to destroy us."

105.    By this date, health officials in Gaza City were storing bodies in ice cream freezer trucks as they prepared to dig mass graves to accommodate all the bodies.

106.    It was further reported by the Gaza Health Ministry that between October 7 and October 15, 9,600 Palestinians had been injured.[6] According to UNRWA, nearly 1 million had been displaced.

107.    On October 16, the death count of Palestinian children surpassed 1,000, and Israeli Prime Minister Netanyahu appeared to justify the mass killings of children, stating: "This is a struggle between the children of light and the children of darkness, between humanity and the law of the jungle." As Israel continued to subject Palestinians in Gaza to a complete siege, UNRWA cautioned that "concerns over dehydration and waterborne diseases are high given the collapse of water and sanitation services, including today's shutdown of Gaza's last functioning seawater desalination plant."

---

[6]    *724 Palestinian children killed in Gaza as Israel targets civilians*, DCI-Palestine (Oct. 14, 2023), https://www.dci-palestine.org/724_palestinian_children_killed_in_gaza_as_israel_targets_civilians; *Gaza: 2,670 Palestinians killed, since the start of escalation on the morning of 7 October, and 9,600 citizens were injured*, Palestinian Ministry of Health (Oct. 15, 2023), https://www.moh.gov.ps/portal/gaza-2670-palestinians-killed-since-the-start-of-escalation-on-the-morning-of-7-october-and-9600-citizens-were-injured/; Nidal Al-Mughrabi & Emily Rose, *Israel vows to demolish Hamas as troops prepare to move on shattered Gaza*, Reuters (Oct. 15, 2023), https://www.reuters.com/world/middle-east/gaza-braces-israeli-ground-assault-fears-conflict-spreading-grow-2023-10-15/; Yakoota Al Ahmad, *Over last week, Israel killed 47 families in Gaza made up of 500 Palestinians: News agency*, AA (Oct. 15, 2023), https://www.aa.com.tr/en/middle-east/over-last-week-israel-killed-47-families-in-gaza-made-up-of-500-palestinians-news-agency/3020636.

108.   By this date, Israeli hostilities had killed at least 2,670, and injured 9,600. 1,000 were reported to be missing – believed to be buried under rubble.

109.   Despite Israel's October 12 order for Palestinians in Gaza to evacuate to southern Gaza, Israeli Air Forces continued striking Khan Yunis and other southern areas. According to one resident in Khan Yunis: "We were inside the house when we found bodies scattering, flying in the air - bodies of children who have nothing to do with the war."

110.   On October 17, Al-Ahli Baptist Hospital was struck, killing 471 Palestinians.

111.   On October 19, Israeli Defense Minister Gallant maintained Israel's plans to advance hostilities and conduct a ground incursion, telling Israeli soldiers: "You see Gaza now from a distance, you will soon see it from the inside. The command will come."

112.   On October 19, an Israeli airstrike damaged the Church of Saint Porphyrius, where at least 500 Palestinians were seeking shelter, killing at least 18 people. The Church was built in 1150 and is believed to be the oldest remaining active church in Gaza and the third oldest church in the world.

113.   On October 21, Israeli forces dropped "urgent warning" leaflets into Gaza, warning Palestinians that "anyone who chooses not to leave from the north of the [Gaza] Strip to south of Wadi Gaza may be determined an accomplice in a terrorist organization," affirming prior statements made by Israeli officials announcing indiscriminately "eliminat[ing]" Palestinians.



*Israel/OPT: Israeli army threats ordering residents of northern Gaza to leave may amount to war crimes*, Amnesty Int'l (Oct. 25, 2023), https://www.amnesty.org/en/latest/news/2023/10/ israel-opt-israeli-army-threats-ordering-residents-of-northern-gaza-to-leave-may-amount-to-war-crimes/ (image via Twitter/X).

**D. Israel's Deliberate Targeting of Hospitals and Disruption of Life-Saving Services, Despite Warnings of Fatalities to Newborns in Incubators, ICU Patients, Thousands of Pregnant People, and Others.**

114.    On or around October 21, Israeli Minister of Economy Nir Barkat issued a threat to neighboring nations: "Israel has a very clear message to our enemies. We are saying to them, look what's happening in Gaza—you are going to get the same treatment if you attack us. *We are going to wipe you off the face of the Earth*."

115.    These threats were made as hospitals in Gaza faced near collapse due to shortages of electricity, medical treatment and equipment, and damage and destruction from continued bombardment.

116.    According to the Director General of the Gaza Health Ministry Dr. Medhat Abbas, doctors have been forced to "operat[e] on some patients in the corridors of the hospitals," without

anesthesia, and using "the light of the mobile phones." Vinegar has been used to treat infected wounds.

117.     On October 23, the Health Ministry of Gaza announced that 12 hospitals and 32 health centers in Gaza were put out of service, including the Indonesian Hospital, which faced disruption of vital facilities due to the power outage.

118.     On October 24, the Health Ministry warned: "We have less than 48 hours before all electric generators in hospitals run out of fuel."

119.     According to the World Health Organization, the lack of fuel caused the partial closing of Gaza's only oncology hospital – the Turkish Friendship Hospital – placing about 2,000 cancer patients at risk.

120.     One day later, on October 25, Al-Shifa Hospital – the largest hospital in Gaza – announced that it would run out of fuel that same day, or, at the latest, the next day. The Director of Gaza's Health Ministry warned: "We have 130 premature (newborns) [in] incubators. If we lose electricity, all will die" within 5 minutes, along with the 120 patients in the Intensive Care Unit.

121.     On October 26, electricity to Al-Shifa Hospital – which was housing 60,000 Palestinians – was entirely cut off.

122.     The closure of hospitals presents grave risks and consequences impacting births. At least 50,000 pregnant people in Gaza are deprived of essential health services, 5,000 of whom are expected to give birth within the next month. There have already been cases of pregnant people forced to give birth in UN-run schools operating as a shelter for tens of thousands of displaced Palestinians, while others have been killed or suffered miscarriages, including because of exposure to white phosphorus.

123.     The UN Population Fund (UNFPA) prepared emergency delivery kits for parents who are unable to reach a healthcare facility: "Each resealable plastic bag holds one bar of soap, a plastic

sheet measuring about 40 inches by 40 inches, a pair of scissors for cutting the umbilical cord, three pieces of umbilical tape, two cotton cloths for cleaning and covering the mother and child, a pair of latex exam gloves and an instruction pamphlet to guide women through their deliveries."

124.   The emergency kits were at a standstill for days, with hundreds of other life-saving aid awaiting permission to enter Gaza.

125.   As of October 26, 7,028 people were killed, 2,913 of whom were children.

**E. Israel Imposes Near-Total Blackout on Palestinians in Gaza and Advances Ground Incursion, Increasing Death Toll to 8,000.**

126.   On October 27, Israel's complete siege disrupted services of internet providers and cell towers and airstrikes continuously damaged telecommunication infrastructures, leaving the entire population of Gaza – some 2.2 million Palestinians – cut off from almost all landline, cellular, and internet communications.

127.   At about 6 p.m. that day, OCHA indicated that "contact with the Gaza Strip has been cut off, following the shutdown of landlines, cellular and internet services."

128.   Health and rescue teams, such as the Palestine Red Crescent Society "completely lost contact with the operations room[s] in Gaza and all [their] teams operating there."

129.   The blackout undoubtedly disrupted, if not made impossible, emergency medical services, including access to the emergency '101' number, which dispatches ambulance vehicles to wounded Palestinians. Ambulances could not rescue people from underneath the rubble, and people could not receive information on where to access humanitarian aid, or where they would be in less danger of Israeli bombardment.

130.   It was also on October 27 that Israel released statements that "Hamas terrorists operate inside and under . . . hospitals in Gaza," and in particular, Al-Shifa Hospital, signaling what could be a systemic campaign targeting hospitals where tens of thousands were seeking refuge.

131.    Israeli military spokesman Rear Adm. Daniel Hagari announced Israel's ground incursion in Gaza, stating the military was "expanding [its] activity" in Gaza and "acting with great force . . . to achieve the objectives of the war."

132.    On the evening of October 27, as the latest reports placed the death toll at 7,300, with 17,439 injured, and as the entire besieged enclave lost connectivity with one another, Israel proceeded with its ground incursion of Gaza.

133.    On this same day, violence in the occupied West Bank by Israeli forces and Israeli settlers increased significantly. Anonymous leaflets threatening Palestinians of a massacre comparable to the Nakba were distributed: "You wanted a Nakba like in 1948 and we will bring down on you a great catastrophe soon. . . . [This is your] last chance to flee to Jordan in an orderly fashion before we forcefully expel you from our holy lands bequeathed to us by God."

134.    According to a spokesperson for the Gaza Health Ministry, Ashraf al-Qidra, after communication services were reinstated, ambulance and civil defense teams discovered hundreds of bodies of those killed and wounded – lying on the ground or trapped under rubble."

135.    On October 28, the total death toll by Israeli airstrikes since October 7 reached more than 7,700, including at least 3,195 children, with 19,740 injured.

136.    On October 29, as the number of people killed by Israel in Gaza rose to 8,000, Prime Minister Netanyahu invoked the story of Amalek in the Bible to justify Israel's assault on Gaza, stating, "You must remember what Amalek has done to you, says our Holy Bible, and we do remember, and we are fighting." In the Bible, God commands the extermination of Amalekite men, women, children, and animals, and this commandment has been described by one scholar as "divinely mandated genocide."

**F.  Israeli Forces Intensify Deliberate Targeting of Densely-Populated Civilian Centers and Shelters; Bomb Refugee Camps, Schools, Critical Infrastructure, and Hospitals Treating and Sheltering Tens of Thousands of People.**

137.    On October 31, Israeli forces struck the Jabalia refugee camp using JDAMs and GBU-31 bombs, allegedly targeting a commander connected to the October 7 attacks against Israel. Jabalia is Gaza's largest refugee camp with 116,011 registered Palestinian refugees. When CNN's Wolf Blitzer asked Israel's Lt. Col. Richard Hecht about the hundreds of civilians, Lt. Col. Hecht responded: "This is the tragedy of war, Wolf." At least 50 Palestinians were killed, and 150 others injured.

138.    On November 1, as Israel imposed another blackout on Palestinians in Gaza, Israel struck Jabalia refugee camp for the second time in two days, alleging to have killed a Hamas militant.

139.    Between Israel's October 31 and November 1 attacks on Jabalia refugee camp, Israeli forces killed at least 195 Palestinians, injured 777, and some 120 were reported to have been missing under the rubble.

140.    On November 1, Israeli Minister of Heritage Amichai Eliyahu made an admission on his Facebook page as to Israel's campaign against Palestinians: "The north of the Gaza Strip. More beautiful than ever. *Everything is blowing up and being flattened—a pleasure for the eyes. We need to talk about the day after. In my mind, we will hand over lots of land to the soldiers who fought in Gaza over the years and to those settlers* who were evicted from Gush Katif."

