Marc Van Der Hout, Cal. Bar No. 80778
Johnny Sinodis, Cal. Bar No. 290402
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Maria C. LaHood, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR

Plaintiffs,

v.

JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,

Defendants.

Case No.: 23-cv-5829

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing: January 11, 2024 at 1:00 pm

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF ISSUES ............................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT .................................................................................................................... 7

   I.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION. ...... 7

   II.   DEFENDANTS WILL NOT SUFFER SUBSTANTIAL HARM AND A
      PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST. ..................................... 10

   III. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
      MERITS. ................................................................................................................... 12

      A.  Genocide ............................................................................................................ 13

          1.  Killings of Palestinian People in Gaza and Causing Serious Bodily or Mental
             Harm ............................................................................................................ 15

          2.  Deliberately Inflicting Conditions of Life on Palestinian People in Gaza
             Calculated to Bring about Physical Destruction, in Whole or in Part ...................... 17

          3.  Specific Intent to Destroy Palestinian People in Gaza, as Such, in Whole or in
             Part ............................................................................................................. 18

      B.  Obligation to Prevent Genocide ............................................................................. 20

      C.  Complicity ........................................................................................................... 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ..............................................................................7

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)..................................................................................13, 14

*Belbacha v. Bush*,
   520 F.3d 452 (D.C. Cir. 2008) .............................................................................7

*Brady v. Maryland*,
   373 U.S. 83 (1963)..............................................................................................10

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
   840 F.2d 701 (9th Cir. 1988) ...............................................................................9

*Doe I v. Cisco Sys., Inc.*,
   73 F.4th 700 (9th Cir. 2023) ..............................................................................24

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) .............................................................................7

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ..........................................................................9, 10

*Harris v. Bd. of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ...............................................................................8

*Heckler v. Mathews*,
   465 U.S. 728 (1984)..............................................................................................9

*Kadić v. Karadžić*,
   70 F.3d 232 (2d Cir. 1995)..................................................................................14

*Manrique v. Kolc*,
   65 F.4th 1037 (9th Cir. 2023) ..............................................................................8

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*,
   176 F.R.D. 329 (C.D. Cal. 1997) ......................................................................11

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) .................................................................9

*The Nereide*,
   13 U.S. (9 Cranch) 388 (1815)...........................................................................13

*The Paquete Habana,*
    175 U.S 677 (1900) .................................................................................................13

*Saravia ex rel. A.H. v. Sessions,*
    905 F.3d 1137 (9th Cir. 2018) ................................................................................7

*Sarei v. Rio Tinto, PLC,*
    671 F.3d 736 (9th Cir. 2011) .................................................................................14

*Siderman de Blake v. Republic of Argentina,*
    965 F.2d 699 (9th Cir. 1992) ...........................................................................11, 13

*Singleton v. Kernan,*
    No. 16-cv-02462-BAS-NLS, 2017 WL 4922849 (S.D. Cal. Oct. 31, 2017)...........7

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ..............................................................................................14

*Williams v. Chrans,*
    50 F.3d 1363 (7th Cir. 1995) ..................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...........................................................................................7, 8, 10

*Yousuf v. Samantar,*
    699 F.3d 763 (4th Cir. 2012) ................................................................................11

**Statutes**

Elie Wiesel Genocide and Atrocities Prevention Act of 2018,
    Pub. L. No. 115-441, 132 Stat. 5586 (2019) .......................................................12

Genocide Convention Implementation Act, 18 U.S.C. § 1091 ..............................11, 14

**Rules**

Fed. R. Civ. P. 65 .....................................................................................................1

**Executive Materials**

Exec. Order No. 13,729, 81 Fed. Reg. 32,611 (May 18, 2016) ...............................12

*Statement by President Joseph R. Biden, Jr. on International Holocaust
    Remembrance Day,* WhiteHouse.gov (Jan. 27, 2021),
    https://www.whitehouse.gov/briefing-room/statements-
    releases/2021/01/27/statement-by-president-joseph-r-biden-jr-on-international-
    holocaust-remembrance-day/ ...............................................................................12

**International Materials**

*Application of Convention on Prevention and Punishment of Crime of Genocide*
  (*Bosn. & Herz. v. Serb. & Montenegro*), Judgment, 2007 I.C.J. 43 (Feb. 26) ......18, 21, 23, 24

*Application of Convention on Prevention and Punishment of Crime of Genocide*
  (*Croat. v. Serb.*), Judgment, 2015 I.C.J. 3 (Feb. 3)....................................................................18

*Application of Convention on Prevention and Punishment of Crime of Genocide*
  *(Gam. v. Myan.)*, Order on Request for Indication of Provisional Measures,
  2020 I.C.J. 3 (Jan. 23) ................................................................................................................19, 20

Convention on Prevention and Punishment of Crime of Genocide,
  Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 ........................................ *passim*

CrimC (DC Jer) 40/61 *Att'y Gen. of Gov't of Isr. v. Eichmann*
  (Dec. 11, 1961) (Isr.), 36 I.L.R. 5 (1968) ........................................................................16, 17

*Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Trial Judgement (Sept. 2, 1998)............13, 16, 17

*Prosecutor v. Blagojević & Jokić,* Case No. IT-02-60-T, Trial Judgement,
  (Int'l Crim. Trib. for the Former Yugoslavia Jan. 17, 2005) ..................................................16

*Prosecutor v. Jelisić*, Case No. IT-95-10-A, Appeal Judgement
  (Int'l Crim. Trib. for the Former Yugoslavia July 5, 2001)..............................................18, 19

*Prosecutor v Karadžić,* Case No. IT-95-5/18-T, Trial Judgement Vol. I
  (Int'l Crim. Trib. for the Former Yugoslavia Mar. 24, 2016)............................................16, 19

*Prosecutor v Muhimana*, Case No. ICTR-95-1B-T,
  Trial Judgement and Sentence (Apr. 28, 2005) ........................................................................15

*Prosecutor v. Musema,* Case No. ICTR-96-13-T,
  Trial Judgement and Sentence, (Jan. 27, 2000) ........................................................................24

*Prosecutor v. Nahimana et al.*, Case No. ICTR-99-52-A,
  Appeal Judgement (Nov. 28, 2007) ..........................................................................................19

*Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A &
  ICTR-96-17-A, Appeal Judgement (Dec. 13, 2004)................................................................24

*Prosecutor v. Popović et al*., Case No. IT-05-88-T, Trial Judgement
  (Int'l Crim. Trib. for the Former Yugoslavia June 10, 2010) ..................................................19

*Prosecutor v. Setako,* Case No. ICTR-04-81-A,
  Appeal Judgement (Sept. 28, 2011)..........................................................................................15

*Prosecutor v. Thaçi et al.*, Case No. KSC-BC-2020-06/F01536,
  Decision on Defence Motion for Judicial Notice of Adjudicated Facts with Annex
  I (Kosovo Specialist Chambers May 18, 2023) ........................................................................13

*Prosecutor v Tolimir,* No. IT-05-88/2-T, Trial Judgement,
 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 12, 2012)...................................16

