| | |
|---|---|
| Marc Van Der Hout, Cal. Bar No. 80778<br>Johnny Sinodis, Cal. Bar No. 290402<br>Van Der Hout LLP<br>360 Post Street, Suite 800<br>San Francisco CA 94108<br>(415) 981-3000<br>ndca@vblaw.com | Sadaf M. Doost, Cal. Bar No. 346104<br>Baher A. Azmy, admitted *pro hac vice*<br>Katherine Gallagher, admitted *pro hac vice*<br>Maria C. LaHood, admitted *pro hac vice*<br>Astha Sharma Pokharel, admitted *pro hac vice*<br>Samah Sisay, admitted *pro hac vice*<br>Pamela C. Spees, admitted *pro hac vice*<br>Center for Constitutional Rights<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>(212) 614-6464<br>sdoost@ccrjustice.org<br>bazmy@ccrjustice.org<br>kgallagher@ccrjustice.org<br>mlahood@ccrjustice.org<br>asharmapokharel@ccrjustice.org<br>ssisay@ccrjustice.org<br>pspees@ccrjustice.org |

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR,<br><br>                        Plaintiffs,<br><br>        v.<br><br>JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,<br><br>                        Defendants. | Case No.: 23-cv-05829<br><br>**DECLARATION OF WILLIAM A. SCHABAS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: January 11, 2024 at 1:00 p.m. |

DECLARATION OF WILLIAM A. SCHABAS                                         Case No. 23-CV-05829

Legal opinion on the obligation to prevent genocide in international law

I, William A. Schabas, pursuant to 28 U.S.C. § 1746, declare the following is true and correct:

1. I have been asked by the Center for Constitutional Rights to provide an opinion on the obligation to prevent genocide under international law, and its current application in relation to the United States of America in regard to Israel's actions against the Palestinian population in Gaza. I understand the opinion is to be submitted in support of an application for declaratory and injunctive relief in the Federal Court of the United States on behalf of Palestinian human rights organizations and individuals against President Biden, Secretary of State Blinken and Secretary of Defense Austin (sued in their official capacity) for violations of customary international law, as codified in the Genocide Convention and under United States law.

2. I am professor of international law at Middlesex University London, emeritus professor of international criminal law and human rights at Leiden University in the Netherlands and emeritus professor of human rights law at the University of Galway in Ireland. I am a past president of the International Association of Genocide Scholars. I am the author of *Genocide in International Law* (Cambridge University Press, 2000, second edition 2009), of the chapter on 'Genocide' in the Max Planck Encyclopedia of International Law and of many other publications on the law of genocide. I am the presenter on the topic of 'Genocide' in the United Nations Audiovisual Library of International Law. A full curriculum vitae is annexed to this opinion.

3. In preparation for this opinion, I have been shown the application. For the purposes of this opinion, I am assuming that the factual allegations it makes are supported by admissible and credible evidence.

...

**The Genocide Convention and customary international law**

4. On 11 December 1946 the United Nations General Assembly adopted unanimously a resolution entitled The Crime of Genocide, A/RES/96 (I). The resolution is understood to be declaratory of international law at the time, confirming that the obligations to prevent and punish the crime of genocide precede the drafting and adoption of the Convention on the Prevention and Punishment of the Crime of Genocide, which was to follow. In other words, the obligations to prevent and punish the crime of genocide are part of customary international law. The General Assembly resolution calls upon States 'to enact the necessary legislation for the prevention and punishment of this crime'. When the Resolution was being adopted, the representative of the United States in the General Assembly said 'the United States supported the affirmation that this horrible crime was a crime against the community of nations'.[1]

5. The Convention on the Prevention and Punishment of the Crime of Genocide was adopted by the United Nations General Assembly on 9 December 1948. It entered into force on 12 January 1951, having obtained the requisite twenty ratifications or accessions. There are now 153 States Parties to the Convention. In proceedings before the International Court of Justice in 1951 the United States of America explained its view of the origins of the Convention: 'The Genocide Convention resulted from the inhuman and barbarous practices which prevailed in certain countries prior to and during World War II, when entire religious, racial and national minority groups were threatened with and subjected to deliberate extermination. The practice of genocide has occurred throughout human history. The Roman persecution of the Christians, the Turkish massacres of Armenians, the extermination of millions of Jews and Poles by the Nazis are outstanding examples of the crime of genocide.'[2]

---

[1] A/C.6/SR.32, 9 December 1946, p. 172.
[2] *Reservations to the Convention on the Prevention of Genocide, Advisory Opinion*, Pleadings, Oral Arguments, Documents, 'Written Statement of the United States of America', pp. 23–47, at p. 25.

