# EXHIBIT

# A-1

🏠 Welcome to the United Nations

عربي   中文   English   Français   Русский   Español



**THE QUESTION OF PALESTINE**

HOME     KEY TOPICS     THE COMMITTEE     EVENTS     DOCUMENT DATABASE

CIVIL SOCIETY     UN SYSTEM     RESOLUTIONS     FAQ     SEARCH

HISTORICAL TIMELINE

Home  /  About the Nakba

The Nakba, which means "catastrophe" in Arabic, refers to the mass displacement and dispossession of Palestinians during the 1948 Arab-Israeli war. Before the Nakba, Palestine was a multi-ethnic and multi-cultural society. However, the conflict between Arabs and Jews intensified in the 1930s with the increase of Jewish immigration, driven by persecution in Europe, and with the Zionist movement aiming to establish a Jewish state in Palestine.

In November 1947, the UN General Assembly passed a resolution partitioning Palestine into two states, one Jewish and one Arab, with Jerusalem under a UN administration. The Arab world rejected the plan, arguing that it was unfair and violated the UN Charter. Jewish militias launched attacks against Palestinian villages, forcing thousands to flee. The situation escalated into a full-blown war in 1948, with the end of the British Mandate and the departure of British forces, the declaration of independence of the State of Israel and the entry of neighbouring Arab armies. The newly established Israeli forces launched a major offensive. The result of the war was the permanent displacement of more than half of the Palestinian population.

As early as December 1948, the UN General Assembly called for refugee return, property restitution and compensation (resolution 194 (II)).  However, 75 years later, despite countless UN resolutions, the rights of the Palestinians continue to be denied. According to the UN

### CONNECT WITH US

   



## Upcoming Events

Nov
29

10:00 am -
1:00 pm EST

International Day of Solidarity with the Palestinian People

View Calendar

Relief and Works Agency for Palestine Refugees (UNRWA) more than 5
million Palestine refugees are scattered throughout the Middle East.
 Today, Palestinians continue to be dispossessed and displaced by
Israeli settlements, evictions, land confiscation and home demolitions.

The Nakba anniversary is a reminder not only of those tragic events of
1948, but of the ongoing injustice suffered by the Palestinians. The
Nakba had a profound impact on the Palestinian people, who lost their
homes, their land, and their way of life. It remains a deeply traumatic
event in their collective memory and continues to shape their struggle
for justice and for their right to return to their homes. In 2022, the UN
General Assembly requested that this anniversary be commemorated
on 15 May 2023, for the first time in the history of the UN.

## LATEST UPDATES

NGO Action News – 9
November 2023

UN Secretary-General's
message to the
International
Humanitarian
Conference for the
Civilian Population in
Gaza

Hostilities in the Gaza
Strip and Israel –
reported impact, 6
November 2023 – OCHA
Infographics

UN Human Rights Chief
travels to the Middle
East in context of
conflict in Israel and the
Occupied Palestinian
Territory

Israel-Palestine crisis:
UN humanitarians plead
for 'access, access,
access' – News Item

Statement Attributable
to the Spokesperson for
the Secretary-General –
on the Middle East

Gaza 'Becoming a
Graveyard for Children',
Warns UN Secretary-
General, Calling for
Humanitarian Ceasefire
– Press Release

Over 60 per cent of
employment has been
lost in Gaza since start

# EXHIBIT
# A-2

United Nations



**General Assembly**

**A**/77/356

Distr.: General
21 September 2022

Original: English

---

**Seventy-seventh session**
Agenda item 68 (c)
**Promotion and protection of human rights: human rights situations and reports of special rapporteurs and representatives**

## Situation of human rights in the Palestinian territories occupied since 1967*

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the General Assembly the report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese, in accordance with Human Rights Council resolution 5/1.

---

\* The present report was submitted after the deadline in order to reflect the most recent information.

22-22141 (E)   121022



Please recycle 

# Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese

*Summary*

      In the present report, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese, addresses a number of human rights concerns, in particular regarding the right of the Palestinian people to self-determination, in the context of the settler-colonial features of the prolonged Israeli occupation.

22-22141

# I.   Introduction

1.     In the present report, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese, addresses a number of concerns pertaining to the situation of human rights in the West Bank, including East Jerusalem, and Gaza and presents an in-depth analysis of the right of the Palestinian people to self-determination. She clarifies legal tenets, meaning and implications of this right, which remains unrealized for the Palestinian people despite being foundational to the mission that the United Nations Member States pledged to achieve in the aftermath of the atrocities committed and witnessed during World War II.[1]

2.     The Special Rapporteur has not been able to visit the occupied Palestinian territory, including East Jerusalem ("occupied Palestinian territory"), before the submission of the present report, despite an invitation received by the Permanent Observer of the State of Palestine to the United Nations Office and other international organizations in Geneva. Access to the occupied Palestinian territory is a key element of her mandate and will be pursued in the future. As her request to meet with the Permanent Representative of Israel to the United Nations Office and other international organizations in Geneva was declined, the Special Rapporteur underscores that the pattern of non-cooperation by Israel with the mandate holder is a serious concern. As open dialogue among all parties is essential for the protection and promotion of human rights, the Special Rapporteur reminds Israel that she remains willing to engage.

3.     The present report is based on legal research and analysis, and enhanced by consultations and submissions. The Special Rapporteur had consultations with fellow and previous Special Rapporteurs, the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and in Israel, and in-person and online meetings with State representatives, academics and non-governmental organizations from the occupied Palestinian territory, Israel and beyond. She examined reports submitted by local and international human rights organizations, in particular from the occupied Palestinian territory and Israel.

4.     The geographic and temporal limitations of the Special Rapporteur's mandate limited the scope of this inquiry, including how violations covered in the report may affect the Palestinian people outside the occupied territory. This does not prejudice the examination of this collective right as it applies to Palestinians who hold Israeli citizenship, and to Palestinian refugees of 1948 and 1967, also entitled to the well-established rights to return, restitution and compensation. Given the interconnectedness of the Israeli occupation that began in 1967 with what preceded it, the Special Rapporteur looks back at certain points in history that may inform and illuminate present circumstances.

# II.   Rationale for investigating the right to self-determination

## A.   Current situation and predominant debates

5.     For 55 years, three generations of Palestinians in the occupied Palestinian territory have grown up under Israeli occupation. About 40 per cent of them are refugees expelled by Israel since 1948 (including their descendants) who fled the

---

[1] Charter of the United Nations, Arts. 55 and 56.

violence that accompanied the creation of the State of Israel.[2] Most of the residents of Gaza, together with many currently facing forcible transfer across the West Bank, including East Jerusalem, are refugees – originally from Galilee, Haifa, Jaffa, Ramleh and Lydda and the Naqab. The 1967 war displaced most of them anew, destroying and depopulating Palestinian villages and denying refugees return, as in 1947–1949.[3] The Palestinians who in 1967 managed to "remain" could not know that, 55 years later, they would still wake up under the yoke of foreign domination, with their rights suspended and, the refugees among them, without concrete prospects of returning to their ancestral lands.

6.      Since 1967, the human rights situation in the occupied Palestinian territory has been steadily deteriorating, primarily as a result of gross violations of international law, including racial segregation and subjugation by the occupying Power, Israel. This has taken various forms: draconian restrictions on Palestinian movement inside and outside the occupied Palestinian territory; repression of political and civic participation; denial of residency rights, status and family unification; dispossession of Palestinian land and property; forcible transfers; unlawful killings; widespread arbitrary arrests and detention, including of children; the obstruction and denial of humanitarian aid and cooperation; the denial of ownership and access to natural resources; settler violence; and violent suppression of popular resistance against the occupation. All together, these practices constitute collective punishment of the Palestinian people.[4]

7.      The gravity of the situation notwithstanding, the Israeli occupation of Palestinian territory continues to be addressed predominantly, and sometimes exclusively, through three main approaches:

        (a)     *Humanitarian approach*. The grave economic and humanitarian conditions generated by a violent occupation are addressed as a (chronic) humanitarian issue that needs to be managed, rather than a political issue to be solved according to international law; Israeli violations are largely addressed with the aim of "improving" certain aspects of life under occupation;

        (b)     *Political approach*. The question of Palestine is often framed as a "conflict" between opposing parties that can be resolved through negotiations. Accordingly, ending the occupation will come about only through a "negotiated peace agreement"; then the humanitarian and economic emergencies in the occupied Palestinian territory will be resolved;

        (c)     *Economic development approach*. In recent years, seekers of a solution have insisted on a framework that hinges on developing the Palestinian territory and artificially sustaining its economy without providing a political solution addressing the root causes of the "conflict", including the numerous violations of Palestinians' rights and freedoms. The aim of this approach is to resolve conflict by promoting businesses and creating opportunities that accompany growth and sustainable development, not through the fulfilment of fundamental human rights.