141.    On November 2, Israel struck Jabalia refugee camp for the third time, this time bombing an UNRWA-sponsored school.

142.    In Khan Yunis, Palestinian journalist Mohammed Abu Hatab was killed at home, alongside 11 members of his family, from an Israeli airstrike.

143.    By this date, the Euro-Med Human Rights Monitor reported that "Israel has dropped more than 25,000 tons of explosives on the Gaza Strip" since October 7, "equivalent to two nuclear bombs."

144.    Between October 7 and November 2, the death toll rose to 9,376, including 3,912 children and 2,213 women. At least 2,176 were reportedly under rubble. An estimated 1.5 million Palestinians had been displaced.

145.    On November 3, Prime Minister Netanyahu invoked, once again, the Biblical story of Amalek, *see supra* ¶ 136, and reiterated the "war" between light and darkness he first referenced on October 16, *see supra* ¶ 107: "This is the war between the sons of light and the sons of darkness. We will not let up on our mission until the light overcomes the darkness – the good will defeat the extreme evil that threatens us and the entire world."

146.    Hours later that same day, Israeli forces coordinated attacks on or near three hospitals in Gaza, bombing the Al-Shifa, Al-Quds, and the Indonesian Hospital, including a convoy of ambulances outside Al-Shifa Hospital transporting wounded Palestinians, killing 15 and injuring at least 60 others.

147.    On November 4, Israeli forces targeted Al-Nasr Children's Hospital, striking the entrance, and struck the power generator of Al-Wafa Hospital.

148.    On November 5, Israeli Minister of Heritage Eliyahu, after asserting in a radio interview that "there are no non-combatants in Gaza," stated that providing humanitarian aid to Gaza would constitute "a failure," and that a nuclear attack on the Gaza Strip would be an option.

149.    The Municipality of Beit Lahia, which is in northern Gaza, reported Israeli forces striking critical infrastructure, including a water well and reservoir which provides for 70,000 Palestinians. According to Euro-Med Human Rights Monitor, Israeli forces also attacked electrical

generators and solar energy units which restaurants and other commercial facilities are dependent on, as well as flour stores, bakeries, and fishermen's boats.

150.    That same day, Israeli military chief spokesman Rear Adm. Hagari, in an evening briefing, announced "a large attack on terrorist infrastructure both below and above ground," as Israel imposed the entire besieged territory to its third widespread blackout which lasted approximately 15 hours and once again cut off civilians from contacting emergency medical services including hospitals and ambulances.

151.    By November 5, OCHA reported that at least 9,770 Palestinians had been killed, including 4,008 children and 2,550 women; 2,260 others were reportedly missing, including 1,270 children, the majority of whom "were presumed to be trapped under rubble."

152.    Overnight between November 5 and 6, Israeli airstrikes targeted the killing of Palestinian journalist Mohammad Abu Hasira in his home, killing him and 42 of his family members.

153.    On November 6, The Guardian detailed the consequences of unsanitary medical conditions as revealed by Dr. Tayseer Hassan, a surgeon at the Indonesian Hospital in Gaza: "Nothing is clean, nothing is sterile. The whole hospital is full of blood and insects." Palestinians who survived airstrikes or were retrieved from under the rubble arrived "scratched and bleeding" and surgeries were done while "injuries [were] covered with flies." Dr. Marwan Abusada, head of surgery at Al-Shifa Hospital, reaffirmed this, stating that a "type of worm" was seen to emerge after a day and "cover[] the wounds after the surgery."

154.    On November 8, 50,000 Palestinians "evacuat[ed]" from the north to the south of Gaza through a "corridor" opened by the Israeli military. While the majority of Palestinians were traveling by foot, those who used vehicles were forced to abandon them. Ultimately, evacuees traveled between 4 to 20 kilometers.



Emanuel Fabian, *Thousands of Gazans use humanitarian corridor to move south as IDF presses offensive*, Times of Isr. (Nov. 8, 2023), https://www.timesofisrael.com/thousands-of-gazans-use-humanitarian-corridor-to-move-south-as-idf-presses-offensive/ (photo by Mohammed Abed, AFP).

155.    One Palestinian informed OCHA observers:

> I've come from Gaza city. I've come with tens of my family members, sisters, brothers, children, aunts, and cousins. My aunt is old and in a wheelchair. We managed to find transportation to drop us at the Kuwaiti roundabout and had to walk for about two hours. I saw a lot of damage on my way, I saw Israeli tanks and soldiers positioned at the eastern side of the road, near Netzarim, and they did not approach us. I saw a few dead bodies and body parts on the road. We had already been displaced inside one of the schools [in the north] and had to evacuate again due to the intensity of the bombardments. We couldn't stay any longer.

156.    As of November 8, one month from the start of Israel's most recent military campaign, siege, and multi-pronged attack against Palestinians in Gaza, 10,569 Palestinians had been killed, including 4,324 children and 2,823 women. At least 26,475 Palestinians had been injured.

157.    On November 9, the day after OCHA reported 32 Palestinian journalists from Gaza had been killed since October 7, former Israeli Defense Minister and War Cabinet Minister Benny Gantz stated, "Journalists found to have known about the massacre, and still chose to stand as idle

bystanders while children were slaughtered - are no different from terrorists and should be treated as such."

158.    OCHA reported that the vicinity around Al Shifa Hospital was hit five times, damaging the maternity ward, and buildings surrounding the Indonesian Hospital were repeatedly struck, resulting in fatalities and injuries at both locations. The Nasser Rantisi Pediatric Cancer Hospital, which was directly hit, was reportedly set on fire and damaged.

159.    On November 10, the vicinity around Al Awda Hospital in Jabalia and Al Quds Hospital in Gaza City was bombarded. The Intensive Care Unit Al Quds was damaged. As of this date, 20 of 36 hospitals in Gaza were no longer functioning.

160.    As concerns of malnutrition and starvation increase, the World Food Programme ("WFP") reported: "Out of 23 bakeries supported by WFP, only one survives. Together they served 200,000 people. Now there is only enough bread for 20,000 people."

**G. As Israel Continues Its Campaign of Genocidal Acts Against Palestinians, the Palestinian Death Toll Rises to 11,078.**

161.    As of November 10, from the start of Israel's most recent military campaign, siege, and multi-pronged attack against Palestinians in Gaza, 11,078 Palestinians have been killed, including 4,506 children and 3,027 women.

162.    One Palestinian child is killed every ten minutes.

163.    At least 35 Palestinian journalists from Gaza have been killed.

164.    At least 27,490 Palestinians have been injured and about 1.6 million have been displaced.

165.    In addition to the deliberate targeting and killing of civilians, Israel's wholesale and indiscriminate bombing of Gaza has:

a. completely destroyed over 41,000 housing units and partially destroyed over 222,000 - the New York Times reported on November 7 that one-third of all buildings in northern Gaza had been destroyed;

b. attacked 135 health facilities and at least 21 hospitals and 47 health care centers are reportedly out of service; and

c. damaged 279 education facilities, 67 mosques, and at least 3 churches.

### III. UNITED STATES' FAILURE TO EXERCISE ITS INFLUENCE OVER ISRAEL TO PREVENT GENOCIDE AND ITS COMPLICITY IN GENOCIDE

166.    Under international law, the United States has a duty to take all measures available to it to prevent a genocide. Yet, Defendants have repeatedly refused to use their obvious and considerable influence to set conditions or place limits on Israel's massive bombing and total siege of Gaza. They have done so despite escalating evidence of Israeli policies directed at inflicting mass harm to the Palestinian population in Gaza, including the creation of conditions of life calculated to bring about their physical destruction through a total siege, and even in the face of mounting deaths including of thousands of children. U.S. officials did not even call for a life-saving ceasefire and lifting of the siege, even vetoing United Nations measures calling for a ceasefire, in the face of overwhelming international support for one. Instead, their actions to fund, arm, and endorse Israel's devastating bombing campaign and total siege of the Palestinians in Gaza constitutes a failure to prevent an unfolding genocide and complicity in its development.

### A. The United States' Historically Close Relationship with and Influence over Israel.

167.    The United States exercises significant influence over Israel, in no small part due to their historically close relationship and unparalleled U.S. support for Israel's military,[7] which the United States has maintained despite Israel's persistent violations of international law.

---

[7]    Jeremy M. Sharp, Cong. Rsch. Serv., U.S. Foreign Aid to Israel (Mar. 1, 2023), https://sgp.fas.org/crs/mideast/RL33222.pdf.

168.    As of 2022, U.S. foreign assistance represents about 16% of Israel's military budget. Since 1946, the United States has sent $260 billion (inflation-adjusted) dollars in military and economic assistance to Israel, intended to maintain Israel's "qualitative military edge" over others in the region. *See* 22 U.S.C. § 2776(h). In 2016, the United States pledged $38 billion in military assistance to Israel over the 10-year period between 2019-2028.

169.    Israel enjoys special access to U.S. weapons. For example, Israel can request access in emergency situations to a U.S. weapon stockpile located in Israel, including missiles, of precision-guided munitions, armored vehicles, and artillery ammunition, which as of March 2023, was valued at up to $4.4 billion. Israel also receives U.S. military equipment that is outdated or excess at discounted rates or no charge.

170.    Israeli warplanes are entirely US-sourced. For example, Israel has purchased fifty F-35 jets produced by Lockheed Martin under the Joint Strike Fighter Program, and Israel and Singapore are the only countries that participate in the program outside of the seven U.S. allies that contribute funding for it. Similarly, Israel is the only country other than Japan to have been approved by the United States to purchase KC-46A Pegasus aerial tankers developed by Boeing.

171.    The United States further provides political and diplomatic cover to Israel. It has consistently used its veto power to block or threaten to block United Nations Security Council resolutions critical of Israeli human rights and international law violations, and it has also undermined accountability for Israel's violations of international law in other international fora, as well as in United States courts, even when sought by United States citizens killed by Israel.[8]

---

[8]    *See* Brief of the United States as Amici Curiae in Support of Affirmance, *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007) (No. 05-36210); Brief of the United States as Amici Curiae in Support of Affirmance, *Dŏgan v. Barak*, 932 F.3d 888 (9th Cir. 2019) (No. 16-56704).

**B. Israel Announces Genocidal Assault on and Siege of Gaza; Defendants Express their Unconditional Support and Begin Close Coordination with Israeli Officials.**

172.    The United States' support of Israel has continued, unequivocally and unconditionally, since October 7. In the immediate aftermath of Israel declaring its assault on Gaza, Defendants Biden, Blinken and Austin began meeting regularly and coordinating with Israeli officials and expressing their unrestrained support. This coordination and support has persisted and intensified throughout Israel's unrestrained bombardment of and siege on Gaza.

173.    On October 7, the day that Netanyahu ordered more than two million Palestinians in Gaza to "get out now" and Israel's Energy Minister Katz announced the complete cut off of electricity to all Palestinians in Gaza, Defendant Biden affirmed that the United States "stand[s] ready to offer all appropriate means of support to the Government and people of Israel," and declared, "[m]y Administration's support for Israel's security is rock solid and unwavering."