*Reservations to Convention on Prevention and Punishment of Crime of Genocide*,
 Advisory Opinion, 1951 I.C.J. 15 (May 28) ...............................................................11

Robert H. Jackson, Chief Counsel for United States, Opening Statement before the
 International Military Tribunal (Nuremberg) (Nov. 21, 1945),
 https://www.roberthjackson.org/speech-and-writing/opening-statement-before-
 the-international-military-tribunal/ ..............................................................................11

**Legislative Materials**

S. Rep. No. 100-333 (1988) ....................................................................................................11

**Other Authorities**

Raphael Lemkin, *Genocide – A Modern Crime*, 4 Free World 39 (1945).....................17

Wes Morriston, *Ethical Criticism of the Bible: The Case of Divinely Mandated
 Genocide*, 51 Sophia 1, 117 (2012) ..........................................................................4

William Schabas, Genocide in International Law: The Crime of Crimes (2009) ........................13

PLEASE TAKE NOTICE that Plaintiffs Defense for Children International–Palestine, Al-Haq, Ahmed Abu Artema, Dr. Omar Al-Najjar, Mohammed Ahmed Abu Rokbeh, Mohammad Herzallah, Laila Elhaddad, Waeil Elbhassi, Bassim Elkarra, and A.N. hereby move the Court for a preliminary injunction. A hearing is scheduled for January 11, 2024, at 1:00 p.m., in the courtroom of the Hon. Donna M. Ryu, located at 1301 Clay Street, Oakland, California.

Plaintiffs seek an order enjoining Defendants and all persons associated with them from providing any further military or financial support, aid, or any form of assistance to Israel's attacks and maintenance of a total siege on Palestinians in Gaza, in accordance with their duty under federal and customary international law to prevent, and not further, genocide. This Motion is brought pursuant to Federal Rule of Civil Procedure 65 and is based on this Motion and materials cited herein; the accompanying declarations; the pleadings and evidence on file in this matter; and such other materials and argument as may be presented in connection with the hearing on the Motion.

## STATEMENT OF ISSUES

Based on the last reports available five days before the date of this filing, in little more than a month, the Israeli military has killed more than 11,000 Palestinian civilians, over 4,500 of them children, forced the displacement of approximately 1.6 million persons, and otherwise sown unrelenting terror, trauma and familial destruction throughout the Gaza Strip – and, increasingly in the Occupied West Bank, including East Jerusalem. These actions have been preceded and accompanied by statements from high level Israeli political and military officials expressing their intent to destroy the Palestinian people in Gaza, in whole or in part – an intent that is ultimately genocidal. The relentless military assault has destroyed critical civilian infrastructure – leveling multiple hospitals, schools, universities, refugee camps, and UN safe havens, shattering almost all other essential attributes of a civil society, and destroying or damaging at least 45 percent of all housing units in Gaza. And the total siege, on top of Israel's 16-year-long blockade of Gaza, has further deprived Palestinians

in Gaza of their basic survival needs, including food, water, fuel, electricity, and medicine. International law which forms part of federal law, makes clear that the October 7 attacks by Hamas's military wing–including unlawful direct attacks against civilians that killed approximately 1,200 civilians and soldiers, and led to the taking of 240 civilian hostages and military captives–cannot justify the campaign of killing and total siege denying basic necessities for life to the Palestinian people in Gaza aimed at their destruction, in whole or in part.

United States officials, including the named Defendants in this case, have known of widely-publicized statements of genocidal intent at the highest levels of the Israeli government and have been put on notice of the unfolding genocide by United Nations experts and officials, and others. As accompanying expert declarations by leading scholars and experts on genocide describe, under customary international law, as codified in the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"),[1] United States officials, including the President of the United States, have a firm duty to prevent ongoing or even incipient genocide – a duty defendants are willfully choosing to defy in the face of all evidence. Instead, they continue to supply weapons and equipment to Israel, even expediting deliveries to assist in the military assault, refusing to place any conditions or "red lines" on this support, while offering diplomatic and political support and obstructing calls for a ceasefire.

Plaintiffs, Palestinian human rights organizations, Palestinian residents of Gaza, and Palestinians in the United States with family members in Gaza, urgently seek an injunction ordering the United States to cease and desist aiding and abetting Israel's genocidal campaign through provision of financial and military aid and other forms of support.

---

[1] Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277.

### STATEMENT OF FACTS

Gaza is a 25-mile strip of land often described as an open-air prison, where many of the 2.2 million Palestinian residents are refugees and descendants of people who were expelled from their land by Zionist militias and the Israeli army during the 1947-1949 Nakba. Declaration of Pamela Spees, annexed hereto, (hereinafter "Spees Decl."), Exs. A-1, A-2, at ¶ 5, E-12; Declaration of Dr. John Cox, Dr. Victoria Sanford, and Dr. Barry Trachtenberg, annexed hereto at ¶ 25 ("Genocide Scholars Decl."). Nearly half of all Gaza residents are children. Spees Decl., Exs. E-18, B-7, at ¶ 1. Israel has occupied Gaza since 1967, blockaded it since 2007 (*id.*, Exs. A-2, at ¶ 5, B-6, at ¶ 14, B-1), and it has subjected the Palestinian people in Gaza to at least five military assaults since this blockade, resulting in the death of 4,269 Palestinians in Gaza, including 1,025 children, and injuring 41,348 (*id.*, Ex. B-7, at ¶¶ 30-31). The blockade itself has been so severe and debilitating that United Nations experts forecast that Gaza would be unliveable by 2020. *Id.*, Ex. B-5.

Despite these persistent violations of international law (*id.*, Ex. A-2, at ¶¶ 6, 71-72), the United States has provided Israel with unequivocal and unconditional support. Israel is the largest cumulative recipient of United States foreign assistance since World War II: since 1946, it has sent $260 billion (inflation-adjusted) dollars in military and economic assistance to Israel. *Id.*, Ex. C-1, at 1. Since 1999, this support has been carried out through 10-year memoranda of understanding between the United States and Israel, the most recent of which pledges $38 billion in military assistance to Israel over the 10-year period of fiscal years 2019-2028. *Id.*, Exs. C-1, at 78; C-2. As of 2022, U.S. military assistance to Israel constituted at least 16 percent of Israel's defense budget. *Id.*, Ex. C-1, at 10. Israel also enjoys special access to U.S. military stockpiles stored in Israel, which may be worth up to $4.4 billion, *id.* at 28, and access to weapons produced in the United States, *id.* at 15. The United States has also long provided political and diplomatic cover to Israel by using its veto power to block efforts at the UN

Security Council to pass resolutions critical of Israel's violations of international law, and undermining efforts for accountability in other international fora. *See, e.g., id.*, Exs. E-6.