6. The United States of America signed the Convention on the Prevention and Punishment of the Crime of Genocide (the 'Genocide Convention') on 11 December 1948, two days after its adoption by the United Nations General Assembly. The United States ratified the Convention on 25 November 1988. The ratification was accompanied by two reservations that do not appear to be relevant to the present litigation. It was also accompanied by five 'understandings', of which three may be germane to the proceedings: '(1) That the term `intent to destroy, in whole or in part, a national, ethnical, racial, or religious group as such' appearing in article II means the specific intent to destroy, in whole or in substantial part, a national, ethnical, racial or religious group as such by the acts specified in article II'; '(2) That the term `mental harm' in article II (b) means permanent impairment of mental faculties through drugs, torture or similar techniques'; '(4) That acts in the course of armed conflicts committed without the specific intent required by article II are not sufficient to constitute genocide as defined by this Convention.'

7. Israel signed the Genocide Convention on 17 August 1949 and ratified it on 9 March 1950, without any reservation or other declaration. The State of Palestine acceded to the Genocide Convention on 2 April 2014, without any reservation or other declaration.

8. That the obligations to prevent and punish genocide are derived both from treaty law – the Genocide Convention, with respect to States Parties – and customary international law is uncontroversial. The customary law applicable to genocide is in some respects even broader than that set out in the Convention. In 1961 the District Court of Jerusalem in the *Eichmann case* described the 1948 Genocide Convention as 'the confirmation of certain principles as established rules of law in customary international law'.[3] The District Court relied upon the 1951 Advisory Opinion of the International Court of Justice which said 'that the principles

---

[3] *A-G Israel* v. *Eichmann*, (1968) 36 ILR 5 (District Court, Jerusalem), para. 21.

underlying the Convention are principles which are recognized by civilized nations as binding on States, even without any conventional obligation'.[4]

**The definition of genocide and the specific intent**

9. The crime of genocide is defined in article II of the 1948 Convention:

    In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

    (a) Killing members of the group;

    (b) Causing serious bodily or mental harm to members of the group;

    (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

    (d) Imposing measures intended to prevent births within the group;

    (e) Forcibly transferring children of the group to another group.

10. This remains the authoritative definition and has been incorporated in much more recent international instruments, such as the Statutes of the International Criminal Tribunals for the former Yugoslavia and Rwanda and the Rome Statute of the International Criminal Court as well as in the national criminal law of many States, including the United States of America.

11. The definition consists of two components. The first is the introductory paragraph or *chapeau* wherein are contained what are called the contextual elements: the 'intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such'. The second, consisting of five sub-paragraphs, lists the punishable acts. Each of the punishable acts has its own *actus reus* and *mens rea*. However, genocide is considered to be a crime of 'specific intent'. None of the punishable acts can be considered an act of genocide unless committed with the 'specific intent' set out in the preliminary paragraph.

---

[4] *Reservations to the Convention on Genocide, Advisory Opinion, ICJ Reports 1951*, p. 15, at p. 24.

DECLARATION OF WILLIAM A. SCHABAS                         4                          Case No. 23-CV-05829

12. In the present conflict in Gaza, there is certainly evidence of the commission of the first three punishable acts of genocide. The acts of killing members of the group and of causing serious bodily or mental harm to members of the group are not in any significant way different from how these concepts are understood in the national criminal law of most if not all countries. As for 'deliberately imposing conditions of life calculated to destroy the group in whole or in part', this has been described by the International Court of Justice as covering 'methods of physical destruction, other than killing, whereby the perpetrator ultimately seeks the death of the members of the group'.[5] The authoritative Elements of Crimes of the International Criminal Court provide that '[t]he term "conditions of life" may include, but is not necessarily restricted to, deliberate deprivation of resources indispensable for survival, such as food or medical services, or systematic expulsion from homes'.[6] International case law has provided many examples, including subjecting the group to a subsistence diet, failing to provide adequate medical care, systematically expelling members of the group from their homes, poisoning of wells, and 'generally creating circumstances that would lead to a slow death such as the lack of proper food, water, shelter, clothing, sanitation, or subjecting members of the group to excessive work or physical exertion'.[7] The term 'deliberately' and the phrase 'calculated to destroy the group in whole or in part' are somewhat redundant to the extent that they repeat