8.      The proponents of these approaches seem to believe that the occupation will end when the parties, starkly unequal in power, are able to achieve a negotiated solution. Regrettably, these perspectives leave unchecked the broader context that frames and unites endless emergencies, political challenges and economic fallouts. Failing to capture critical overarching issues concerning the Israeli occupation, these

---

[2] Benny Morris, *The Birth of the Palestinian Refugee Problem Revisited*, revised ed. (Cambridge, United Kingdom of Great Britain and Northern Ireland, Cambridge University Press, 2004).

[3] Tom Segev, *1967: Israel, the War, and the Year that Transformed the Middle East*, 1st ed. (New York, Metropolitan Books, 2007).

[4] A/HRC/44/60 (2020), paras. 24 and 27.

perspectives conflate root causes and symptoms, and focus on Israeli lack of compliance with international law as a siloed phenomenon, rather than a longstanding structural component of the prolonged disfranchisement of the Palestinians under occupation.

9.    In recent years, a number of reputable scholars and organizations have concluded that systemic and widespread discriminatory Israeli policies and practices against the Palestinians amount to the crime of apartheid under international law.[5] While the international community has not fully acted upon it, the concept that Israeli occupation meets the legal threshold of apartheid is gaining traction. This may help overcome a certain tendency to scrutinize Israeli violations, often individual and decontextualized, under specific bodies of international law rather than the very system through which Israel rules over the Palestinians.

10.    At the same time, if considered alone and not as part of a holistic examination of the experience of the Palestinian people as a whole, the apartheid framework presents some limitations:

    (a)    First, with few exceptions,[6] the scope of recent reports on Israeli apartheid is primarily "territorial" and excludes the experience of Palestinian refugees. The recognition of Israeli apartheid must address the experience of the Palestinian people in its entirety and in their unity as a people, including those who were displaced, denationalized and dispossessed in 1947–1949 (many of whom live in the occupied Palestinian territory);

    (b)    Second, a focus on Israeli apartheid alone misses the inherent illegality of the Israeli occupation of the Palestinian territory, including East Jerusalem. The Israeli occupation is illegal because it has proven not to be temporary, is deliberately administered against the best interests of the occupied population and has resulted in the annexation of occupied territory, breaching most obligations imposed on the occupying Power.[7] Its illegality also stems from its systematic violation of at least three peremptory norms of international law: the prohibition on the acquisition of territory through the use of force; the prohibition on imposing regimes of alien subjugation, domination and exploitation, including racial discrimination and apartheid; and the obligation of States to respect the right of peoples to self-determination.[8] By the same token, Israeli occupation constitutes an unjustified use of force and an act of aggression.[9] Such an occupation is unequivocally prohibited

---

[5]  A/HRC/49/87 (2022) (advance unedited version); Amnesty International, *Israel's Apartheid against Palestinians: Cruel System of Domination and Crime against Humanity* (2022) (available at https://www.amnesty.org/en/documents/mde15/5141/2022/en/); Human Rights Watch, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (2021); B'Tselem, "A regime of Jewish supremacy from the Jordan River to the Mediterranean Sea: this is apartheid" (12 January 2021)*;* Al-Haq and others, *Joint Parallel Report to the United Nations Committee on the Elimination of Racial Discrimination on Israel's Seventeenth to Nineteenth Periodic Reports* (10 November 2019); and Economic and Social Commission for Western Asia (ESCWA), *Israeli Practices towards the Palestinian People and the Question of Apartheid*: *Palestine and the Israeli Occupation*, issue No. 1 (E/ESCWA/ECRI/2017/1) (2017).

[6]  Amnesty International, Al-Haq and others, *Joint Parallel Report to the United Nations Committee on the Elimination of Racial Discrimination;* and E/ESCWA/ECRI/2017/1 (see footnote 5).

[7]  A/72/556 (2017).

[8]  Ardi Imseis, "Negotiating the illegal: on the United Nations and the illegal occupation of Palestine, 1967–2020", *European Journal of International Law*, vol. 31, No. 3 (2020), pp. 1055–1085.

[9]  Ralph Wilde, "Using the master's tools to dismantle the master's house: international law and Palestinian liberation", *The Palestine Yearbook of International Law* (Netherlands, Brill, 2021), p. 7.

A/77/356

under international law and contrary to the values, purposes and principles of the United Nations as enshrined in its Charter;

(c)    Third, the apartheid framework does not address the "root causes" of the web of racially discriminatory laws, orders and policies that have regulated daily life in the occupied Palestinian territory since 1967 and Israeli *animus* (intention) in seizing land while subjugating and displacing its indigenous people and replacing them with its nationals. This is the hallmark of settler-colonialism, and a war crime under the Rome Statute.

11.    In essence, the limitations of the apartheid framework as currently applied bypass the critical issue of the recognition of the Palestinian people's fundamental right to determine their political, social and economic status and develop as a people, free from foreign occupation, rule and exploitation. Dismantling the Israeli apartheid in the occupied Palestinian territory in particular, while necessary, will not automatically address the question of Israeli domination over the Palestinians, restore permanent sovereignty over the lands Israel occupies and the natural resources therein, nor, on its own, fulfil Palestinian political aspirations.

## B.    Resetting the mind

12.    Discussions around Palestinian self-determination were once limited to the debate concerning the future of Palestine and its people, as part of the decolonization struggle. The Middle East peace process that started in the early 1990s has altered this, giving the impression that the realization of Palestinian self-determination was being achieved via statehood. Exercising the right to self-determination in the form of a politically independent State in all of the occupied Palestinian territory would be a minimum requirement of justice for the Palestinian people; yet its realization is as distant as ever, largely because of settler-colonial endeavours pursued by Israel through its prolonged occupation of the Palestinian territory.

13.    Colonialism, a phenomenon often disguised as a "civilization project" and historically imposed by "Western countries" on "third world" countries, was achieved through cultural subordination of the natives, economic exploitation of their land and resources and suffocation of their political claims.[10] Colonialism is characterized as "settler" when also driven by the logic of elimination of the indigenous character of the colonized land.[11] This manifests in the establishment and promotion of colonies,[12] namely, settlements of foreign people implanted among the indigenous population with the aim of subjugating and dispossessing the natives and "permanently securing hold" over specific areas.[13] The violation of the peoples' right to self-determination is inherent to settler-colonialism.

14.    The normative framework of self-determination, especially as affirmed in the context of decolonization processes, provides the necessary lens to (re-)examine and resolve the legitimate claims to emancipation of the Palestinian people from decades

---

[10] Antony Anghie, "Colonialism and the birth of international institutions: sovereignty, economy, and the mandate system of the League of Nations", *New York University Journal of International Law and Politics*, vol. 34, No. 3 (2002), pp. 513–634.

[11] Patrick Wolfe, "Settler colonialism and the elimination of the native", *Journal of Genocide Research*, vol. 8, No. 4 (2006), p. 387.

[12] In the occupied Palestinian territory, the term "colonies" is more accurate than the term "settlements", as the latter neutralizes their illegal character (this resonates with the term *colonies,* as used in French: see, e.g., Security Council resolution 2334 (2016)).

[13] Lorenzo Veracini, "Introduction: the settler colonial situation", in *Settler Colonialism* (London, Palgrave Macmillan, 2010).

22-22141

of Israeli occupation, while respecting the rights of all Palestinians and Israelis in the region.

## III. Law of external self-determination
## An indispensable framework

### A. Legal foundation

15.   The right to self-determination constitutes the collective right par excellence, and the "platform right" necessary for the realization of many other rights.[14] If a population grouping is not free to "determine their political status and … pursue their economic, social and cultural development" as a people,[15] other rights will almost certainly not be realized.

16.   Prompted by the decolonization movement that spread from the late 1950s through the 1970s, the right to self-determination was universally codified in 1966 with the adoption of the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights. This changed the approach to the self-determination framework from a general United Nations principle[16] into a qualified normative framework for peoples to exercise free will as "cohesive national groups",[17] choose their independent forms of political organization and determine their cultural and socioeconomic development.[18] This includes two intertwined components:

(a)   *Political component*. The capacity of a people to choose its own Government and govern itself without interference. This has two dimensions: (i) the internal dimension of self-determination, namely, a people's entitlement to rule themselves through constitutional and political processes that allow for the democratic exercise of the right in practice within the framework of an existing State;[19] and (ii) the external dimension of self-determination that broadens the scope of the right to the formation of the people's own will to determine their own political status free from external control and alien domination;[20]

(b)   *Economic component*. The people's collective right to enjoy their natural wealth and resources as an expression of permanent sovereignty over them.[21] This is pivotal to realizing and preserving the independent existence of a people through their own means of subsistence.