174.    On October 8, the White House released a readout of Vice President Kamala Harris's call with President Herzog, reporting: "The Vice President underscored that the United States' commitment to Israel's security is unwavering. The Vice President reiterated our commitment to provide Israel all appropriate means of support."

175.    On October 9, Defendant Biden, along with other leaders of Western allies – France, Germany, Italy, and the United Kingdom – released a statement of support and encouragement to Israel declaring their commitment to remain "united and coordinated . . . to ensure Israel is able to defend itself, and to ultimately set the conditions for a peaceful and integrated Middle East region." This statement came on the same day that Israeli Defense Minister Gallant declared, in a widely reported statement, that "[t]here will be no electricity, no food, no fuel, everything is closed. We are fighting human animals and we are acting accordingly."

176.    On October 10, with the knowledge of Israeli Defense Minister Gallant and other Israeli officials' dehumanization of Palestinians in Gaza and declaration that all residents of Gaza would

be deprived of basic necessities of life, and the killing of 830 people, including at least 140 children by Israeli airstrikes, Defendant Biden reasserted that the United States "will make sure Israel has what it needs to take care of its citizens, defend itself, and respond to this attack."

177.    On that same day, when Department of State spokesperson Matthew Miller was asked about the large number of Palestinians killed and whether the United States will "call on Israel to cease its . . . effort now in cutting off medicine, water, humanitarian aid [and electricity]" to Gaza, he spoke approvingly of Israel's response: "Israel has a right to conduct an aggressive response to respond to the terrorism that's been committed against its citizens. We expect them to follow international law, we believe that they will, and we will remain in close contact with them about it."

178.    On the morning of October 11, the White House reported that Defendant Biden and "Vice President Harris spoke with Prime Minister Netanyahu to discuss ongoing U.S. support for Israel as Israel defends itself and protects its people."

179.    By October 12, it was widely reported that Israeli airstrikes in Gaza had killed 1,537 Palestinians, including 500 children. UN experts issued a press release warning that Israel's attacks on Gaza constituted "collective punishment," condemning the "appalling language" of the Israeli Defense Minister "that dehumanizes the Palestinian people," and urging a ceasefire. That same day, on a trip to Israel where Defendant Blinken held public and private meetings with Israeli officials about the ongoing assault on Gaza, he reaffirmed U.S. assistance, stating that the United States "will always be there, by your side." Reflecting the close coordination and planning regarding Israel's operation, Defendant Blinken added that this message was delivered by Defendant Biden to Prime Minister Netanyahu "from the moment this crisis began," and communicated to Israeli counterparts "on a daily–even an hourly–basis."

180.    By the next day, Israel had ordered the evacuation of 1.1 million Palestinian residents of Northern Gaza.

181.    Defendants have continued to express their unequivocal support for Israel's siege of and attack on Gaza, blocking efforts to stop it, while coordinating with Israel closely on military strategy and providing it with unconditional military and diplomatic support.

**C. Defendants Pledge and Provide Military Financial Assistance and Equipment for Israel's Assault on Gaza.**

182.    Since October 7, Defendants have provided Israel with unconditional military financial assistance, equipment, and personnel to support and further its assault on Gaza. Such assistance is additional to the significant military assistance, equipment and munitions set forth in Section III(A). The munitions killing Palestinians in the Gaza Strip are overwhelmingly American-made.

183.    On October 8, Defendant Austin announced that the United States "will be rapidly providing the Israel Defense Forces with additional equipment and resources, including munitions," that will "begin moving today and arriving in the coming days." He further reaffirmed that "[s]trengthening our joint force posture, in addition to the materiel support that we will rapidly provide to Israel, underscores the United States' ironclad support for the Israel Defense Forces and the Israeli people."

184.    Defendants Biden, Blinken and Austin quickly made good on this promise, despite IDF spokesperson Daniel Hagari's revelation on October 10 that the Israeli military's "emphasis [was] on damage and not on accuracy." That same day, Boeing accelerated delivery of 1,000 small diameter bombs which were reported to have been flown from a U.S. Air Force base to Israel.

185.    By at least October 9, if not earlier, white phosphorus artillery shells with U.S. Department of Defense identification codes had been positioned in Sderot, outside Gaza. On October 11, Israel dropped white phosphorus bombs in densely-populated areas across Gaza, on the same day that the first planes carrying ammunition from the United States for use in Gaza were reported to have landed in Israel.

186.     On October 12, the Israeli Air Force announced it had already dropped an estimated 6,000 bombs on Gaza since October 7. Still that day, the Pentagon confirmed that it had shipped munitions and interceptors to Israel, and that it was "consulting with Israelis" on providing them Joint Direct Attack Munitions (JDAMs) and small diameter bombs.

187.     That same day, Defendant Biden also confirmed reports of arms transfers for use in the assault on Gaza, stating that the United States' material support to Israel includes "supplying ammunition, interceptors to replenish Israel's Iron Dome, alongside other defense material," with the first shipment of support having already arrived. Defendant Austin also affirmed continued assistance and encouragement:"[o]ur support for Israel is rock solid. We're working urgently to get Israel what it needs . . . including munitions and Iron Dome interceptors."

188.     In response to a question from a reporter about whether the United States would withhold military aid to Israel—which by this point had cut off food, water, electricity, and fuel to Gaza—until it created a humanitarian corridor, White House National Security Council Coordinator John Kirby responded: "We are providing [Israel] military aid as we speak. So, no, there's no plans of — of holding back military assistance. We wouldn't do that. The President has been talking now for three days about how we're going to keep giving them the capabilities that they need." Later, Kirby stated that the U.S. is "actively having conversations with the Israelis and the Egyptians about a safe passage corridor so that people who want to leave can leave," and having "conversations" about humanitarian goods.

189.     By October 13, Israeli airstrikes had killed at least 1,900 people in Gaza. That day, Defendant Austin traveled to Israel, where he held meetings with Prime Minister Benjamin Netanyahu, Israeli Minister of Defense Gallant, and the Israeli War Cabinet. In a joint press conference with Gallant, and with knowledge of his widely reported comments that Palestinians in Gaza were "human animals" having all basic necessities withheld by Israel, Defendant Austin stated

that the United States was prepared to deploy additional military assistance to Israel, further explaining that "munitions, air defense capabilities and other equipment and resources" were already "rapidly flowing." At that press conference with Defendant Austin, Gallant confirmed:

> I briefed the secretary on strategic developments in our region, and the chief of staff together with the IDF leadership shared our operations. Defense cooperation and U.S. support in the Pentagon, in the White House, in the Congress ensure freedom of operation and enforce our capabilities. In fact, today we will receive the second aircraft carrying essential munition to the IDF. U.S. deployment of assets on land, in air and at sea sends a strong message to both partners and enemies in the region. On behalf of Israel's defense establishment and on behalf of our citizens, Mr. Secretary, thank you very much.

190.    On October 14, the day that Israeli Minister Gideon Sa'ar revealed in a public news broadcast Israel's intent to ensure that the Gaza strip "must be smaller at the end of the war," Defendant Biden "spoke with Prime Minister Netanyahu to reiterate unwavering U.S. support for Israel."

191.    This was also the day that UN experts issued another press release warning that "[t]here is a grave danger that what we are witnessing may be a repeat of the 1948 Nakba, and the 1967 Naksa, yet on a larger scale . . . . Again, in the name of self-defence, Israel is seeking to justify what would amount to ethnic cleansing." The experts alerted UN member states of their "responsibility to prevent and protect populations from atrocity crimes," and called on them to "urgently mediate a ceasefire."

192.    The same day, the Pentagon announced the deployment of a second carrier strike group, the USS Dwight D. Eisenhower Strike Group, which includes a guided-missile cruiser and two guided-missile destroyers, and U.S. Air Forces Central announced deploying fighter jets and ground-attack jets to the region.

193.    On October 15, Defendant Blinken announced "We will stand with [Israel] today, tomorrow, and every day, and we're doing that in word and also in deed." He added, "we've backed

that up not only with the words that we're saying, but with what we're actually doing, including the deployment of [U.S.] aircraft carrier battle groups."

194.    On October 16, the day that Prime Minister Netanyahu described Israel's genocidal attack on Gaza as "a struggle between the children of light and the children of darkness, between humanity and the law of the jungle[,]" reports indicate that Defendant Austin had ordered 2,000 U.S. military troops to prepare to deploy in support of Israel. According to Department of Defense Deputy Press Secretary Sabrina Singh: "Since leaving Israel, [Defendant Austin] has held calls with [Minister of Defense] Gallant . . . on a near daily basis and will likely have another call today," declaring that "[w]e are working to meet Israel's needs, which include air defense, precision guided munitions, artillery and medical supplies." The same day, Defendant Blinken held a seven-hour meeting with the Israeli war cabinet.

195.    By October 17, 3,000 Palestinians, 1,030 of whom were children, had been killed by Israeli bombardment in Gaza.

**D. Calls for a Ceasefire Grow and Officials Within Administration Urge Defendants to Reconsider Military Assistance to Israel.**

196.    On October 18, Defendant Biden traveled to Israel. By then, calls for a ceasefire had become widespread, and officials within the Biden Administration had begun raising serious concerns about Defendants' continued, unconditional provision of military support to Israel.

197.    By October 18, fifteen House Democrats had co-sponsored a resolution calling on Defendant Biden to call for a ceasefire. That same day, hundreds of demonstrators from Jewish advocacy groups gathered in the rotunda of the Cannon House Office Building demanding a call for a ceasefire.

198.    Also that day, Josh Paul, a former director in the State Department's Bureau of Political-Military Affairs, resigned after more than a decade in the Department. He stated that his

resignation was "due to a policy disagreement concerning [the United States'] continued lethal assistance to Israel."

199.    Paul later wrote in an op-ed in the Washington Post that after the October 7 attack, "Israeli requests for munitions started arriving immediately, including for a variety of weapons that have no applicability to the current conflict." He had urged caution because "[t]he risk is obvious that American weapons provided to Israel, especially air-to-ground munitions, will inflict civilian harm and violate human rights." Yet Defendants were "so adamant to avoid any debate on this risk," which in Paul's experience was "an unprecedented unwillingness to consider the humanitarian consequences of our policy decisions." He continued, "[t]he absence of a willingness to hold that debate when it comes to Israel is not proof of our commitment to Israel's security. Rather, it is proof of our commitment to a policy that, the record shows, is a dead end — and proof of our willingness to abandon our values and turn a blind eye to the suffering of millions in Gaza when it is politically expedient."

200.    On October 19, United Nations experts issued a statement "sounding the alarm" on the crimes against humanity in Gaza. They noted, "[c]onsidering statements made by Israeli political leaders and their allies, accompanied by military action in Gaza and escalation of arrests and killing in the West Bank, there is also a risk of genocide against the Palestinian People." They called for a ceasefire, humanitarian aid, and a guarantee of physical safety for civilians.