On October 7, 2023, Israel launched its deadliest assault on Gaza, following the attacks against Israel by Hamas's military wing. Compl. ¶ 66; Spees Decl. ¶ 5(a)-(ff). In the immediate aftermath of the October 7 attacks, Israeli officials—including the President, Prime Minister, and Minister of Defense—have declared an all-out assault and siege on the Palestinian people in Gaza, and have directly expressed a genocidal intent behind their campaign, Spees Decl., Exs. D-2, D-3, D-11, D-15, to kill, seriously harm, and create conditions of life to destroy, in whole or in part, the population. As set forth more comprehensively in the Complaint, *see* Compl. ¶¶ 67-163, these officials have described Palestinians in Gaza as "human animals," Spees Decl., Exs. D-3, D-11, and "children of darkness," *id.*, Ex. D-18, declaring that "an entire nation out there [] is responsible [for the October 7 attack]," *id.*, Ex. D-11, and promising that Israel will "eliminate everything." *Id.*, Ex. D-15. More than once in the past weeks, the Prime Minister has invoked the biblical story of Amalek to justify Israel's attack on Gaza—which has been described as a story of "divinely-mandated genocide." *Id.*, Exs. D-22, D-26. Genocide Scholars Decl. at ¶ 13 (noting Amalek is a "biblical story of *total* destruction") (emphasis in original); Wes Morriston, *Ethical Criticism of the Bible: The Case of Divinely Mandated Genocide*, 51 Sophia 1, 117 (2012). Statements such as these have historically been associated with genocidal campaigns, and are considered by experts to be a key warning sign of genocide. Genocide Scholars Decl. ¶ 8(i) ("Past historical precedents reveal that intent is often articulated through explicitly dehumanizing and demonizing language."), ¶¶ 9-14, 19-20; *see also* Spees Decl., Ex. D-32, at 16 (United Nations Office of Genocide Prevention's Framework of Analysis noting that "[i]ncreased inflammatory rhetoric, propaganda campaigns or hate speech targeting protected groups, populations or individuals" are indicators/warnings of atrocity).

Acting upon these statements of intent, Israel has bombed or attacked schools, hospitals, ambulances, shelters, bakeries, and entire refugee camps. Spees Decl., Exs. D-10, D-27, D-28, D-30. It has ordered civilians to evacuate certain areas, only to bomb designated "safe zones" and routes. *Id.*, Exs. D-10, D-16, D-17. It has imposed a total siege on Gaza: restricting, and prohibiting, the entry of basic necessities for human survival including food and medicine, and has cut off internal access to electricity and water, including by actively striking water wells and tanks. *Id.*, Exs. D-3, D-6, D-7, D-10, D-11, D-12, D-27, D-28. In one month, Israel has damaged or destroyed at least 45 percent of all housing units in Gaza. *Id.*, Ex. D-31. Since October 7, the U.S. Defendants have supported, communicated and coordinated closely with Israel and its military. *Id.*, Exs. E-1, E-2, E-3, E-4, E-15, E-20, E-22, E-33. As Israel's Prime Minister Netanyahu affirmed, Defendant Biden's "support every day in the depth and breadth of cooperation" has been "unprecedented" from the United States. *Id.*, Ex. E-21. In some instances Defendants have influenced or even, in Defendant Austin's spokesperson's own words, "guided" Israel's military strategy, *id.*, Ex. E-38, including for the purpose of securing the release of American-Israeli hostages, *id.,* Ex. E-41, but have not exercised the same influence to prevent the continued killing of Palestinians and siege of Gaza, even as Defendants have been repeatedly put on notice of the risk or indicators of genocide, including by UN experts and officials, and as calls for a ceasefire have grown. *Id.*, Exs. E-12, E-16, E-17, E-18, E-24, E-36, E-40, E-45, E-46. Defendants have expedited delivery to Israel of an overwhelming amount of unconditional military assistance and weapons, *id.,* Exs. E-28, E-39, E-10, E-26, but have refused to monitor how assistance or weapons are used, *id.*, Ex. E-26, to condition assistance, *id.*, Exs. E-34, E-48, E-42, E-38, or to initiate internal processes to assess whether there is an unfolding genocide, *id.*, Exs. E-46, E-49, despite warnings from their staff of the necessity of this monitoring. *Id.*, Exs. E-16, E-17, E-19. On November 8, 2023, U.S. Assistant Secretary of State Barbara Leaf confirmed to lawmakers at a hearing before the House Committee on Foreign Affairs that the number of Palestinians killed in Gaza

is likely "higher than is being cited." *Id.*, Exs. E-53, E-54. At the same hearing, Dana Stroul, Deputy Assistant Secretary of Defense, reconfirmed that the department's commitment to Israel is "ironclad" and further advised lawmakers that "[d]eliveries [including of artillery and ammunition] are taking place on a near daily basis." *Id.*, Exs. E-52, E-54, E-55.

As of the date of this filing, it is not even possible to provide current estimates of those killed in Gaza due to the "collapse of services and communications" at hospitals, which has prevented the Ministry of Health in Gaza from updating casualty figures for five consecutive days. *Id.*, Ex. D-1. The last figures provided by the Ministry on November 10 reported that 11,078 Palestinians in Gaza had been killed, 4,506 of whom were children, 27,490 were injured, and about 2,700, including approximately 1,500 children, were missing, and 1.5 million had been internally displaced. *Id.* The Washington Post has reported that the last fatality figures reported (just over 11,000) translated into one person killed for every 200 people in Gaza. *Id.*, Ex D-33.

Plaintiffs Defense for Children International-Palestine ("DCIP") and Al-Haq ("Organizational Plaintiffs") are nongovernmental human rights organizations in Palestine with staff members in Gaza. Compl. ¶¶ 18-21; Al Haq. Decl. ¶ 9. Plaintiffs Ahmed Abu Artema, Mohammed Ahmed Abu Rokbeh, and Omar Al-Najjar are Palestinian residents of Gaza. Compl. ¶¶ 22-24; Al-Najjar Decl. ¶ 1; Abu Rokbeh Decl. ¶ 1; Abu Artema Decl. ¶ 1. Plaintiffs Laila Elhaddad, Waeil Elbhassi, Basim Elkarra, Mohammad Herzallah, and A.N. are U.S. citizens and residents of Palestinian origin with family members in Gaza. Compl. ¶¶ 25-29. Collectively, Plaintiffs and their relatives have been displaced, injured, and lost family members to Israel's bombardment; they or their families have been deprived of basic necessities for their survival as a result of Israel's total siege of Gaza; they have witnessed atrocities against their people; and they fear for their lives and the lives of their loved ones. Compl. ¶¶ 18-29; Al-Najjar Decl. ¶ 8; Abu Rokbeh Decl. ¶¶ 5-7, 9; Abu Artema Decl. ¶ 22. In the face of this

1   unrelenting destruction of Palestinian life, they come to this Court to seek enforcement of Defendants'

2   duty under international law and federal common law to prevent, not further, an unfolding genocide.

3                                    **ARGUMENT**

4        When moving for a preliminary injunction, a plaintiff "must establish that he is likely to

5   succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

6   that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia*

7   *ex rel. A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council,*

8   *Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge." *Drakes*

9   *Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). A preliminary

10  injunction may also issue where the plaintiff raises "serious questions going to the merits . . . and the

11  balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d

12  1127, 1135 (9th Cir. 2011) (citation omitted). A motion for preliminary injunction cannot fail as a

13  matter of law if the prospective harm is sufficiently grave, even in cases in which success on the merits

14  is "far from clear." *See Belbacha v. Bush*, 520 F.3d 452, 459 (D.C. Cir. 2008) (finding risk of torture

15  sufficiently grave to warrant preliminary injunction).