---

[5] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia* v. *Serbia), Judgment, I.C.J. Reports 2015*, p. 3, para. 161.
[6] Elements of Crimes, ICC-ASP/1/3, p. 114.
[7] *Prosecutor v. Karadžić* (IT-95-5/18-T), Judgment, 24 March 2016, para. 547; *Prosecutor v. Brđanin* (IT-99-36-T), Judgment, 1 September 2004, para. 691; *Prosecutor v. Stakić* (IT-97-24-T), Judgment, 31 July 2003, para. 517*; Prosecutor v. Musema* (ICTR-96-13-T), Judgment, 27 January 2000, para. 157; *Prosecutor v. Bashir* (ICC-02/05-01/09), Second Decision on the Prosecution's Application for a Warrant of Arrest (12 July 2010), para. 38; *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia* v. *Serbia), Judgment, I.C.J. Reports 2015*, p. 3, para. 161. Also Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar, A/HRC/39/CRP.2 (17 September 2018), para. 1401.

components of the specific intent which is set out in the preliminary paragraph or *chapeau* of article II of the Convention.

13. Each of the sub-paragraphs in article II refers to 'the group' or to 'members of the group'. This requires reference to the phrase 'national, ethnical, racial or religious group' in the preliminary paragraph. Case law of international tribunals has identified various groups for the purposes of applying the Convention, including Bosnian Muslims, Croatians, Krajina Serbs in Croatia and Hutu, Tutsi and Twa in Rwanda. I cannot imagine that there could be any dispute about describing the Palestinian people as a group protected by one or more of the adjectives listed in article II of the Genocide Convention.

14. The preliminary paragraph of article II of the Convention as well as sub-paragraph (c) employ the phrase 'in whole or in part'. As mentioned above, at the time it ratified the Convention the United States formulated an understanding that this means 'in whole or in substantial part'. In fact, the additional qualifier 'substantial' is widely accepted in international case law.[8] There are two approaches to this issue in the present case. One would be to consider the Palestinians of Gaza as a distinct group. The second would be to consider them as a part of a larger group, namely, the Palestinians. If the latter approach is adopted, they constitute approximately 40% of the 5 million Palestinians resident in both Gaza and the West Bank, in which case they are a 'substantial part' of a distinct group.

15. The phrase 'intent to destroy', which also appears in the preliminary paragraph of article II of the Convention, has been held to refer only to physical destruction (or 'biological' destruction in the case of imposing measures to prevent births within the group). Thus, it excludes from

---

[8] For example, *Prosecutor v. Krstić* (IT-98-33-A), Judgment, 19 April 2004, paras. 8-11; *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, I.C.J. Reports 2007*, p. 43, para. 201.

the scope of the Genocide Convention measures intended to destroy the culture of the group with a view to its assimilation.

16. Because the intent to destroy the group in whole or in part is a specific intent, the intent cannot be presumed in the way that it is for ordinary crimes where only general intent is required. The evidence of specific intent may be direct, in the form of documents and statements, for example, but it may also be based upon inferences drawn from what international tribunals have referred to as a 'pattern of conduct'.

17. In the present case, there is much direct evidence in the form of statements by senior officials and politicians in Israel indicating an intent to destroy the people of Palestine. Furthermore, the conduct of the State of Israel provides evidence from which genocidal intent may be inferred. The avowed policy of depriving Gaza of water, food, medicine and electricity, bearing in mind the rather desperate economic situation in the territory prior to the conflict and the fact that the borders are sealed, leaving the people of Gaza with nowhere to go, will inexorably lead to their physical destruction. If the siege and blockade continue, there can be no other outcome.

**The obligation to prevent genocide**

18. The full title of the Convention is the Convention on the Prevention and Punishment of the Crime of Genocide. Article I of the Convention declares that genocide 'is a crime under international law which [the Contracting Parties] undertake to prevent and to punish'. The Convention is quite laconic. Most of its provisions deal with matters relating to the punishment of the crime and the implementation of the Convention itself. The Convention itself provides little guidance on the interpretation and application of the terms 'prevention' and 'prevent'. The prohibitions of 'conspiracy' and 'direct and public incitement' are directed at prevention because they are inchoate in nature. Our contemporary understanding of the obligation to

prevent genocide is largely based on case law and in particular the 2007 judgment of the International Court of Justice in *Bosnia v. Serbia*.