17.   These two interconnected components allow people to exist as independent both demographically (as a people) and territorially (within a given region) and to pursue

---

[14] A/72/556, para. 62.
[15] International Covenant on Civil and Political Rights and International Covenant on Economic, Social and Cultural Rights, common article 1 (1)–(2).
[16] Charter of the United Nations, Arts. 55 and 56.
[17] Ian Brownlie, *Principles of Public International Law*, 5th ed. (Oxford, United Kingdom Clarendon Press, 1998), p. 599.
[18] Antonio Cassese, *Self-determination of Peoples: a Legal Reappraisal*, vol. 12, (Cambridge, Cambridge University Press, 1995), p. 53.
[19] James Crawford, *The Creation of States in International Law,* 2nd ed. (Oxford, Oxford University Press, 2007).
[20] Hurst Hannum, "Rethinking self-determination", *Virginia Journal of International Law*, vol. 34, No. 1 (1993), pp. 1 and 33.
[21] Catriona Drew, "The East Timor story: international law on trial", *European Journal of International Law*, vol. 12, No. 4 (2001), pp. 651 and 663.

their cultural, economic and social development through what the territory and associated resources offer.[22]

18.   The external dimension of the right to self-determination is the precondition to the effective enjoyment of both the political and economic components of the right. How can a Government function independently while remaining subjugated, without enjoying full jurisdiction over the whole of its territory, citizens and resources? Alien domination and foreign occupation are thus incompatible with "the law of external self-determination" as a regulatory framework.[23]

19.   In essence, the right to self-determination is the right to live and grow as a people within a political community of its own, usually an independent State. This implies the right to resist alien domination, subjugation and exploitation that may impede the fulfilment of this right.[24] In 1977, this was spelled out in Additional Protocol I to the Geneva Conventions, in which people's fight "against colonial domination and alien occupation and against racist régimes in the exercise of their right of self-determination" was recognized.[25] Liberation and decolonization struggles across history have shown how the right to exist as a people and the right to resist foreign rule and domination are interconnected. History also shows that international support to anti-colonial struggles, especially from Governments and decision-makers, remains critical for the enfranchisement of a subjugated people. Decolonization became possible when anti-colonial movements and States managed to create a consensus at the United Nations on the illegitimacy of colonial domination; respect for basic human rights played an important role in creating this consensus.[26]

20.   In the 1960s, self-determination became the normative framework for advancing decolonization. In the wake of the "irresistible and irreversible" process of liberation to which all peoples were entitled, colonialism, and all forms of segregation or discrimination associated therewith, were fully banned.[27] The normative force of self-determination was drawn from the Charter of the United Nations of 1945, in which the principle of "equal rights and self-determination of peoples" are placed among its primary objectives, together with the maintenance of international peace and security. To achieve decolonization, the General Assembly thus recognized that:

> All peoples have an inalienable right to complete freedom, the exercise of their sovereignty and the integrity of their national territory … All peoples have the right to self-determination; by virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.[28]

21.   In the face of persistent colonial endeavours, the General Assembly explicitly prohibited acts that may undermine colonized peoples' efforts to achieve independence and prohibited "the use of force" by States or the threat thereof, against the territorial integrity or political independence of any State, existing international boundaries, armistice lines, established by or pursuant to an international agreement, which may result in the deprivation of peoples' "right to self-determination and freedom and independence".[29]

---

[22] Hannum, "Rethinking self-determination" (see footnote 20).
[23] Wilde, "Using the master's tools to dismantle the master's house" (see footnote 9).
[24] Antonio Cassese, "Terrorism and human rights", *American University Law Review*, vol. 31, No. 4 (1982), pp. 945–958.
[25] Additional Protocol I to the Geneva Conventions (1977), art. 1 (4).
[26] Roland Burke, *Decolonization and the Evolution of International Human Rights* (Philadelphia, University of Pennsylvania Press, 2011).
[27] General Assembly resolution 1514 (XV) (1960).
[28] Ibid.
[29] General Assembly resolution 2625 (XXV) (1970).

22.    The General Assembly also clarified that the territory of a State could be neither "the object of military occupation" nor "acquisition by another State" resulting from the threat or use of force.[30] This was reinforced in 1974, when, in defining "aggression", the General Assembly prohibited the "use of armed force to deprive peoples of their right to self-determination, freedom and independence, or to disrupt territorial integrity".[31]

23.    The inviolability of the right to self-determination stems from its *erga omnes* and *jus cogens* character. *Erga omnes* means that all States have an inherent interest in the realization of and obligation to respect the right to self-determination, owed by and to the international community as a whole.[32] Such an obligation exists not only in relation "to their own peoples but vis-à-vis all peoples which have … been deprived of the possibility of exercising their right to self-determination."[33] This arises out of the *jus cogens* or peremptory norm character of the right to self-determination, which cannot be violated or derogated (except by another peremptory norm).[34] The international community is obliged to ensure that all peoples entitled to self-determination effectively achieve it, and that all obstacles are removed.[35]

24.    International practice from occupied Namibia in the 1950s to occupied Ukraine in 2022 documents how the international community, whether through international tribunals, such as the International Court of Justice,[36] the International Criminal Court (ICC)[37] and ad hoc tribunals,[38] or the General Assembly,[39] the Security Council,[40] and individual States through domestic jurisdictions and sanctions,[41] have used the means provided by international law to end illegal occupations and forms of subjugation. Under the law of external self-determination, the Palestinian people are entitled to and must enjoy comparable international cooperation and determined action.

## B.    Applicability to the Palestinian people in the occupied Palestinian territory

25.    The right to self-determination is an "inalienable right" of the Palestinian people, as affirmed by the General Assembly.[42] The origins of Palestinians' right to self-determination can be traced back more than a century, preceding the first codification in the Charter of the United Nations. The people of Palestine (Muslims, Christians and Jews),[43] like other peoples in the Levant, also had their right to self-determination recognized under the Covenant of the League of Nations of 1919.

---

[30] Ibid.

[31] General Assembly resolution 3314 (XXIX) (1974).

[32] Cassese, *Self-determination of peoples* (see footnote 19).

[33] Human Rights Committee, general comment 12, para. 6.

[34] International Law Commission (ILC), A/CN.4/L.960/Add.1 (2022), conclusions 3 and 17.

[35] Advisory opinion rendered on 9 July 2004 by the International Court of Justice (ICJ), on the legal consequences of the construction of a wall in the Occupied Palestinian Territory.

[36] ICJ, Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970).

[37] International Criminal Court (ICC), "ICC Presidency assigns the Situation in Ukraine to Pre-Trial Chamber II" (2 March 2022).

[38] Security Council resolution 827 (1993).

[39] General Assembly resolution 43/106 (1988).

[40] Security Council resolution 264 (1969).

[41] Government of the United States, Comprehensive Anti-Apartheid Act of 1986, Public Law. No. 99-440 (1986).

[42] General Assembly resolutions 3236 (XXIX) (1974) and 2672 (XXV) (C) (1970).

[43] In the early 1900s, the largest communities were 81 per cent Muslim, 11 per cent Christian and 8 per cent Jewish. See Sergio Della Pergola, "Demographic trends in Israel and Palestine: Prospects and policy implications", *American Jewish Yearbook* vol. 103 (2003), pp. 3–68.

Article 22 of the Covenant stipulated that "Class A" mandates (Iraq, Lebanon, Palestine, Trans-Jordan and Syria) would enjoy provisional independence "until such time as they are able to stand alone".[44] The "wishes" of the local communities were to be "a principal consideration in the selection of the Mandatory".[45]

26.  The culmination of centuries of antisemitism and persecution of Jews in Europe in the genocidal horror of the Holocaust strengthened support for political Zionism. This movement saw Palestine as the land to realize a "State for the Jews" through settlement and colonization.[46] However, in that land a native Palestinian Arab population had resided for millennia. In 1947, the United Nations resolved to reconcile the separate claims to the land of the indigenous Palestinian people and the largely European Jewish settlers and refugees from Europe,[47] by recommending the partitioning of British Mandate Palestine into an "Arab State" and a "Jewish State".[48] Soon after, the creation of the State of Israel in most of the territory of Mandate Palestine was accompanied by massacres and the mass expulsion, wholesale denationalization and dispossession of most of the Arabs of Palestine. They continue to be deprived of their right to self-determination, together with their descendants, the refugees further displaced in 1967 and other non-refugee Palestinians.