201.    Also on October 19, the Center for Constitutional Rights sent Defendants Biden, Blinken, and Austin an emergency briefing paper putting them on notice that there was powerful factual evidence that Israel was attempting, if not actively committing, genocide against the Palestinian people in Gaza, and that the United States was not only failing to uphold its obligation to prevent genocide, but that there was plausible and credible case that its actions to further the

Israeli military operation, closure, and campaign against the Palestinian population in Gaza, rise to the level of complicity in the crime under international law.

202.    That same day, there were reports of a "mutiny brewing" inside the State Department, with officials expressing frustration over Defendants' unconditional support for Israel.

**E. Defendants Refuse to Call for a Ceasefire, Veto UN Resolutions Calling for "Humanitarian Pauses" to Israel's Bombardment, and Intensify their Coordination with, and Unconditional Military Support for, Israel's Assault on Gaza.**

203.    Despite widespread calls for a ceasefire and calls for limitations on military assistance to Israel in the face of Israel's total siege and large death toll including of Palestinian children, Defendants continued providing unconditional support to Israel for its assault on Gaza.

204.    On October 18, during Defendant Biden's visit to Israel, he did not urge a ceasefire. Instead, he said to Netanyahu, "[m]y administration has been in close touch with your leadership from the first moments of [the October 7 attack], and we are going to make sure we have — you have what you need to protect your people, to defend your nation." He reaffirmed that, "[f]or decades, we've ensured Israel's qualitative military edge. And later this week, I'm going to ask the United States Congress for an unprecedented support package for Israel's defense." Defendant Biden assured Prime Minister Netanyahu, "[t]he United States isn't going anywhere . . . We're going to stand with you."

205.    At a joint press conference during the visit, Netanyahu again confirmed the ongoing coordination on the Gaza assault between Defendants and Israel: "I've seen your support every day in the depth and breadth of cooperation that we have had since the beginning of this war, a level of cooperation that is truly unprecedented in the history of the great alliance between our two nations. We see that support in your steadfast commitment to provide Israel with the tools we need to defend ourselves."

206.    That same day, the United States exercised its veto power in the UN Security Council to block international calls for a ceasefire. The U.S. Ambassador to the United Nations, Linda Thomas-Greenfield, vetoed a Security Council resolution condemning all violence against civilians and urging "humanitarian pauses" to deliver aid to Palestinians in Gaza. Ambassador Thomas-Greenfield used this veto power against a similar Security Council resolution on October 25, and voted against a UN General Assembly resolution calling for a ceasefire, which nonetheless passed with an overwhelming majority on October 27, because the United States does not have veto power in the General Assembly.

207.    While international and domestic calls for a ceasefire continued to grow, Defendants continued providing unconditional military backing to support Israel's attacks on Gaza.

208.    By October 19, an Israeli airstrike had bombed the Church of Saint Porphyrius, where at least 500 Palestinians were seeking shelter, killing 18 people. That day, Boeing Co., under guidance of Defendant Austin's Pentagon,[9] delivered 1,800 JDAM kits from the United States to Israel. JDAMs are used by the Israeli Air Force to drop bombs on Gaza.

209.    That same day, reports indicated, and a senior Department of Defense official later confirmed, that tens of thousands of 155mm artillery shells that had been set aside for Ukraine had been withdrawn and redirected to Israel. Reports also indicated that a million rounds of 7.62mm ammunition and tens of thousands of 30mm rounds had been delivered by the United States to Israel earlier that week.

210.    On October 20, Defendant Biden requested $14.1 billion from Congress in additional military assistance to Israel.

---

[9]     While the Pentagon provided guidance on the shipment, it did not ship the kits on US military aircraft because it is part of a direct sale approved in 2021.

211.    That day, Israeli Defense Minister Gallant indicated how crucial, and influential, military support by the United States is to Israel and its assault on Gaza: as reported by Israel's Channel 12, when asked by a Knesset committee about the provision of humanitarian aid to Gaza before the hostages had been released, Gallant stated that "[t]he Americans insisted and we are not in a place where we can refuse them. We rely on them for planes and military equipment. What are we supposed to do? Tell them no?"

212.    On October 21, Defendant Austin announced a number of steps to "increase force protection for U.S. forces in the region, and assist in the defense of Israel[,]" including: redirecting the Dwight D. Eisenhower Carrier Strike Group to Central Command, which includes the Middle East, instead of the Eastern Mediterranean; "the deployment of a Terminal High Altitude Area Defense (THAAD) battery as well as additional Patriot battalions to locations throughout the region to increase force protection for U.S. forces[;]" the placement of "an additional number of forces on prepare to deploy orders as part of prudent contingency planning, to increase their readiness and ability to quickly respond as required."

213.    By October 23, Israeli airstrikes had killed over 5,000 people in Gaza, including at least 2,055 children. When asked about a ceasefire, Defendant Biden stated that he would refuse to discuss it until hostages held in Gaza were released.

214.    Meanwhile, news reports revealed that Lt. Gen. James Glynn, a three-star Marine general, and other officers had been sent by the United States to Israel to advise Israeli officials on its plans for the attacks on Gaza.

215.    White House National Security Council Spokesperson John Kirby confirmed these reports, and also confirmed that the United States had continued to be in close communication with Israel about its military strategy. He stated:

> I can tell you, we have, since the beginning of the conflict, in the early
> hours,   maintained   a   level   of   communication   with   our   Israeli

counterparts to ascertain their intentions, their strategy, their aims to — to see what their answers are to the kinds of tough questions that any military ought to be asking before you launch any kind of a major operation. Have you thought through the branches? Have you thought through the sequels? Have you thought through the unintended consequences?

216. A senior defense official confirmed that "Small Diameter Bombs, ammunition and JDAM Tail Kits" had been provided to Israel through Direct Commercial Sales Contracts.

217. On October 24, the U.S. Office for Palestinian Affairs in Jerusalem reportedly sent a diplomatic cable to the White House warning it of the need to take immediate action in order to "save the lives of tens of thousands of people."

218. That same day, when asked whether in discussions with Israeli counterparts the United States had "set or discussed any possible red lines," Kirby answered "no." This is despite the fact that the Conventional Arms Transfer policy issued by the Biden Administration in 2023 prohibits transfer of weapons when "it is more likely than not" that those weapons will be used by the recipient to commit genocide or other serious violations of international humanitarian or human rights law.

219. By at least October 25, reports revealed that the United States had successfully convinced Israel to delay a ground invasion into Gaza, while, according to U.S. officials, the United States worked to get close to a dozen air-defense systems to the Middle East.

220. On October 26, Kirby stated that President Biden "continues to be routinely updated by the national security team on the situation there. Obviously continuing to support . . . Israel's military. Security assistance continues to flow to them as needed, almost on a daily basis."

221. By October 27, Israeli airstrikes had killed 7,028 Palestinians in Gaza, including at least 2,913 children. That day, Israel cut off all internet and phone communications in Gaza, began its ground invasion, and carried out its massacres in Gaza in total darkness.

222.     That same day, Kirby again reiterated that the United States "is not drawing red lines for Israel," confirming once again that the United States was not placing any limits on Israel's attacks against Palestinians in Gaza, as it continued to provide military equipment and other support.

223.     The next day, on October 28, the United Nations High Commissioner on Human Rights, Volker Türk, called "on all parties as well as third States, in particular those with influence over the parties to the conflict, to do all in their power to de-escalate this conflict."

**F.  Despite Staggering Civilian Casualties and Unlivable Conditions Imposed in Gaza, Defendants Reject Calls for Ceasefire or Limits on Israeli Use of U.S. Military Assistance, Admit to Influencing and "Guiding" Israeli Military Strategy, and Refuse to Even Monitor U.S. Weapon Use and the Unfolding Genocide in Gaza.**

224.     Far from de-escalation, on October 30, despite acknowledging that Israel's assault had resulted in "thousands" of "civilian casualties," Kirby stated in a press conference unequivocally that the administration does "not support a ceasefire at this time."

225.     Several statements by Defendants and their spokespeople also confirmed their influence over Israel's strategy and choices in its assault on Gaza. When asked by a reporter whether the United States had "convinced Israel to reverse" its shutdown of phone and internet communication in Gaza, Kirby did not deny the United States' influence over Israel and stated, "yes, we were part of the conversations that — that led to that restoration."

226.     Likewise, at a separate press conference that same day, Deputy Pentagon Press Secretary Sabrina Singh admitted that "conversations both [at the Department of Defense] and across other agencies and all the way up to the president have certainly informed and at least guided some of what the Israelis are doing on the ground in their ground operation," but concluded "we're not directing them."

227.     She reiterated that the United States was continuing to provide "air defense, artillery, precision-guided munitions," and reiterated Defendants' position on whether there should be any limits imposed on Israel's use of U.S. weapons: "We are not putting any limits on how Israel uses

weapons that is provided [sic]. That is really up to the Israel Defense Force to use in how they are going to conduct their operations. But we're not putting any constraints on that."

228.    By October 31, Israel had bombed Jabalia refugee camp in Gaza using JDAMs and GBU-31 bombs, killing dozens of Palestinian refugees, and the director of the New York office of the United Nations High Commissioner of Human Rights had resigned over the UN's response to Israel's assault on Palestinians in Gaza, which he described as a "textbook case of genocide." That day, in response to a reporter who alerted Kirby to Netanyahu's unequivocal reference to the genocidal biblical story of Amalek, Kirby responded "I think we've been clear . . . on our concerns about genocidal behavior by – by any leader. And that is not what we're seeing Israel desire to do."

229.    That same reporter revealed that 160 of his relatives had been killed in Gaza, and Kirby stated, "right now is not the time for a ceasefire."

230.    Also that day, Defendants Blinken and Austin testified to the U.S. Senate Appropriations Committee on the importance of Defendant Biden's request for military assistance to "help Israel defend itself."

231.    The same day, the Department of State submitted a formal notification to Congress of an approval of a $320 million transfer of defense articles to an Israeli company to manufacture precision bomb kits.

232.    On November 1, Defendant Biden acknowledged his substantial influence over Israel, saying "I'm the guy that convinced Bibi to call for a cease-fire to let the prisoners out." National security officials later clarified that he was referring to a pause in the Israeli bombardment while two American-Israeli hostages were released, not a ceasefire.

233.    On November 2, United Nations experts issued a statement warning that "the Palestinian people are at grave risk of genocide," and that time was running out to prevent it.

234.     But as Defendant Blinken boarded a plane to Israel that day, he said "[a]s we've said from the start, Israel has not only the right but the obligation to defend itself . . . ." Vice President Kamala Harris stated at a press briefing in the United Kingdom: "we are not going to create any conditions on the support that we are giving to Israel to defend itself."

235.     That same day, there were reports that Defendant Biden had requested to be able to make arms transfers with Israel exempt from congressional notification procedures. Josh Paul, the former State Department official who resigned on October 18, stated that "[a] proposal in a legislative request to waive Congressional notification entirely for [Foreign Military Financing]-funded Foreign Military Sales or Direct Commercial Contracts is unprecedented in my experience. Frankly, [it's] an insult to Congressional oversight prerogatives."