16       Plaintiffs meet the threshold necessary for a preliminary injunction. Their claims that

17  Defendants are failing to prevent, and are complicit in, an unfolding genocide, the "crime of crimes,"

18  could not be more grave. Plaintiffs will suffer the most irreparable—and unfathomable—of harms if

19  Defendants' conduct is not enjoined. The public interest necessitates upholding the *jus cogens*

20  customary international law obligation to prevent, not further, genocide.

21  **I.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION.**

22       Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a

23  preliminary injunction." *Singleton v. Kernan*, No. 16-cv-02462-BAS-NLS, 2017 WL 4922849, at *3

24  (S.D. Cal. Oct. 31, 2017), *aff'd*, 730 F. App'x 540 (Mem.) (9th Cir. 2018) (internal quotation omitted).

Plaintiffs need not demonstrate that irreparable injury is certain, but only that it "is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The irreparable injury in this case—genocide, or even the risk of it occurring—is grave.

Absent an injunction, Plaintiffs Abu Rokbeh, Abu Artema, and Al-Najjar, as well as some staff members of Plaintiffs DCIP and Al-Haq, who are currently in Gaza, face the risk of death as a result of Israel's assault and siege that Defendants are failing to prevent and thus enabling. Compl. ¶¶ 18-29; Al-Najjar Decl. ¶ 8; Abu Rokbeh Decl. ¶¶ 4, 9; Abu Artema Decl. ¶ 22-23; Al Haq Decl. ¶¶ 13-14. There could be no harm greater and more irreparable than death or severe injury in a genocidal attack, as even one death is precisely the type of irreparable harm preliminary injunctions are designed to prevent. *See, e.g., Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (holding that "pain, infection, amputation, medical complications, and death" constitute irreparable harm); *Williams v. Chrans*, 50 F.3d 1363, 1364 (7th Cir. 1995) (per curiam) ("In this case, as in all death cases, there is no question of irreparable injury."). Short of death, or serious bodily or mental injury, Plaintiffs will continue to face conditions of life that are calculated to destroy, including starvation, dehydration, lack of access to medical care, fuel and electricity. *See, e.g., Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (risks of "contracting a fatal illness or experiencing other serious health declines" as a result of prison conditions in Peru constituted irreparable injury).

The unfolding genocide of Plaintiffs' people has other obvious and severe consequences for Plaintiffs. Collectively, at least 115 family members of Plaintiffs Abu Artema, Al-Najjar, Elbhassi, Herzallah, Elhaddad, Elkarra, and of staff of Plaintiff Al-Haq, have already been killed by Israel's assault on Gaza. Compl. ¶¶ 22-29; Al-Najjar Decl. ¶ 19; Abu Artema Decl. ¶¶ 6-10; Abu Rokbeh Decl. ¶ 15; Al-Haq Decl. ¶¶ 9-10. Other Plaintiffs have family members or staff at risk of death in Gaza. Compl. ¶¶ 18-29; Al-Haq Decl. ¶¶ 7-11; Abu Artema Decl. ¶¶ 12-14; Al-Najjar Decl. ¶¶ 16,20; Abu Rokbeh Decl., ¶¶ 3-9. If injunctive relief is not granted, Individual Plaintiffs, staff members of

Organizational Plaintiffs, and their family members will continue to suffer grave psychological and emotional terror, and potentially physical pain and suffering, that results from being subjected to a genocide and the irreparable and irreplaceable loss of their family members, or the fear of this loss, and the loss of more of the Palestinian people caused by Defendants' actions. Al-Najjar Decl. ¶¶ 8, 24; Abu Rokbeh Decl. ¶¶ 3-9; Abu Artema Decl. ¶¶ 22-24. This constitutes irreparable harm. *See, e.g., Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988) ("emotional stress, depression and reduced sense of well-being," which are forms of "psychological and physiological distress," can constitute irreparable injury for purposes of preliminary injunction) (internal quotation omitted); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal.), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) (same).

Plaintiffs will also experience the irreparable harm of the most extreme form of discrimination based on nationality or ethnicity: Plaintiffs' people—Palestinians in Gaza (Compl. ¶¶ 18-29; Al-Najjar Decl. ¶ 24)—as a group will continue to be targeted. As the Supreme Court has held, "stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community . . . can cause serious non-economic injuries to those persons." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (internal quotation omitted).

Organizational Plaintiffs' staff will continue facing the irreparable harm described above, including displacement and potentially death, which is a direct harm to Organizational Plaintiffs themselves and additionally, compounded by the fact that those staff members also lack freedom of movement and access to telecommunications, Al-Haq Decl. ¶¶ 9, 12, 13; Abu Rokbeh Decl. ¶ 16, frustrates the organizations' missions by harming their ability to function and operate, and exist. Moreover, Defendants' actions have caused Organizational Plaintiffs to divert their resources toward immediate intervention in preventing the further commission of genocide instead of toward their core programs. Al-Haq Decl. ¶¶ 3-7, 14, 15; Compl. ¶¶ 18-19. *See E. Bay Sanctuary Covenant v. Biden*,

993 F.3d 640, 677-78 (9th Cir. 2021) (government action that frustrates organizational plaintiffs' missions and forces them to divert resources away from core programs constitutes irreparable harm).

It is "likely" that "in the absence of an injunction," Plaintiffs will experience these harms. *Winter*, 555 U.S. 7 at 22. Between October 7 and November 10 (the latest date on which OCHA was able to update its casualty figures given the collapse of services and communications at hospitals in Gaza), Israel has killed 11,078 Palestinians, including 4,506 children. Spees Decl., Exs. D-1, D-31. That is 316 people, including 128 children, a day. The number of people injured since October 7 is 27,490, and 1.6 million people have been displaced. *Id*. Israel has continued its siege on Gaza, depriving residents of food, water, fuel, and electricity. *Id*. At the same time, Defendants have continued to unconditionally support Israel's genocidal assault on Gaza, rejected all calls for a ceasefire, *id*., Exs. E-50, E-51, and have continued to transfer and approve more weapons and funds to fuel the ongoing genocide. *Id*., Exs. E-28, E-39. Every day that passes without an injunction, Plaintiffs will continue facing the harm caused by Defendants' actions.

## II.   DEFENDANTS WILL NOT SUFFER SUBSTANTIAL HARM AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

When the government is a party to a case, the balance of the equities, which takes into consideration harm to defendants, and the public interest, merge. *E. Bay Sanctuary Covenant*, 993 F.3d at 668. Defendants cannot be harmed by a preliminary injunction enjoining them to comply with the law, to take measures within their power to prevent the unfolding genocide of which they are on notice, and to cease being complicit in the genocide. Such an injunction serves humanity and therefore the public interest.