19. The reference to prevention in article I of the Genocide Convention is not merely 'hortatory or purposive' the International Court of Justice said in its seminal judgment of February 2007 on Bosnia and Herzegovina's application against Serbia. The undertaking to prevent and punish genocide is unqualified, said the Court. 'It is not to be read merely as an introduction to later express references to legislation, prosecution and extradition . . . That conclusion is also supported by the purely humanitarian and civilizing purpose of the Convention.'[9] The Court explained that the preparatory work (*travaux préparatoires*) of the Convention confirms the 'operative and non-preambular character of Article I'.[10]

20. The International Court of Justice concluded that Serbia[11] had breached international law not because it was directly responsible for perpetration of the crime but because it had failed to prevent it. The Court had reached the conclusion that the massacre of several thousand Muslims of Eastern Bosnia, in the Srebrenica enclave, constituted the crime of genocide. Its perpetrators were Bosnian Serb forces, one of the factions in the civil war in Bosnia and Herzegovina. However, the neighbouring State of Serbia was the respondent in the case. The Court did not find sufficient evidence to attribute responsibility to Serbia for the killings.

21. The Court concluded that even if a State itself is not responsible for actually committing genocide, it may nevertheless incur liability for failing to prevent genocide that is perpetrated by others outside its own borders. In other words, this obligation to prevent genocide is not

---

[9] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, I.C.J. Reports 2007*, p. 43, para. 162.
[10] *Ibid.*, para. 164.
[11] Note that at the time of the massacre, Serbia was known as the Federal Republic of Yugoslavia. Its capital was and remains Belgrade.

| DECLARATION OF WILLIAM A. SCHABAS | 8 | Case No. 23-CV-05829 |
|---|---|---|

only a collective one, in that it calls for appropriate action by international bodies like the United Nations, but it is also an obligation that is imposed upon States individually.

22. This is a quite extraordinary obligation, one that underscores the importance of the duty to prevent genocide under customary law as well as pursuant to the Convention. Some other international treaties include a call for prevention. For example, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment imposes an obligation of prevention but it specifies that this applies 'in any territory under its jurisdiction'.[12] Three other treaties specify an obligation of prevention but it is explicitly confined to 'their respective territories'.[13] In *Bosnia v. Serbia* the International Court of Justice made reference to these treaties.[14] All four treaties presented as examples confine the obligation to prevent to the territory of the State Party. By contrast, and underscoring the unique and fundamental importance of prevention of genocide, the Court said that the obligation has an extraterritorial scope.

23. The obligation to prevent is one of means rather than one of result. The Court spoke of this as a duty of 'due diligence' that varies depending upon circumstances, involving several parameters:

> The first, which varies greatly from one State to another, is clearly the capacity to influence effectively the action of persons likely to commit, or already committing, genocide. This capacity itself depends, among other things, on the geographical distance of the State concerned from the scene of the events, and on the strength of the political links, as well as links of all other kinds, between the authorities of that State and the main actors in the events. The State's capacity to influence must also be assessed by legal criteria, since it is clear that every State may only act within the limits

---

[12] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, (1987) 1465 UNTS 85, arts. 2(1), 16(1).
[13] Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, (1977) 1035 UNTS 167, art. 4; Convention on the Safety of United Nations and Associated Personnel, (1999) 2051 UNTS 363, art. 11; International Convention on the Suppression of Terrorist Bombings, (2001) 2149 UNTS 256, art. 15.
[14] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, I.C.J. Reports 2007*, p. 43, para. 429.

permitted by international law; seen thus, a State's capacity to influence may vary depending on its particular legal position vis-à-vis the situations and persons facing the danger, or the reality, of genocide.[15]

24. I draw attention to the phrases 'likely to commit' and 'the danger … of genocide'. These dictate action to prevent genocide before it has been committed. Indeed, it would be quite illogical to contend that there is only an obligation to prevent genocide after it has been committed.