27.  The 1967 war that initiated the Israeli occupation was a major turning point. The Security Council, in resolution 242 (1967), underscored the "inadmissibility of the acquisition of territory by war" and called for the "withdrawal of Israel[i] armed forces" from the territory that Israel had occupied and emphasized the right of everyone in the region "to live in peace within secure and recognized boundaries free from threats or acts of force".[49] This mirrored the General Assembly's condemnation of any use of force that may result in denial of peoples' freedom and independence as a clear and incontrovertible expression of colonialism.[50]

28.  Since 1967, the United Nations, reflecting the postcolonial sensibility of its expanded membership, adopted resolutions that not only reaffirmed the Palestinian people's right to self-determination but also viewed resistance against outside domination as justified.[51] In 1974, in the face of the already protracted and unwarranted Israeli occupation, the General Assembly acknowledged the "right to self-determination without external interference" and "the right … to return" of Palestinian refugees as "inalienable" rights of the Palestinian people.[52]

29.  By 1982, following continuous non-compliance by Israel, the General Assembly affirmed that "the denial of the inalienable rights of the Palestinian people to self-determination, sovereignty, independence and return to Palestine and the repeated acts of aggression by Israel against the peoples of the region constitute a serious threat to international peace and security".[53] In the same resolution, the Assembly also urged "all States, competent organizations of the United Nations system, specialized agencies and other international organizations to extend their support to the

---

[44] Covenant of the League of Nations (1919), article 22. The mandate system was established after World War I to deal with ex-Ottoman and ex-German territories. Mandates were classified as A, B or C, based on what was considered a country's readiness for self-rule.

[45] Ibid.

[46] Theodor Herzl, *Der Judenstaat* (Leipzig and Vienna, Breitenstein, 1896).

[47] Official Records of the General Assembly, Second Session, Supplement No. 11 (A/364) (Report of the United Nations Special Committee on Palestine), vol. I (1947).

[48] General Assembly resolution 181 (II) (1947).

[49] Security Council resolution 242 (1967); see also Security Council resolutions 298 (1971), 476 (1980) and 2334 (2016).

[50] General Assembly resolution 2625 (XXV) (1970).

[51] A/CONF.32/41 (1968).

[52] General Assembly resolution 3236 (XXIX) (1974).

[53] General Assembly resolution 37/43 (1982).

Palestinian people through its sole and legitimate representative, the Palestine Liberation Organization, in its struggle to regain its right to self-determination and independence".[54]

30.   The General Assembly's acknowledgement of the Palestinians' struggle to "regain" their right to self-determination and independence in the context of the worldwide decolonization process, was an important recognition of the Palestinian national resistance led by the Palestine Liberation Organization (PLO) which, by the 1970s, federated the main Palestinian political forces mostly in exile. At that time, it was clear that the law of self-determination legitimated Palestinians' right to resist, by virtue of the violent and acquisitive nature of Israeli occupation from which Palestinians were struggling to liberate themselves.

31.   By 1983, the General Assembly had already exposed the "repeated acts of aggression" by Israel against Palestinians.[55] Over the past decades, dozens of United Nations resolutions have reaffirmed Palestinians' right to self-determination, calling for the withdrawal of Israel from the territory occupied in 1967 and for an end to the occupation.

32.   In 2016, even the Security Council – generally paralysed on this issue by United States of America support for Israel – declared that "the establishment by Israel of settlements in the occupied Palestinian territory, including East Jerusalem, has no legal validity", firmly condemning the enterprise as "a flagrant violation under international law".[56]

## IV.   Before our eyes
## Fifty-five years of preventing Palestinian self-determination

### A.   Reality check

33.   As an occupier, Israel has no sovereignty over the occupied Palestinian territory. Even if the occupation was established purely for bona fide Israeli security needs (in itself, an aberration, given its adverse impact on Palestinians' fundamental rights and freedoms), on what basis does Israel continue to seize Palestinian land to build colonies in the West Bank, exploiting water and energy that belong to the Palestinians? On what basis does Israel destroy essential civilian infrastructure of the occupied population?

34.   In defiance of numerous United Nations resolutions recognizing the violation of Israeli obligations as an occupying Power and calling for its withdrawal from the occupied Palestinian territory,[57] Israel has consolidated its military rule and presence, making it more visible and painful for the Palestinians, while pursuing its own interests.[58] The way that Israel has administered the occupied Palestinian territory resembles that of a colony, "deeply committed to exploiting its land and resources for Israel's own benefit, and profoundly indifferent, at very best, to the rights and best interests of the protected people".[59]

35.   The profound illegality of the situation in the occupied Palestinian territory emanates from the intentional unlawful displacement of its native (and refugee)

---

[54] Ibid., para. 23.
[55] General Assembly resolution 38/17 (1983).
[56] Security Council resolution 2334 (2016).
[57] Ibid. and Security Council resolution 242 (1967).
[58] Yehuda Z. Blum, "The missing reversioner: reflections on the status of Judea and Samaria", *Israel Law Review* vol. 50 (2017), p. 276.
[59] A/72/556 (2017).

Palestinian inhabitants, coupled with alteration of the legal status, geographical nature and demographic composition of the occupied territory through fragmentation of land, seizure and exploitation of natural resources, impairment of Palestinian economic development, through and for a (growing) colonist minority. Altogether, the imposition of settlers, settlements and settlement infrastructure in the topography and space of the Palestinians has served to prevent the realization of the Palestinians' right to self-determination, violating a number of peremptory norms of international law, absolutely prohibited under international law.[60]

36.   Evidence laid out in the following sections confirms that the occupation is not merely belligerent, but is settler-colonial in nature and that Israel has prevented the realization of Palestinian people's right to self-determination, violating each component of that right, wilfully pursuing the "de-Palestinianization" of the occupied territory. This is, in essence, proof of the intent to colonize the occupied Palestinian territory, continuing what the Zionist movement had envisaged for modern-day Israel over a century ago.[61] In parallel, for more than 55 years, the international community has systematically failed to hold Israel accountable, thus enabling its impunity and permitting its settler colonial endeavours.

## B.   The dawn of occupation
## Sett(l)ing the grounds

37.   When, in 1967, Israel invaded what remained of British Mandate Palestine – which had until then been under the control of Egypt (Gaza Strip) and Jordan (West Bank, including East Jerusalem) – many, both in Israel and abroad, saluted the "capture" of the West Bank, Gaza Strip and the Old City of Jerusalem "with ecstatic revelry".[62] Emboldened by the swift control over large swaths of lands, Israeli leaders devised plans to consolidate permanent Israeli control over the territory that it had just occupied.[63] From the onset of the occupation, successive Governments of Israel have acted as if that territory was "captured" *terra nullius*; this is not dissimilar to the attitude that Zionist movement leaders have displayed towards Palestine since the days of the Ottoman Empire.

38.   In the analyses of Israeli strategists of that time, the planned future of the occupied territory would be tied to "creat[ing] a Greater Eretz Yisrael [land of Israel] from a strategic point of view, and establish[ing] a Jewish state from a demographic point of view".[64] The 1967 Allon Plan articulated a formal vision of a unitary "Jewish state" from the Jordan River to the Mediterranean Sea through the full annexation of the Jordan Valley and the creation of demilitarized Palestinian Bantustans therein.[65] The Plan provided for a complete redrawing of the map of Israel, where neither the Green Line nor other armistice lines would be relevant.[66] The Old City of Jerusalem, in the eastern part of the city, was to be annexed and the Palestinians living there

---

[60] Security Council resolution 478 (1980); General Assembly resolution 3314 (XXIX) (1974); and Security Council resolution 267 (1969).

[61] Rashid Khalidi. *The Hundred Years' War on Palestine: A History of Settler Colonialism and Resistance: 1917–2017* (New York, Metropolitan Books, 2020).

[62] Seth Anziska, *Preventing Palestine: A Political History from Camp David to Oslo* (Princeton, Princeton University Press, 2018), p. 7.

[63] Segev, *1967: Israel, the War, and the Year that Transformed the Middle East* (see footnote 3).

[64] Israeli commander (acting Prime Minister, 1969), Yigad Allon, cited by Robert Friedman, *Zealots for Zion: Inside Israel's West Bank Settlement Movement* (New York, Random House, 1992).

[65] Geoffrey Aronson, *Creating Facts: Israel, Palestinians and the West Bank* (Washington, D.C., Institute for Palestine Studies, 1987).