236.     Also on November 2, there were reports of U.S. military flying surveillance drones over Gaza, leading the New York Times to conclude that the "U.S. is more involved than previously known [in Israel's bombardment of Gaza]." Additionally, the United States has reportedly been using its military satellites and other aircraft to collect additional intelligence, and has been increasingly sharing intelligence with Israel.

237.     Finally, reports that day revealed that a State Department taskforce on preventing atrocities, which in the context of other global crises meets frequently, did not hold its first meeting on Israel's siege on Gaza until October 20, almost two weeks after the siege began, and that the taskforce was being sidelined.

238.     On November 3, reports of Israel's attacks on or near the Al-Shifa, Al-Quds, and the Indonesian Hospital had been widely publicized. Yet, on November 5, Defendant Austin once again reaffirmed in a phone call with Israeli Defense Minister Gallant the United States' "ironclad commitment to Israel's right to defend itself."

239.    Also on November 5, Josh Paul stated in an interview with Democracy Now! that he believed that U.S.-provided arms were being used to "massacre civilians in Gaza," that the State Department's normal procedures for assessing the human rights implications of weapons transfers had "not happened in this context for Israel," and that the decision to not place any conditions on these arms transfers was "unlike any arms transfer decision I've ever been a part of." He said he believed that these decisions were "coming from the very top of the U.S. government and from the Biden White House." He noted that he had in his career "dealt with many morally challenging, controversial arms sales[,]" but unlike in "all those previous instances," in this case, in both the State Department and Congress, "there was no space for debate."

240.    On November 6, the UN Secretary General stated in a press conference that "Gaza is becoming a graveyard for children. Hundreds of girls and boys are reportedly being killed or injured every day. More journalists have reportedly been killed over a four-week period than in any conflict in at least three decades. More United Nations aid workers have been killed than in any comparable period in the history of our organization . . . . The parties to the conflict -- and, indeed, the international community -- face an immediate and fundamental responsibility: to stop the inhuman collective suffering and dramatically expand humanitarian aid to Gaza."

241.    By that day, Israel's assault on Gaza had killed over 10,000 Palestinian people, including over 4,000 children.

242.    On November 7, at a press briefing, a reporter asked Department of State Deputy Press Spokesperson Patel what metric Defendants were using to assess whether a genocide was occurring in Gaza. Patel explained that there is generally "a rigorous process in place for evaluating whether something constitute as genocide or not," but admitted that there was no such "active, ongoing process" for Israel's actions in Gaza.

243.    The same day, Department of Defense Deputy Press Secretary Singh once again admitted that "we don't put conditions on weapons that . . . we're sending or that Israel is using." When asked whether there was any sort of end-use monitoring in place for weapons transferred to Israel, as is required under U.S. law by 22 U.S.C. § 2785, she admitted, "I wouldn't say it's necessarily an end use monitoring," but stated only "we expect them to be used in accordance with [humanitarian] laws.

244.    Also that day, at a White House press briefing, NSC Coordinator John Kirby was asked by a reporter whether the Administration was still not drawing any "red lines" for Israel, in light of the death toll of Palestinian civilians that keeps rising, Kirby responded "that is still the case."

245.    On November 8, Deputy Assistant Defense Secretary for the Middle East Dana Stroul testified on U.S. support for Israel before the House Foreign Affairs Committee, stating, "We are working around-the-clock to determine which munitions and equipment from U.S. inventory can quickly be made available . . . Air defense is a high priority, as are medical supplies, artillery, ammunition and precision-guided munitions. Deliveries are taking place on a near daily basis."

246.    On November 9, Patel, speaking on behalf of Defendant Blinken, once again confirmed that the "rigorous process" that exists to evaluate whether there is an unfolding genocide had not yet been initiated for the assault on Gaza.

247.    Also on November 9, when Defendant Biden was asked at a press briefing about the chances of a ceasefire, he responded "None. No possibility." Kirby confirmed that the position of the Biden Administration is that it "still [doesn't] believe a ceasefire is appropriate at this time."

248.    As of November 10, 11,078 Palestinians have been killed, including 4,506 children and 3,027 women. Defendants have not called for a ceasefire or placed any conditions on their military and other assistance to Israel. Defendants are instead currently attempting to send at least $14.1

billion in additional military assistance, as well as at least $320 million worth of military equipment transfers to Israel.

## IV.     THERE EXISTS AN ABSOLUTE PROHIBITION ON GENOCIDE AND A CORRESPONDING DUTY TO PREVENT GENOCIDE UNDER CUSTOMARY INTERNATIONAL LAW, WHICH IS PART OF FEDERAL COMMON LAW.

249.    Customary international law prohibits the commission, attempted commission, incitement of, conspiracy to commit, and complicity in genocide. Because of the gravity of genocide, customary international law also places a duty on all States to prevent genocide, and specifically, for those States with the ability to influence the actions of people likely to commit or already committing genocide, to take all measures reasonably available to them to prevent the risk of genocide. This duty starts from the moment the States learn of, or should have learned of, the serious risk that genocide will be committed. The United States recognizes the duty to prevent and punish genocide as part of customary international law.

250.    In the aftermath of World War II and the evil of the Holocaust, the Genocide Convention was adopted to deter and prevent such horrors in the future, and, failing that, to hold those responsible accountable. In its first opinion examining the scope, purpose and obligations under the Genocide Convention, the International Court of Justice ("ICJ") found "its object on the one hand is to safeguard the very existence of certain human groups and on the other to confirm and endorse the most elementary principles of morality." *Reservations to Convention on Prevention and Punishment of Crime of Genocide,* Advisory Opinion, 1951 I.C.J. 15, at 23 (May 28). The Genocide Convention recognizes responsibility at both the State level and of individuals, and calls for accountability at both levels. See Genocide Convention arts. I and IV.

251.    The Genocide Convention defines genocide as committing specified acts "with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such." Genocide Convention art. II, chapeau. The "group" is what must be targeted, on grounds including nationality

or ethnicity; and it is the "group" that is protected. The "part" targeted for destruction can be represented by a subgroup, for example, in a specific geographic area. *See, e.g., Prosecutor v. Blagojević & Jokić*, Case No. IT-02-60-T, Trial Judgement (Int'l Crim. Trib. for the Former Yugoslavia Jan. 17, 2005). Palestinians living in Gaza, as part of the Palestinian population, can constitute the targeted group for the purposes of the Genocide Convention.

252.   Genocide, like the crime against humanity of persecution, is a crime distinguished by the specific intent to target a group on recognized grounds through a series of acts often reflected in and achieved through State policies. In the case of genocide, the protected group itself is targeted for destruction. As the General Assembly underscored in 1946, the "denial of the right of existence shocks the conscience of [hu]mankind, results in great losses to humanity in the form of cultural and other contributions represented by these human groups, and is contrary to moral law and to the spirit and aims of the United Nations." *Application of Convention on Prevention and Punishment of Crime of Genocide (Gam. v. Myan.)*, Order on Request for Indication of Provisional Measures, 2020 I.C.J. 3, ¶ 69 (Jan. 23) (quoting G.A. Res. 96(I) (Dec. 11, 1946)).

253.   The specific intent to destroy a group, which can be inferred from the general context, is incompatible with the argument of self-defense. International criminal law scholars agree that the gravity and specificity of the crime of genocide – where the perpetrator must intend to destroy a group – makes inconceivable the justification of defensive force. A group's very existence (in this case Palestinians in Gaza) would thus need to be characterized as an imminent unlawful threat, which is an untenable proposition here. Further, the right of self-defense is bound by the principles of international law, *see Legality of Threat or Use of Nuclear Weapons*, Advisory Opinion, 1996 I.C.J. 226, ¶ 42 (July 8), as well as the rule of proportionality. It is black-letter law that "self-defence cannot operate as a defence to justify violating a prohibition that is recognised in international law as being absolute." *Prosecutor v. Thaçi et al*., Case No. KSC-BC-2020-06/F01536, Decision on

Defence Motion for Judicial Notice of Adjudicated Facts with Annex I, ¶ 24 (Kosovo Specialist Chambers May 18, 2023); *see also Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro)*, Judgment, 2007 I.C.J. 43, ¶ 430 (Feb. 26) ("every State may only act within the limits permitted by international law"). For this reason, "no State or individual can ever be permitted to justify genocide in the name of self-defence." *See* William A. Schabas, Genocide in International Law: The Crime of Crimes 395 (Cambridge Univ. Press 2009).

254.    In addition to prohibiting the commission of genocide, the Genocide Convention prohibits conspiring to commit, inciting, attempting to commit, and complicity in genocide. Genocide Convention art. III. The International Criminal Tribunal for Rwanda ("ICTR") and the International Criminal Tribunal for the Former Yugoslavia ("ICTY") have addressed different forms of complicity in the crime of genocide, including aiding and abetting genocide, as well as conspiracy and joint criminal enterprise, and affirmed that each constitutes a violation of customary international law.

255.    Mass killings are one means by which genocide is committed, but that is not the only method by which a group is "destroyed" or exterminated (in whole or in part). Raphael Lemkin, the Polish-Jewish lawyer credited with coining the term, said that genocide often includes "a coordinated plan aimed at destruction of the essential foundations of the life of national groups so that these groups wither and die like plants that have suffered a blight . . . . It may be accomplished by wiping out all basis of personal security, liberty, health and dignity." Raphael Lemkin, *Genocide – A Modern Crime*, 4 Free World 39-43 (Apr. 1945). More than fifty years after Lemkin's foundational observation, the ICTR rendered the first genocide conviction by an international court and held that, in addition to killings, "subjecting a group of people to a subsistence diet, systematic expulsion from homes and the reduction of essential medical services below the minimum requirement" constituted

the crime of genocide as "methods of destruction by which the perpetrator does not immediately kill the members of the group, but which, ultimately, seek their physical destruction." *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Trial Judgement, ¶¶ 505-06 (Sept. 2, 1998).

256.   Recently the United States again acknowledged and affirmed its understanding of, as well as agreement with, the obligations to prevent and punish genocide. *See generally* Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Allegations of Genocide under Convention on Prevention and Punishment of Crimes of Genocide (Ukr. v. Russ.)*, I.C.J. (Sept. 7, 2022). When it intervened in Ukraine's case against Russia at the International Court of Justice, the United States explicitly acknowledged, as that court had previously held, that a State's "obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a *serious risk* that genocide will be committed." (emphasis in original). *Id.* at ¶ 22 (citing *Bosn. & Herz. v. Serb. & Montenegro*, 2007 I.C.J. at 222, ¶ 431 (Feb. 26)).