An injunction that confines the government's behavior to its lawful bounds is necessarily in the public interest. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *E. Bay Sanctuary Covenant*, 993 F.3d at 679 (the public has an interest in ensuring that executive follows statute as well as congressional intent reflected in the signing of the 1951 Refugee Convention). This applies with equal

if not greater force when the law at issue is a *jus cogens* norm—the most supreme of international laws—which, as described in greater detail below, the prohibition on genocide is. *See, e.g.*, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 716 (9th Cir. 1992) ("the supremacy of *jus cogens* extends over all rules of international law"); *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (a *jus cogens* norm is a "peremptory norm of general international law"). The prohibition on genocide is considered absolute, and as the International Court of Justice ("ICJ") has stated with regard to the Genocide Convention: "States do not have any interests of their own; they merely have, one and all, a common interest . . . Consequently, in a convention of this type one cannot speak of individual advantages or disadvantages to States . . . ." *Reservations to Convention on Prevention and Punishment of Crime of Genocide*, Advisory Opinion, 1951 I.C.J. 15, at 23 (May 28).

More fundamentally, there is a moral imperative and a national security interest, and therefore a public interest, in preventing and prohibiting genocide. *See, e.g., Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,* 176 F.R.D. 329, 354 (C.D. Cal. 1997) ("it would be difficult to contend that . . . alleged jus cogens violations of international human rights were 'in the public interest'"). In 1945, Justice Robert R. Jackson stated in his opening at the Nuremberg Trials, where the concept of genocide took shape: "The wrongs which we seek to condemn and punish have been so calculated, so malignant, and so devastating, that civilization cannot tolerate their being ignored, because it cannot survive their being repeated."[2] In 1988, the Senate Committee on the Judiciary wrote in its report recommending the passage of the Genocide Convention Implementation Act, 18 U.S.C. § 1091, co-sponsored by then-senator Defendant Biden, that the Act "would reaffirm the values upon which our society was founded and which have been woven into the Convention: respect for the dignity and freedom of each individual and the preservation of human rights for all." S. Rep. No. 100-333, at 4 (1988). In 2021,

---

[2] Robert H. Jackson, Chief Counsel for United States, Opening Statement before the International Military Tribunal (Nuremberg) (Nov. 21, 1945), https://www.roberthjackson.org/speech-and-writing/opening-statement-before-the-international-military-tribunal/.

Defendant Biden reiterated this commitment, stating, "I recommit to the simple truth that preventing future genocides remains both our moral duty and a matter of national and global importance."[3] In 2016, the Obama-Biden Administration issued Executive Order 13729, affirming that "preventing mass atrocities and genocide is a core national security interest and a core moral responsibility of the United States." Exec. Order No. 13,729, 81 Fed. Reg. 32,611 (May 18, 2016). The Elie Wiesel Genocide and Atrocities Prevention Act of 2018, enacted to "help prevent acts of genocide and other atrocity crimes, which threaten national and international security," declared as a matter of federal policy that prevention of atrocities including genocide is in the "national interest." Pub. L. No. 115-441, § 3(1), 132 Stat. 5586 (2019).

## III.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs can show through compelling evidence that the Israeli government is undertaking a campaign to destroy, in whole or in part, the Palestinian people in Gaza through mass killings, deliberate infliction of conditions of life calculated to bring about their destruction, and serious bodily or mental harm, which, as discussed below, is the definition of genocide. Plaintiffs can further show that Defendants have not only failed in their legal obligation to prevent this unfolding genocide, they are enabling its development through their efforts to expedite and provide massive amounts of military assistance – weapons and equipment that have been used in the mass bombardments of Palestinians in Gaza.

---

[3] *Statement by President Joseph R. Biden, Jr. on International Holocaust Remembrance Day*, WhiteHouse.gov (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/27/statement-by-president-joseph-r-biden-jr-on-international-holocaust-remembrance-day/.

## A. Genocide

Considered the "crime of crimes,"[4] genocide is a *jus cogens* norm in customary international law, which is binding on all states at all times with obligations *erga omnes*, i.e. obligations on all States, through their officials, to prevent and punish it. *Siderman de Blake,* 965 F.2d at 714-15. In the aftermath of World War II and the horror of the Holocaust, the universal prohibition against genocide was also codified in a treaty when the Genocide Convention was unanimously adopted by the United Nations General Assembly in 1948. Declaration of William A. Schabas, annexed hereto, ¶¶ 4-5 ("Schabas Decl.").

Genocide is a crime whether committed in time of peace or war. Genocide Convention art. I. That genocide takes place while a party is in an armed conflict with another group "can in no way be considered as an extenuating circumstance for it." *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Trial Judgement, ¶ 128 (Sept. 2, 1998). Because the prohibition against genocide is absolute, any purported interest—of national security or self-defense, for example—cannot serve as a justification for genocide. *See Prosecutor v. Thaçi et al.*, Case No. KSC-BC-2020-06/F01536, Decision on Defence Motion for Judicial Notice of Adjudicated Facts with Annex I, ¶ 24 (Kosovo Specialist Chambers May 18, 2023) (offenses that are based on absolute prohibition under international law cannot be justified by "the argument that the military action was taken in self-defence").

Customary international law, also referred to as the "law of nations," forms a part of the laws of the United States. *See The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) ("the Court is bound by the law of nations which is a part of the law of the land"); *The Paquete Habana,* 175 U.S 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination"); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423 (1964) ("[I]t is, of course,

---

[4] *See, e.g.,* William Schabas, Genocide in International Law: The Crime of Crimes (2009).

true that United States courts apply international law as a part of our own in appropriate circumstances"), *superseded on other grounds by statute*, *Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703 (2021); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (recognizing that "international disputes implicating . . . our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist); *Sarei v. Rio Tinto, PLC,* 671 F.3d 736, 751 (9th Cir. 2011), *vacated on other grounds sub nom. Rio Tinto PLC v. Sarei,* 569 U.S. 945 (2013) (courts permitted to "develop the federal common law by incorporating into it certain claims that derive from norms of international law").

The Genocide Convention was also ratified by the United States in 1988, via legislation co-sponsored by then-Senator Joseph Biden, and Congress enacted a criminal statute to provide for criminal liability in United States courts for those found guilty of, or complicit in, genocide. 18 U.S.C. § 1091, *et seq*. The treaty ratification and the criminal statute codify and reaffirm the pre-existing legal prohibition against and right of action for genocide under customary international law. *Kadić v. Karadžić,* 70 F.3d 232, 242, 242 n.6 (2d Cir. 1995) (finding that a private remedy for genocide pre-existed and continued after ratification of Genocide Convention and enactment of criminal statute); *see also Sarei v. Rio Tinto, PLC,* 671 F.3d at 759 (same).

Article II of the Genocide Convention defines genocide as certain acts "committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such," including: 1) killing members of the group; 2) causing serious bodily or mental harm to members of the group; and 3) deliberately inflicting conditions of life calculated to bring about its physical destruction in whole or in part. Genocide Convention art. II.

Article I of the Convention imposes an obligation on all parties to prevent genocide. Schabas Decl. ¶¶ 18-25. And Article III(e) of the Convention includes "complicity in genocide" as one of the

forms of liability that can be punished under the Convention, alongside direct commission, conspiracy, attempt and incitement.