25. Indeed, this is precisely what the International Court of Justice said in the *Bosnia v. Serbia* case: '[A] State's obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a serious risk that genocide will be committed. From that moment onwards, if the State has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent (dolus specialis), it is under a duty to make such use of these means as the circumstances permit.'[16]

26. In my opinion, the United States of America's relationship to Israel has many parallels with that between Serbia and the Bosnian Serb forces at the time of the Srebrenica massacre in 1995. The Bosnian Serb forces were very dependent upon weaponry and other logistical support from Serbia, and there were strong political and economic ties. There has been a close relationship between the United States of America and Israel for many decades, manifested in high levels of development assistance, supply of weaponry and sharing of military technology and intelligence.

27. In assessing Serbia's failure to prevent genocide, the Court noted its 'undeniable influence' over the Bosnian Serbs, and said its federal authorities should 'have made the best efforts within their power to try and prevent the tragic events then taking shape, whose scale, though

---

[15] *Ibid.*, para. 430.
[16] *Ibid.*, para. 431.

DECLARATION OF WILLIAM A. SCHABAS

10

Case No. 23-CV-05829

it could not have been foreseen with certainty, might at least have been surmised'. It noted that Serbia and its leaders 'were fully aware of the climate of deep-seated hatred which reigned between the Bosnian Serbs and the Muslims in the Srebrenica region'. The Court recognized that 'it has not been shown that the decision to eliminate physically the whole of the adult male population of the Muslim community of Srebrenica was brought to the attention of the Belgrade authorities'. Nevertheless, 'given all the international concern about what looked likely to happen at Srebrenica' and the fact that 'the dangers were known and that these dangers seemed to be of an order that could suggest intent to commit genocide, unless brought under control, it must have been clear that there was a serious risk of genocide in Srebrenica'.[17]

28. I note that the Court did not require Serbia to make a definitive determination that genocide was actually taking place or that it had taken place. I draw attention to the Court's observation that the 'dangers were known' and 'seemed to be of an order that could suggest intent to commit genocide, unless brought under control'. Nor is it necessary, for the purposes of this opinion, to reach such a conclusion. For the duty to prevent genocide to arise it is sufficient that there be a serious risk the crime will be committed.

29. This is the position of the United States of America, formulated in a Declaration that was submitted to the International Court of Justice in the ongoing proceedings between Ukraine and the Russian Federation based upon the Genocide Convention. There, the United States referred to its 'long history of supporting efforts to prevent and punish genocide'. The United States cited the *Bosnia v. Serbia* judgment of the International Court of Justice, noting that 'the Court has interpreted Article I [of the 1948 Convention], in particular its undertaking to prevent genocide, to create obligations distinct from those that appear in the subsequent articles of the Convention, which primarily address the punishment of genocide by individuals'. It went on

---

[17] *Ibid.*, para. 438.

to refer to the same paragraphs in the judgment that I have cited in the preceding paragraphs of this opinion. The Declaration reproduced the following phrase, italicizing the words 'serious risk': '[A] State's obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a *serious risk* that genocide will be committed.'[18]

30. The Declaration was filed with the Court in accordance with article 63 of the Statute of the International Court of Justice, accompanied by a covering letter from Secretary of State Antony Blinken dated 29 August 2022. Article 63(2) of the Statute declares that if a State exercises its right to intervene in proceedings, 'the construction given by the judgment will be equally binding upon it'. The Court has yet to rule on the merits of the *Ukraine v. Russia* case, and it may make no pronouncement on the obligation to prevent genocide if it deems this to be unnecessary. It is very unlikely that the Court will in any way reverse what it said in the 2007 judgment about the duty to prevent genocide. Regardless of the outcome of the *Ukraine v. Russia* case, I consider that the Declaration of the United States is a unilateral act that has legal effects, and that the United States is bound by the interpretation of the duty to intervene that it set out, including its endorsement of the reasoning of the International Court of Justice.

---

[18] *Ukraine v. Russian Federation*, Declaration of Intervention of the Government of the United States of America pursuant to article 63 of the Statute of the International Court of Justice, 6 September 2022, para. 22.

31. I conclude that there is a serious risk of genocide committed against the Palestinian population of Gaza and that the United States of America is in breach of its obligation, under both the 1948 Genocide Convention to which it is a party as well as customary international law, to use its position of influence with the Government of Israel and to take the best measures within its power to prevent the crime taking place.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 9 November 2023 in Paris, France.

Prof. William A. Schabas OC MRIA