[66] Cited in Gershom Gorenberg, *The Unmaking of Israel*, 1st Harper Perennial ed. (New York, Harper Perennial, 2012).

would be given "conditional residency status".[67] The rest of the land would be given priority if lightly populated; the lowlands along the Jordan River, argued to be "vital" for the defence of Israel, and the Sinai Peninsula, as well as Bethlehem and Hebron, were to be annexed. The remainder of the territory, more densely populated by Palestinians, was to be granted to Jordanian rule.[68]

39.   The Allon Plan has continued to shine and thrive through the actions of successive Governments of Israel. In 1973, the Foreign Minister of Israel, Moshe Dayan, one of the architects of the 1967 occupation, expressed his view for a "new State of Israel with broad frontiers, strong and solid, with the authority of the Israel Government extending from the Jordan [river] to the Suez Canal".[69] In 1979, the Prime Minister of Israel, Menachem Begin stated: "the green line no longer exists – it has vanished forever".[70] As former Israeli politician Matityahu Drobles revealed in 1980, the intention had always been "to hold forever the territories of Judea and Samaria. The best and most efficient way [to do so] is an accelerated colonization drive in these areas".[71] A leading example has been Israeli annexation of occupied East Jerusalem since 1967, which was formally consolidated in 1980 via administrative and legislative measures[72] that altered the status and the character the Old City, repeatedly condemned by the Security Council as "null and void".[73]

40.   Developments on the ground bear testament to the execution of the Allon Plan, even if it was never formally adopted as an official policy. After decades of Israel building facts on the ground to consolidate the annexation of large parts of the occupied Palestinian territory, in 2019, the then Prime Minister of Israel, Benjamin Netanyahu stated, "a Palestinian state will endanger our existence. I will not divide Jerusalem, I will not evacuate any community and I will make sure we control the territory west of Jordan".[74] Multiple Governments of Israel and political and military leaders have reaffirmed these views.[75] The presence of "settlers" and Kahanists in the Israeli Knesset makes it difficult to disentangle settler-colonialism from Israeli public policy.

41.   Since 1967, Israel has settled its civilian population in the 22 per cent of Mandatory Palestine that had become (out of political pressures and pragmatism), the territory where the Palestinians would realize their right to self-determination in the form of independent statehood (while, in 1947, the General Assembly had deliberated that the territory of the "Arab State" would correspond to 45 per cent of the territory which had constituted Palestine under British Mandate).

42.   In a tragic irony, Palestinians have experienced an entrenching settler-colonialism at a moment in history when the rest of the world was slowly progressing towards decolonization. Worldwide, national resistance movements, symbolically enabled by the United Nations, challenged their colonizers and succeeded in ending their rule. However, in the occupied Palestinian territory, including East Jerusalem,

---

[67] Ibid.

[68] Ibid.

[69] Minister of Foreign Affairs of Israel, Abba Eban, cited by Abba Eban, *Abba Eban: An Autobiography* (New York, Random House, 1977).

[70] "Foreign Minister Dayan on the future of settlements in Judea, Samaria and Gaza", 24 April 1979.

[71] Matityahu Drobles, "Settlement in Judea and Samaria: Strategy, Policy and Programmes", in *World Zionist Organization, Settlement Section* (Jerusalem, 1980).

[72] Knesset, "Basic Law: Jerusalem, Capital of Israel" (1980).

[73] Security Council resolution 478 (1980), para. 3.

[74] "Netanyahu says will begin annexing West Bank if he wins Israel election", *Haaretz*, 7 April 2019.

[75] Tovah Lazaroff, "Michaeli: no one thinks half a million settlers will be evacuated", *Jerusalem Post*, 9 March 2021; "Benny Gantz, Netanyahu rival, gives campaign launch speech: full English transcript", *Haaretz*, 30 January 2019; and Gil Stern Hoffman, "Lapid: US helped Iran fund its next war against Israel", *Jerusalem Post*, 26 January 2016.

Israeli expansionism consolidated into an apartheid regime through the longest occupation in modern history.

## C.  Preventing unity
## Territorial fragmentation

43.   Territorial sovereignty, an essential component of the Palestinian "self-determination unit",[76] has been targeted since the early days of the occupation. "Strategic fragmentation" has been part of the Israeli toolbox to contain and control the Palestinian people, curtailing freedom of movement inside and outside the occupied territory, depriving them of access to large areas of land, punctuating it with roadblocks, checkpoints, diversions, the Wall and more.[77] This is painfully reminiscent of the destruction and attempted erasure of hundreds of Palestinian villages in former British Mandate Palestine that accompanied the creation of the State of Israel, disfiguring its landscapes, reinventing the land to serve the specific interests of Israel and separating, containing and isolating the Palestinian people through areas under its control. Heavy control of the Palestinian population, epitomized by today's besieged Gaza, has become a hallmark of Israeli policies of domination.

44.   The fragmentation and separation between the West Bank, East Jerusalem and the Gaza Strip have been meticulously planned and executed. As of 1967, the adoption of different administrative and military regimes to the Gaza Strip and the West Bank – signalled by the adoption of separate systems ranging from identification cards to car plates – has been the prime vector for this fragmentation.[78] Since the early days of the occupation, the unlimited land expropriation for the establishment of Israeli colonies has exacerbated it.[79] The establishment of colonies, which already constituted a grave breach of international law in 1967,[80] manifests the execution of Israeli leaders' plans to permanently settle in those areas.[81] This design is particularly visible in East Jerusalem, which Israel has unlawfully treated as "annexed" for decades.[82] More than 40 Security Council resolutions have reminded Israel of the impermissibility of alteration of the status, character, and demography of Jerusalem.[83] However, the annexation, and de-Palestinianization, of Jerusalem and most of the West Bank, has progressed.

45.   The Oslo Accords, which Israel and PLO signed between 1993 and 1995, divided the West Bank into "areas" A, B and C, and further fragmented the territory available to the Palestinians. The fragmentation of the West Bank has facilitated the construction and "protection" of Jewish-only colonies in occupied territory. Meanwhile, thousands of Palestinian structures have been destroyed, with tens of thousands of Palestinians forcibly displaced since 2009. Pastoralist and Bedouin communities in Area C, 70 per cent of whom are refugees, are the most exposed to such a "coercive environment".[84]

---

[76]  Crawford, *The Creation of States in International Law* (see footnote 19), p. 428.
[77]  E/ESCWA/ECRI/2017/1 (2017) (see footnote 5).
[78]  Jean-Pierre Filiu, *Gaza: A History* (Oxford, Oxford University Press, 2014).
[79]  Military Order 58 (1967).
[80]  Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 (Fourth Geneva Convention), art. 147; International Committee of the Red Cross, commentary of 1958.
[81]  ICJ, Legal consequences of the construction of a wall in the Occupied Palestinian Territory, advisory opinion (2004) (see footnote 35).
[82]  Law and Administration Ordinance (Amendment No. 11) Law of 1967.
[83]  Security Council resolution 2334 (2016).
[84]  A/HRC/31/43.

46.    The transformation of the Gaza Strip into a heavily populated, impoverished enclave controlled by Israel through a suffocating sea, land and air blockade, is part and parcel of that same settler-colonial design. The containment of the colonial population into heavily controlled reserves is at the core of the settler-colonial goal to ensure the demographic supremacy and prevent Palestinian self-determination.[85] Conversely, the obligation to consider the Gaza Strip and the West Bank, including East Jerusalem, as a single territorial unit is rooted in the law of occupation, the principle of self-determination of peoples, and a number of bilateral treaties concluded by Israel and PLO.[86]

## D.    Preventing economic prosperity
## Exploiting natural resources

47.    Permanent sovereignty over natural resources is integral to peoples' economic development, enshrined in the right to self-determination.[87] The complex system of control and restrictions that Israel enforces in the occupied Palestinian territory to the exclusive profit of its colonies crushes the possibility for Palestinians to freely pursue their economic development and "dispose of their natural wealth and resources".[88]

48.    Palestinian communities, historically self-sufficient through agriculture, livestock and fishing (in Gaza), with income generated from the sale of their products,[89] are now trapped in a vicious circle of dependency on both Israeli economy and international aid. Access to livelihoods, water, land and roads has been systematically disrupted through Israeli restrictions.

49.    In Area C of the West Bank, which contains the majority of the natural resources and almost all the arable land in the West Bank, Israel maintains complete monopoly over water springs[90] and has designated a mere 1 per cent of land for Palestinian development.[91] The "coordination system" that Israel has ostensibly established to facilitate Palestinians' access to their land is convoluted and inefficient.[92] Israeli control over Palestinian resources hampers Palestinian production and self-sufficiency, particularly endangering the survival of the Bedouin and other Palestinian pastoral communities in the area. According to United Nations estimates, without the Israeli occupation, the West Bank gross domestic product (GDP) per capita in 2019 would have been 44 per cent higher than its actual value.[93]

50.    In the besieged Gaza Strip, the economic situation is beyond dire.[94] In 2021 the unemployment rate in Gaza rose above 50 per cent, and 80 per cent of the population was dependent on aid.[95] Repeated large-scale Israeli military offensives, coupled with

---

[85] Tareq Baconi, "Gaza and the one-State reality", *Journal of Palestine Studies*, vol. 50, No. 1 (2020), pp. 77–90.