## A. Elements of Genocide

257.   Customary international law, as codified in Article II of the Genocide Convention, defines the crime of genocide by two main elements: (1) specific underlying acts, and (2) intent. The same elements define the crime of genocide in the statute of the ICC, as well as the ICTY and ICTR. *See* Rome Statute of the International Criminal Court ("Rome Statute") art. 6, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for the Former Yugoslavia ("ICTY Statute") art. 4 (adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993)); Statute of the International Criminal Tribunal for Rwanda ("ICTR Statute") art. 2 (adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994)).

258.   The United States codified the punishment of genocide in 18 U.S.C. § 1091. President Obama reaffirmed in Executive Order No. 13,729 that "preventing mass atrocities and genocide is a

core national security interest and a core moral responsibility of the United States." 81 Fed. Reg. 32,611 (May 18, 2016).

259.    Genocide is a crime whether committed in time of peace or war. Genocide Convention art. I. That genocide takes place while a party is in an armed conflict with another group "can in no way be considered as an extenuating circumstance for it." *Akayesu* Trial Judgement, ¶ 128. *See* Rome Statute art. 31(1)(c).

260.    The first element, specific underlying acts, includes any of the following: (a) killing members of the group; (b) causing serious bodily or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) imposing measures intended to prevent births within the group; and (e) forcibly transferring children of the group to another group. *See* Genocide Convention art. II; ICTR Statute art. 2(2); ICTY Statute art. 4(2). *See also* 18 U.S.C. § 1091(a).

261.    As is particularly relevant to Gaza, *deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part* is an act of genocide. The International Criminal Court ("ICC") Elements of Crimes, drawing from customary international law, defines the term "conditions of life" as including but not limited to "deliberate deprivation of resources indispensable for survival, such as food or medical services, or systematic expulsion from homes." *See* ICC, Elements of Crimes, art. 6(c) n.4 (2011). Courts have found that "generally creating circumstances that would lead to a slow death such as the lack of proper food, water, shelter, clothing, sanitation" are among the conditions calculated to bring about a group's destruction. *See Prosecutor v. Tolimir,* Case No. IT-05-88/2-T, Trial Judgement, ¶ 740 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 12, 2012). "The actual nature of the conditions of life, the length of time that members of the group were subjected to them, and the characteristics of the group such as its vulnerability are illustrative factors to be considered in evaluating the criterion of probability." *See*

*Prosecutor v. Karadžić,* Case No. IT-95-5/18, Trial Judgement Vol. I, ¶ 548 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 24, 2016). Notably, this underlying act of genocide "does not require proof of a result such as the ultimate physical destruction of the group in whole or in part." *Tolimir* Trial Judgement, ¶ 741.

262.     For the purposes of genocide, *killing* is equated with murder, meaning causing the death by an act or omission, with the intent to either kill or cause serious bodily harm that would likely lead to death. Under customary international law, there is no minimum number of people killed necessary to establish that genocide has been committed. Because of the obligation on states to take all measures to prevent genocide, as well as the prohibition on the "attempt" to commit genocide, state obligations are triggered when killings are done in a manner that reveals an intention to destroy a targeted population, in whole or in part.

263.     Under customary international law, *causing serious bodily or mental harm* as an act of genocide includes torture, inhumane or degrading treatment, interrogations combined with beatings, and harm that damages health or causes disfigurement or serious injury to the external or internal organs of members of the group, although the harm does not need to be permanent and irremediable. Threats of death and knowledge of impending death can constitute serious mental harm with war crimes tribunals specifically recognizing the serious mental harm caused by the threat of indiscriminate killings. Torture, as an underlying act of genocide, means causing serious physical or mental harm, which can be done through physical injuries or by threats to harm or kill a person (or relative or loved one) in order to coerce or punish, with the intention of producing mental suffering such as fear. Deportation has also long been recognized as causing serious bodily or mental harm.

264.     The second element – intent – requires that these acts be committed "with the intent to destroy, in whole or in part, a national, ethnical, racial or religious group." Genocide Convention art. II. Genocidal or specific intent means that the result of destroying the group (in whole or in part)

is clearly intended; it is the group *qua* group (and not only certain individual members of the group) that must be targeted to be destroyed, in whole or in part. *See e.g., Application of Convention on Prevention and Punishment of Crime of Genocide* (*Croat. v. Serb.*), Judgment, 2015 I.C.J. 3, ¶ 139 (Feb. 3). "In part" is understood as a substantial part of a particular group, which can be part of the larger group "within a geographically limited area." *Bosn. & Herz. v. Serb. & Montenegro*, 2007 I.C.J. at 126, ¶ 199. *See also* 18 U.S.C. § 1093(8). This specific intent may be established or inferred from the facts and circumstances of a case. *See Prosecutor v. Popović et al.*, Case No. IT-05-88-T, Trial Judgement, ¶ 823 (Int'l Crim. Tribunal for the Former Yugoslavia, June 10, 2010) ("'By its nature, intent is not usually susceptible to direct proof' because '[o]nly the accused himself has first-hand knowledge of his own mental state, and he is unlikely to testify to his own genocidal intent'").

265.    Evidence of specific intent can include, but is not limited to: the general context, the scale of atrocities, the systematic targeting of victims on account of their membership in a particular group, the perpetration of other culpable acts systematically directed against the same group, or the repetition of destructive and discriminatory acts. *See Prosecutor v. Popović et al.*, Case No. IT-05-88-A, Appeal Judgement, ¶ 468 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 30, 2015) (citation omitted). While forcible transfer is not deemed a stand-alone indicia of the intent to destroy, it is a relevant consideration when assessing genocidal intent. *Popović* Trial Judgment at ¶ 824. The existence of a plan or policy can also be a factor used to establish specific intent, but it is not required. *Id.* at ¶ 828.

266.    Genocidal intent may also be inferred from public speeches and statements by officials. *See generally Prosecutor v. Nahimana et al.* ("Media Trial"), Case No. ICTR-99-52-A, Appeal Judgement (Nov. 28, 2007). The International Court of Justice has found evidence of genocidal intent through "the systematic stripping of human rights, the dehumanizing narratives and rhetoric, the methodical planning, mass killing, mass displacement, mass fear, overwhelming levels of

brutality, combined with the physical destruction of the home of the targeted population, in every sense and on every level." *Gam. v. Myan.*, 2020 I.C.J. at 23-24, ¶¶ 55-56 (citation omitted).

## B.  The Duty to Prevent Genocide

267.    Article I of the Convention creates a legal duty to prevent genocide: "The Contracting Parties confirm that genocide, whether committed in time of peace or in time of war, is a crime under international law which they undertake to prevent and to punish." This obligation to prevent reflects the international community's collective commitment to ensure that groups are not targeted for destruction because of their identity, and is part of customary international law.

268.    The undertaking to prevent genocide is not a passive obligation but "is one of conduct and not one of result" where States are obligated "to employ all means reasonably available to them . . . to prevent genocide." *Bosn. & Herz. v. Serb. & Montenegro,* 2007 I.C.J. at 221, ¶ 430. The International Court of Justice explained that "the notion of 'due diligence', which calls for an assessment *in concreto*, is of critical importance." *Id.* As the Genocide Convention prohibits attempts as well as the commission of genocide, the International Court of Justice held with regard to States' obligations:

> This obviously does not mean that the obligation to prevent genocide only comes into being when perpetration of genocide commences: that would be absurd, since the whole point of the obligation is to prevent, or attempt to prevent, the occurrence of the act. . . . [A] State's obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a serious risk that genocide will be committed. From that moment onwards, if the State has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent (*dolus specialis*), it is under a duty to make such use of these means as the circumstances permit.

*Id.* at 222, ¶ 431. Notably, "certainty" that "genocide was about to be committed or was under way" is not required for a State that should have acted but failed to do so; that the State was aware or should have been aware is sufficient. *Id.* at 223, ¶ 432.[10]

269.    Recognizing that the duty "varies greatly from one State to another" in regards to a particular risk of genocide, a primary consideration is "the capacity to influence effectively the action of persons likely to commit, or already committing, genocide." *Id.* at 221, ¶ 430. To find a breach of the obligation to prevent, "it does not need to be proven that the State concerned definitely had the power to prevent the genocide; it is sufficient that it had the means to do so and that it manifestly refrained from using them." *Id.* at 225, ¶ 438. Among the factors to consider in determining whether a State, and its officials, have breached the duty to prevent genocide include strong "political, military and financial links," as well as links of all other kinds, between the authorities of that State and the main actors in the events. *Id.* at 221-23, ¶¶ 430-31, 434.

270.    States will be held responsible for failing to prevent "if the State manifestly failed to take all measures to prevent genocide which were within its power, and which might have contributed to preventing the genocide." *Id.* at 221, ¶ 430. To the extent they exercise influence, States are required to prevent outside of their territory as well.[11]

---

[10] In the case finding Serbia breached its obligation to prevent in relation to the genocide in Srebrenica by the Army of the Republika Srpska against Bosnia and Herzegovina, the ICJ found that the occupation of the Srebrenica enclave and warnings by governmental and intergovernmental bodies voicing serious concern of atrocities (even if not genocide specifically) made the State and its officials "aware" of "dangers [that] seemed to be of an order that could suggest intent to commit genocide, unless brought under control," making clear "that there was a serious risk of genocide." *Id.* at 225, ¶ 438.

[11] The United States has recognized the extraterritorial obligations to prevent genocide, as it "is one of the only parties to the Genocide Convention to have publicly invoked Article VIII [of the Genocide Convention] in calling on the United Nations to address genocide in the territory of another Contracting Party." Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Ukr. v. Russ.*, ¶ 10. Article VIII "expressly addresses the prevention of genocide." *Id.* at ¶ 27.

### C. Complicity in Genocide

271. Complicity to commit genocide is a standalone crime, triggering both State responsibility and individual criminal responsibility, regardless of position, under the Genocide Convention. *See Bosn. & Herz. v. Serb. & Montenegro,* 2007 I.C.J. at 114, 200, ¶¶ 167, 381; Genocide Convention art. III(e), art. 4 ("Persons committing genocide . . . shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals"). It is also a crime in the U.S. Code. *See* 18 U.S.C. 1091 §§ (a), (b). Complicity can only exist when there is a punishable act of genocide by another State or persons, with which the accomplice associates itself. Complicity in genocide requires that some positive action has been taken to furnish aid or assistance to the perpetrators of the genocide, including provision of means to enable or facilitate the commission of the crime. The State or individual complicit in genocide need not share the specific intent to commit genocide but must act with knowledge of the perpetrators' specific intent when it provides aid or support.