### 1. _Killings of Palestinian People in Gaza and Causing Serious Bodily or Mental Harm_

As set out in the Complaint, and as set forth in the declarations annexed hereto, the Israeli government's campaign of genocide against the Palestinian people in Gaza has so far resulted in the killing of over 11,000 people, the majority of whom have been women and children, in just a little over a month. Spees Decl., Exs. D-1, D-31. These attacks have injured tens of thousands more. _Id_. These killings and widespread, serious harm have been committed in large part through aerial bombardment with emphasis on "damage and not on accuracy." _Id_., Exs. D-4, D-5, D-24. The Israeli military has bombed schools, hospitals, refugee camps, and even designated "safe zones" to which Israeli officials had instructed civilians to evacuate. _Id_., Exs. D-1, D-10, D-16, D-17, D-23, D-28, D-30, D-31. Over 1.6 million Palestinian people have been forcibly displaced in Gaza, exacerbating already debilitating conditions of life calculated to bring about their destruction. _Id._, Ex. D-31.

For the purposes of genocide, _killing_ is equated with murder, meaning causing the death by an act or omission, with the intent to either kill or cause serious bodily harm that would likely lead to death. _Prosecutor v. Setako,_ Case No. ICTR-04-81-A, Appeal Judgement, ¶ 257 (Sept. 28, 2011). There is no minimum number of people killed necessary to establish that genocide has been committed. _See Prosecutor v Muhimana_, Case No. ICTR-95-1B-T, Trial Judgement and Sentence, ¶ 498 (Apr. 28, 2005); Genocide Scholars Decl. ¶¶ 18-24. Because of the obligation on states to take all measures to prevent genocide, as well as the prohibition on the "attempt" to commit genocide, state obligations are triggered when killings are done in a manner that reveals an intention to destroy a targeted population, in whole or in part. _See_ Schabas Decl. ¶¶ 23-25, 28.

Bodily harm, when done with the intent to destroy a people in whole or in part, constitutes an act of genocide. War crimes tribunals have recognized as genocidal injuries which damage health or

cause disfigurement or serious injury to the external or internal organs of members of the targeted group. *Prosecutor v Karadžić,* Case No. IT-95-5/18-T, Trial Judgement Vol. I, ¶ 545 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 24, 2016); *Akayesu,* ¶ 503-04.

Deportation and forced displacement have been recognized as causing serious bodily or mental harm, based on the recognition that "the forced displacement of women, children and elderly people [is] itself a traumatic experience." *Prosecutor v. Blagojević & Jokić,* Case No. IT-02-60-T, Trial Judgement, ¶¶ 646, 650 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 17, 2005) (citing CrimC (DC Jer) 40/61 *Att'y Gen. of Gov't of Isr. v. Eichmann* (Dec. 11, 1961) (Isr.), 36 I.L.R. 5 (1968)). Other examples of mental harm as a form of genocide have included threats of death and knowledge of impending death. *Prosecutor v Tolimir,* No. IT-05-88/2-T, Trial Judgement, ¶¶ 754-55 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 12, 2012). War crimes tribunals have specifically recognized the serious mental harm caused by the threat of indiscriminate killings: "[t]he fear of being captured, and, at the moment of the separation, the sense of utter helplessness and extreme fear for their family and friends' safety, is a traumatic experience from which one will not quickly – if ever – recover." *Blagojević*, ¶ 647.

Finally, torture, as an underlying act of genocide, means causing serious physical or mental harm, such as through physical injuries or by threats to harm or kill a person (or relative or loved one) in order to coerce or punish, with the intention of producing mental suffering such as fear. *Akayesu*, ¶ 503. It also includes "starvation, deportation and persecution," and placement in "conditions which were designed to cause their degradation, deprivation of their human rights as human beings and to suppress them and cause them inhumane suffering and torture." *Id.* (quoting CrimC (DC Jer) 40/61 *Att'y Gen. of Gov't of Isr. v. Eichmann* (Dec. 11, 1961) (Isr.), 36 I.L.R. 5 (1968)).

### 2. *Deliberately Inflicting Conditions of Life on Palestinian People in Gaza Calculated to Bring about Physical Destruction, in Whole or in Part*

The Genocide Convention recognizes that direct, immediate killings are not the only way to destroy a people or group, and explicitly includes the deliberate infliction of conditions of life calculated to bring about the destruction of a group, in whole or in part, as a means through which a genocide may be carried out. Genocide Convention art. II(c). Raphael Lemkin, the Polish-Jewish lawyer credited with coining the term and driving force behind the development of the Convention, said that genocide often includes "a coordinated plan aimed at destruction of the essential foundations of the life of national groups so that these groups wither and die like plants that have suffered a blight . . . It may be accomplished by wiping out all basis of personal security, liberty, health and dignity." Raphael Lemkin, *Genocide – A Modern Crime*, 4 Free World 39 (1945).

More than fifty years after Lemkin's foundational observation, the International Criminal Tribunal for Rwanda ("ICTR") rendered the first genocide conviction by an international court and held that, in addition to killings, "subjecting a group of people to a subsistence diet, systematic expulsion from homes and the reduction of essential medical services below the minimum requirement" constituted the crime of genocide as "methods of destruction by which the perpetrator does not immediately kill the members of the group, but which, ultimately, seek their physical destruction." *See Akayesu*, ¶¶ 505-06. *See also* Schabas Decl. ¶ 12. As noted above, the tribunal in *Akayesu* drew from historic Israeli precedent in *Eichmann* when it recognized these kinds of conditions as forms of torture that cause serious bodily and mental harm.

Over the past five weeks, the Israeli government has intensified its pre-existing and already-severe blockade of Gaza, Spees Decl., Exs. B-1, B-2, B-3, with a "total siege" in further restricting the entry of basic necessities, including food, water, medicine, and fuel, and cutting off access to electricity. *Id.*, Exs. D-3, D-6, D-12. Prior to this most recent escalation, the situation was already so dire for Palestinian people living under the blockade originally imposed in 2007 that the United

Nations warned years ago that Gaza would be "unliveable" by 2020. *Id.*, Ex. B-5. The gravity and severity of the current restrictions must be understood in that context—that Palestinian life in Gaza was already precarious and endangered as a result of Israel's 16-year blockade. Now, as Professor Schabas describes, the "avowed policy of depriving Gaza of water, food, medicine and electricity, bearing in mind the rather desperate economic situation in the territory prior to the conflict and the fact that the borders are sealed, leaving the people of Gaza with nowhere to go, will inexorably lead to their physical destruction. If the siege and blockade continue, there can be no other outcome." Schabas Decl. ¶ 17.

### 3. *Specific Intent to Destroy Palestinian People in Gaza, as Such, in Whole or in Part*

The constituent acts of genocide, whether killings, or causing bodily or mental harm, or imposing life-threatening conditions, must be committed "with the intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such." Genocide Convention art. II. Genocidal or specific intent means that the result of destroying the group (in whole or in part) is clearly intended. *See e.g., Application of Convention on Prevention and Punishment of Crime of Genocide* (*Croat. v. Serb.*), Judgment, 2015 I.C.J. 3, ¶ 139 (Feb. 3). "In part" is understood as a substantial part of a particular group, which can be part of the larger group "within a geographically limited area." *Application of Convention on Prevention and Punishment of Crime of Genocide* (*Bosn. & Herz. v. Serb. & Montenegro*), Judgment, 2007 I.C.J. 43, ¶ 199 (Feb. 26); *Croat. v. Serb.*, 2015 I.C.J. at 66, ¶ 142. This specific intent may be proven from the facts and circumstances of a case. *Prosecutor v. Jelisić*, Case No. IT-95-10-A, Appeal Judgement, ¶ 47 (Int'l Crim. Trib. for the Former Yugoslavia July 5, 2001).