[86] Marco Longobardo, "The Legality of Closure on Land and Safe Passage between the Gaza Strip and the West Bank", *Asian Journal of International Law*, vol. 11, No. 1 (2021).

[87] Drew, "The East Timor story: international law on trial" (see footnote 22).

[88] International Covenant on Civil and Political Rights and International Covenant on Economic, Social and Cultural Rights, common article 1 (2).

[89] B'Tselem, "Expel and exploit: the Israeli practice of taking over rural Palestinian land" (2016).

[90] See A/HRC/37/39 (2018).

[91] Orhan Niksic and others, *Area C and the Future of the Palestinian Economy* (World Bank, 2014), p. 13.

[92] See B'Tselem, "Expel and exploit" (see footnote 89).

[93] See United Nations Conference on Trade and Development (UNCTAD), *The Economic Costs of the Israeli Occupation for the Palestinian People: Arrested Development and Poverty in the West Bank* (UNCTAD/GDS/APP/2021/2 and UNCTAD/GDS/APP/2021/2/Corr.1) (2021).

[94] UNCTAD, *The Economic Costs of the Israeli Occupation for the Palestinian People: The Impoverishment of Gaza under Blockade* (UNCTAD/GDS/APP/2020/1) (2020).

[95] World Bank, *Assistance Strategy for the West Bank and Gaza for the Period FY22-25* (156451-GZ) (2021).

Israeli-imposed electricity shortages, have compounded the difficulties faced by the Palestinian people in Gaza, for whom a dignified life is rendered unattainable.[96] The illegal Israeli blockade, a form of collective punishment, has also allowed Israel to exploit the offshore natural gas reserves and oil reservoirs of Gaza.[97]

51.   Meanwhile, a web of national and international businesses operate in the illegally occupied Palestinian territory.[98] These businesses "field-prove" military equipment on Palestinians,[99] exploit water denied to and diverted from Palestinians,[100] farm and graze land, quarry for stone, extract minerals and drill for oil and natural gas and allocate resources almost exclusively for the colonies and the occupying Power.[101] Final products are globally marketed as "products of Israel", generally exported and received within the territories of third States, in some cases tariff-free.[102] The obligation to label these products as from the occupied territory[103] does not resolve the illegality of trading settlement products; it merely transfers the burden to consumers of the receiving States to decide on products that should not be allowed in territories of High Contracting Parties to the Geneva Conventions.

52.   The engineered denial of Palestinian access to and control over their natural resources makes any prospect of economic development a mere surrogate for prosperity.[104] The "de-development" that Israel has imposed on the occupied Palestinian territory[105] has irreparably harmed the Palestinian economy and is the antithesis of the self-determination that the United Nations embraced in the rejection of colonialism.

## E.   Preventing identity
## Erasing Palestinian cultural and civil rights

53.   In a settler-colonial context and an apartheid regime, any display of collective identity and (re)claimed sovereignty from the subjugated people represents a threat to the regime itself. On 13 May 2022, Palestinian pallbearers were attacked by Israeli forces while also carrying their national flag during the funeral of Palestinian journalist Shireen Abu Akleh who had been killed two days earlier (see para. 58). In fact, Palestinian "symbols", like the Palestinian flag, are systematically attacked and torn down, in public places, during public events, protests and even funerals, with the display of Palestinian national identity being de facto banned. In the occupied Palestinian territory, preventing the Palestinian people from expressing their collective identity in their own land has taken many forms.

---

[96] Ibid.

[97] UNCTAD, *The Economic Costs of the Israeli Occupation for the Palestinian People: the Unrealized Oil and Natural Gas Potential* (UNCTAD/GDS/APP/2019/1) (2019).

[98] Wesam Ahmad, "Business and human rights, conflict and the converging legacies of colonialism in the Palestinian present", *Cambridge Core* blog, May 2021.

[99] Marya Farah, "Business and human rights in Occupied Territory: guidance for upholding human rights" (Al-Haq, 2020).

[100] Al-Haq, "Water for one people only: discriminatory access and 'water apartheid' in the OPT" (2013).

[101] Al-Haq, "Palestinian human rights organisations submit file to ICC prosecutor: investigate and prosecute pillage, appropriation and destruction of Palestinian natural resources", 26 October 2018.

[102] Canada-Israel Free Trade Agreement (2014).

[103] Court of Justice of the European Union, case C-363/18 (12 November 2019).

[104] Al-Haq and Emergency Water, Sanitation and Hygiene group (EWASH), "Israel's violations of the International Covenant on Economic, Social and Cultural Rights with regard to the human rights to water and sanitation in the Occupied Palestinian Territory" (2011).

[105] Sara Roy, "De-development revisited: Palestinian economy and society since Oslo", *Journal of Palestine Studies*, vol. 28, No. 3 (1999), pp. 64–82.

54.   This is part of a broader and deeper endeavour to "deconstruct and replace" Palestine from the collective imagination through a combination of cultural appropriation and the erasure of key cultural entities.[106] The Moroccan Quarter in the Old City of Jerusalem, destroyed at the beginning of the occupation to make space for the Wailing Wall esplanade, is one of the first recorded cases of Palestinian venues destroyed or seized and converted to Israeli cultural sites soon after June 1967. Similarly, attempts to erase the Palestinian character of what is left of Palestinian ancestral land include: the elimination of Palestinian history in East Jerusalem schools,[107] the revocation of licences to Palestinian schools not adhering to Israeli curriculum policies[108] and the conversion or closure of sites representing Palestinian cultural, political and religious identity.[109]

55.   Attacks on cultural objects of significance to eliminate all traces and expressions of Palestinian existence, and the incorporation of a revisionist view of history to assert (false) claims of sovereignty in the occupied Palestinian territory, demonstrate the occupier's intention to permanently strip the land of its indigenous identity.

## F.   Preventing political existence (and resistance)

56.   The exercise of the right to self-determination constitutes the beating heart of a people as a collective and as a polity. Since 1967, to maintain its domination, Israel has systematically carried out human rights violations, including extrajudicial killings, arbitrary detention and imprisonments (including of elected representatives), residency revocations and mass deportations, including of political figures outside the occupied Palestinian territory, among others. These violations have hampered the organic formation and functioning of a cohesive Palestinian political leadership and thus the exercise of the right to self-determination by Palestinians.

57.   Portrayed as terrorists, many civilian Palestinian political leaders and advocates have allegedly been killed for their messages and their potential impact on the formation of Palestinian political thinking.[110] What started in the 1960s as security operations in reaction to "terrorist operations", became, over the years, a policy of assassinations targeting not only operatives of such attacks but also political leaders of organizations designated by Israel as terrorists.[111] This includes many members of PLO, even though both the United Nations and later Israel recognized it as the "legitimate representative of the Palestinian people" in 1974 and 1993 respectively. Israel has allegedly used targeted killings – extrajudicial executions – as an alternative political strategy to negotiations.[112] This approach was reportedly implemented

---

[106] Wolfe, "Settler colonialism and the elimination of the native" (see footnote 11).

[107] Musa Ismael Basit, "The Israeli curriculum and the Palestinian national identity in Jerusalem", *Palestine-Israel Journal*, vol. 22, No. 4 (2017).

[108] "Education minister revokes licences of 6 East Jerusalem schools for incitement", *Times of Israel*, 28 July 2022.

[109] Luma Zayad, "Systematic cultural appropriation and the Israeli-Palestinian conflict", *DePaul Journal of Art Technology and Intellectual Property Law, vol. 28*, No. 2 (2018), p. 81; Mahmoud Hawari, "Capturing the castle: archaeology, architectural history and political bias at the Citadel of Jerusalem", *Jerusalem Quarterly* No. 55 (2013); Mahmoud Hawari, "The Citadel of Jerusalem: a case study in the cultural appropriation of archaeology in Palestine", *Present Pasts* vol. 2, No. 1 (2010); Tom Abowd, "The Moroccan Quarter: a history of the present", *Jerusalem Quarterly* No. 7 (2000).

[110] Eyal Weizman, *Hollow Land: Israel's Architecture of Occupation* (London, Verso Books, 2012).

[111] Ronen Bergman, *Rise and Kill First: The Secret History of Israel's Targeted Assassinations* (New York, Random House Publishing Group, 2019).