272. For individual criminal responsibility, complicity is accomplished by instigation, aiding and abetting, or procuring the means for the commission of the genocide. *Prosecutor v. Musema,* Case No. ICTR-96-13-T, Trial Judgement and Sentence, ¶ 176 (Jan. 27, 2000); *Akayesu* Trial Judgement, ¶¶ 533-35, 537 (detailing complicity by procuring, aiding and abetting and instigation). Providing weapons or other instruments and means used in the commission of genocide, knowing that they would be used for that purpose, constitutes a form of complicity. *Musema* Trial Judgement and Sentence, ¶ 178; *Akayesu* Trial Judgement, ¶ 536. Knowingly aiding in the planning of or enabling acts of genocide constitutes a form of complicity. *Akayesu* Trial Judgement, ¶ 537. For aiding and abetting genocide, the aider and abettor "commit[] acts specifically aimed at assisting . . . or lending moral support" for the perpetration of the crime, and "this support ha[s] a substantial effect on the perpetration of the crime." *Prosecutor v. Seromba*, Case No. ICTR-2001-66-A, Appeal

Judgement, ¶ 44 (Mar. 12, 2008). The accomplice does not have to share with the perpetrator the genocidal intent – the specific intent to destroy a group in whole or in part based on its identity. *Musema* Trial Judgement and Sentence, ¶ 181.

273.    The *mens rea* for complicity, including aiding and abetting genocide, is knowledge of the principal perpetrator's genocidal intent; the aider and abettor — convicted for complicity in genocide — does not have to share the intent to destroy in whole or in part the group. *See Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgement, ¶¶ 364, 501 (Dec. 13, 2004).

**D. Early Warnings: United Nations' Framework for Analysis for the Prevention of Genocide and Other Atrocity Crimes**

274.    Because genocide and other "[a]trocity crimes take place on a large scale, and are not spontaneous or isolated events," but rather "processes, with histories, precursors and triggering factors which, combined, enable their commission,"[12] in 2014, the United Nations Office on Genocide Prevention and the Responsibility to Protect adopted the Framework of Analysis for Atrocity Crimes: A Tool for Prevention ("the Framework"). The Framework was the product of decades of research and study by experts of previous genocides to assess common features and recurring patterns to enable the international community to identify genocidal processes and intervene to prevent them.

275.    The Framework identifies fourteen risk factors for "atrocity crimes" — which include genocide as well as crimes against humanity and war crimes / grave breaches. The Framework stresses that "not all risk factors need to be present for there to be an assessment that there is a

---

[12] United Nations Office of Genocide Prevention and the Responsibility to Protect, Framework of Analysis for Atrocity Crimes: A Tool for Prevention iii (2014), https://www.ohchr.org/sites/default/files/2021-11/Genocide-Framework-of-Analysis-English.pdf.

significant risk" of genocide or other atrocity crimes occurring, but the more "that are present, the greater the risk that an atrocity crime may be committed." *Id.* at 6-7.

276.    The risk factors include, but are not limited to: Situations of armed conflict or other forms of instability; Record of serious violations of international human rights and humanitarian law; Capacity to commit genocide and other atrocity crimes; Intergroup tensions or patterns of discrimination against protected groups; Signs of an intent to destroy in whole or in part a protected group; Signs of a widespread or systematic attack against any civilian population; Serious threats to those protected under international humanitarian law; and Serious threats to humanitarian and or peacekeeping operations.

277.    As set forth in detail herein, most, if not all, of the risk factors identified in the Framework are present in Israel's unfolding genocide against Palestinian people in Gaza.

**CLAIMS FOR RELIEF**

**GENOCIDE: ALLEGATIONS COMMON TO ALL CLAIMS**

<u>**Customary International law and Jus Cogens Prohibitions**</u>

278.    Plaintiffs incorporate by reference the allegations set forth in the Complaint as if the same were fully set forth herein.

279.    Genocide is considered the "crime of crimes" and the prohibition against it is a *jus cogens* norm in international law, binding on all states at all times, and creates obligations *erga omnes on all States, through their officials, to prevent and punish it*.

280.    As a *jus cogens* norm, the prohibition permits no derogation and prevails over and invalidates international agreements in conflict therewith.

281.    The universal prohibition against genocide was also codified in a treaty when the Convention on the Prevention and Punishment of the Crime of Genocide was unanimously adopted by the United Nations General Assembly in 1948.

282.     Underscoring the gravity of this crime, the very first article of the Convention codified a legal duty to prevent genocide, providing that: "The Contracting Parties confirm that genocide, whether committed in time of peace or in time of war, is a crime under international law which they undertake to prevent and to punish." Genocide Convention art. I.

283.     Article II of the Genocide Convention defines genocide as certain acts "committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group as such," including:

a)       Killing members of the group;

b)       Causing serious bodily or mental harm to members of the group;

c)       Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

d)       Imposing measures intended to prevent births within the group;

e)       [...]

284.     Article III of Convention identifies the crimes that can be punished under the Convention as:

a) Genocide;

b) Conspiracy to commit genocide;

c) Direct and public incitement to commit genocide;

d) Attempt to commit genocide;

e) Complicity in genocide.

285.     The United States ratified the Convention in 1988 through legislation that then-Senator Joseph R. Biden co-sponsored, and Congress added 18 U.S.C. § 1091 to the federal criminal code, to provide for punishment for those found guilty of committing, conspiring to commit, directly and publicly inciting to commit, attempting, and complicity in genocide, in accordance with Article I of the Convention.

286.    As the Senate Report on the implementation of the Genocide Convention affirms, "genocide is among the most depraved acts that can be committed." S. Rep. No. 100-333, at 4 (1988). Implementation of the Genocide Convention was understood as a "reaffirm[ation of] the values upon which our society was founded and which have been woven into the Convention: respect for the dignity and freedom of each individual and the preservation of human rights for all." *Id.*

**Specific Intent to Destroy in Whole or in Part a National, Ethnical, Racial or Religious Group**

287.    Genocide must be committed with a specific intent to destroy, in whole or in part, a national or ethnic group.

288.    Israeli officials have both voiced and demonstrated by their actions an explicit and specific intent to destroy, in whole or in substantial part, the Palestinian population of Gaza.

289.    As set forth in detail above, Israeli officials have repeatedly made statements evidencing an intent to destroy the Palestinian people in Gaza, including using dehumanizing descriptions, which is frequently associated with genocidal and persecutory campaigns, by among other things, referring to the Palestinian people as "human animals" and "bloodthirsty monsters" and promising that "there will only be destruction" and a "Nakba that will overshadow the Nakba of [19]48" to "deal a blow that hasn't been seen in 50 years and take down Gaza" and voicing an intent to wipe the people of Gaza "off the face of the Earth."

290.    The actions taken by Israel, including a mass bombing campaign against the entirety of the Gaza Strip, imposing a siege on the Gaza Strip denying the population food, water, fuel and electricity, and ordering a mass "evacuation" while denying freedom of movement to Palestinians in Gaza, evinces the specific intent to destroy, in whole or in part, the Palestinian population in Gaza.

**Killing Members of the Group**

291.    The Israeli government's campaign of genocide against the Palestinian people in Gaza has so far resulted in the killing of at least 11,078 people, the majority of which have been children

and women, in just five weeks. Palestinians have been killed when schools, medical facilities, shelters, homes and residential areas, places of worship and "evacuation" routes have been bombed, frequently with precision guided bombs and missiles, including JDAMs, with inherently indiscriminate weapons, or chemical weapons.

292.    These killings have been carried out with a specific intent to destroy, in whole or in part, the Palestinian people of Gaza, and achieved in large part through intentionally indiscriminate bombings with an emphasis on "damage and not on accuracy."

293.    Plaintiffs Abu Artema, Abu Rokbeh, Al-Najjar, Elbhassi, Herzallah, Elhaddad, and Elkarra have family members who are among those killed during this genocidal campaign.

294.    Plaintiff Al-Haq has two Palestinian staff members who each have family members who are among those killed during this genocidal campaign - six members for one staff and three for another, including a four year old child who succumbed to his critical injuries.

295.    Plaintiffs Abu Artema, Al-Najjar, and Abu Rokbeh are Palestinians from and currently in Gaza whose lives are in jeopardy in this campaign of genocide.

296.    All individual Plaintiffs have family members, and Organizational Plaintiffs have staff members, in Gaza and whose lives are in jeopardy in this campaign of genocide.

### Deliberately Inflicting on the Group Conditions of Life Calculated to Bring About its Physical Destruction in Whole or in Part

297.    The Israeli government has also inflicted upon the Palestinian people of Gaza conditions of life calculated to bring about their physical destruction in whole or in part.

298.    The Israeli government has escalated and intensified a pre-existing blockade and closure of Gaza, cutting off access to all basic necessities, including food, water, electricity, fuel, and medical supplies, threatening humanitarian efforts to get aid to the population.

299.     Israeli airstrikes targeted civilian infrastructure, including water and sewage facilities, attacked health care facilities and medical staff, bombed bakeries, further inflicting conditions on the besieged and displaced population calculated to inflict fatal conditions on Palestinians.

300.     The Israeli government has also forced the "evacuation" of over one million Palestinians out of northern Gaza, including at least 23 hospitals providing life-saving treatment for thousands of patients, and where tens of thousands of internally displaced Palestinians sought refuge, and cutting off all access to telecommunications. Hundreds of thousands, if not more than a million people, are displaced from their homes.

301.     These coordinated actions by the Israeli political and military leadership to deprive Palestinians in Gaza of basic necessities and trap them under these destructive conditions demonstrate that the total closure and siege is calculated to bring about their physical destruction.

302.     Plaintiffs Abu Artema, Al-Najjar, and Abu Rokbeh, as well as staff members of Organizational Plaintiffs, are themselves experiencing the impacts of this total siege, are displaced, and are being deprived of the basic necessities that they need for their survival such as food, water, fuel, and electricity.

303.     All individual Plaintiffs have family members who are similarly experiencing the grave impacts of this total siege.

**Causing Serious Bodily or Mental Harm to Members of the Group**

304.     The Israeli government has caused serious bodily or mental harm to the Palestinian population in Gaza, with the intention to destroy the Palestinian population in whole or in part, through its unceasing military assault and total siege.

305.     Between October 7 and November 10, the Israeli government's indiscriminate bombardment in Gaza has injured at least 27,490 Palestinians. Another 2,700, including 1,500

children, are reported missing and may remain trapped under the rubble of collapsed buildings and infrastructures.

306.    Injuries have been sustained through Israel's indiscriminate bombardment of densely-populated civilian centers and shelters including refugee camps, hospitals, schools, and religious centers; the targeting of ambulance and evacuation convoys despite coordination with Israeli forces to permit the transfer of civilians, including the wounded; and the use of white phosphorus have injured civilians in mass numbers and created conditions of threat to, or knowledge of, impending death.

307.    Additionally, Israel has deliberately coordinated and maintained the deterioration, damage, and collapse of the entire health system in Gaza, depriving injured and vulnerable Palestinians in need of life-saving medical attention and treatment from obtaining adequate care, if at all, resulting in serious bodily or mental harm to members of the group.

308.    Specifically, Israel's forced "evacuation" orders, targeting of hospitals and health facilities, complete siege on electricity, fuel, food, and water, and weeks-long blockade on humanitarian aid from entering the besieged territory, including urgently needed medical supplies and equipment, has exacerbated the already imminent threat to life, causing substantial bodily or mental harm to Palestinians in Gaza.