Evidence of specific intent can include, but is not limited to: the general context, the scale of atrocities, the systematic targeting of victims on account of their membership in a particular group, other culpable acts systematically directed against the same group, or the repetition of destructive and

discriminatory acts. *Id.*; *Prosecutor v. Karadžić,* ¶ 550. While forcible transfer is not deemed a stand-alone indicia of the intent to destroy, it is a relevant consideration when assessing genocidal intent. *Prosecutor v. Popović et al.*, Case No. IT-05-88-T, Trial Judgement, ¶ 824 (Int'l Crim. Trib. for the Former Yugoslavia June 10, 2010). The existence of a plan or policy can also be a factor used to establish specific intent, but it is not required. *Jelisić*, ¶ 48. Genocidal intent may also be inferred from public speeches and statements by officials. *See generally Prosecutor v. Nahimana et al.,* ("Media Trial"), Case No. ICTR-99-52-A, Appeal Judgement (Nov. 28, 2007).

When considering a request for provisional measures in regard to the unfolding genocide of Rohingya in Myanmar (Burma), the ICJ looked at various United Nations fact-finding missions, reports and resolutions to assess whether it was "plausible" that the underlying acts and genocidal intent were satisfied. The court specifically noted "the systematic stripping of human rights, the dehumanizing narratives and rhetoric, the methodical planning, mass killing, mass displacement, mass fear, overwhelming levels of brutality, combined with the physical destruction of the home of the targeted population, in every sense and on every level" to grant provisional measures. *Application of Convention on Prevention and Punishment of Crime of Genocide (Gam. v. Myan.),* Order on Request for Indication of Provisional Measures, 2020 I.C.J. 3, ¶¶ 55-56 (Jan. 23).

Israel's attack on the Palestinian people in Gaza exhibits the hallmarks of genocidal intent and action. As Professor Schabas notes, "there is much direct evidence in the form of statements by senior officials and politicians in Israel indicating an intent to destroy the people of Palestine." Schabas Decl. ¶ 17. Israeli officials and prominent, influential individuals have used dehumanizing rhetoric to describe the Palestinians in Gaza while defiantly refusing to distinguish between the civilian population and combatants, including describing them as "human animals," Spees Decl., Exs. D-3, D-11, and "children of darkness," *id.*, Exs. D-18, D-25, and declaring that "an entire nation out there is responsible [for the October 7 attack]." *Id.*, Ex. D-11. Israeli officials have repeatedly declared and

acknowledged—or confessed—that their plan and policy is to destroy the Palestinian people in Gaza, promising that Israel will "eliminate everything." *Id.*, Ex. D-15.

Early in this genocidal campaign, Netanyahu ordered the more than two million Palestinian people in Gaza to "get out now" before bombardments and a ground invasion. *Id.*, Ex. D-2; *see also id.*, Exs. D-13, D-19, D-24, D-28. That these families and communities were trapped inside Gaza and had nowhere to go because of Israel's closure is further evidence of an official policy and intent to destroy them. To further demonstrate the specific intent underlying Israel's statements and actions, this cruel, feigned "evacuation" order, *id.*, Exs. D-12, D-19, followed an announcement by the Israeli Minister of Defense Yoav Gallant that "[t]here will be no electricity, no food, no fuel, everything is closed. We are fighting human animals and we are acting accordingly." *Id.*, Ex. D-3. Gallant also threatened to bomb those attempting to provide aid to Palestinians in Gaza. *Id.*, Ex. D-7. These statements and dehumanizing rhetoric and vows to "eliminate everything," *id.*, Ex. D-15, have been accompanied by "methodical planning, mass killing, mass displacement, mass fear, overwhelming levels of brutality," and "the physical destruction of the home of the targeted population." *See Gam. v. Myan.*, 2020 I.C.J. at 23-24, ¶ 55-56.

Israeli officials are informing the world of what they intend, and what it is they are doing: setting out to destroy the Palestinian people in Gaza.

## B. Obligation to Prevent Genocide

Because genocide is a *jus cogens* violation binding on all states at all times and is considered so grave and serious that it harms the international community as a whole, Article I of the Genocide Convention emphasizes a legal duty to prevent genocide.[5] This undertaking to prevent genocide is not a passive obligation, but rather "is one of conduct and not one of result" where States are obligated

---

[5] Article I of the Genocide Convention provides: "The Contracting Parties confirm that genocide, whether committed in time of peace or in time of war, is a crime under international law which they undertake to prevent and to punish."

"to employ all means reasonably available to them . . . to prevent genocide." *Bosn. & Herz.*, 2007 I.C.J. at 221, ¶ 430. This obligation to prevent reflects the international community's collective commitment to ensure that no human beings and groups are targeted for destruction because of their identity or affiliation with a group or collectivity. The ICJ has made clear that "a State's obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a serious risk that genocide will be committed." *Id.* at 222, ¶ 431. "[I]t would be quite illogical to contend that there is only an obligation to prevent genocide after it has been committed." Schabas Decl. ¶ 24. That the duty to prevent genocide arises as soon as there is a known serious risk of genocide is a position that the United States has adopted in an intervention in the ongoing proceedings at the International Court of Justice between the Ukraine and the Russian Federation. Schabas Decl. ¶ 29; Spees Decl. Ex. E-43.

States are required to take all measures "reasonably available to them" to prevent this risk from that moment onwards, "if the State has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent." Schabas Decl. ¶ 25; *Bosn. & Herz.*, 2007 I.C.J. at 221-22, ¶¶ 430-31. Whether a State has breached its duty to prevent depends on the State's ability to effectively influence the actions of the people likely to commit, or already committing, genocide; strong political links, as well as links of all other kinds, between the authorities of that State and the main actors in the events are indicia of capacity to prevent genocide. Schabas Decl. at ¶ 23. States will be held responsible for failing to prevent "if the State manifestly failed to take all measures to prevent genocide which were within its power, and which might have contributed to preventing the genocide." *Bosn. & Herz.*, 2007 I.C.J. at 221, ¶ 430.

As set forth above, in the Complaint, and in the Declarations enclosed herewith, acts of genocide are underway in Gaza, and they are being carried out with an intent on the part of Israeli officials to destroy the Palestinian population in Gaza, in whole, or in part, including by and through

mass killings, serious bodily and mental harm, and inflicting on Palestinians the conditions of life calculated to bring about their physical destruction, in whole or in part, through the siege on the most basic necessities required for survival including food, fuel, water and electricity while in the closed Gaza Strip under continual massive bombardment. Spees Decl., Exs. D-1, D3, D-6, D-9, D-12, D-24, D-30, D-31. Defendants have been on notice of the risk of genocide since at least October 9, if not already on October 7, through the public and widely-circulated statements and actions by Israeli officials with whom they were in close, regular contact and consultation, as well as by warnings of indicators of genocide from United Nations officials and other sources) that have only increased since then. Spees Decl., Exs. E-12, E-18, E-24, E-36, E-40.