[112] Weizman, *Hollow Land: Israel's Architecture of Occupation* (see footnote 110).

during the second Intifada, when 300 Palestinians accused of terrorism were wilfully killed, resulting in a further 150 civilian casualties.[113]

58.   Humanitarians and journalists are regularly among the victims of the widespread recourse by Israel to lethal force. Lack of accountability remains pervasive. The killing of Palestinian journalist Shireen Abu Akleh, while documenting an Israeli raid on the Jenin refugee camp on 11 May 2022, remains unaccounted for despite numerous investigations concluding that the journalist was hit by Israeli soldiers' fire.[114]

59.   Israel continues to imprison Palestinian Authority ministers, mayors and teachers, human rights defenders and civil society representatives. Ten members of the Palestinian Legislative Council were reportedly incarcerated in 2020 alone. The practice of mass arbitrary arrests, which includes administrative detention without charge or trial, has been increasingly executed since Palestinians began protesting the illegal construction of the Wall in the West Bank and East Jerusalem.[115] Almost 4,500 Palestinians are currently detained, 730 without any charge and largely based on secret evidence. Children as young as the age of 12 have been victims of arbitrary arrest and detention – 500–700 minors are held yearly.[116] Many believed to be leading resistance, such as public servants, religious leaders and activists, lawyers, journalists and students involved in political activities, have been deported to the Gaza Strip.[117] Deporting elected leaders, preventing Palestinians from voting and interfering with Palestinian politics, have inhibited the independent formation of a Palestinian leadership and political will that could challenge Israeli colonial interests.[118]

60.   Civil society organizations and human rights defenders have also been the target of Israeli repression. Using mass spyware surveillance to "monitor" human rights activists and defenders' devices with the Pegasus software – now exported and used across the globe – Israel has shrunk the space for political activities of Palestinians.[119] In 2021, six reputable Palestinian civil society organizations, which are at the forefront of the battle for international justice and accountability in the occupied Palestinian territory, were designated as "terrorist organizations" by Israel without evidence. In August 2022, the premises of these organizations were raided and ordered to be closed by Israel, with some of their senior leaders summoned and threatened. This appears to be an attempt to further shrink, if not outright ban, space for human rights monitoring and legal opposition to the Israeli occupation in the Palestinian territory,[120] while abusing counter-terrorism legislation.[121] As the designated organizations are fully engaged in the ongoing *Situation of Palestine* case before ICC, Israel, by attacking them and their work, may be "destroying, tampering with, or interfering with the collection of evidence" of war crimes and crimes against

---

[113] Noura Erakat, "Extrajudicial executions from the United States to Palestine", *Just Security*, 7 August 2020.

[114] See, for example, OHCHR, "Killing of journalist in the occupied Palestinian territory", 24 June 2022.

[115] Addameer, Administrative detention fact sheet 2022 (20 January 2022).

[116] Defense for Children International Palestine, "Number of Palestinian children (12–17) in Israeli military detention", 14 June 2022. Available at www.dci-palestine.org/children_in_israeli_detention.

[117] Miftah fact sheet, "The Palestinian Exodus" (2002).

[118] Ibid.

[119] Front Line Defenders, "Six Palestinian human rights defenders hacked with NSO Group's Pegasus Spyware", 8 November 2021.

[120] Michael Kearney, "Lawfare, legitimacy and resistance: the weak and the law", *Palestine Yearbook of International Law*, vol. 16, No. 1 (2010).

[121] A/HRC/40/52 (2019).

humanity, absolutely prohibited under international criminal law.[122] This would constitute an offence against the administration of criminal justice.

61.    Attacks on human rights defenders and humanitarian operators are far too common in the occupied Palestinian territory. Salah Hammouri, a French-Palestinian lawyer from Jerusalem, has been subjected to harassment, arbitrary arrest and detention since the age of 16. Detained without charges or trial since 7 March 2022 on allegations of terrorism, Hammouri risks the revocation of his residency in Jerusalem on the ground of breach of allegiance to Israel.[123] This would set a dangerous precedent, as he would be the first Jerusalemite deprived of his residency on the ground of secret evidence related to national security threats. Similarly, Mohammad el-Halabi, an aid worker for World Vision in the Gaza Strip, has been convicted of diverting organization funds to Hamas and other terrorism-related crimes, after six years and across 160 court hearings, largely based on secret evidence, and despite an external investigation that found no evidence of wrongdoings.[124]

62.    The relentless attacks on the Palestinian people, their political manifestations and even their legal resistance have been assessed as amounting to persecution,[125] which ultimately restricts Palestinians' ability to develop as a people.

## G.    Preventing statehood
## "Negotiating the illegal"?

63.    Under the law on State responsibility, the breach of an international obligation by a State gives rise to an internationally wrongful act,[126] the commission of which requires first and foremost the State responsible to immediately cease the illegal act, ensure non-repetition and provide reparation for the damage done.[127] It follows that a breach of international law should not be subjected to negotiations, as this would legitimize what is illegal.[128] Therefore, because of the illegality of the Israeli occupation, owing to its prolonged, acquisitive and bad-faith nature, the obligation of cessation of the occupation cannot in any way be conditioned on negotiations.[129]

64.    Since the start of the Middle East peace process with the Madrid Conference of 1991, the main political actors involved (particularly the Middle East Quartet) have argued in favour of advancing peace through bilateral negotiations. As with the Palestinian Declaration of Independence of 1988, PLO had yielded to the ineluctability of a compromise solution and its acceptance of Security Council resolutions 242 (1967) and 338 (1973) was seen as limiting Palestinians' claims to sovereignty to the occupied Palestinian territory.[130] The Oslo Accords, which many see as the benchmark for resolving the Israeli-Palestinian question via statehood within the 1949 armistice lines, neither realized nor advanced the realization of the Palestinian people's right to self-determination. The Accords, which framed the right to self-determination as the final objective of peacemaking after an interim self-rule, built on the mutual recognition of the State of Israel and PLO (not the State of

---

[122] ICC Statute (1998), art. 70 (1) (c).
[123] Addameer, "Salah Hammouri", 8 September 2022.
[124] Amnesty International, "Israel/OPT: quash flawed conviction of aid worker Mohammed al-Halabi" (16 June 2022).
[125] Human Rights Watch, *A Threshold Crossed* (see footnote 5), p. 170.
[126] ILC, articles on responsibility of States for internationally wrongful acts, art. 2 (a) and (b).
[127] Ibid. arts. 30 (a) (b) and 31 (1) and (2).
[128] Imseis, "Negotiating the illegal: on the United Nations and the illegal occupation of Palestine, 1967–2020" (see footnote 8), p. 1068.
[129] Ibid.
[130] Palestine National Council, "Palestinian Declaration of Independence", Algeria, 15 November 1988.

Palestine, as it had been declared in 1988),[131] but merely recognized Palestinian autonomy in parts of the West Bank and the Gaza Strip and Palestinians' "legitimate and political rights" in the occupied Palestinian territory.[132] In practice, the Accords left open the possibility that Palestinian self-rule short of independence could be extended in perpetuity. Critically, they left 61 per cent of the West Bank under full Israeli control.[133]

65.    The right to self-determination remains a fundamental norm of international law that must be ensured by the broader community of States. Under international law, "special agreements [within the terms of the Fourth Geneva Convention] cannot violate peremptory rights nor can they derogate from or deny the rights of 'protected persons' under occupation."[134] Given the peremptory character of the norm, the Oslo Accords cannot waive Palestinians' right to self-determination. Such a fundamental *jus cogens* norm cannot be negatively affected in negotiations, especially considering the asymmetry of negotiating power between the occupier and the occupied (i.e., between the colonizer and the colonized).[135] Any interpretation of the Oslo Accords that negates the right to self-determination of the Palestinian people would render the Accords themselves questionable, if not invalid.[136]

66.    Indeed, any solution that perpetuates the occupation, that does not acknowledge the power asymmetries between the subjugated Palestinian people and the occupier State of Israel and that does not address once and for all Israeli settler-colonialism, violates the Palestinians' right to self-determination, among other critical provisions of international law.

## V.   Need for a paradigm shift

67.    For more than 55 years, the Israeli military occupation has prevented the realization of the Palestinian right to self-determination attempting to "de-Palestinianize" (i.e., diminish the presence, identity and resilience of Palestinians in) the occupied Palestinian territory, attempting to transform most of it into a permanent extension of Israeli metropolitan territory, with as few Palestinians as possible. This behaviour, reminiscent of a colonial past that the international community firmly rejected decades ago, has become more entrenched with the acquiescence of the international community and failure to hold Israel accountable.

68.    The Palestinian people's right to self-determination, as part of the decolonization struggle, has nearly disappeared from the international political and humanitarian discourse, even more so in the context of diplomatic "normalization" with Israel, despite reaffirmations by human rights advocates, scholars and civil society. Some seem to approach it as an ideological slogan rather than as a legal reality from which clear responsibilities emanate.