309.    The repeated blackouts on all telecommunications during periods of heavy bombardment have also prevented life-saving care or treatment to civilians who are injured or buried under the rubble as hospitals, ambulances, and rescue teams cannot be contacted. Such communication and literal electric blackouts have also caused profound mental suffering, terror and trauma, including to the more than one million Palestinian children subjected to these conditions in Gaza.

310.   The continual bombardment across the entirety of the closed Gaza strip, even after and despite Israel's "evacuation" order of 1.1 million to the south for purported safety and particularly against the threats and pronouncements of Israeli officials to "eliminate everything" in Gaza, has spread terror across the Palestinian population in Gaza, of which half the population is children, with the widespread understanding that there is no safe place in Gaza, causing serious mental harm to members of the group.

311.   Plaintiffs Abu Artema, Al-Najjar, and Abu Rokbeh, as well as staff members of Organizational Plaintiffs, are Palestinians from and currently in Gaza who are being subjected to serious bodily or mental harm in this campaign of genocide.

312.   All individual Plaintiffs have family members in Gaza and who are being subjected to serious bodily and mental harm in this campaign of genocide.

### CLAIM I: VIOLATION OF THE DUTY TO PREVENT GENOCIDE

313.   Article I of the Genocide Convention imposes and codifies a legal duty under customary international law to prevent genocide.

314.   Where a State, acting through its officials, has the capacity to prevent a genocide, it can be held responsible for failing to do so if it fails to take all measure within its power to prevent it, or that might contribute to preventing it.

315.   This obligation to prevent and duty to act to prevent a genocide arise at the instant that the State and its senior officials learn of, or should normally have learned of, the existence of a serious risk that genocide will be committed.

316.   This duty exists particularly when a "State has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent." *Bosn. & Herz. v. Serb. & Montenegro,* 2007 I.C.J. at 222, ¶ 431.

317.     As Israel's closest ally and strongest supporter, being its biggest provider of military assistance by a large margin and with Israel being the largest cumulative recipient of U.S. foreign assistance since World War II, the United States has the means available to have a deterrent effect on Israeli officials now pursuing genocidal acts against the Palestinian people in Gaza. *See supra* Section III(A).

318.     Israeli officials have acknowledged as much when the Israeli Defense Minister admitted that the Israeli government was not in a position to refuse "the Americans" because "[w]e rely on them for planes and military equipment." Defendants themselves have admitted to guiding, convincing, and influencing Israel on certain military decisions and strategy.

319.     Defendants have been, or should have been, aware that genocide by Israel against the Palestinians in Gaza was about to be committed or is underway since at least October 7, 2023. On that day, Prime Minister Netayahu declared that "the enemy will pay an unprecedented price" and ordered the more than two million Palestinians in Gaza to "get out now" despite the fact that they have nowhere to go due to Israel-imposed closure, threatening that "[Israel] will be everywhere and with all our might." This was soon followed by the Minister of Energy announcing the cutting off of all electricity and announcing "what was will not be," and the Minister of Defense's dehumanizing reference to the entire Palestinian population in Gaza as "human animals" when announcing "there will be no electricity, no food, no fuel, everything is closed. We are fighting human animals and we are acting accordingly." The actions by Israel pursuant to these statements, including an indiscriminate bombing campaign against the entirety of Gaza, the total closure and siege of Gaza, and the "evacuation" order issued to 1.1 million people in a closed Gaza Strip further put Defendants on notice. The United Nations and other inter-governmental agencies explicitly, and now repeatedly, warned of mass atrocities, including genocide, within days of the Israeli assault commencing.

320.     The United States government, through Defendants, has failed to prevent this unfolding genocide, which has thus far resulted in the killing of over 11,000, the majority of whom are women and children, the injuring over tens of thousands, the displacement of over one million people, and an inhumane and deadly closure and total siege. Since October 7, 2023, Defendants have not taken measures to deter Israel's killing, inflicting conditions of life calculated to bring about destruction or causing serious bodily or mental harm to Palestinian civilians, but instead have consistently and repeatedly affirmed their full support for Israel's assault on Gaza, pledged and then delivered military equipment, munitions and advisers while declaring that there are no conditions and "no red lines," and rejecting calls for a ceasefire. Defendants have refused to monitor how assistance or weapons are used, and have failed to initiate internal processes to assess whether there is a genocide unfolding in Gaza, even after officials and others have warned them of the risk of an unfolding Genocide. Even as the death toll rose, and the population suffered due to lack of food, water, fuel and electricity — including for medical facilities — the United States refused to use its considerable influence to call for an end to the bombing, cut off weapons deliveries or take measures to end the siege on the Palestinian populations in Gaza.

321.     Plaintiffs have been seriously and gravely harmed by the United States government's failure to prevent the genocidal campaign.

## CLAIM II: COMPLICITY IN GENOCIDE

322.     Article III(e) of the Genocide Convention identifies "complicity in genocide" as a stand-alone crime. 18 U.S.C. § 1091 implements the Genocide Convention's obligation to punish genocide under U.S. criminal law and defines the offense of genocide. *See* 18 U.S.C. § 1091(a).

323.     Complicity in genocide exists when there is a punishable act of genocide by another State or persons, to which the complicit party associates itself.

324.    Complicity includes the provision of means to aid, abet, enable or facilitate the commission of the crime.

325.    Aiding and abetting consists of knowingly providing assistance to the principal which has a substantial effect on the perpetration of the violation.

326.    Defendants knowingly provided assistance with a substantial effect on the commission of Israel's violations of international law, and specifically on the underlying acts of genocide of killing, causing serious bodily or mental harm, and inflicting conditions of life on the Palestinian population calculated to bring about its destruction. Defendants provided assistance knowing that their actions would assist these violations of international law, or with awareness of a substantial likelihood that their acts would assist such violations.

327.    Complicity requires that some positive action be taken to furnish aid or assistance to the perpetrators of the genocide.

328.     An individual is complicit where they act with knowledge of the violation when they provide aid or support; they need not also share the specific intent to destroy a group in whole or in part.

329.    An individual, acting in their official capacity, is complicit in genocide if they use the organs under their control with the knowledge that genocide was about to be committed or was under way, and if the aid and assistance supplied, from the moment they became so aware onwards, to the perpetrators of the underlying acts or to those who were on the point of committing them, enabled or facilitated the commission of the acts.

330.    Individuals can be held responsible for complicity if they instigated, aided or abetted, or procured the means for the commission of the genocide.

331.    Providing weapons or other instruments and means used in the commission of a genocide, knowing that they would be used for that purpose, constitutes complicity.

332.     As set forth above, Defendants, acting in their official capacity as President, Secretary of State and Secretary of Defense of the United States, have provided and continue to provide massive and unparalleled amounts of military assistance, equipment, weapons, and support to the Israeli government, without conditions and with promises of more, in full awareness of its plans to target and destroy in whole or in part the Palestinian population in Gaza.

333.     Defendants have also provided encouragement and moral support that has a substantial effect on Israel's violations, including by coordinating with Third States to remain collectively united in supporting Israel's assault on Gaza, continuously assuring Israel and Prime Minister Netanyahu that the United States will "stand" with Israel during its assault on Gaza, and repeatedly declaring that the United States will not create conditions on its support to Israel, and "no red lines," while rejecting calls for a ceasefire in domestic and international fora.

334.     As set forth in detail above, the United States government, through Defendants, has provided significant assistance to the Israeli government that has had a substantial effect on the perpetration of the genocide in progress.

335.     The United States government's provision of military assistance, weapons, military advisors and other forms of support has enabled the Israeli government's bombardment and attacks on, and siege against, the Palestinian people of Gaza.

336.     Defendants have provided all assistance, support, and encouragement knowing of the genocidal intent of senior Israeli officials, including the President, Prime Minister, Minister of Defense and Minister of Energy, through these officials' well-publicized statements regarding the assault on Gaza and the Palestinian people there, as well as their actions.

337.     Israeli officials have acknowledged repeatedly the substantial effect of the aid and assistance provided by the United States on their ability to carry out their plans.

338.     Prime Minister Netanyahu revealed that the United States' daily support, along with its "depth and breadth of cooperation" since the beginning of Israel's most recent military campaign, siege, and multi-pronged attack against Palestinians, has been "unprecedented" in the history of the two nations' alliance.

339.     This cooperation and coordination has been affirmed by Defendants, who have acknowledged remaining "in close touch" with Israeli officials and leadership since the "first moments" after the October 7 attacks and everyday thereafter.

340.     As such, Defendants are complicit in the Israeli government's genocidal campaign against the Palestinian people of Gaza.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

a.  Declare that Defendants have violated their duty under customary international law, as part of federal common law, to take all measures within their power to prevent Israel from committing genocide against the Palestinian people of Gaza;

b.  Declare that Defendants have violated their duty under customary international law, as part of federal common law, that prohibits their complicity in genocide by knowingly continuing to provide assistance that enables and facilitates Israel's commission of genocidal acts against the Palestinian people of Gaza.

c.  Issue injunctive relief ordering Defendants to take all measures within their power to prevent Israel's commission of genocidal acts against the Palestinian people of Gaza, including but not limited to:

i.   Order Defendants to take all measures within their power to exert influence over Israel to end its bombing of the Palestinian people of Gaza, resulting in mass killing and serious injury;

ii.    Order Defendants to take all measures within their power to exert influence over Israel to lift the siege on Gaza, including allowing all electricity, fuel, food, water, and humanitarian aid into Gaza;

iii.    Order Defendants to take all measures within their power to exert influence over Israel to prevent the "evacuation" or forcible transfer and expulsion of Palestinians from Gaza and ensure freedom of movement.

d.  Issue injunctive relief enjoining Defendants from aiding, abetting, enabling or facilitating Israel's commission of genocidal acts against the Palestinian people of Gaza, including but not limited to:

i.    Enjoin Defendants from providing, facilitating, or coordinating military assistance or financing to Israel; from initiating, acting upon, continuing, expediting, or completing sales, transfers, or delivery of weapons and arms to Israel; and from providing military equipment and personnel, advancing Israel's commission of genocidal acts;

ii.    Enjoin Defendants from obstructing attempts by the international community, including at the United Nations, to implement a ceasefire in Gaza and lift the siege on Gaza.

e.  Grant any other and further relief as the Court deems appropriate and necessary.

Dated: November 13, 2023              Respectfully submitted,

                                          */s/ Johnny Sinodis*

Sadaf M. Doost, Cal. Bar No. 346104        Johnny Sinodis, Cal. Bar No. 290402
Baher A. Azmy, *pro hac vice* motion pending    Marc Van Der Hout, Cal. Bar No. 80778
Katherine Gallagher, *pro hac vice* motion pending  Van Der Hout LLP
Maria C. LaHood, *pro hac vice* motion pending   360 Post Street, Suite 800
Astha Sharma Pokharel, *pro hac vice* motion pending San Francisco CA 94108
Samah Sisay, *pro hac vice* motion pending     (415) 981-3000
Pamela C. Spees, *pro hac vice* motion pending   ndca@vblaw.com
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6430
sdoost@ccrjustice.org

bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org