The United States, through Defendants, is uniquely positioned to prevent Israel's genocide campaign from commencing in the first place, and from continuing, because of their unparalleled, decades-long close relationship, as well as the military support and assistance that the United States has provided to the Israeli government. Schabas Decl. ¶ 26; Spees Decl., Ex. C-1. Since October 7, Defendants themselves, or their spokespeople, have unambiguously admitted to and recognized their influence over Israel's military strategy, which Defendant Austin's spokesperson admits has "informed and at least guided" (Spees Decl., Ex. E-38) and Defendant Biden admits has "convince[d]" (*id.*, Ex. E-41) Israel of certain military decisions. Acknowledging the depth of this influence, the Israeli Minister of Defense put it plainly: "[t]he Americans insisted and we are not in a place to refuse them. We rely on them for planes and military equipment. What are we supposed to do? Tell them no?" *Id.*, Ex. E-29.

Defendants are failing in their duty to prevent this unfolding genocide by, as described in greater detail below, providing financial and material assistance, as well as unequivocal moral, political, and diplomatic support, for Israel's assault and siege on Gaza. *See* Schabas Decl. ¶ 31. Additionally, Defendants have failed to use all measures within their power to prevent this crime, *id.*,

including by: refusing to call for an end to the siege on Gaza and explicitly rejecting the possibility of ceasefire, describing it as not "appropriate" as recently as on November 9, Spees Decl., Exs. E-37, 5-50, 5-51; placing no "conditions," "constraints," or "limits" on how Israel uses the military assistance provided by the United States, *id*., Exs. E-38, E-42, E-47; stating repeatedly that they have not placed, or even discussed, "red lines" that Israel could possibly cross to jeopardize the support from the United States, *id*., Exs. E-34, E-48; repeatedly obstructing and blocking efforts by the international community, including at the UN Security Council, to call for a ceasefire in Gaza, *id*., Exs. E-22, E-23, E-24; refusing to monitor how U.S. weapons transferred to Israel are used, *id*., Ex. E-47; and refusing to engage internal processes to even assess whether Israel's actions constitute a genocide—which Defendant Blinken's spokesperson claims exist but admits have not been initiated for Israel's assault and siege on Gaza. *Id*., Exs. E-46, E-49.

## C. Complicity

Complicity to commit genocide is a standalone crime, triggering both State responsibility and individual criminal responsibility, regardless of position, under the Genocide Convention. *See Bosn. & Herz.,* 2007 I.C.J. at 114, 200, ¶¶ 167, 381; Genocide Convention art. III(e), art. 4 ("Persons committing genocide . . . shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals"). Complicity can only exist when there is a punishable act of genocide by another State or persons, with which the accomplice associates itself, even if the principle perpetrator has not been tried. *Bosn. & Herz.*, 2007 I.C.J. at 120, ¶ 182. As the ICJ has explained, for purposes of State responsibility under the Genocide Convention, complicity "includes the provision of means to enable or facilitate the commission of the crime . . . it is similar to a category found among the customary rules constituting the law of State responsibility, that of the 'aid or assistance' furnished by one State for the commission of a wrongful act by another State." *Bosn. & Herz.*, 2007 I.C.J. at 217, ¶ 419. It is enough that a State acts with "knowledge . . . of the wrongful act"—in this case

genocide—when it provides aid or support; it does not need to share the specific intent to commit genocide. *Id.* at ¶¶ 420 (looking to aiding and abetting under the International Law Commission's Articles of State Responsibility art. 16), 421.

Under customary international law, a defendant is liable for aiding and abetting a violation of international law when they knowingly provide assistance, encouragement, or moral support that has a substantial effect on the violation. *Doe I v. Cisco Sys., Inc.,* 73 F.4th 700, 724 (9th Cir. 2023) (collecting cases). Provision of arms and ammunition, personnel, and operational support and advice, which armed forces used in committing atrocities, have been found to constitute assistance with a "substantial effect" on the crimes. *Id.* at 726. *See also Prosecutor v. Musema,* Case No. ICTR-96-13-T, Trial Judgement and Sentence, ¶¶ 176, 178 (Jan. 27, 2000) (complicity accomplished by aiding and abetting, or by procuring the means for the commission of the genocide). The accomplice does not have to share the perpetrator's the genocidal intent—the specific intent to destroy a group in whole or in part. *Id.* at ¶ 181. Rather, the *mens rea* for aiding and abetting liability under international law is "knowledge that a defendant's actions will assist in the commission of an international law violation" or "awareness of a substantial likelihood that [their] acts would assist" such a violation, not that the defendant act with the purpose of facilitating the crime. *Doe I v. Cisco,* 73 F.4th at 729-34 (internal quotation omitted). *See also Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgement, ¶ 501 (Dec. 13, 2004).

As set forth in the Complaint and shown in the exhibits annexed hereto, Defendants have continued to provide the Israeli government with significant amounts of military assistance, equipment, and weapons. Since October 7, Defendants have sent military advisors to Israel, Spees Decl., Ex. E-32, and transferred a significant amount of military equipment and weapons to Israel, including: Joint Direct Attack Munition, *id.*, Exs. E-10, E-25, E-26; ammunition, *id.*, Exs. E-26, E-27; small diameter bombs, *id.*, Exs. E-10, E-26; interceptors, *id.*, Ex. E-10; alongside other military

equipment, *id.*, Ex. E-7, E-11, E-15. On October 20, Defendants requested authorization from Congress for $14.1 billion in additional military assistance to Israel, *id.*, Ex. E-28, and on October 31, Defendant Blinken approved a $320 million transfer of military equipment to an Israeli manufacturer of precision bomb kits. *Id.*, Ex. E-39. On November 8, Dana Stroul, Deputy Assistant Secretary of Defense, advised lawmakers that "[d]eliveries [including of artillery and ammunition] are taking place on a near daily basis" to Israel. *Id.*, Exs. E-52-55. Defendants have admitted that they are coordinating closely with Israel, *id.*, Exs. E-1, E-2, E-3, E-4, E-15, E-20, E-22, E-33, at times even guiding them. *Id.*, Ex. E-41. And finally, as described above, Defendants have provided moral, diplomatic, and political support, to the Israeli government in full awareness of its plans to target the Palestinian population in Gaza for destruction, in whole or in part.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court enjoin Defendants and all persons associated with them from providing any further support, aid, or assistance to Israel's genocidal acts, including transferring any financial or material assistance to Israel.

Dated: November 16, 2023

Respectfully submitted,

*/s/ Maria C. LaHood*

Johnny Sinodis, Cal. Bar No. 290402
Marc Van Der Hout, Cal. Bar No. 80778
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

Maria C. LaHood, admitted *pro hac vice*
Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6430
mlahood@ccrjustice.org
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org