69.    Meanwhile the occupation has become further entrenched with systematic and forced alteration by Israel of the legal status, character and demographic composition

---

[131] Exchange of letters between PLO Chairman Arafat, Israeli Prime Minister Rabin and Norwegian Foreign Minister Holst (1993). Available at www.un.org/unispal/document/auto-insert-205528/.

[132] Israel and PLO, "Declaration of Principles on Interim Self-Government Arrangements (Oslo I)" (1993).

[133] The Oslo Accords divided the West Bank into Area A (under exclusive Palestinian Authority civil and security control), Area B (under Palestinian Authority civil control and joint Israeli-Palestinian security control), and Area C (under full Israeli civil and military control).

[134] ICC-01/18 (2021), para. 25.

[135] Imseis, "Negotiating the illegal: on the United Nations and the illegal occupation of Palestine, 1967–2020" (see footnote 8), p. 1065.

[136] ICC, *Asem Khalil and Halla Shoaibi*, case No. ICC-01/18-73 (2020), para. 71.

of the occupied Palestinian territory. Without challenging it, the "humanitarian", "political" and "economic development" approaches to the occupied Palestinian territory normalize the occupation itself,[137] rendering the regulatory and remedial functions of international law irrelevant.

70.   This must change; a paradigm shift is needed as the only possible way to overcome this situation by opting for a solution premised on respect for history and international law. This can only be resolved by respecting the cardinal norm of peoples' right to self-determination and the recognition of the absolute illegality of the settler-colonialism and apartheid that the prolonged Israeli occupation has imposed on the Palestinians in the occupied Palestinian territory. Given the settler-colonial nature of the occupation, its overall assessment must change, and so the deliberations of the international community.

71.   This starts with the recognition of the current reality in the occupied Palestinian territory as that of an intentionally acquisitive, segregationist and repressive regime, which has enabled, for 55 years, the disenfranchisement of the Palestinians, caging them into Bantustans of disrupted memories, broken ties and hopes, pursuing the ultimate goal to consolidate minority rule over a native majority on lands usurped through force, abusive and discriminatory policies and pillaging of resources. A prolonged occupation maintained for ostensible "security reasons" disguising Israeli settler-colonial intentions to extinguish Palestinian people's right of self-determination while acquiring their receding territory as its own, as explicitly indicated by Israeli political figures, is something that the international community can no longer tolerate. This must be addressed in a holistic fashion.

72.   Within the framework of the law of external self-determination, the very existence of such an occupation entails an unlawful use of force and therefore can be seen as an act of aggression. An act of aggression constitutes a violation of the *jus ad bellum*, which cannot be dismissed, as Israel often does, by claims of "pre-emptive" self-defence. This triggers consequences under the Charter of the United Nations and the law of State responsibility. Such grave violations of international law render (a) an immediate withdrawal of Israeli presence imperative and non-derogable, so that sovereignty can be returned to and regained by the native Palestinian people and (b) reparations necessary as a step toward justice and peace for both the Palestinians and the Israelis.

## VI.   Concluding observations

73.   **The violations described in the present report expose the nature of the Israeli occupation: that of an intentionally acquisitive, segregationist and repressive regime designed to prevent the realization of the Palestinian people's right to self-determination.** Since 1967, Israel has wilfully and intentionally violated the self-determination of the Palestinians in the occupied Palestinian territory, by preventing their exercise of territorial sovereignty over natural resources, suppressing their cultural identity and repressing Palestinian political character and resistance. In short, Israeli endeavours in the occupied Palestinian territory are indistinguishable from settler-colonialism; by seizing, annexing, fragmenting, and transferring its civilian population to, the occupied territory, Israeli occupation violates Palestinian territorial sovereignty; by extracting and exploiting Palestinians' resources in order to generate profits benefiting third parties, including "settlers", it violates Palestinians' sovereignty over natural resources needed to develop an independent economy; by erasing or appropriating symbols expressing Palestinian identity, the

---

[137] Daniela Huber, "The EU and 50 years of occupation: resistant to or complicit with normalization", *Middle East Critique* vol. 27, No. 4 (2018), pp. 351–364.

occupation endangers the cultural existence of the Palestinian people; by repressing Palestinian political activity, advocacy and activism, the occupation violates Palestinians' ability to organize themselves as a people, free from alien domination and control.

74. **Realizing the inalienable right of the Palestinian people to self-determination requires dismantling once and for all the Israeli settler-colonial occupation and its apartheid practices.** International law is very clear in this regard. No solution can be just and fair, nor effective, unless it centres on decolonization, allowing the Palestinian people to freely determine their political will and pursue their social, economic and cultural development, alongside their Israeli neighbours. The international community must embrace a more accurate diagnosis of the Israeli settler-colonial occupation in the occupied Palestinian territory and abide by its own obligations under international law to fully realize the Palestinian people's right to self-determination.

75. **The Middle East "peace process" and subsequent bilateral peacemaking attempts have proven ineffective; they have not focused their approaches on human rights, particularly the right to self-determination, and have overlooked the settler-colonial underpinnings of the Israeli occupation.** As the Oslo process has shown, politically mandated peace negotiations cannot succeed without resolving the Palestinians' enduring subordinate status, ergo without challenging Israeli settler colonial endeavours. The end of the settler-colonial occupation must be the sine qua non condition for Palestinians to enjoy their right to self-determination in the occupied Palestinian territory, without being compelled to negotiate the conditions of their subjugation.

76. **As a peremptory norm of international law, the right to self-determination cannot be derogated from under any circumstances and gives rise to obligations *erga omnes*.** Given that the denial of the Palestinian people's self-determination is intentional and inherent to Israeli settler-colonial occupation, the unwavering enforcement of the law of external self-determination and the law on the use of force must be the cornerstone of any solution. International law, as the force that should orient politics in the pursuit of justice, requires the cessation of Israeli subjugation of the Palestinian people and unlawful attempts to acquire sovereignty over portions of the occupied Palestinian territory. This implies an obligation on Israel to withdraw without conditions or reservations. Third States shall not recognize as lawful, nor aid or abet, the illegal situation created by internationally wrongful acts by Israel. Shielding Israel from respect for international law and accountability undermines deterrence and breeds a culture of impunity. The exceptionalism demonstrated towards Israel not only undermines the effectiveness of international law, but also tarnishes the image, trustworthiness, and role of the international community and the United Nations, including its judicial organs.

# VII. Recommendations

77. **The Special Rapporteur recommends that the Government of Israel complies with its obligations under international law and ceases to impede the realization of the right to self-determination of the Palestinian people, ending its settler-colonial occupation of the Palestinian territory immediately and unconditionally and making reparations for its wrongful acts.**

78.    The Special Rapporteur recommends that all States:

(a)    Condemn the intentional violations by Israel of the Palestinian right to self-determination including through settler-colonial practices. This requires that:

(i)    States demand an immediate end to the illegal Israeli occupation, return of all land and resources from which the Palestinian people have been displaced and dispossessed while refraining from making withdrawal subject to negotiation between Israel and Palestine;

(ii)    The General Assembly develops a plan to end the Israeli settler-colonial occupation and apartheid regime;

(iii)    States stand ready to resort to the diplomatic, economic and political measures afforded by the Charter of the United Nations in case of non-compliance by Israel;

(b)    Deploy an international protective presence to constrain the violence routinely used in the occupied Palestinian territory and protect the Palestinian population, in line with the report of the Secretary-General on the protection of the Palestinian civilian population (A/ES-10/794);

(c)    Act to ensure a thorough, independent and transparent investigation of all violations of international human rights law and international humanitarian law, including those amounting to potential war crimes, crimes against humanity and the crime of aggression, committed in the occupied Palestinian territory. The Special Rapporteur further recommends that the international community pursue accountability for perpetrators through both ICC in its ongoing investigation into the situation in Palestine, and universal jurisdiction mechanisms;

(d)    Take appropriate steps to prevent, investigate and redress human rights abuses by all business enterprises domiciled in their territory and/or under their jurisdiction by adopting the necessary policies to regulate business conduct in the occupied Palestinian territory, including disengaging from the colonies and providing effective remedy for victims.

79.    The Special Rapporteur recommends that the High Commissioner for Human Rights release, without delay, the updated database of businesses involved in settlements (Human Rights Council resolution 31/36).

80.    The Special Rapporteur fully supports the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and in Israel, and encourages it to investigate the status of the right to self-determination and Israeli settler-colonial endeavours in more depth than the territorial and geographic limitations of her mandate allow.

—————————