# EXHIBIT

# B-1

Case 4:23-cv-05829-JSW   Document 19-9   Filed 11/16/23   Page 2 of 104

  Welcome to the United Nations

عربي  中文  English  Français  Русский  Español



| HOME | KEY TOPICS | THE COMMITTEE | EVENTS | DOCUMENT DATABASE |
| CIVIL SOCIETY | UN SYSTEM | RESOLUTIONS | FAQ | SEARCH |
| HISTORICAL TIMELINE | | | | |

# Israeli Security Cabinet declares Gaza hostile territory – Israeli Foreign Ministry press release//Non-UN document

## Security Cabinet declares Gaza hostile territory

Hamas engages in hostile activity against the State of Israel and its citizens.

(Communicated by the Prime Minister's Media Adviser)

Prime Minister Ehud Olmert today (Wednesday), 19 September 2007, convened the Security Cabinet, in continuation of its September 5 meeting, in order to discuss possibilities for taking action in light of both the continued Kassam rocket fire from the Gaza Strip at Sderot and other communities near the Gaza Strip and the continued terrorism in the Strip.

In today's unanimous decision, it was determined:

Hamas is a terrorist organization that has taken control of the Gaza Strip and turned it into hostile territory. This organization engages in hostile activity against the State of Israel and its citizens and bears responsibility for this activity.

In light of the foregoing, it has been decided to adopt the recommendations that have been presented by the security establishment, including the continuation of military and counter-terrorist operations against the terrorist organizations. Additional sanctions will be placed on the Hamas regime in order to restrict the passage of various goods to the Gaza Strip and reduce the supply of fuel and electricity. Restrictions will also be placed on the movement of people to and from the Gaza Strip. The sanctions will be enacted following a legal examination, while taking into account both the humanitarian aspects relevant to the Gaza Strip and the intention to avoid a humanitarian crisis.

**Subscribe to our mailing list**    ∨

Sign-up to get UN updates, incoming events straight to your inbox

**SUBSCRIBE!**

You can unsubscribe anytime

**Document Type:** Press Release
**Country:** Israel
**Subject:** Access and movement, Closures/Curfews/Blocka
**Publication Date:** 19/09/2007

# EXHIBIT

# B-2

🔗  https://www.unrwa.org/where-we-work/gaza-strip

# Gaza Strip | UNRWA

The Gaza Strip has a population of approximately 2.1 million people, including some 1.7 million Palestine Refugees. For at least the last decade and a half, the socioeconomic situation in Gaza has been in steady decline.

A blockade on land, air and sea was imposed by Israel following the Hamas takeover of the Gaza Strip in 2007. There are now very few options left for the people of Gaza, who have been living under collective punishment as a result of the blockade that continues to have a devastating effect as people's movement to and from the Gaza Strip, as well as access to markets, remains severely restricted. The UN Secretary-General has found that the blockade and related restrictions contravene international humanitarian law as they target and impose hardship on the civilian population, effectively penalizing them for acts they have not committed.

Food security in Gaza has deteriorated with 63 per cent of people in the Gaza Strip being food insecure and dependent on international assistance. The continuing intra-Palestinian divisions exacerbate the humanitarian and service delivery crisis on the ground. With 81.5 per cent of the population living in poverty, an overall unemployment rate of 46.6 per cent (48.1 per cent for Palestine Refugees living in the camps) at the end of the third quarter of 2022 and an unemployment rate of 62.3 per cent among youth (15-29 years, refugees and non-refugees), the already fragile humanitarian situation in Gaza threatens to deteriorate further. The economy and its capacity to create jobs have been devastated, resulting in the impoverishment and de-development of a highly skilled and well-educated society. Access to clean water and electricity remains at crisis level and impacts nearly every aspect of life. Clean water is unavailable for 95 per cent of the population. Electricity is available up to an average of 11 hours per day as of July 2023. However, ongoing power shortage has severely impacted the availability of essential services, particularly health, water, and sanitation

services, and continues to undermine Gaza's fragile economy, particularly the manufacturing and agriculture sectors.

Eight recognized Palestine Refugee camps span the Gaza Strip and have some of the highest population densities in the world. Operating through over 13,000 staff in over 300 installations across the besieged coastal enclave, UNRWA delivers education, health and mental health care, relief and social services, microcredit and emergency assistance to registered Palestine Refugees.

On 7 July 2014, a humanitarian emergency was declared by UNRWA in the Gaza Strip, following a severe escalation of hostilities, involving intense Israeli aerial and navy bombardment and Palestinian rocket fire for 50 days. The scale of human loss, destruction, devastation, and displacement caused by this third conflict within seven years was catastrophic and unprecedented. While significant progress with regard to the physical reconstruction of Gaza has been achieved since 2014, the compounded effects of the blockade and repeated armed conflicts and violence continue to have less visible, but profound, psychological impact on the people of Gaza. UNRWA mounted an extraordinary emergency response which highlighted its unique position as the largest UN organization in the Gaza Strip and the only UN Agency that undertakes direct implementation.

A new round of hostilities in May 2023, while Gaza's population was still recovering from the August 2022 devastation, resulted in civilian deaths, including of children and women, and further damage to homes and infrastructure. In addition, a number of previous limited escalations of hostilities had also taken place, including Israeli airstrikes and, in retaliation, the firing of rockets and mortars by Gaza-based militants. In May 2021, an 11-day escalation of hostilities killed more than 200 Palestinians in Gaza, including over 60 children, among them 19 UNRWA students. You can read their names here and find more information from OCHA oPt. With exceptionally high poverty and unemployment rates, an already fragile humanitarian situation in Gaza threatens to deteriorate further.

In an environment of increasing needs and dependency, UNRWA has traditionally been perceived as a pillar of stability by Palestine Refugees in Gaza. In recent years, UNRWA has made significant improvements to its services in Gaza as part of Agency-wide reform as, for example, in the fields of education and health care.

Notwithstanding the Agency's ongoing funding crisis, which has forced UNRWA in Gaza to take mitigating measures, particularly with regard to its emergency interventions, UNRWA continues to:

- Improve the academic achievement, behavior, and values of school students.
- Focus on the overall health and well-being of Palestine Refugees by providing Primary Health Care. The main provided service areas include infant and child health care, maternal health care, health care of patients suffering from communicable and non-communicable diseases, mental health psychosocial support, in addition to the outpatient services and the provision of essential medication and life-saving hospitalization coverage.
- Construct desperately needed infrastructure, including schools and shelters Improve the quality and targeting of its food and cash assistance to the poorest of the poor.
- Promote gender equality and human rights for all.

---

- Last updated August 2023

- For more information about current UNRWA operations in Gaza, please visit the Gaza Emergency Page.

Generated with Reader Mode

# EXHIBIT
# B-3

BRIEFING PAPER





مركز الميـزان لحقـوق الإنسـان
AL MEZAN CENTER FOR HUMAN RIGHTS



# DELAYED, DENIED AND DEPRIVED:

## THE COLLECTIVE PUNISHMENT OF PALESTINIAN PATIENTS IN GAZA IN THE CONTEXT OF ISRAEL'S 15-YEAR BLOCKADE

JUNE 2022

Al Wehda Street, heading to the Al Rimal clinic and Ministry of Health in Gaza. (Photo credit: Reflection Media / MAP).

# CONTENTS

**1** Introduction — **1**

**2** Israel's obligations towards Palestinian healthcare access under international law — **2**

**3** The effects of Israel's closure on Gaza's healthcare system — **3**

**4** The impact of Israel's May 2021 offensive on health and healthcare in Gaza — **4**

**5** COVID-19 and hindered access to healthcare — **5**

**6** The effects of Israeli restrictions on patients' access to healthcare — **6**

**7** Deaths of patients — **10**

**8** The psychological impact of cruel and degrading treatment on referred patients — **11**

**9** Israel's arbitrary arrest and detention of Palestinian patients and their accompaniers — **11**

**10** Conclusions and recommendations — **12**

**11** Endnotes — **13**

# 1.  INTRODUCTION

In June 2007, Israel intensified its closure and blockade regime over Gaza. The past fifteen years have been characterised by suffocating restrictions on the movement of people and goods, repeated military attacks on civilians and civilian infrastructure, and other discriminatory and fragmentary policies and practices. In defiance of international law and in full sight of the international community, Israel has imposed collective punishment on Gaza's two million inhabitants, precipitating a human-made humanitarian catastrophe that continues to deteriorate year-on-year.[1] Israel's draconian, stifling closure of Gaza serves to deny inhabitants their fundamental, inalienable rights as part of an entrenched system of oppression, domination and discrimination against the Palestinian people. A plurality of Palestinian, Israeli and international human rights organisations[2] and, recently, the UN Special Rapporteur for human rights in the occupied Palestinian territory,[3] have concluded that this system constitutes a regime of apartheid.

The right to the highest attainable standard of physical and mental health, like other economic, social and cultural rights, has become unreachable to many Palestinians living in Gaza as a result of deteriorating socioeconomic conditions and key underlying determinants of health. This is manifested in the soaring poverty rate which, according to the World Bank, has reached 59 percent,[4] adversely impacting the living conditions of around two million Palestinians in Gaza.

In particular, economic deterioration – compounded by reductions of international humanitarian funding and relief action – has contributed to the decline in the labour force participation rate. Unemployment and food insecurity are 47 percent[5] and 64 percent[6] respectively, with approximately 80 percent of the population in Gaza dependent on international aid.[7]

Lack of access to adequate housing is another challenge to health in Gaza, resulting from Israel's deliberate attacks on residential buildings during military escalations, paired with increasing demand due to population growth. Housing construction has slowed dramatically in tandem with Israel's restrictions on the entry of construction material. Severe shortages in electricity supply, drinking water access, and sewage treatment capacity all exacerbate Gaza's escalating humanitarian crisis.

Meanwhile, the COVID-19 pandemic continues to affect Gaza's overburdened healthcare system, notably as it coincides with Israel's barriers to safe and equitable access to vaccines; a lack of qualified, specialist medical personnel; and persistent shortages of essential medicines and disposables. At the end of 2021, 40 percent of essential drugs and 19 percent of medical disposables were reportedly at 'zero stock', meaning less than one month's supply available at Gaza's Central Drug Store.[8]

Gaza's health system, already fragile due to Israel's closure restrictions, was further degraded during Israel's May 2021 military offensive. Lack of respect for the protection of healthcare, in the form of attacks on facilities and personnel and stringent movement restrictions, severely compromised access to health services both within and outside Gaza.

The closure policy and related restrictions on healthcare derive from a broader system of discrimination that is imposed collectively on Palestinians on the basis of nationality and ethnicity, and serve to fragment the Palestinian people and the services available to them, such as healthcare.[9] This system presents a fundamental challenge to Palestinians' rights to health and dignity in Gaza and inhibits the delivery and development of the healthcare system of sufficient availability, accessibility, acceptability and quality to meet the population's needs. In its 2021 report concluding that Israel is imposing apartheid against Palestinians, Al Mezan described the impact on the right to health of Palestinians in Gaza as one of the manifestations of this regime.[10]

This report presents an overview of the right to health in Gaza after 15 years of blockade and closure, and one year on from its devastating offensive in May 2021, with a focus on the impacts of Israel's movement restrictions on patients.

## 2. ISRAEL'S OBLIGATIONS TOWARDS PALESTINIAN HEALTHCARE ACCESS UNDER INTERNATIONAL LAW

Under international humanitarian law (IHL), Israel has specific duties toward the protection of medical personnel and facilities, and ensuring access to adequate healthcare for the Palestinian population under its occupation.

Articles 16 and 18 of the Fourth Geneva Convention (GCIV) require that "[t]he wounded and sick, as well as the infirm, and expectant mothers" be afforded "particular protection and respect", and that "[c]ivilian hospitals organized to give care to the wounded and sick, the infirm and maternity cases, may in no circumstances be the object of attack, but shall at all times be respected and protected by the Parties to the conflict."[11] Unimpeded access for wounded and sick individuals to healthcare is required under Articles 17, 27 and 38, and collective punishment is expressly prohibited under Article 33.[12]

Furthermore, Article 55 provides that "[t]o the fullest extent of the means available to it, the Occupying Power has the duty of ensuring the food and medical supplies of the population", while Article 56 imposes the duty of "ensuring and maintaining, with the cooperation of national and local authorities, the medical and hospital establishments and services, public health and hygiene in the occupied territory, with particular reference to the adoption and application of the prophylactic and preventive measures necessary to combat the spread of contagious diseases and epidemics" and that "[m]edical personnel of all categories shall be allowed to carry out their duties."[13]

Israel's obligations under international human rights law (IHRL) also require that it respect, protect and fulfil the right to health of all people under its effective control and subject to its jurisdiction, including those in Gaza, and to ensure that health services and facilities are available, accessible, acceptable and of good quality.[14] This obligation is articulated in Article 12 of the International Covenant on Economic, Social and Cultural Rights.[15]

Non-discrimination is also a fundamental principle of IHRL, according to which all discriminatory acts affecting the provision of health services are prohibited. The International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) stipulates that States Parties shall undertake "to pursue all appropriate means and without delay a policy of eliminating racial discrimination in all its forms and promoting understanding among all races"[16] and "to prohibit and to eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law", notably in the enjoyment of economic, social and cultural rights including "[t]he right to public health, medical care, social security and social services".[17]



Ministry of Health building in Gaza. (Photo credit: Reflection Media / MAP)

## 3. THE EFFECTS OF ISRAEL'S CLOSURE ON GAZA'S HEALTHCARE SYSTEM

Since its occupation of Gaza in 1967, Israel has enacted multiple military orders and imposed a permit regime that enabled it to systematically control the movement of the Palestinian population. The Israeli permit regime sets substantial barriers to the lives of patients and students wishing to leave Gaza as well as individuals whose families and relatives reside in the West Bank or beyond the 'Green Line' in Israel.[18]

For many years, Israel has imposed a stringent closure on Gaza, restricting the movement of civilians and goods to and from Gaza. The restrictions were intensified with the imposition of a comprehensive blockade after Hamas took control of the Gaza Strip on 14 June 2007. One of the most prominent Israeli measures taken was the declaration by Mini-Ministerial Council (Cabinet) of the Gaza Strip as a "hostile entity" on 19 September 2007.

Israel's closure and blockade is the root cause of the deterioration of living conditions in Gaza, including the inaccessibility and unavailability of many key social, economic and environmental determinants of health. In particular, Palestinian health is challenged by soaring rates of poverty, unemployment and food insecurity; the lack of adequate housing; and the psychological effects of pervasive human rights violations and violence.

The provision of health services—including many diagnostic and therapeutic services—is challenged by the frequent unavailability of essential materials, equipment, spare parts and other maintenance and materials necessary to fix medical devices. The Ministry of Health in Gaza has, for example, been unable to import medical devices for radiology and imaging, such as CT, PET and x-ray scanning machines and spare parts. In 2021, the Palestinian Authority submitted 120 requests for the entry of such equipment, of which only 25 percent (30) were approved by February 2022.[19] Israel's obstruction of the entry of aesthetic gas (nitrous oxide) in 2021 threatened to halt surgical, emergency and scheduled operations.[20]

> **CASE STUDY: ISRAEL PREVENTS ENTRY OF COVID-19 DIAGNOSTIC DEVICES**
>
> With the spread of COVID-19, Ministry of Health staff use radiology devices to diagnose patients in the intensive care units (ICU), inpatient wards and respiratory screening centres to detect the extent of lung infections. There are 22 such portable medical devices in Ministry of Health facilities, and due to the severe pressure and restrictions on the entry of spare parts, eight devices are currently out of service.
>
> In October 2021 the director of the medical imaging unit in the Palestinian Ministry of Health reported to Al Mezan that the Israeli authorities have banned the entry into Gaza of 14 medical imaging devices commonly used for patients testing positive for COVID-19 (eight portable devices and six stationary ones) via the Karem Abu Salem (Kerem Shalom) crossing. The devices are a donation from the Palestinian Economic Council for Development and Reconstruction (PECDAR) and the Palestine Children's Relief Society (PCRF). For ten months, the importing company had been trying to bring these devices into Gaza but to no avail.[21]

The development of Gaza's healthcare workforce continues to be hindered due to Israel's frequent denial of permits to medical personnel seeking to exit to attend external training courses, scientific conferences, and other professional development opportunities that would equip them with up-to-date skills and knowledge. Health service providers are forced to adopt austerity plans to extend the delivery of medical services, especially in light of the worsening electricity shortage crisis. Reliance on backup generators and alternative power services for hours at a time each day increases costs, and frequent switching from mains electricity can damage sensitive equipment.[22]

Eighty-seven generators are used by Ministry of Health facilities to compensate for the electricity shortage, requiring 300,000 litres of diesel per month with an average rate of eight hours power outage following each eight-hour period of mains electricity.[23] It costs USD 2,000 per hour of power outage to operate the generators. Further, the generators have become dilapidated because of their long-term operation and require regular maintenance and spare parts, which are often unavailable due to the closure.

## 4. THE IMPACT OF ISRAEL'S MAY 2021 OFFENSIVE ON HEALTH AND HEALTHCARE IN GAZA

Between 10-21 May 2021, Israel carried out a full-scale military offensive against Gaza. The offensive was characterised by deliberate attacks on civilians and civilian objects including medical personnel and facilities, and residential buildings. Israeli forces also targeted vital infrastructure like paved roads, severely compromising access to health services.

According to information collected by Al Mezan, Israeli military attacks, both direct and indirect, inflicted various levels of damage on four hospitals, 34 medical centres and clinics, three laboratories, and nine pharmacies. Among these, three clinics, a laboratory and a pharmacy were completely destroyed. Damage to doors, windows, walls, hospital beds and equipment, including testing devices and computers, impacted a large portion of the facilities.

Further, an Israeli airstrike partially destroyed Al-Rimal Clinic, Gaza's only laboratory for the processing of COVID-19 tests, and the administrative building of the Ministry of Health in Gaza. The attack not only led to the injury of one health worker but also rendered the laboratory inoperable.[24]

Meanwhile, Israeli authorities shut down crossing operations at Kerem Shalom, banning the entry of medical supplies and the fuel needed to operate Gaza's power plant. Further intensified by Israeli attacks on electricity infrastructure, the subsequent deficit in power supply reached 76 percent. Crossings into Israel through Erez also fell dramatically.[25]



Health facilities damaged in Gaza during Israel's military offensive in May 2021. (Photo credit: Reflection Media / MAP)

# 5. COVID-19 AND HINDERED ACCESS TO HEALTHCARE

The COVID-19 pandemic has uncovered weaknesses in Gaza's already deteriorating health system and its unpreparedness for a crisis of such magnitude. Since the onset of the pandemic, medical facilities reported shortages in medical oxygen and ICU beds equipped with ventilators, as well as additional PCR tests, due to the heavy demand. According to data from the Ministry of Health, 195,328 people were infected with COVID-19 in the Gaza Strip in 2021, with 1,744 confirmed deaths (55 percent male, 45 percent female). Amid stock shortages and high reported hesitancy among the population to take the vaccine, 26 percent of Gaza's population was vaccinated, 44 percent of whom are from the target 'high risk' group.[26]

Despite Gaza's need for additional doses, Israel excluded Palestinians in Gaza from its vaccination programmes, and failed to meet its legal obligation to ensure equitable access to vaccines for the millions of Palestinians living under its control.[27]

On 14 September 2021, a Palestinian Ministry of Health statement revealed that it had disposed of 50,000 damaged doses of the 'Sputnik Light' vaccine it had shipped to Gaza earlier in the same month after their cold chain was compromised due to Israeli movement restrictions. En route to Gaza, the Israeli authorities reportedly ordered the vaccine shipment to be stopped and unloaded at an Israeli checkpoint in Beitunia (to the west of Ramallah, the in West Bank) and again at Kerem Shalom crossing. No procedures or special logistics were taken to maintain the uninterrupted, low temperature-controlled supply chain.[28]

Gaza's cancer patients, in particular, have been directly impacted by the Israeli movement restrictions during the pandemic as the lack of some diagnostic imaging (including PET scans), chemotherapy, and all radiology services in Gaza drives them to seek treatment elsewhere. In an attempt to centralise specialised healthcare services, the Ministry of Health contracted Haya Specialized Hospital in Gaza for cancer care provision starting in April 2020. This initiative, however, did not mitigate the chronic drug shortage, and some of the patients who were referred to the hospital had to leave Gaza eventually for medical treatment at the Augusta Victoria Hospital in East Jerusalem, while subjected to complicated and risky conditions posed by the pandemic, including a 21-day quarantine upon return to Gaza.[29]



Palestinians receive treatment at an UNRWA health centre amid an outbreak of COVID-19 in Rafah, Gaza. (Photo credit: Anas Mohammed)

## 6. THE EFFECTS OF ISRAELI RESTRICTIONS ON PATIENTS' ACCESS TO HEALTHCARE

With Gaza's healthcare system beset by challenges as a result of closure and military assaults, many services – such as radiotherapy, genetic medicine, and certain cardiac surgeries – are completely unavailable inside Gaza. Consequently, many patients must be referred out of Gaza to services in the West Bank, including East Jerusalem, or in Israel and Jordan. Movement restrictions imposed by Israel, however, substantially undermine access to these services.

Patients' travel is governed by Israel's capricious and discriminatory permit regime, with each case decided by the Israeli authorities upon the submission of a formal request, via the Palestinian Ministry of Health, to leave Gaza. This procedure is characterised by frequent, arbitrary rejections and excessive delay.

According to Al Mezan's monitoring and documentation, a patient's urgent need for medical attention, evidenced by their medical reports, is not by itself sufficient to obtain an Israeli exit permit. Gaza's patients first undergo cumbersome medical examination by the Ministry of Health's special committees to determine their eligibility for a referral. After this, an application must be submitted to the Israeli authorities requesting an exit permit to leave Gaza via Israeli-controlled crossings.

Even when a permit is granted, Israeli authorities may arbitrarily arrest patients or their companions upon arrival at the crossing. The following table shows the responses received from the Israeli authorities to permit applications submitted by Palestinian patients who were seeking to leave Gaza for urgent medical appointments:

**TABLE 1**

### RESPONSE OF THE ISRAELI AUTHORITIES TO PERMIT REQUESTS BY PALESTINIAN PATIENTS IN 2021

| RESPONSE CATEGORY | NO. OF RESPONSES |
|---|---|
| Approved | 9,786 |
| Rejected | 70 |
| No response | 1,087 |
| 'Under review'[30] | 4,239 |
| Subject to a prior security interview | 2 |
| Replacement of patient companion required | 26 |
| Pending security interview | 14 |
| New appointment | 59 |
| New request | 2 |
| Returned | 1 |
| Local care[31] | 1 |
| Overstaying[32] | 3 |
| In need of new medical report | 11 |
| **Total** | **15,301** |

As indicated by the figures above, at the time of the scheduled medical appointment 36 percent of all permit requests in 2021 were either rejected, received no response, or were delayed on the pretext of the application being still under review.[33] Patterns of responses also show that the Israeli authorities often respond to a permit application long after the patients' hospital appointments are due, thus forcing them to undergo the same lengthy process again. Applications for sick women and children are not excluded. The approval of requests is often communicated close to or on the day of the scheduled hospital appointment, and sometimes patients are informed in the very late hours of the day, adding an additional burden on patients and their families.

Al Mezan is keen to monitor and document all the barriers and restrictions imposed on patients through its effective follow-up to their conditions and continuous work to enable them to obtain their right to free movement, especially those referred to hospitals outside Gaza. Al Mezan receives patient complaints and prepares their files, which include their medical reports and hospital appointments, and based on that, Al Mezan intervenes with the competent Israeli authorities in order to allow them to travel and access their respective hospitals.

Nevertheless, legal interventions and advocacy efforts by Al Mezan, and likewise other human rights organisations, have limited successes in this regard. In 2021, Al Mezan's Legal Aid Unit received 635 requests from patients, including 158 women and 235 children, seeking assistance in obtaining Israeli exit-permits to reach hospitals outside Gaza. Only 240 of the patients (39 percent), including 100 children and 74 women, were granted permits following Al Mezan's interventions, while Israeli authorities officially rejected the applications of 388 others.

The fact that 39 percent of patients were granted permits following Al Mezan's assistance in filing the paperwork, however, demonstrates the arbitrariness of the initial decisions and delays. This is particularly the case in instances where patient permits' rejections on alleged security grounds were overturned following Al Mezan's administrative support.

**FIGURE 1**



**PERMIT REQUESTS APPROVED AND REJECTED BY THE ISRAELI AUTHORITIES IN 2021**

Delayed and rejected **36%**

**64%** Approved

The affidavits below, collected by Al Mezan, reflect the suffering of patients with medical referrals as a result of Israel's practices and restrictions.

> **FADI ZIYAD SHANNAN, 27, TOLD AL MEZAN:**
>
> *I felt my vision become unclear, so I had medical examinations at the Eye Specialist Hospital and some specialised centres in Gaza. It turns out that I needed a corneal implant in my left eye. The doctors told me that this operation cannot be performed in medical facilities in the Gaza Strip. After I was presented to the competent medical committee, I received Form No. 1, and an appointment for treatment was booked at Al-Najah National University Hospital in Nablus on 28 July 2021. I prepared the medical file, which included a detailed report confirming that my treatment is not available in the Gaza Strip and sent it through the Coordination and Liaison Administration of the Ministry of Health to the Israeli authorities to obtain a permit and pass Erez crossing. After waiting, I received a text stating that my application is under review. I had to make another appointment at the hospital and received one on 1 September 2021. I received a response stating that my application is under review. Now I've lost complete vision in my left eye. As an auto rickshaw driver, I'm very afraid of losing my sight because it will also mean losing my source of income. I don't know why my application has been taking so long to process.*



A Palestine Red Crescent Society ambulance in Gaza. (Photo credit: Abed Rahim Khatib)

### A 42-YEAR-OLD WOMAN WHO SUFFERS FROM CANCEROUS TUMORS PROVIDED THE FOLLOWING ACCOUNT OF THE IMPLICATIONS OF ISRAEL'S MEASURES:

*I felt pain in the thyroid as a result of a small mass in my neck during March 2020, and I've suffered a lot trying to sleep since then. I went to Nasser Hospital in Khan Younis and the doctors recommended that I undergo surgery. In June 2020, I underwent thyroidectomy, but my health condition did not improve. The tests then showed new health problems due to the abnormal decrease in calcium. Doctors told me that the decrease is sharp and is not linked to the surgery and can only be treated through medications. Fatigue and pain continued even after the thyroidectomy. Doctors informed me that my condition required treatment using radioactive iodine in order to destroy the cancer cells. Due to the lack of this type of treatment in health facilities in the Gaza Strip, I started the necessary procedures to obtain the medical referral from the Palestinian Ministry of Health. I received an appointment on 7 February 2021 and then received a new one on 12 September 2021 at Al-Ahli Hospital in Hebron. I applied through the Coordination and Liaison Administration of the Ministry of Health to the Israeli authorities. Due to my unstable financial situation and thus my inability to pay additional costs [referring to transportation costs] and to ensure that the request doesn't get obstructed, I did not register a companion with me. In preparation for travel and 21 days before the appointment, I had to stop taking my medications and painkillers as it is a condition required before undergoing radioactive iodine therapy and atomic scans. When the time came to travel, I was surprised by the status of the request. The Coordination and Liaison Administration told me that the request is under examination, so I could not travel. At that time, I resumed the process of taking my medications and painkillers, which intensified the severity of the pain and I felt exhausted because I had stopped taking them for several days. I made a new appointment at Al-Ahli Hospital in Hebron on 9 November 2021, and in preparation for travel, I've stopped taking my medications from today because the date of travel to the hospital is approaching. I suffered a lot from the process of stopping and then starting my medications and waiting for my permit. I'm in so much pain that I've become mentally drained because of the pressure and constant thinking about my inability to reach the hospital and receive treatment. I wish everyone would find it in their hearts to help me attain my right to treatment.*

Some of the patients, despite their serious illness, were summoned for interviews at Erez. Firas Jaber al-Harazin, 36, told Al Mezan the following:

> I felt pain in my neck, shortness of breath and discomfort during my sleep. I went to al-Shifa Hospital to get a CT scan of the neck and the image showed a clear swelling of the thyroid gland, and based on the doctors' recommendations, I underwent a thyroidectomy. The doctors were surprised by the size of the tumor and the results of the lab tests showed that the tumor was malignant. During my regular follow-up at al-Rantisi Hospital in Gaza, my doctor told me I have to conduct a radioactive iodine uptake test, which are unavailable in Gaza. I started working on the procedures to get a medical referral from the Ministry of Health. The referral and financial coverage were issued two weeks after I applied, but the problem was that the referral was to Nasser Institute Hospital in Egypt, and I refused to go because travelling to Egypt is expensive, tiring and takes time. After my appeals to the competent authorities in the Ministry of Health, I received a medical referral and a hospital appointment scheduled for 14 November 2021 at Al-Ahli Hospital in Hebron. The doctors asked me to stop my hormone therapy in preparation to do the aforementioned test. I submitted a request for a travel permit via the Palestinian General Authority of Civil Affairs[34], to the Israeli CLA, but I received a text on 13 November 2021 that my request was under review. I informed my doctor, and he asked me to get back on the hormone therapy that I had stopped earlier. I asked the committee for the Israeli response and they told me that the Israeli authorities asked me for an interview at Erez, and I accepted. I obtained a new hospital appointment scheduled for 23 January 2022, and I went for the interview at Erez on 10 January 2022. After the interview, the Israeli officer at Erez told me that my request had been approved and I could access the hospital at the scheduled time, however, I received a text one day before my appointment stating that my request was still under review. This delay caused me real suffering and worsened my health condition. My life became at risk when I stopped taking the treatment in preparation for the travel. I obtained a new hospital appointment on 20 February 2022 and I'm again waiting for the Israeli response.

Another example is the case of Nada Abu Hajras, 40, who provided the following testimony:

> I was diagnosed with thyroid cancer in 2015, and I started receiving treatment at that time. I received treatment at Hadassah Medical Center and Al-Ahli Hospital in Hebron. I underwent a thyroidectomy, and I'm still receiving treatment. On 23 October 2021, I submitted a request for a travel permit via the Palestinian General Authority of Civil Affairs to the Israeli CLA, to continue my treatment at Al-Ahli Hospital in Hebron. The Israeli CLA responded to my request with 'under review'. I renewed the request and obtained a new hospital appointment, but still in November the Israeli CLA responded again with under review. I renewed the request for the third time in December, and the response remained under review. When I asked the committee about the reason for the delay, they informed me that it was because of my husband who accompanied me during my treatment and did not return back to Gaza. I now have regular follow ups at the Turkish Hospital in Gaza, but it lacks the radioactive iodine therapy I need. My health condition is deteriorating due to the delay.

The following is the testimony of Ali Bhar, 38, talking about his 10-year-old daughter, who suffers from cancer:

> My daughter, Zina Bhar, was diagnosed with cancer in 2020 at Al-Shifa Hospital. She received six doses of chemotherapy at Al-Rantisi Hospital in Gaza, one dose per month. Zina felt so bad after completely losing her hair due to the chemotherapy. To make her feel better, we bought her a wig to cover her head and she could hardly accept it. I bought her nine wigs of different colors. In January 2021, the doctors referred Zina to Augusta Victoria Hospital in Jerusalem for radiotherapy, but her request for a travel permit remained under review. We submitted four requests for travel permits in 2021, but all remained under review. In 2022, the doctors recommended that my child do a PET scan to check if she still has any cancerous cells in her body.

## 7.  DEATHS OF PATIENTS

Palestinian patients in Gaza often experience lower access to healthcare and worse health outcomes due to Israel's rejections and excessive delay in processing permit applications. Following the Israeli authorities' refusal to grant permits, four patients died in 2021, including two children, according to Al Mezan's documentation.

One of the patients, 15-year-old Amr Fakher Al-Kurd, suffered from meningitis that needed to be diagnosed and treated outside Gaza, but Israeli authorities refused to grant him an exit permit in time. Al-Kurd's father told Al Mezan:

> *Doctors were able to run the necessary medical tests for my 15-year-old son in the neurosurgery department at Al-Shifa Hospital on 5 May 2021. The results revealed that he suffers from meningitis (severe brain infections). His health condition worsened, he lost his balance and appetite and became unable to walk. Doctors decided to transfer him to receive treatment abroad. On 9 May 2021, he received the necessary referral for treatment at Al-Ahli Hospital in Hebron. We applied through the Civil Liaison Authority of the Ministry of Health to the Israeli authorities to obtain permits and we included the names of two of the child's uncles to accompany him: Nader (60) and Zuhair (58) because they are over 40 years old.[35] The same evening, we learned that the application was under review. After going to the Civil Affairs department to inquire on the morning of 10 May 2021, we were informed that the Israeli authorities refused to grant a permit to the patient and the companions. We replaced the companions, and registered the names of about 30 companions from relatives, acquaintances and friends, but the Israeli authorities rejected them all. Attempts to put the names of new accompaniers carried on until 3:30 p.m. the same day. The security [situation] in Gaza deteriorated and it was announced that Rafah crossing would close. At about 6:00 p.m. the same day, the Israeli offensive against the Gaza Strip began and Erez crossing closed. Amr stayed in the hospital and was unable to travel for treatment. On 11 May 2021, his condition worsened and he entered a coma, and was transferred to the intensive care unit. The pleas through social media platforms couldn't save his life. He was announced dead at around 9 p.m. on Wednesday, 19 May 2021.*

Another pertinent example is the case of Hasan Ahmed Al-Kharti, 62, who died on 30 May 2021 following a missed appointment at Al-Makassed Hospital in Jerusalem because his permit application was rejected. Al-Kharti suffered from tumors in the lower jaw and tongue.

The shutdown of Israeli crossing operations during and after Israel's May 2021 offensive has exacerbated the risk to the lives of vulnerable Palestinians. On 13 May, for instance, Aisha Hasan Abu Jazar, a one-year-old infant, passed away after being unable to attend her appointment for follow-up treatment at Wolfson Medical Center in Holon, Israel, where she had undergone surgery six months earlier.

Similarly, Mohammed Abdelrauf Al-Mabhouh missed an appointment at Augusta Victoria Hospital in Jerusalem on 25 May as Erez crossing remained closed at the time. Five days later, he sought medical treatment in Egypt instead. However, the doctors who handled Al-Mabhouh's case said that his condition had already deteriorated drastically leading to his death on 11 June at the age of 64.



Damage to the Palestinian Ministry of Health building and Al-Rimal dispensary, Gaza City. (Credit: Mohammed Zaanoun)

## 8. ISRAEL'S ARBITRARY ARREST AND DETENTION OF PALESTINIAN PATIENTS AND THEIR ACCOMPANIERS

The lives of Gaza's patients, notably those in need of urgent medical attention elsewhere, are plagued by a constant sense of threat, as Israeli authorities routinely use Erez crossing as a means to entrap Palestinian travellers who are granted a permit only to face arbitrary arrest, interrogation, deliberate delay, harassment, or detention at the crossing. Al Mezan's documentation shows that three patient accompaniers were arrested in 2021, as follows:

1. **On Monday morning, 25 January 2021**, the Israeli authorities at Erez crossing arrested Walaa Mohammed Refaie, 35, despite having approved his request to accompany his wife, a cancer patient, to Al-Makassed Hospital in Jerusalem. Refaie was then detained at Ashkelon Central Prison.

2. **On Tuesday, 2 March 2021**, Karam Salem Abu Hadayed, 39, was arrested at Erez crossing while accompanying his 61-year-old mother, also a cancer patient, to hospital.

3. **On Wednesday, 24 November 2021**, Hassan Mustafa Abu Mustafa, 49, was arrested at Erez crossing while accompanying his 50-year-old wife to hospital.

## 9. THE PSYCHOLOGICAL IMPACT OF CRUEL AND DEGRADING TREATMENT ON REFERRED PATIENTS

In highlighting the links between mental health and undermined healthcare due to Israeli barriers— whether through overtly denying access to health services outside Gaza or disrupting patients' treatment regimens—experts from Gaza Community Mental Health Programme told Al Mezan[36]:

> *Israeli measures against patients have serious psychological repercussions on the patients and on their families and friends. Denying them access to health facilities to receive treatments has resulted in negative psychological impacts that extend to society as a whole. If the patient loses hope of getting treatment, s/he feels very frustrated, which may lead to anxious depression. This will affect the patient's health and is likely to develop into a psychological disorder, thus undermining the patient's ability to perform daily tasks. This negatively affects the patient's relationship with his/her family and s/he resorts to taking their frustration out on in their family and children. The state of major depression also causes a low level of immunity and the patient's body becomes weaker and unlikely to respond to medication and painkillers. Patients with a strong mental state have greater resilience and resistance to the disease and are likely to respond better to treatment. Denial of treatment psychologically affects relatives and friends, as the constant reminder of potential loss increases the level of fear, tension and anxiety. This causes psychological imbalance and triggering for these people and their reactions become irrational due to chronic stress. It doesn't stop there as denying patients access to decent treatment makes members of society live in ongoing concern. Such turmoil may lead people to look for an alternative to this place (Gaza) that lacks the basics of life, and therefore the desire to migrate, and search for a better life with basic conditions, especially the right to treatment, keeps growing.*

The denial of medical treatment constitutes cruel, inhuman, and degrading treatment, or even torture. Notably, the excessive delay in processing permit applications of patients requiring life-saving treatment compounds the suffering of patients and their families.

# 10. CONCLUSIONS AND RECOMMENDATIONS

The suffering of Palestinian patients residing in Gaza is exacerbated by unnecessary barriers to healthcare access, particularly Israel's control of crossings with Gaza and broader system of multidimensional discriminatory policies against Palestinians. While a speedy recovery is every patient's ultimate hope, Palestinians in Gaza only aspire to be able to reach hospital in the first place. Ultimately, they are victims of an unconscionable policy of collective punishment imposed on Gaza's population through Israel's 15-year blockade and closure, that the international community must ensure is finally brought to an end.

## PROMPTED BY THE ABOVEMENTIONED FACTS, AL MEZAN AND MEDICAL AID FOR PALESTINIANS MAKE THE FOLLOWING CALLS FOR ACTION:

**The international community must:**

- Pressure Israel to end its closure, blockade and collective punishment of Gaza which drives the deterioration of healthcare services and underlying determinants of health.

- Promptly and effectively intervene to end Israeli barriers to Palestinians' access to healthcare services, and ensure Israel's respect of its obligations under international humanitarian and human rights law.

- Independently monitor, assess and make public findings on the compliance of Israel with its obligations under international law.

- Ensure that aid and cooperation initiatives focus on the sustainable development of essential institutions such as healthcare, and invest in essential infrastructure, capacity building, and professional development for health workers.

- Support projects that overcome fragmentation by bringing together Palestinians from different geographic areas to pursue their common economic, social and cultural development.

**Palestinian authorities must:**

- Redouble efforts to centralise healthcare services and develop relevant facilities through increasing healthcare budgets and investing in human resources and infrastructure.

**The World Health Organization should:**

- Collaborate with the international community and governments to ensure the adequate and uninterrupted provision of essential healthcare resources to Gaza, including COVID-19 vaccines and necessary testing supplies.

**International human rights organisations and UN mechanisms including Special Procedures mandate holders should:**

- Continue to investigate and highlight Israel's practices that hinder Palestinian patients' healthcare access, and continue advocacy and campaigning efforts in coordination with international medical institutions.

- Increase legal interventions aimed at facilitating Palestinian patients' access to hospitals for adequate medical treatment.

# 11.  ENDNOTES

**1**  UN Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967, Michael Lynk. (17 July 2020) https://www.un.org/unispal/document/israels-collective-punishment-of-palestinians-illegal-and-an-affront-to-justice-special-rapporteur-on-the-situation-of-human-rights-in-the-opt-press-release; International Committee of the Red Cross (14 June 2010) Gaza closure: not another year! https://www.icrc.org/en/doc/resources/documents/update/palestine-update-140610.htm

**2**  See, for example: Al Mezan Center for Human Rights (2021) The Gaza Bantustan: Israeli Apartheid in the Gaza Strip https://www.mezan.org/en/post/24083; Al Haq, BADIL, PCHR, Al Mezan, Addameer, CCPRJ, CIHRS, Habitat International Coalition, (2019) Joint Parallel Report to CERD on Israel's Seventeenth to Nineteenth Periodic Reports https://www.alhaq.org/cached_uploads/download/2019/11/12/joint-parallel-report-to-cerd-on-israel-s-17th19th-periodic-reports-10-november-2019-final-1573563352.pdf; B'Tselem, (2021) A regime of Jewish supremacy from the Jordan River to the Mediterranean Sea: This is apartheid, https://www.btselem.org/publications/fulltext/202101_this_is_apartheid; Human Rights Watch, (2021) A Threshold Crossed, https://www.hrw.org/report/2021/04/27/ threshold-crossed/israeli-authorities-and-crimes-apartheid-and-persecution; Amnesty International (2021) Israel's Apartheid against Palestinians: A Cruel System of Domination and Crime Against Humanity https://www.amnesty.org/en/latest/news/2022/02/israels-apartheid-against-palestinians-a-cruel-system-of-domination-and-a-crime-against-humanity/

**3**  UN Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967, Michael Lynk. (25 March 2022) https://www.ohchr.org/en/press-releases/2022/03/israels-55-year-occupation-palestinian-territory-apartheid-un-human-rights

**4**  World Bank (2021), Palestinian Economy Experiences Growth but Prospects Remain Uncertain: https://www.worldbank.org/en/news/press-release/2021/11/09/palestinian-economy-experiences-growth-but-prospects-remain-uncertain

**5**  Palestinian Central Bureau of Statistics (2021) Press release on the results of the Labour Force Survey: https://pcbs.gov.ps/site/512/default.aspx?lang=en&ItemID=4177

**6**  Palestine Economic Policy Research Institute- MAS (2020), Socio-economic and food security Survey: https://mas.ps/en/SEFSEC

**7**  European Commission, European Civil Protection and Humanitarian Aid Operations, Palestine: https://ec.europa.eu/echo/where/middle-east/palestine_en

**8**  Palestinian Ministry of Health (MoH), General Administration of Pharmacy, Monthly Report December 2021 – Shortage of drugs and medical disposables in MoH.

**9**  Medical Aid for Palestinians (2021) Systematic discrimination and fragmentation as key barriers to Palestinian health and healthcare. https://www.map.org.uk/downloads/reports/map-health-inequalities-paper-final.pdf

**10**  Al Mezan Center for Human Rights (2021), The Gaza Bantustan: Israeli apartheid in the Gaza Strip, available at http://mezan.org/en/uploads/files/16381763051929.pdf

**11**  Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, 12 August 1949, Arts 16 & 18.

**12**  Geneva Convention (IV), Arts 17, 27, 38 & 33

**13**  Geneva Convention (IV), Arts 55 & 56.

**14**  CESCR General Comment No. 14: The right to the highest attainable standard of health (Art 12), 2000, available at: https://www.refworld.org/pdfid/4538838d0.pdf

**15**  International Covenant on Economic, Social and Cultural Rights, Art 12.

**16**  International Convention on the Elimination of All Forms of Racial Discrimination, Art. 2.

**17**  International Convention on the Elimination of All Forms of Racial Discrimination, Art. 5.

**18**  Issam Younis, Al Mezan's General Director, "Permits: The mechanism of controlling demography and fragmentation of geography", available in Arabic only at: https://cutt.us/yrybb

**19**  World Health Organization (March 2022) Monthly Health Access Report http://www.emro.who.int/images/stories/palestine/Feb_2022_Monthly_2.pdf?ua=1

**20**  Al Mezan Center for Human Rights (8 August 2021), Israeli authorities ban the entry of anesthetic gas to Gaza: https://mezan.org/en/post/24036

**21**  Al Mezan Center for Human Rights (27 October 2021), Press Release: Al Mezan calls for an international intervention to end Israel's restrictions on the entry of medical equipment and supplies into Gaza: https://www.mezan.org/en/post/24070

**22**  Dr. Mohammed Hammad, Administrative Officer, Palestinian Ministry of Health, interviewed by Al Mezan on 6 October 2021.

**23**  Al Mezan Center for Human Rights (30 May 2021), Press Release: Energy crisis worsens humanitarian conditions in Gaza http://mezan.org/en/post/23999

**24**  Al Mezan Center for Human Rights (19 May 2021), Under Heavy Attacks and Tightened Blockade, Gaza Health Services are at Risk of Collapse, available at: https://mezan.org/en/post/23989

**25**  Al Mezan Center for Human Rights (13 July 2021), In Focus: The effects of Israel's offensive and tightened blockade on Gaza's patients and healthcare system – May 2021: https://mezan.org/en/post/24021

26  Basem Abu Jray, Al Mezan's researcher, Interviewed Hani al-Wahidi, director of health information systems in the Ministry of Health, on 2 February 2022.

27  Medical Aid for Palestinians (February 2021) Equal access to COVID-19 vaccines: Who is responsible in the occupied Palestinian territory? https://www.map.org.uk/downloads/map-position-paper---equal-access-to-covid-19-vaccines-.pdf

28  Palestinian Ministry of Health (14 September 2021): https://www.facebook.com/mohps/posts/4159490157510164

29  Al Mezan Center for Human Rights (15 June 2020), News Brief: In a Letter to the Palestinian Minister of Health, Al Mezan Calls for Comprehensive Cancer Care for Gaza Patients: https://www.mezan.org/en/post/23754

30  'Under review' is the most frequent response that patients receive from the CLA; the response means that the permit is not granted and the patient cannot travel, often missing the appointment, and allows the Israeli authorities to keep its rejection rate relatively low, although the outcome is the same for patients. The Israeli authorities claim by this response that the treatment is available in Gaza.

31  The Israeli authorities claim by this response that the treatment is available in Gaza.

32  Overstaying' means that the patient or one of their relatives previously stayed/is staying 'illegally' (according to Israeli authorities) in the West Bank.

33  Al Mezan Center for Human Rights (31 October 2016), Under Security Check, watch video at: https://www.youtube.com/watch?v=ehe8S9o3ZR0

34  Referred to as 'the Palestinian Civil Affairs Committee' by NGOs.

35  The Palestinian General Authority of Civil Affairs advises that patient accompaniers be at least 40 years old, as individuals in this age bracket are shown to have a better success rate for the receipt of permits, with younger companions often being called to interview and subjected to lengthier security checks.

36  Dr. Akram Nafei, Director of Gaza Community Mental Health Programme, interviewed by Al Mezan on 26 September 2021.



**Medical Aid for Palestinians (MAP)** works
for the health and dignity of Palestinians living
under occupation and as refugees.

Visit us online: **www.map.org.uk**
Call today on: **020 7226 4114**

Follow MAP on Twitter **@MedicalAidPal**
**facebook.com/MedicalAidforPalestinians**
and on Instagram **@medicalaidpal**

33a Islington Park Street, London, N1 1QB
**Email:** info@map.org.uk
Registered Charity no: 1045315



**Al Mezan Center for Human Rights** is a Palestinian
non-governmental human rights organization that works
for the protection and promotion of Palestinian human
rights in Gaza as part of occupied Palestine.

Visit us online: **www.mezan.org**

Follow Al Mezan on Twitter **@AlMezanCenter**
**facebook.com/MezanCenter**
**youtube.com/user/mezancenter**

**Email:** info@mezan.org
Registered Charity no: 563130798

# EXHIBIT
# B-4



A child in Gaza beside a destroyed structure from the May escalation, 9 June 2021. Photo by OCHA

OPT HOME   /   ARTICLES

# Overview | November 2021

*03 Nov 2021*

**Published as part of:**   The Humanitarian Bulletin | Gaza after the May escalation - November 2021

The 11-days of intense fighting, 10-21 May 2021, between Israeli forces and Palestinian armed groups in the Gaza Strip, was the gravest since 2014. In Gaza, scores of civilians were killed and injured. Tens of thousands were displaced. Homes and vital infrastructure were destroyed or damaged and the supply of basic services was severely disrupted. The outbreak of hostilities followed weeks of rising tension in East Jerusalem around access restrictions of Palestinians to holy sites during the month of Ramadan and the threat of forced eviction of Palestinian families by the Israeli authorities in Sheikh Jarrah.

According to the Office of the High Commissioner for Human Rights (OHCHR), during the escalation in Gaza, 261 Palestinians were killed, including 67 children and 41 women. Of those fatalities, 130 were civilians and 64 were members of armed groups, while the status of the remaining 67 has not been determined. Over 2,200 Palestinians were injured, including 685 children and 480 women, some of whom may suffer a long-term disability requiring rehabilitation. In Israel, 13 people, including two children, were killed, and 710 others were injured.[1]


A child in Gaza beside a destroyed structure from the May escalation, 9 June 2021. Photo by OCHA

At the height of the escalation, 113,000 internally displaced persons (IDPs) sought shelter and protection at UNRWA schools or with hosting families. According to the Shelter Cluster 8,250 people remain displaced, as their houses were destroyed or so severely damaged they are uninhabitable.

The Inter-Agency Appeal, requesting $95 million to support emergency humanitarian and initial recovery activities, details the most pressing needs resulting from the escalation. The subsequent Rapid Damage and Needs Assessment (RDNA), conducted in Gaza between 25 May and 30 June, estimates up to US$380 million in physical damage and US$190 million in economic losses. Recovery needs have been estimated up to US$485 million during the first 24 months.[2]

The hostilities exacerbated the already dire humanitarian conditions and trauma under which Palestinians in Gaza live. This issue of the Humanitarian Bulletin seeks to tell the stories of everyday Gazan people struggling to live in the aftermath of the hostilities and offers insights into the impact of displacement, gender-based violence, mental health, environmental and health risks, and destruction of livelihoods. The bulletin concludes with Gaza's UNRWA summer camps, a story of hope and recovery, and how recreational activities offer children a sense of normality amidst such difficult circumstances.

In response to the escalation, on 27 May, the Humanitarian Coordinator for the oPt, Lynn Hastings, launched the inter-agency Flash Appeal, As of 3 September, 67 per cent of the requested amount has been raised.[3] However, for any sustainable recovery to endure, the Israeli blockade has to be lifted, the internal Palestinian political divide has to end, and International Human Rights Law and Humanitarian Law to be respected.

# EXHIBIT
# B-5



UNITED NATIONS

NATIONS UNIES

# GAZA
# TEN YEARS LATER

United Nations Country Team in the occupied Palestinian territory
July 2017

## ACRONYMS AND ABBREVIATIONS

AMA:        Agreement on Movement and Access

ARA:        Access Restricted Area

CM:         Cubic Meter

CMWU:       Coastal Municipalities Water Utility

ERW:        Explosive Remnants of War

GBV:        Gender-Based Violence

GDP:        Gross Domestic Product

GRM:        Gaza Reconstruction Mechanism

IDF:        Israeli Defense Forces

KM:         Kilometer

KM2:        Square Kilometer

MCM:        Million Cubic Meter

MoEHE:      Ministry of Education and Higher Education

MoH:        Ministry of Health

MW:         Mega Watt

NGEST:      Northern Gaza Emergency Sewage Treatment Plant

NM:         Nautical Mile

Non-BC:     Items, other than re-bar and cement, which Israel considers as having dual-use

OCHA:       (United Nations) Office for the Coordination of Humanitarian Affairs

oPt:        occupied Palestinian territory

PA:         Palestinian Authority

STLV:       Short Term Low Volume

UN:         United Nations

UNCT:       United Nations Country Team

UNRWA:      United Nations Relief and Works Agency

WFP:        World Food Programme

## TABLE OF CONTENTS

**FOREWORD** ................................................................................................................. **2**

**SUMMARY: GAZA'S DE-DEVELOPMENT TRAJECTORY
AND PROJECTIONS FOR THE FUTURE** ............................................................ **3**

**10 YEARS OF DIVISION, CLOSURES AND CONFLICT** ................................. **5**

    INTERNAL PALESTINIAN DIVISION ................................................................. 5

    ISRAELI CLOSURES ............................................................................................... 7

    RECURRENT HOSTILITIES .................................................................................. 11

**THE ECONOMY** .......................................................................................................... **13**

    IMPACT ON GAZA'S PRODUCTIVE SECTORS ............................................. 15

    WOMEN AND YOUTH ...................................................................................... 17

**BASIC INFRASTRUCTURE** ..................................................................................... **18**

    ELECTRICITY ......................................................................................................... 18

    WATER AND SANITATION .............................................................................. 20

**SOCIAL SERVICES** ................................................................................................... **22**

    HEALTH .................................................................................................................. 22

    EDUCATION ......................................................................................................... 24

**PROTECTION AND HUMAN RIGHTS** ............................................................... **25**

    INTERNATIONAL HUMANITARIAN LAW .................................................. 25

    HUMAN RIGHTS ............................................................................................... 25

    VIOLATIONS IN THE ACCESS RESTRICTED AREAS (ARAS) .................... 26

    GENDER-BASED VIOLENCE AND CHILD PROTECTION ........................... 27

**GAZA 2020: THREE YEARS UNTIL THE UNLIVEABLE?** ............................. **28**

# 1 FOREWORD

Attempts to tell the story of what is happening to normal citizens inside Gaza today, quickly become the target of polemic – over what is cause and what is effect, around the correct sequencing of events and responses, over the language used and so on and so forth.

Meanwhile, on the ground, life for the average Palestinian in Gaza is getting more and more wretched. This year electricity is the most visible deterioration in the living conditions in Gaza but it comes on top of a host of other chronic and acute problems that have become part of 'normal' life. An 11 year-old child has not experienced more than 12 hours of electricity in a single day in his/her lifetime. No one remembers a time in recent memory when drinkable water reliably appeared out of the tap. Memories of ease of movement in and out of the Strip are also increasingly distant.

In 2012 the UN Country Team produced a report on living conditions in Gaza and predicted that based on the trends we were seeing then, Gaza was on track to become 'unliveable' by 2020.  Sadly, as we check-in on those same trends again in this 2017 report, the deterioration has accelerated, sped along not least by a devastating round of hostilities in 2014 from which we are only now starting to recover.

In my fortnightly visits to Gaza I am constantly amazed at the resilience of a people who manage to get by despite such odds. For most of us, with electricity only 2 hours a day as was the case recently, and youth unemployment at 60%, the 'unliveability' threshold has already been passed. Yet, somehow, families in Gaza find ways to 'make do'.

But this does not change the fact that it is profoundly unjust and inhuman to put Gaza's civilians through such an ordeal. In full view of the world. And still there is no end in sight, 10 years after the dramatic events of 2006-2007 that left the Strip closed, isolated and divided from the West Bank. Life in Gaza has been in perpetual crisis, ever since.

This report attempts to update our understanding of where things stand in Gaza in 2017. On behalf of the 'regular' citizens of the Strip that pose a threat to no-one but are nevertheless paying a high price for the acts and failures of others. The report tries to look past the polemic and to review – as we approach 2020 - the socio-economic, humanitarian and human rights disaster that is unfolding in Gaza and to advocate on behalf of the two million people trapped in this sad reality.



**Robert Piper**

UN Coordinator for Humanitarian Aid and Development Activities in the Occupied Palestinian Territory

11 July 2017

# 2 SUMMARY:
## GAZA'S DE-DEVELOPMENT TRAJECTORY AND PROJECTIONS FOR THE FUTURE

Since the publication in 2012 of the UNCT's report on 'Gaza 2020'[1], Gaza's population has increased by 400,000, reaching 2 million people by the end of 2016. Gaza's population is projected to further increase to 2.2 million by 2020 and to 3.1 million by 2030[2] - just 12 years away.

Reviewing the indicators which in 2012 led the UN to question whether Gaza would become 'unliveable' by 2020, it is clear that very little progress has been made to change the basic trajectory identified in 2012. The population has actually grown slightly faster than projected and neither the economy nor basic infrastructure and services have been able – even remotely – to keep pace. The findings of this report indicate that most of the projections for 2020 have in fact deteriorated even further and faster than anticipated.

In 2012, the UN projected an annual growth rate of real GDP per capita in Gaza of 0.6-1.5%, or even as high as 5.7-6.6% if a significant easing of trade and other restrictions were to take place. Since then, real GDP per capita in Gaza has instead *de*creased. Provision of basic services, including health and education, has continued to decline, as the needs for additional health clinics and classrooms and doctors, nurses and teachers, outlined in the 2020 report, have not been met. Instead, the number of doctors, nurses and hospital beds, relative to the population, declined by 15, 12 and 5 percentage points respectively between 2010 and 2017; and the teacher/student ratio declined by more than five percentage points over the past five years. It should be noted that these reductions do not apply to services provided by UNRWA, where the teacher-student ratio has improved in recent years.

The only indicator which has not deteriorated as quickly as was projected in 2012, relates to the water aquifer. The projection in 2012 that the aquifer would become unusable by 2016, has now been shifted to the end of 2017, thanks mainly to a doubling of water supplied by the Israeli water company and paid for by the Palestinian Authority (PA).  But there is little to celebrate as by the end of this year, Gaza's only water source will be depleted, and irreversibly-so by 2020, unless immediate remedial action is taken.

In addition to the impact of the violent Hamas takeover and ensuing Israeli measures imposed in 2007, three rounds of armed hostilities between Israel and Hamas – with the most devastating round in 2014 – have dealt repeated blows to the Gazan economy and damaged essential infrastructure. As a result, the past three years have been focused mainly on the reconstruction of conflict-damages, drawing attention away from the desperate needs that Gaza faced even before the conflict in 2014. Huge reconstruction needs triggered an easing in imports of construction material to Gaza, particularly through the temporary Gaza Reconstruction Mechanism (GRM), but access to material necessary to allow the Gazan economy to recover and expand remains highly restricted.

Despite the warnings issued by the UN in 2012, Gaza has continued on its trajectory of de-development, in many cases even faster than the UN had originally projected. Ongoing humanitarian assistance and international service delivery, especially through UNRWA's services, are helping slow this descent, but the downward direction remains clear.

## KEY INDICATORS

| Indicator | 2011/12 | 2016/17 Update | 2020 Projection |
|---|---|---|---|
| Gaza Population Size | 1.6 Million People | 2 Million People | 2.2 Million People (up from 2.13 million projected in 2012) |
| Population Density | 4,383 People/KM² | 5,479/ KM² | 6,197 People/ KM² (up from 5,835/ KM² projected in 2012) |
| Real GDP per capita | US$ 1,165 | $1,038 | $1,058 |
| Unemployment Rate | 29% | 42% | 44.4% |
| Energy - % of demand met | 60% | 26-46% | 25-71% |
| Water - % of aquifer safe for drinking | 10% | 3.8% | 0% |
| Year Aquifer will be unusable | Projected in 2016 | Projected in 2017 | The aquifer will be irreversibly damaged |
| Health – hospital beds per 1,000 people | 1.8 | 1.58 | Over 1,000 additional hospital beds needed |
| Health – doctors per 1,000 people | 1.68 | 1.42 | Over 1,000 additional doctors needed |



Gaza - West Bank
Safe Passage closed 2001
MEDITERRANEAN SEA
West Bank
Safe Passage (Non-functional)
Gaza Strip
ISRAEL
DEAD SEA
6 Nautical miles fishing limit enforced by Israeli forces since November 2012
377,126
645,205
273,380
351,934
233,490
Erez
North Gaza
Beit Hanoun 4-4 Palestinian checkpoint
Gaza
Nahal Oz
Closed since January 2010
Karni
Closed since June 2007 (conveyor belt closed since March 2011)
Gaza Middle
Khan Yunis
Israel
Rafah
Egypt
Rafah
closed with exceptions since 2014
Sufa
Closed since September 2008 (exceptionally opened from March to April 2011)
Kerem Shalom
Crossing point
Closed crossing point
100 metres no-go zone
100-300 metres high risk zone
Up to 1,000 metres risk zone
Built-up area
Concrete wall
Wired fence
Population (source: PCBS)

# 3 10 YEARS OF DIVISION, CLOSURES AND CONFLICT

## INTERNAL PALESTINIAN DIVISION

Following the January 2006 Palestinian legislative elections in which Hamas won a majority of the seats in the Legislative Council, a new Hamas-led Palestinian Government was established. However, tensions between Fatah and Hamas quickly escalated as Hamas refused to recognize the Middle East Quartet's (EU, Russian Federation, UN and US) demands to accept all previous agreements, recognize Israel's right to exist, and renounce violence meant that International assistance to the new Government was heavily curtailed. Following several months of negotiations, a National Unity Government was established in March 2007, but was dissolved by President Abbas three months later. Increased confrontations between Fatah and Hamas subsequently escalated, ending with the latter's violent take-over and expulsion of the Palestinian Authority from the Gaza Strip in June 2007.

Upon seizing control of Gaza, Hamas has increasingly tightened its grip on power, including by executing, maiming and jailing opponents and suppressing dissent. For years, Hamas was able to sustain its de facto authority and build up its military strength primarily through controlling the movement of goods smuggled through tunnels between Gaza and Egypt and taxing this trade, while the Palestinian Authority paid for essential services to Gaza residents, including some civil service salaries, electricity, water and medical care. In 2013 Egypt effectively shut down the smuggling tunnel network.  It created a buffer zone on its side of the border and placed severe limitations on the opening of Gaza's only border crossing with Egypt at Rafah. Facing a growing financing deficit in the PA budget, in the spring of 2017 President Abbas started curtailing financial transfers to Gaza by reducing salaries and payments to Israel for Gaza's electricity.

The Hamas coup in Gaza in June 2007 and the administrative division that followed between the PA and Hamas has had a significant impact on administration and public services in Gaza. Despite several national unity agreements between Fatah and Hamas over the past ten years, including, inter alia, the Cairo agreement in 2011, the Doha agreement in 2012, and finally the 2014 "Beach Camp" agreement, which

gave rise to a "government of national consensus", the two sides remain increasingly divided, administered separately and on progressively divergent policy directions.

In recent months, Hamas has sought to reposition itself, including through the adoption of a new policy document. However, the key issues separating the factions have remained unchanged over the years, with continuing ideological differences, including over the recognition of the right of Israel to exist and the use of violence. Hardening the divisions, in March, Hamas established an "Administrative Committee" to run governmental affairs in the Strip. In response, the PA has undertaken a number of measures, with serious humanitarian consequences, to pressure Hamas into bringing Gaza back under political control of the GNC.

## IMPACT ON GOVERNANCE AND SERVICES:

Following Hamas' take-over of Gaza in 2007, the Palestinian Authority (PA) ordered some 70,000 PA employees in Gaza not to report to work or lose their PA-funded salaries. Subsequently, Hamas recruited thousands of its own employees and security personnel. Despite the establishment of a Government of National Consensus in April 2014, nothing changed. Thousands of Hamas-hired workers in Gaza continued to receive a partial salary from the de facto authorities, while others continue to be paid by the PA but not report to work. Currently, the PA is paying the salaries of some 25,658 civil servants (12,293 of whom are not working)[3] and 33,550 security personnel (all of whom are not working) in Gaza[4]. A number of these PA-supported civil servants are slated for early retirement. Meanwhile, the de facto authorities in Gaza are paying partial salaries to approximately 20,299 civil servants. Most of these were hired by Hamas post-2007, except 2,340 PA employees who continued to work in Gaza after 2007.[5]

The Hamas takeover of Gaza has had a significant impact on the legislative, judicial and executive branches. The fact that no presidential or legislative elections have been held in Palestine since 2006 has also created a democratic deficit that undermines the legitimacy of state institutions and their actions on both sides of the divide. The Palestinian Legislative Council (PLC) has not formally convened since the division, significantly impeding Palestine's progress

towards democracy. This has had deep repercussions on the 'social contract' between the citizens and the state, while also challenging the legitimacy of government authorities more generally.

The division has resulted in the establishment of two different lawmaking processes and the enactment of diverging laws in Gaza and the West Bank, further eroding the unity and coherence of the future state of Palestine. In Gaza, elected members of the PLC from the Hamas-affiliated 'Change and Reform' bloc have continued to convene, notwithstanding the expiration of their terms on 25 January 2010. Since the Hamas-affiliated PLC members did not constitute a quorum (partly because of the imprisonment of some Hamas PLC members), a proxy system was developed and relied upon to enact 55 new or amended laws in the Gaza Strip since 2007, including foundational laws such as the new Civil Code. The constitutionality or legality of this system has been challenged both by the Palestinian Authority and legal experts. Some of these newly introduced laws contain provisions that breach international human rights standards in relation to civil and political rights, and gender equality.

Meanwhile in the West Bank, law reform has relied upon Article 43 of the Basic Law limiting the passage of laws by presidential decree to cases of 'necessity'. Article 43 further stipulates that any presidential decree law must be confirmed in the first sitting of a reconvened PLC. The scope of the necessity provision remains legally unsettled as it was intended to deal with only short-term lapses in convening the PLC.  In addition, no court has interpreted or adjudicated the meaning of 'necessity' and therefore a range of interpretations has developed around the constitutionality of laws passed by Presidential decree over the past years. Hamas's contention that the Presidents' term expired on 9 January 2009 is an additional element in the political polarization.

The division also led to the establishment of a parallel justice system in the Gaza Strip. As early as September 2007, the new de facto Council of Ministers established a parallel High Judicial Council in Gaza responsible for the Strip's ten Regular Courts as well as a parallel Higher Sharia'a Court Council related to the family courts. The new judges and prosecutors lack experience. External support for capacity-building has been unavailable due to limits on foreign assistance for work associated with Hamas. Moreover there are no guarantees for judicial independence, which substantially jeopardizes the safeguarding of human rights and essential freedoms in Gaza. More than 100 death sentences have been issued in Gaza since 2007,[6] many of which were issued by military courts, which lack procedural and substantive safeguards to ensure a fair trial.[7]  In addition, the lack of a harmonized legal framework and judiciary has at times created situations whereby courts in the West Bank have refused to implement



© WFP

verdicts issued by Gaza courts and vice versa, to the great detriment of the individuals and families involved.

The internal division also caused a split of the Palestinian civil service, impacting the delivery of basic services such as education and health care. The inability of Hamas to recruit and ensure regular salary payment for civil servants, coupled with the restricted access of professionals to training and learning outside the Gaza Strip, are severely affecting the quality of service provision in the Strip.

For example, in the health sector, some 57% of the Ministry of Health (MoH) employees in Gaza are paid by Hamas and typically receive a lower remuneration than their counterparts paid by the PA. This, in addition to protracted shortages of essential drugs and disposable medical supplies, has a significant impact on the quality of health care delivered in Gaza. Low morale, reduced working hours, increased absences, frequent strikes and the postponement of many elective surgeries are also chronic problems in the Strip.

In the education sector, the de facto Ministry of Education and Higher Education (MoEHE) in Gaza is facing difficulties recruiting new teachers and covering their salaries. As a result, it faces a shortage of 800 teachers and administrative staff and a deficit of $300,000 each month for salaries, resulting in overcrowded schools and limited hours of instruction, with the average daily class room time per student as low as four hours.

Critically, the mistrust and power struggle between the PA and Hamas impedes efforts to find solutions that will improve the provision of basic services in Gaza. This is particularly evident in the energy sector, where lack of transparency on revenue collection and prices of fuel and electricity, as well as disagreement on taxation, have exacerbated political disagreements and led to a major disruption in the supply of energy in 2017.

Ten years later, the Palestinian divide shows no sign of narrowing. The divisiveness and mistrust between Fatah and Hamas poses significant challenges to the development of the Strip. Externally funded projects must be approved by the PA, but must be implemented with a separate body of service-delivery providers in Gaza.

## ISRAELI CLOSURES

Despite the Israeli unilateral disengagement from the Strip in 2005 – including the withdrawal of its soldiers and settlers -- Israel retains full control of all movement of people and goods to and from Gaza by sea, air and land, with the exception of a 12 km strip of border with Egypt which, since 2013 in particular, has also remained closed most of the time, due to the security situation in the Sinai.

Movement restrictions imposed by Israel on the population of Gaza have gradually tightened over the decades in the context of Israel's unilateral disengagement in 2005, the Hamas takeover in June 2007 as well as continuing Hamas rocket attacks on Israel. During the First Intifada, in the early 1990s, Israel began requiring Palestinians to obtain permits to enter its territory (necessary to pass also between Gaza and the West Bank), and completed the building of a fence separating the Strip from Israel.  In 2000, with the beginning of the Second Intifada, the movement of Palestinians through Erez and Rafah crossings was heavily restricted on security grounds. This included restrictions on movement to the West Bank, and shutting down the Gaza Airport after less than two years of operation. In 2005 Israel signed an Agreement on Movement and Access (AMA) with the Palestinian Authority aimed at facilitating movement of people and goods to and from Gaza.

However, further to the events of 2006/2007, including significant military escalation and rocket attacks by Hamas and other armed groups on Israel, the AMA was for all intents and purposes shelved as restrictions were significantly increased. Following the expulsion of the PA by Hamas in the summer of 2007, the Israeli Government declared Gaza "hostile territory" and, again citing security concerns, announced a number of new sanctions and restrictions on the access and movement of people and goods, ultimately amounting to a blockade by sea, air and land. Many of the restrictions imposed then, are still in place, although several have been eased in recent years.

Many of these measures are contrary to international law in that they penalize the entire population of Gaza, without regard to individual responsibility and thus amount to collective punishment[8]. Moreover, the blockade has a serious impact on the human rights of the population in Gaza, notably their right to freedom of movement as well as economic, social and cultural rights, ultimately undermining an adequate standard of living[9].

A further impediment to access and movement has been the military build-up in Gaza by Hamas and other militant groups, which continued and intensified over the past decade, including the development, stockpiling and firing of rockets capable of reaching deep into Israel and the construction of sophisticated tunnels used for kidnappings and terrorist attacks in Israel. Israel has repeatedly reported that Hamas uses the movement of civilians and goods to smuggle weapons, money and other material for its military purposes.

Access and movement restrictions over the past decade can be divided into three distinct phases:

## PHASE 1: **2007 TO 2010**

The initial and most severe phase followed a year of gradual tightening of access restrictions in the wake of the kidnapping of an Israeli soldier by Hamas in June 2006. The period also saw some 6,500 rockets fired from Gaza into Israel.[10] Following Hamas' violent take-over of Gaza in June 2007, stringent restrictions in the form of a land, air and sea blockade were imposed. In terms of imports, only 'basic humanitarian products' (primarily food, fodder, medical supplies and hygiene items) were allowed in. A complete ban on exports and transfers of goods to the West Bank during the first two years of the blockade led to the closure of 95% of Gaza's industrial establishment and the loss of 120,000 jobs.[11] Palestinian access to farming land and fishing areas was also significantly reduced at this time as more than 76,000 dunums of land along the fence line were categorized as "Access Restricted Areas" (ARA) and fishing grounds were also reduced by at least half by the Israeli navy. During this phase, restrictions on the exit of Palestinians through the Erez crossing was limited to "humanitarian cases", and three of the four crossings for goods between Gaza and Israel were shut down. The impact of the closures was further aggravated by the near complete closure of the Rafah crossing by Egypt during the same period, and smuggling tunnels under the border with Egypt became the main point of entry for construction material, livestock, fuel, cash and food products.

## PHASE 2: **2010 TO 2014**

In June 2010 in the wake of the MV Mavi Marmara incident, Israel announced a package of measures to ease the restrictions, including a significant lifting of restrictions on imports of goods. This resulted in an increase in the volume and variety of goods allowed to enter Gaza, although significant restrictions remained on the import of items that Israel considered having potentially 'dual' civil and military use (henceforth 'dual-use' items). Such items were only allowed in for projects funded by international organizations through a multi-layered system of approvals regulating the entry of each individual consignment of materials. Meanwhile, import of equipment needed for the normal functioning of industries and basic services remained severely restricted. The local market in Gaza was unable to compete with many of the products and produce now entering the Strip due to the relaxations on import of such items as well as the flourishing smuggling tunnels from Egypt. However, when these tunnels were closed in 2013, lack of affordable fuel and building materials brought many activities to a halt, triggering a new crisis. During this phase, exports also resumed to a limited extent, primarily cut flowers and strawberries allowed to reach overseas markets, but with marginal economic impact. The West Bank and Israel – previously the two main markets for products from Gaza such as garments, furniture and agricultural produce remained off limits. This period, which includes the conflicts in 2012 and 2014, saw more than 11,800 rockets and mortars fired towards Israel[12]

## PHASE 3: **2014 TO PRESENT**

The current access and movement regime put in place in late 2014 following the latest round of hostilities, included additional relaxations on both imports, exports and movement of people. Since 2015, some 200 rockets have been fired from Gaza into Israel.[13]  With the establishment of the temporary Gaza Reconstruction Mechanism (GRM), import of some 'dual-use' items, mainly construction materials, was facilitated not just for international organizations, but also for individuals and for the private sector in order to respond to the vast needs for reconstruction following the 2014 hostilities. Commercial transfers from Gaza to the West Bank also resumed, first for agricultural produce and later for textiles and furniture. In March 2015, the first exports from Gaza to Israel since 2007 were permitted. This undeniable progress nevertheless still falls far short of pre-2007 levels; in 2016 total exports and transfers of goods from Gaza remained less than 20% of what it had been in the first half of 2007, in part due to continued export restrictions and in part due to restrictions on import of material and equipment necessary for local production.[14] The criteria and quotas for the passage of Palestinians in and out of Gaza were also expanded following the 2014 hostilities,[15]  and yet they remained mostly restricted to businesspeople, medical patients and employees of international organizations. While the number of Palestinians permitted to cross Erez more than doubled from 2014 to 2015, this trend reversed in the latter part of 2016, which saw a 13% drop compared to 2015. The decline continued throughout the first half of 2017, which saw an additional drop of 1.5% compared to the latter part of 2016.

## IMPACT ON ACCESS AND MOVEMENT:

While Israeli restrictions on movement of people and goods in and out of Gaza have gradually eased since the near complete closure of 2007, movement remains highly restricted and unpredictable, further adding to the isolation of the two million people living in the Gaza Strip.

The Israeli measures imposed on the Strip continue to significantly impact the daily lives of Gaza's inhabitants and the efforts of the international community to implement humanitarian and development projects. Israel considers many materials needed for these projects to be 'dual-use' and posing security concerns, thus  subjecting them to severe import restrictions. These include construction materials, raw material for the productive sectors, including wood and pesticides, medical equipment and water pumps necessary to deal with seasonal flooding. Despite improvements, particularly for construction materials, the import of other 'dual-use' items faces significant delays in approval for importation.

Many families are permanently split between Gaza and the West Bank or Israel, and relatives cannot meet except under specific circumstances, such as a death, grave illness or a wedding of a "first degree relative". The effect of not having contact with people outside of Gaza has significant social, economic and even psychological consequences as the population remains essentially cut off from the rest of the world.

Gaza's economy remains largely dependent on the Israeli and West Bank markets, where more than 80% of all goods shipped out of Gaza were once sold. Businesspeople and traders rely on travel to establish and maintain business ties and take advantage of economic opportunities. Many professionals are unable to travel for conferences or other academic learning opportunities and thus unable to keep up with scientific innovations. Medical patients rely on treatment only available in the West Bank, Israel or abroad, and Gazan students cannot travel to study in fields not available in universities in Gaza.

The impact of the restrictions on the different sectors such as the economy, basic infrastructure, basic services and protection is analysed in detail throughout this report.

The number of departures out of Gaza through Erez already declined significantly in the few years prior to 2007, as some restrictions were tightened, but dropped markedly again by mid-2007 when the blockade was imposed. Over the past decade, the annual number of departures has gradually increased from an annual average of 32,400 people departing Gaza in the first phase of the closures (2008 to 2010) to 62,000 people in the second phase of the closures (2011 through 2013) and 141,645 in the third phase (2014-2016). The annual average number of departures from Gaza over the past two years has approximated that of 2006, but remains less than a third of the number of people that departed Gaza in 2004, when around 1,000 Palestinians



©Shareef Sarhan, UNDP/PAPP image bank



Departures via Israel (Erez Crossing): 2017-2004

entered Israel to work every weekday.[16] Prior to 2004, many thousands of Palestinians entered Israel from Gaza on a daily basis and thus, the average number of departures was much higher.

Import of goods to Gaza also dropped significantly with the imposition of the blockade in mid-2007. By 2008, the monthly average of truckloads entering Gaza had decreased by 75%[17]. The amount of imports slowly increased as import restrictions were gradually relaxed, with the number of trucks entering in 2015 and 2016 reaching levels similar to those prior to 2007. It is difficult to draw a parallel between 2015/2016 and 2007 however, given that due to the vast needs for post-hostilities reconstruction as well as recovery of Gaza's deteriorating infrastructure, coupled with rapid population growth, demand for import into Gaza was much higher in 2015/16 than it was prior to 2007.

Exit of goods from Gaza (exports as well as commercial transfers to the West Bank) dropped dramatically in mid-2007 and started to recover slowly only in 2015, as exporters have had to cope with the challenges of restoring production capacity and regaining markets that they have lost since 2007, as well as continued restrictions on import of raw material and delays at the crossings. The average monthly number of truckloads of goods exiting Gaza in the first five months of 2017 is still less than a third of what it was in the first half of 2007, despite a significant increase over recent months.

The access restrictions in and around Gaza continue to profoundly impede improvements in the quantity and quality of services in Gaza, to delay implementation of infrastructure projects and to prevent Gaza's private sector and manufacturing industries from reaching their productive potential.

The United Nations continues to call for the lifting of the closures, in line with UN Security Council Resolution 1860 (2009) and taking into account Israeli security concerns. In the immediate term, it is critical that both parties continue to facilitate the movement of people (particularly humanitarian cases and staff) as well as the entry of critical material, including through the GRM.



Import of goods to Gaza: monthly average of truckloads



**Exit of goods from Gaza
monthly average of truckloads**

The GRM has facilitated import of 2.3 million tons of construction material (cement, aggregate and re-bar), including 1.6 million tons of cement for reconstruction as well as new construction for development agencies and the private sector.  Nearly 120,000 people whose homes were damaged or destroyed have purchased cement through the GRM. Almost 380 large scale construction projects have been completed through the GRM and another 330 are underway. Many of these projects are financed by International donors including Qatar, Germany and the United States.

However, the GRM has been much less successful in enabling import of 'dual-use' items other than re-bar and cement (non-BC). For example, at the time of publication nearly 5,000 'non-BC' items such as water pumps, elevators, wood, steel, cables and other electrical equipment, requested through the GRM, are still awaiting a decision by the Israeli Government with 2,000 of these pending for more than six months. These delays impact large scale development

projects, especially in the critical energy, water and health sectors. As we move towards completing the reconstruction and repair of homes damaged in the 2014 hostilities, the GRM will reach its natural conclusion and discussions may ensue to see what kind of mechanism – if any – might follow to facilitate larger-scale development programming.

## RECURRENT HOSTILITIES

Over the past decade, Gaza has experienced successive rounds of violent confrontation at varying levels, including three major clashes between Hamas and Israel (in 2008, 2012 and 2014) involving shelling of Israel with rockets and massive air and land attacks from Israel on Gaza. These clashes have had a devastating economic and humanitarian impact on the population of Gaza.

The conduct of the hostilities by both sides has also raised serious concerns about the protection of civilians and respect for international humanitarian law, including of the principles of distinction, proportionality and precaution in attack. Accountability for these violations has remained elusive. The Israeli authorities have opened 31 criminal investigations, which so far have resulted in the indictment of three soldiers for a case of looting. At the same time, no meaningful investigations into alleged violations have been announced by the Palestinian authorities. Impunity denies victims and survivors the justice and redress they deserve, and prevents the deterrence of future violations. At the same time, all sides have failed to ensure adequate safeguards for the civilian population, further exacerbating vulnerabilities.

Regular military activities, including Israeli incursions and airstrikes in response to rocket fire from Hamas in Gaza, as well as the rounds of major hostilities with Israeli forces over the past decade has taken its toll. The hostilities have resulted in massive internal displacement, large-scale loss of life and injury and widespread damage to basic infrastructure, with



**Cement Import to Gaza per year**

the vulnerability of Palestinian civilians intensified by the almost total absence of basic protective measures, such as warning systems and bomb shelters. During the same period, Hamas carried out campaigns of rocket fire from Gaza toward Israel and continued to construct sophisticated tunnels for terrorist and kidnapping operations inside Israel.

The first major round of hostilities broke out on 27 December 2008 and lasted for more than three weeks. During this time, nearly 1,400 Palestinians and 13 Israelis[18] were killed and some 60,000 homes were damaged or destroyed, leaving some 20,000 people without a home.  The second major escalation of hostilities began on 14 November 2012 and lasted for one week, in which 174 Palestinians, including 107 civilians, and six Israelis, of which three were civilians, were killed, and some 10,000 homes damaged. The latest, and most devastating round of hostilities, took place between 8 July and 26 August 2014. During these 51 days, 2,251 Palestinians, including at least 146 civilians, and 71 Israelis, of whom five were civilians, were killed, and 171,000 homes were damaged – 17,800 of them rendered completely uninhabitable and displacing their 100,000 inhabitants.

In addition to the damage and destruction of houses and the resulting displacement of the civilian population inside Gaza, recurrent rounds of hostilities have inflicted additional damage to already scarce infrastructure, disrupting services, causing physical and mental trauma. For example, on seven separate occasions during the hostilities in 2014, UNRWA schools that had been sheltering displaced persons were struck either directly or in the immediate vicinity by shells or other munitions as a result of Israeli actions, causing deaths and/or injuries, and at least 83 UNRWA school buildings and 10 health centres were damaged.[19]

Nearly three years after the latest escalation of hostilities, despite significant progress in the physical reconstruction of damages, many services are yet to be fully restored. Damaged agricultural land – only half of which has been rehabilitated - is years away from yielding a harvest comparable to pre-conflict levels. Most of the damaged businesses have been unable to fully resume operations, and some 30,000 people remain displaced waiting for their homes to be rebuilt.

At the same time, while significant focus has – rightly – been on reconstructing the houses damaged in 2014, the total size of the housing shortage in Gaza has increased from 71,000 in 2012 to 120,000 today – in large part due to natural population growth. However, these chronic challenges tend to be forgotten in the face of large scale destruction.

In fact, the recurrent focus on reconstruction following each escalation of hostilities inevitably diverts attention away from the longer-term structural investments needed to reverse Gaza's development trajectory while also redirecting efforts and funding away from longer-term sustainable investments. After each round of hostilities, donor conferences have been held where substantial pledges have been made to repair damaged homes and infrastructure and promote recovery. At the latest donor conference, held in Cairo in October 2014, US$3.5 billion was pledged for Gaza. The earlier donor conference at Sharm El-Sheikh in March 2009 garnered $4.5 billion in pledges.



# 4 THE ECONOMY

Over the past decade, the Gaza Strip has seen a significant decline in key socio-economic indicators, reaching an estimated poverty level of about 40%, and faring much worse than the West Bank.

In terms of real GDP, the ten-year average growth rate for Gaza reached only 2.8% compared to 6.9% in the West Bank, causing a growing divergence between the two regions. Critically, since Gaza's average GDP growth rate has been lower than its population growth rate therefore per capital real GDP in Gaza has actually decreased over the last decade. Per capita real GDP in Gaza declined by 5.3% from 2006 to 2016, while it grew by 48.5% in the West Bank, during the same period, increasing the gap in living standards between the two regions significantly.[20]

Gaza's economic performance suffered a heavy blow initially due to the events of 2005-2008, from the disengagement, through the Hamas take-over, the tightening of the closure, and the escalation of hostilities. It suffered another major setback following the 2014 escalation. The contraction of economic activity was particularly significant in 2014 when real GDP fell by over 15%. Inflow of foreign aid for reconstruction after each escalation of hostilities in 2008-09, 2012 and 2014 have helped boost Gaza's growth rates temporarily.

| Indicator | Value |
|---|---|
| Gaza Real GDP per capita | 2006: US$1,096  | 2016: $1,038 | 2020 (projected): US$1,058 |
| Unemployment rate | 2011: 29%  | 2016: 42%  | 2020 (projected): 44.4% |
| Poverty rate | 2004: 30% | 2007: 50% | 2016: ~40% |
| Food insecurity | 2012: 44% | 2017: 47% |

As Gaza's real GDP per capita failed to demonstrate significant growth, poverty has increased. In 2004, Gaza had a poverty rate of 30%. The rate increased sharply to more than 50% immediately after the intensification of the closures in 2007[21]. The poverty rate then declined to 39% in 2011.[22] In the past few years poverty has stabilized at around 40%.[23]

The impact of the economic contraction in Gaza is also reflected in the unemployment rate. Gaza's unemployment rate increased from 34.1% in the first quarter of 2006 to 40.6% in the last quarter of 2016, translating into 203,000 unemployed persons at the end of 2016.[24] Gaza's unemployment rate has been highly volatile over the past decade reflecting changes in the level of restrictions, periodic rounds of hostilities and reconstruction, and fluctuations in demand for seasonal labour in the farming and fishing sectors. Unemployment peaked in the third quarter of 2014 – exceeding 47% at the height of the hostilities.



© Shareef Sarhan, UNDP PAPP image bank

13

The increase in unemployment has been particularly stark among youth and women. Between the first quarter of 2006 and the last quarter of 2016, the unemployment rate for 20-24 year olds increased by nearly 10 percentage points (from 50.6% to 60.3%) while that of 25-29 year olds increased by close to 16 percentage points from (36.3% to 52.1%). In the same period, the unemployment rate for women increased from 35.1% to 64.4%, with the gap between men and women steadily increasing over the decade.

With increasing poverty and unemployment as well as high food prices, affordable food is out of reach for many families in Gaza. Over one million Palestinians in Gaza are moderately-to-severely food insecure, despite many of them already receiving food assistance or other forms of social transfers. As an example, the number of refugees requiring food assistance has been continuously increasing. The increase started already in the early 2000s, and in the past decade the number of people relying on UNRWA food assistance increased by 27% to more than 960,000 people in 2016, with projections of one million recipients in 2017.[25] An additional 25,000 food insecure non-refugees in Gaza rely on food assistance through WFP.

### FORECAST:

In the Gaza 2020 report, it was projected that between 2012 and 2015 the annual growth rate of real GDP would reach 4% to 5% in a low-growth scenario, or 9% to 10% in a high-growth scenario, based on a "significant easing of trade and other restrictions". Given the high annual population growth rate of 3.37%, real GDP per capita was thus projected to grow at between 0.6% and 1.5% annually in the low-growth scenario, and by 5.7% to 6.6% in the high-growth scenario. However, in large part due to the economic contraction in connection with the 2014 hostilities, real GDP instead



declined in this period - by nearly 5% - while real GDP per capita decreased by over 13% between 2012 and 2015.

Assuming the current energy crisis is resolved by the end of 2017 and the economy recovers in due course, Gaza's real GDP is expected to be around US$2,327 (with 2004 as the base year) in 2020, which would translate into a real per capita GDP of US$1,058. Even in 2020, real per capita GDP in Gaza will continue to be lower than pre-2014 levels.

Moreover, due to the high population growth in the Gaza Strip, the labor force is projected to increase significantly. Even to keep the current high unemployment rate from deteriorating further-still, 24,000 new jobs will have to be created each year. This figure will increase to  27,000 new jobs per year in 2020-2025 and to 30,000 new jobs per year by 2025-2030[26].  If employment growth in Gaza continues at the rate of the historical trend over the last 10 years, by 2020 the unemployment rate in Gaza will exceed 44%.

Gaza's economic trajectory over the past decade is a strong indicator of the ongoing de-development in the Strip. The gap between Gaza and the West Bank also continues to widen.



## Unemployment rate in Gaza disaggregated by gender: 2006-2016

# IMPACT ON GAZA'S PRODUCTIVE SECTORS

Gaza's productive sectors have been particularly hard hit by the events of the last decade and their share of the Strip's GDP has been declining steadily. Between 2006 and 2016, the share of agriculture, forestry and fishing in GDP declined from 6.1% to 4.1% and the share of mining, manufacturing, electricity and water declined from 11.9% to 8.4%. According to the Palestinian Central Bureau of Statistics, GDP growth rate during these 10 years was driven largely by construction, wholesale and retail trade, services as well as public administration and defence. Public administration and defence accounted for nearly a third of Gaza's economy in 2016.

## Private businesses

Most businesses in Gaza are traditionally family-owned and family-operated, and largely engaged in trade and services activities. Businesses are mostly small in size, with the majority only employing 1-4 workers[27] and having asset values under US$30,000[28]. Gaza firms compare far less favourably than their counterparts in East Jerusalem and the West Bank in terms of productivity and cost-effectiveness. According to the World Bank, Gaza's private sector businesses are characterized by a low-level of labour productivity (i.e. value-added per worker), capital intensity (capital units per worker) and total factor productivity (a measure of firms' technical efficiency).[29]

Gaza's private sector is the engine of any future economic growth but remains highly constrained by the impact of the restrictions on movement and access to natural resources and markets, in addition to recurrent destructive outbreaks of hostilities. During the 2014 hostilities, Gaza's productive sector incurred direct damages estimated at US$418 million while indirect losses due to lost income and business opportunities as a result of the conflict reached an additional $451 million. Two years after the latest round of hostilities, Gaza's private sector still report a 50-60% decline in terms of capital assets, production and sales, employment and exports, compared to pre-2014 levels.[30] This has been exacerbated by inadequate international financial support to address the extensive damage and losses caused by the escalation in hostilities and to help initiate recovery.

For the past 10 years the international community has been providing financial and technical support to Gaza businesses to alleviate the adverse impact of the stringent conditions under which they operate. This support has mainly been provided through projects that either target specific productive sectors or business segments with the purposes of repairing damages, promoting new jobs, enhancing quality and performance, or supporting expansion. Generally, the overall strategy of these projects aims to help Gaza recover part of the productive capacity it possessed before the blockade or to compensate for the damages that resulted from the recurrent hostilities. This project-by-project approach has however provided only limited success in bolstering Gaza's private sector



©Shareef Sarhan, UNDP/PAPP image bank

15

when coupled with the ongoing limited access to external markets, raw materials, and public infrastructure, and a weak international and national appetite for business investment as a result of political instability and security challenges.

A fresh approach is needed to create a more sustainable private sector that can boost Gaza's resilience. Investments are needed for developing new business sectors and ideas that can survive under the current situation and which can capitalize on the comparative advantages of Gaza in relation to its rich human capital, knowledge sectors and servicing capacity. This new approach would aim to improve the ability of the private sector to cater better to the domestic market with quality and affordable services and goods, and simultaneously offer services to external markets, especially in areas that already show potential such as offering business solutions, e-work, research, and business design and development. This requires a fundamental long-term strategic shift and substantial investment in education, skilling, technological advancement, enabling infrastructure and market promotion for Gaza.

## Agriculture and Fisheries

In the agricultural sector the annual average value of agriculture trade during the years 2000-2006 reached $18 million. In 2014 agricultural trade had dropped to a paltry US$2.2 million. Progress since, has seen exports valued at $13.3 million by 2016 but still well below the levels 10 years before. As the predictability of trade flows has improved over the past decade, farmers have returned to or expanded their cultivation of export-oriented crops, which generate a much higher return than selling on the local Gaza market. Continuing to build on these gains depends on easing restrictions that affect overall agricultural production as well as specifically those which govern trade, particularly on the types of crops that can be exported to Israel.[31]

The growth of the agricultural sector has also been hindered by restrictions on import of raw material for the productive sectors. Certain fertilizers and a range of common pesticides feature on the Israeli 'dual-use' list. Limited access to these has restricted Gaza's agricultural yields, as the fertilizer concentrations currently being used are lower than those used by farmers in nearby countries, preventing farmers from maximizing their yields. Certain chemicals which increase the shelf life of agricultural produce also feature on the 'dual-use' list. Similarly, inputs necessary for even basic manufacturing like spare parts for lathes and machinery for milling, screwing or iron rolling also feature on the 'dual-use' list. Moreover, access restrictions are not only limited to movement in and out of Gaza. As noted above, Israel has also designated Access Restricted Areas (ARAs) on both land and at sea; up to 35% of Gaza's agricultural land and as much as 85% of its fishing waters have been affected at various points[32].

At sea, the "allowed" fishing area agreed in the Oslo accords extended to 20 nautical miles (NM), but never exceeded 12NM and since 2006, has varied between 3 and 6NM, occasionally extending to 9NM for a few weeks at a time. These restrictions have heavily impacted sardine fishing,



© Shareef Sarhan/UNDP/PAPP image bank

Gaza's most important catch. Sardines flourish at the 6 NM boundary and have consistently accounted for over 50% of the annual catch except during the period when access restrictions were limited to 3 nautical miles (2009-2012).[33] A sustained extension of the current fishing limit to 12 NM (and eventually to 20 NM as agreed in Oslo) would significantly boost the sardine catch, increasing it from the current 350 tons to at least 2,500 tons, with a potential revenue of hundreds of millions of shekels. It would also allow fishermen to exploit high-value "bottom fish" leading to higher incomes and an increase in fish catch. Ongoing restrictions limit fishing activities to shallower zones inhabited by juvenile fish. This is leading to overfishing of resources further endangering the sustainability of fishing livelihoods in Gaza.

## WOMEN AND YOUTH

The women's labour force participation in Gaza is amongst the lowest in the world. Their economic activity is largely concentrated in unpaid agricultural work or informal employment. Thus while 18.3% of economically active women work in agriculture – constituting 30% of agricultural employees in Gaza[34] - they are often classified as "unpaid family members" and do not have access to an independent income or control over agricultural assets[35]. Strict social codes of segregation between men and women mean that women and girls are confined to the private sphere of their homes and are mainly reliant on male family members for their livelihoods as well as access to critical information about the security situation, work opportunities, humanitarian assistance and services. The gendered division of roles and social restrictions on women and girls often translate into their exclusion and limited role in decision-making within the household and beyond.

Gaza has one of the youngest populations in the world, with 43% below the age of 15. This has many implications on the structure of society as well as on the demand for services and on the economy. Youth in the Gaza Strip face many challenges. They are deprived of basic necessities and face social and economic marginalization, isolation and limited access to social and cultural facilities. For economic and social reasons, some youth drop out of school, leave their jobs, or marry at an early age in exchange for protection or a shelter for them and their families. This has negative effects, both short and long-term, on the entire society.[36]

On the one hand, the 'youth bulge' presents an opportunity as these young people reach working age resulting in an increased participation in the labor market. However, for this to happen, there needs to be significant investment in their future. An investment that includes adequate education and above all an investment in developing their knowledge, skills and ambition. Currently, those opportunities are highly constricted in Gaza, and youth lack any meaningful prospects for professional growth.

However, education alone will not create additional job opportunities. Currently, even higher education in Gaza does not protect from unemployment and poverty. In 2016, the unemployment rate for graduates with an Associate Diploma Certificate or above reached 42.9%. This is even more pronounced for women, with a 65% unemployment rate for women with more than 13 years of education, while the unemployment rate was actually lower for women with fewer years of education.



© WFP

17

# 5 BASIC INFRASTRUCTURE

Gaza's infrastructure has suffered significantly from a lack of investment affecting key areas such as water, energy and communications networks[37]. Basic services are simply unable to keep up with demand.

## ELECTRICITY

| Indicator | 2012 | 2017 | 2020 (projection) |
|---|---|---|---|
| Electricity Supply | 210 MW | 120-142 MW | 210-360MW |
| Electricity demand | 350 MW | 450 MW | 550 (low-growth) 850 (high-growth) |

Gaza's chronic energy shortages continue to impact everyday-life, while at the same time undermining the functioning of other infrastructure and services, such as water treatment and health care facilities, as well as adversely impacting Gaza's productive sectors.

The daily demand for electricity in Gaza, which was estimated to be 350MW in 2011, is currently estimated at 450 MW. Meanwhile, the supply of energy has remained stagnant at a maximum of 210MW[38] since 2006. In early 2006, the 210MW consisted of about 90MW from the Gaza Power Plant (GPP) and 120MW from the Israeli Electricity Company (IEC) paid by the PA. As the GPP production reduced following an Israeli bombardment of the Plant in 2006, reaching only half capacity of 60MW, Egypt began providing 17MW which later increased to 20-30MW[39]. However, the power supply from Egypt is regularly interrupted due to maintenance issues.

Recent months have seen a significant decline in energy supply due to the latest stand-off between the PA and Hamas. As the PA refused to waive taxes on fuel for the GPP, and the de facto authorities refused to purchase the taxed fuel, the operation of the power plant came to a halt in April 2017. As a result, Gaza's energy supply reduced to only 120MW, received through Israeli lines (increasing to 142MW when the Egyptian lines are operational), and daily blackouts reached 20 hours per day. Subsequently, in June 2017 the PA decided to reduce its payments by 25% for electricity supplied from Israel to the Gaza Strip. At the time of writing, the Israeli supply has also been reduced to around 80MW, following the PA's decision to reduce payments for Israeli-supplied electricity. This reduction has partially been off-set by the import of Egyptian fuel, paid by Hamas, enabling the GPP to produce some 55MW. Thus the total supply again is up at 127MW (155MW when the Egyptian lines are functioning)



©Shareef Sarhan, UNDP/PAPP image bank

**ENERGY DEMAND AND SUPPLY IN MEGAWATTS**



## FORECAST:

Based on population growth, a conservative projection will see the demand for energy increase to 550MW by 2020. However, in a more optimistic scenario, the next few years would see the completion of a number of critical water and wastewater facilities as a well further progress in Gaza's economic recovery. In this scenario, the energy demand would increase to 850MW.

Projecting future supply is much more difficult. Several key projects, which have been in the pipeline for years, including the establishment of a 161Kv line from Israel and conversion of the GPP to natural gas, are moving forward, albeit slowly, despite broad agreement on the urgent need to address the Strip's energy shortages. Seeing these projects reach fruition also requires agreement on, inter alia, new arrangements for revenue collection, payment and management, project financing and import permits given much of the equipment required is considered 'dual use' by the Israeli Defense Ministry.

Assuming that the current (2017) energy supply crisis will be overcome, three scenarios can be offered for Gaza's energy:

**Scenario 1:** A pessimistic estimate would be that the energy supply in 2020 remains at similar levels to recent years, i.e. 210 MW. In this case, only 38% of Gaza's energy needs would be met by 2020, assuming a low-growth in demand, while only 25% would be met if demand increases to 850 MW.

**Scenario 2:** A more optimistic projection would see the completion of the 161kV line from Israel leading to an increase of 70MW. However, even in this scenario, total supply would only increase to 280MW by 2020, covering 56% of Gaza's energy needs (or 36% if the demand increases according to the higher-growth scenario).

**Scenario 3:** The current best-case scenario would see, in addition to the 161kV line, the conversion of the GPP to run on natural gas and the installation of a gas pipeline, increasing the power plant's capacity to 140MW by 2020 and potentially more at later stages, as well as a doubling of Egyptian supply to 60MW. In this scenario, total supply could reach 390MW by 2020 meeting 71% of demand (or 46% if demand follows the high-growth scenario).



© Shareef Sarhan, UNDP/PAPP Image bank

19

## WATER AND SANITATION

| Indicator | 2012 | 2017 | 2020 (projection) |
|---|---|---|---|
| Share of aquifer water that is safe for drinking | 10% | 3.80% | 00% |
| Year when the aquifer may become unusable | 2016 | 2017 | Aquifer will be irreversibly damaged |
| Amount of untreated or partially treated waste water that is pumped in the ocean | 90,000 CM/Day | 100,000 - 108,000 CM/Day | 120,000 CM/Day |

### SHARE OF AQUIFER SAFE FOR DRINKING



Access to safe drinking water in Gaza through the public water network plummeted from 98.3% in 2000 to a mere 10.5% in 2014, compared to almost 97% in the West Bank. As a result, reliance on water tanks, containers and bottled water rose from 1.4% to 89.6% during the same period.

For other domestic use (ie. not for drinking), currently 50% of the population receives water for only 8 hours every four days, 30% receives water for 8 hours every three days, and the remaining 20% receives water for 8 hours every two days.

Having to rely on water trucking comes at a high cost on consumers, as trucked water is 15-20 times more expensive than water from the network. This particularly impacts the most vulnerable who are often poor and unemployed and do not have access to piped network water. Trucked water is also unregulated and unreliable in terms of quality.

The increasing population and unsustainable demands on Gaza's sole water source due to systematic over-extraction of the underlying coastal aquifer has resulted in the intrusion of seawater and in 96.2% of the groundwater in Gaza becoming unfit for human consumption – up from 90% in 2012. Due to the deployment of new fresh water sources of good quality, particularly an additional 5 MCM of water supplied by the Israeli water company Mekorot and paid for by the PA (bringing this to a total of 10 MCM), and 3 MCM of desalinated seawater that has been developed in the recent past, the projection made in 2012 that the coastal aquifer would become unusable by 2016 has been shifted to the end of 2017. It is still expected that the damage to the

aquifer will become irreversible by 2020 unless additional measures are implemented immediately.

At the same time, the amount of untreated or partially treated waste-water which is released into the ocean each day has increased from 90,000 CM per day in 2012 to 100,000 CM per day in 2016, which recently increased further to 108,000 CM per day due to the electricity crisis. This equates to 43 Olympic-size swimming pools of poorly treated sewage being dumped into the Mediterranean every day.

This is in large part due to the lack of electricity to operate waste-water treatment facilities as well as the continued delays in completing and making operational the three central waste-water treatment plants, in Gaza and Middle area Governorates, Khan Younis Governorate and North Gaza Governorate. Due to electricity shortages, the Coastal Municipalities Water Utility (CMWU) is currently prioritizing the operation of 55 sewage pumping stations to avoid localized flooding in residential areas. Those stations are pumping the sewage to the waste-water treatment plants, which have reduced functioning due to energy crisis, and thus dumping poorly or untreated sewage to the sea.

Of particular concern is the delay in implementation of the Northern Gaza Emergency Sewage Treatment Plant (NGEST), which upon completion would be able to treat 36,200 CM of waste-water per day. The plant was due to start operations by the end of 2012. However, restrictions on

© UNICEF SoP / ElBaba

delivery of equipment and materials, access to the site, and the lack of provision of a 3MW power supply has delayed operation up to the present day. The plant's operational delay is exposing 10,000 households in Beit Lahia to public health and environmental health risks.

To address the water and waste-water crises it is critical that additional water treatment facilities are constructed. Since 2012, work has started on three Short Term Low Volume (STLV) desalination plants, which will produce an additional 13MCM water, as well as on sewage treatment plants in both the North, Middle and South areas of Gaza. However, the construction of the facilities have been delayed in large part due to restrictions on imports of the necessary dual-use material, and only 23% of the planned STLV interventions forecast to be completed by 2016 were achieved. The completion date for the remainder is now expected in 2019 at the earliest. The recent opening of the Seawater Desalination Plant for the Southern Gaza Strip, designed to provide safe drinking water to 75,000 people, with plans for expansion to serve 150,000 people is a welcome development, but can only be sustained if a solution is found to the ongoing energy crisis. This STLV inaugurated in January 2017 is only operated for a limited number of hours, depending on the availability of fuel, pending the supply of 1.5 MW of electricity from the grid

### FORECAST:

It is forecast that by 2020 Gaza's coastal aquifer will be irreversibly damaged. The impact of this will be catastrophic. Already the supply of water in Gaza does not meet the global WHO standards of 100 liters per person per day.  In order to meet this standard, 73MCM would currently be required in Gaza – but the supply is only 58.32MCM, or 80% of demand. Even assuming that the Mekorot supply will remain stable and that there are no further obstacles to implementation of or energy supply for water facilities, this gap is expected to grow by a couple of percentage points by the year 2020, given rapid population growth.

### WATER DEMAND AND SUPPLY (PROJECTION)



### SEWAGE DUMPED IN THE SEA EACH DAY



With the supply of water too low to meet the demand, the living and health conditions of the people of Gaza can only further deteriorate, exposing the population to water-borne illnesses, and other threats.

Without further progress towards improvement of waste-water treatment, most urgently through increased electricity supply, the amount of sewage pumped into the ocean is also expected to increase by another 20% to 120,000 CM per day by 2020, with significant environmental consequences, not only for Gaza.

A large number of projects are currently underway to avert this disaster, including through increased desalination and waste water treatment facilities. However, these projects are progressing very slowly and facing continued obstacles in the import of essential equipment. Moreover, all of these facilities, once completed, will depend on a reliable electricity-supply.



# 6 SOCIAL SERVICES

Throughout most of the period, Gaza has shown remarkable resilience in the areas of primary health and basic education, in large part due to services provided by UNRWA and other international partners. However, in neither area have services been able to keep up with the growing demand. Restrictions on import of construction material and equipment, damages sustained in multiple rounds of conflict, low human resources and morale are leading to a gradual decay in the quality of services.

At the same time, providers of humanitarian assistance and other social services are heavily impacted by the long-standing electricity crisis. To maintain a minimum level of critical services, providers rely on back-up generators, which are constantly at risk due to funding shortages for fuel, limited fuel storage capacity, recurrent malfunctioning due to overuse, and challenges in procuring spare parts and new generators due to import restrictions. Since December 2013, emergency fuel supplies from the international community to the most vital health, WASH and municipal facilities have prevented the collapse of these services. Currently, 186 critical facilities receive emergency fuel: 32 in the health sector, 124 in the water and wastewater sector and 30 in the solid waste sector.

## HEALTH

| Indicator | 2010 | 2016 | 2020 projection (requirements to maintain 2010 service level) |
|---|---|---|---|
| Number of hospital beds per 1,000 people | 1.8 | 1.58 | Over 1,000 hospital beds needed |
| Number of doctors per 1,000 people | 1.68 | 1.42 | Over 1,000 doctors needed |
| Number of nurses per 1,000 people | 2.09 | 1.98 | Almost 1,000 nurses needed |

The Israeli closures compounded by the Palestinian divide directly affect the sector's ability to ensure quality staff training, medical supply and equipment, and maintenance of infrastructure.  Several hospitals and clinics were also damaged or destroyed during the three rounds of hostilities in Gaza. As a result, while the population has doubled since 2000, the number of functioning primary health care clinics has decreased from 56 to 49 (note UNRWA currently runs an additional 22 health centers), resulting in crowded conditions, decreased doctor-patient time and further reduced quality of services. In addition, an insufficient and intermittent supply of electricity has contributed to difficulties in the provision of health care particularly with



© UNRWA Gaza 2017

## PROJECTED HEALTH CARE SYSTEM REQUIREMENTS



- ■ Still needed by 2020
- ■ Added since 2010

regard to the effectiveness of immunization (vaccines) programmes which are dependent on uninterrupted functioning of the cold chain.

While there has been a slight increase in the numbers of hospital beds, doctors and nurses between 2010 and 2016, high population growth has meant that their availability per capita has actually decreased over the same period. Thus, while the absolute number of hospital beds in Gaza increased from 2,769 in 2010 to 2,974 in 2016, the rate of beds per 1,000 people declined from 1.80 to 1.58 over the same period.   Similarly, the number of doctors in Gaza increased slightly from 2,578 in 2010 to 2,663 in 2016, but the rate of doctors per 1,000 people declined from 1.68 to 1.42.  For nurses, the increase in numbers has been slightly greater, with an additional 518 nurses added to the 3,207 nurses in Gaza in 2010 translating nevertheless into a slight decline in the rate of nurses per 1,000 people from 2.09 in 2010 to 1.98 in 2016.

The reduction in the structural capacities and human resources of the health care system in Gaza has worrying implications for the quality and overall capacity of services. These problems are further compounded by chronic shortages in essential drugs and medical disposables and the lack of regular payment of Ministry of Health staff.

While some basic health indicators in Gaza have remained relatively high – in large part due to services provided with international assistance, particularly through UNRWA - many of these indicators have now started to stagnate or even decline. For example, studies of Gaza's refugee population revealed no significant reduction in Gaza's infant mortality

rate in recent years.[40&41] The rate of breast cancer survival declined from 59% in 2006-2010 to 46% in 2010-2014. This sensitive marker illustrates the need for improved breast cancer services for effective detection and treatment.

At the same time, the rising burden of non-communicable diseases has resulted in increased and unmet needs for prevention and treatment measures, while tertiary health care services in Gaza lag behind the standard expected in the region, including for mental health care, metabolic diseases, cancer treatment and trauma rehabilitation.

As a result of the poor quality of healthcare and the lack of many services, many patients look for medical assistance and treatment in West Bank and beyond, which is challenging due to limitations in movement and obtaining permits. The annual number of MoH referrals of patients for care outside of Gaza tripled in the past ten years from 8,276 in 2006 to 24,616 in 2016. Over the same time period the approval rate of permits granted by Israel to patients to exit Gaza for medical treatment dropped from 90% to 62% of applicants.[42]

## FORECAST

In 2010, the UN projected that by 2020, Gaza would require almost 800 additional hospital beds; more than 1,000 additional doctors and more than 2,000 additional nurses. Since then, more accurate data has become available and the UN has therefore subsequently adjusted these requirements to 1,240 additional hospital beds, 1,163 additional doctors and 1,447 additional nurses.[43]

However, since 2010, only 205 additional hospital beds have been provided and 85 additional doctors have been registered, while 518 additional nurses were registered in the same period. As a result the number of hospital beds, doctors and nurses per capita has further decreased.

In order to revert to the already low 2010 levels of beds, doctors and nurses per 1,000 people, it is now projected that an additional 1,035 hospital beds, 1,078 additional doctors and 929 additional nurses will be needed in Gaza by 2020.

While these additional staff would help to improve services, there were significant gaps in the availability and quality of health care for people in Gaza in 2010, with a reliance on external referral for specific areas of hospital care, including many cancer treatments.  The deterioration in the availability of health services, as expressed by these indicators, points to a worrying trend for the future health of Gaza's population.

## EDUCATION

| Indicator | 2012 | 2017 |
|---|---|---|
| Number of teachers per 1,000 students | 38.7 | 36.7 |
| Number of class rooms per 1,000 students | 26.3 | 26.4 |
| Number of class room hours per student | 4 Hours | 4 hours |

In the education sector, Gaza also has a high-level of basic educational attainment, in large part due to UNRWA and other international organizations, providing primary schooling. Over the past decade, the literacy rate in Gaza increased from 94% in 2006 to 97% in 2016. At the same time, the average years of schooling increased from 9.17 to 10.66 years, and remained higher than in the West Bank.

Meanwhile, the infrastructure and the quality of learning in non-UNRWA schools have deteriorated significantly over the past ten years. In addition, many schools were damaged or destroyed during successive rounds of hostilities, further increasing the pressure on education facilities. During the 2014 hostilities, 547 educational facilities, including 259 schools, 274 kindergartens, and 14 tertiary education institutions were damaged or destroyed, affecting 350,000 students. To date, most of the affected schools have been repaired, however 181 kindergartens and 11 higher education institutions are yet to be repaired due to lack of funds.

The shortage of infrastructure – and in the case of UNRWA schools, the agency's financial challenges - also has an impact on the quality of education. Classrooms now have an average of 38.9 students in public schools and 39.3 in UNRWA schools. Moreover, 61.7% of government schools and 70.4% of UNRWA schools currently operate on a double shift system, limiting student access to the classroom to only four hours per day.[44] The internal political division also means that public education services in the Strip do not have a regular budget for running costs and budget shortfalls have left many teachers unpaid for months.

As a result, there is a growing risk that the high-level of educational attainment cannot be sustained.

### FORECAST

By 2020, it is estimated that 665,000 students will be enrolled in schools and 100,000 will be enrolled in universities. Keeping pace with the growth of pupils and students in the Gaza strip will be one of the major challenges for the sector of education in the coming years as at least 900 new schools will be required in Gaza Strip by 2030. In the Gaza 2020 report, it was projected that 250 additional schools were needed immediately, and another 190 schools would be needed by 2020 to meet the demands of a rapidly expanding population. However, between 2012 and the end of 2016, only 33 governmental schools and 24 UNRWA schools were built, i.e. well below the actual need.

In addition to the problem of ensuring adequate facilities, equipment and personnel to keep up with the high growth in the student population and the quality of the services in the education sector will be difficult to sustain. This will require increased opportunities for training of teachers and educational advancement, which requires a relaxation on the restrictions of travel to the West Bank and abroad.



© UNRWA Gaza 2017

# 7 PROTECTION AND HUMAN RIGHTS

## INTERNATIONAL HUMANITARIAN LAW

As the occupying power[45], Israel has obligations to the population and in particular to facilitate rapid and unimpeded passage of humanitarian relief for civilians in need.[46]

Provisions of international law relating to the conduct of hostilities are also relevant within the context of Gaza, and must be respected by all parties to the conflict, including Hamas and other Palestinian armed groups. In particular, all parties have to respect the principles of distinction, proportionality and precaution.[47]

The independent commission of inquiry established by the Human Rights Council to investigate all violations of IHL and international human rights law in the oPt in the context of the 2014 military operations concluded that both the IDF, Hamas and other Palestinian armed groups may have committed war crimes.[48] Alleged violations during the 2014 hostilities in Gaza are similar to those documented and investigated in 2008/09 and 2012, underscoring the recurrent nature of the violations in Gaza and the failure of efforts to prevent their repetition.[49] However, almost three years after the 2014 escalation in hostilities, serious concerns persist regarding the degree of accountability by the Israeli authorities and the absence of investigations by Palestinian authorities concerning alleged violations of international humanitarian law and international human rights law, including allegations of war crimes.

## HUMAN RIGHTS

Substantial human rights violations are also taking place in Gaza under Hamas's control. These occur not only during times of heightened tensions or when hostilities escalate but have also become a feature of daily life.

Following its take-over of Gaza in June 2007, Hamas launched a broad campaign aimed at consolidating power by reforming security apparatuses and neutralizing opponents. Since then Hamas has committed human rights violations, including restrictions on freedom of expression, association and assembly as well as a campaign of arbitrary arrests, harassment, torture that even lead to death in custody. Certain associated armed groups, such as members of the Qassam Brigades, were also responsible for extra-judicial kidnappings, beatings and murders of political opponents.[50] In recent years violations by the de facto authorities in Gaza have continued, albeit at lower-scale, including restrictions on the freedom of expression and assembly, arbitrary detention and ill-treatment targeting in particular dissenting voices, journalists and social media activists, members of Salafi groups and political opponents considered as "collaborating" with Israel or the Palestinian Authority.[51] Between 2007 and 2017, a total of 28 civilians sentenced to death were executed by the Hamas in Gaza without the Palestinian President's ratification, as required by the Palestinian law.



© Shareef Sarhan (UNDP/PAPP) made on unit

The past decade has also witnessed an increasing trend of restricted freedom of expression in Gaza, with the de facto authorities reportedly arbitrarily detaining and torturing civilians, including journalists and social media activists, for expressing views that are perceived as favouring the PA. The de facto authorities also restricted right to freedom of assembly by requiring permission from the Ministry of Interior.[52]

The State of Palestine is also responsible for implementing its human rights obligations in the entirety of the oPt, including Gaza.[53] The de facto authorities in Gaza also bear human rights obligations given their exercise of government-like functions and territorial control,[54] and the State of Palestine, which is legally bound by its ratification of human rights treaties, also has human rights obligations towards individuals in the Strip.

Meanwhile, the numerous restrictions imposed by Israel on both movement of people and goods into and out of Gaza impede the enjoyment of a range of human rights such as the right to freedom of movement and a number of economic, social and cultural rights, including the right to health, education, work, adequate standard of living, and family life.[55] As highlighted below, concerns persist as to the right to life and security of persons following the apparent use of excessive force in law enforcement operations within the ARA, including at sea. Given its jurisdiction and effective control exercised as the occupying power, Israel is bound by human rights obligations towards the population of Gaza.[56]

## VIOLATIONS IN THE ACCESS RESTRICTED AREAS (ARAS)

Israel's methods of enforcement of access restrictions also impact the right to life and security of person in Gaza. When Israel announced its intention to withdraw from Gaza in 2003, it embarked on a campaign to establish wide "buffer areas" along Gaza's perimeter areas and to restrict access to these by fishermen. These security zones have come to be known as access-restricted areas (ARAs), unilaterally determined by Israel to address security concerns, including the digging of tunnels. In order to enforce these limits, Israel regularly uses force through daily shootings in the direction of fishermen at sea and by the perimeter fence towards farmers, bystanders and demonstrators.  Palestinians entering the Access Restricted Areas (ARAs) on land and sea risk being shot even if they present no imminent threat.

On the land border, the size of the ARA has been shifting and there is a lack of clarity on the exact scope of the area. According to available information, the ARA was set at 150 meters from the fence in 2000, extended to 300 meters in May 2009, and reduced back to 100 meters for farmers only with the 2012 ceasefire understanding.[57] Another UN study found that in 2010, the "no-go area" reached up to 500 meters from the fence.[58] The absence of clear criteria for distinguishing between farmers and ordinary residents who are present in the areas between 100-300 meters from the fence, has added to the uncertainty surrounding the access



©OCHA

restrictions to these areas. The ISF uses firearms almost on a daily basis in the context of protests or clashes along the fence, risking the life of civilians living or present there. The OHCHR chaired Protection Cluster together with a number of Palestinian NGO's documented the killing of 389 people (including 10 women, and 60 children), amongst whom 23 fatalities occurred in the context of protests, and the injury of 2,829 others (including 401 children, and 53 women) by Israeli fire in these areas between 2007 and 2017 .[59]

At sea, the scope of ARA has also fluctuated over the last ten years.[60] To enforce access restrictions at sea, the Israeli Security Forces use live and rubber bullets, shells, conduct limited incursions, detain fishermen, confiscate, damage, and sink their fishing boats and equipment. During this period, Israel has claimed that militant groups in Gaza have made continuous efforts to smuggle weapons and materials for weapons production through the sea, including by using fishing boats.[61] However under international law, unless there is a credible suspicion that a fishing vessel is being used to commit a hostile act, the use of force against these carriers is only considered as lawful when used in accordance with the principles of necessity and proportionality. The use of lethal force is only justified in instances where there is an immediate threat to life or injury.  The majority of the fishermen arrested at sea are never charged or convicted of a crime.

## GENDER-BASED VIOLENCE AND CHILD PROTECTION

Over the past decade, Gaza has also seen rising levels of gender-based violence, and child protection violations. While accurate reporting on these issues remains difficult, a recent report suggests that more than 148,000 women in Gaza are exposed to gender-based violence[62]. Between 2011 and 2014 UNRWA identified 3,160 survivors of gender-based violence in Gaza and provided a range of different services including psychosocial support and legal assistance.[63] Moreover, the Women's Centre for Legal Aid and Counselling has documented 27 killings of women and girls in 2014, 15 cases in 2015 and 18 cases in the first eight months of 2016.

Due to the war, displacement and impoverishment in Gaza, adolescent boys and girls are especially vulnerable to significant protection concerns, including physical and emotional violence, sexual abuse, arrest and detention, child labour, recruitment and use by armed groups, as well as early marriage. Adolescent boys are also subject to direct protection threats either as a result of their involvement with Hamas and armed groups or their targeting by the IDF in the ARAs. Similarly, boys are more at risk of being injured from ERWs[64].



Shareef Sarhan UNDP/PAPP image bank

# 8 GAZA 2020: THREE YEARS UNTIL THE UNLIVEABLE?

Over the past decade, Gaza's economy has weakened, with real GDP per capita largely stagnant and the unemployment rate increasing over time. At the same time, Gaza's infrastructure, basic services and private sector have been gradually debilitated.

As a result, there has been a steady deterioration in living standards and an increase in the vulnerability of the Strip's 2 million people. This vulnerability is further amplified in times of crisis when hostilities have escalated. Consequently, Gaza has been facing a downward spiral of de-development, while the people in Gaza are caught in a cycle of humanitarian need and perpetual aid dependency. Over the past decade, the number of people in humanitarian need has remained above 1 million, with 1.2 million people in need of humanitarian assistance in 2017.

The United Nations and our partners continue to spare no effort to provide emergency humanitarian assistance, while facilitating longer-term projects. However, the current restrictions on the operating environment in Gaza, the fact that the Strip remains beyond the reach of the legitimate Palestinian Authorities and under Hamas control, essentially mean that most of the focus remains on short-term humanitarian and reconstruction projects. The measures needed to move towards more sustainable recovery and development remain elusive if not off-limits.

The costs of inaction are great. Indicators for basic health and education are already starting to decline, and provision of basic services are only kept afloat by humanitarian service-providers. This year, the United Nations and humanitarian partners are requesting $371 million to provide humanitarian assistance for Gaza – to address vulnerabilities stemming from the critical shortages of basic services and high protection needs. Without these services, Gaza would have been deemed unliveable years ago.

We have less than three years until 2020.  It remains essential that the people of Gaza are enabled to live dignified, healthy and productive lives in peace and security and that the current downward spiral is reversed. That requires immediate action by all parties; by Israel, the PA, Hamas and by the international community towards more sustainable development, reinvigoration of Gaza's productive sectors, improvement of freedom of movement for both people and goods, as well as respect for human rights and international humanitarian law.

Without such steps, Gaza will become more isolated and more desperate, the threat of a renewed, more devastating escalation will increase, and the prospects for intra-Palestinian reconciliation will dwindle – and thus so will the prospects for peace between Israel and Palestine.

© Shareef Sarhan, UNDP/PAPP image bank

28

# ENDNOTES

1. United Nations Country Team in the occupied Palestinian territory: Gaza 2020, August 2012: http://www.unsco.org/Documents/Media/Gaza%20in%202020%20-%20a%20liveable%20place.pdf

2. UNFPA Palestine: Palestine 2030 - Demographic Change: Opportunities for Development: http://palestine.unfpa.org/publications/palestine-2030-demographic-change-opportunities-development#sthash.XBsKxTiU.dpuf

3. Data from the Ministry of Finance, April 2016.

4. Securing Gaza: Challenges to Reunifying the Palestinian Security and Justice Sectors, unpublished report by the Geneva Centre for the Democratic Control of Armed Forces (CDAF), 2015.

5. Data from the Ministry of Finance, April 2016.

6. Palestinian Centre for Human Rights (PCHR) Press Release, "Military Courts Issues 7 Death Sentences in Gaza in One Day", 20 February 2017: http://pchrgaza.org/en/?p=8831

7. Al Haq, Capital punishment in Gaza: A continuing and alarming practice, 8 March 2012: http://www.alhaq.org/documentation/weekly-focuses/542-capital-punishment-in-gaza-a-continuing-and-alarming-practice

8. While citing security reasons, the Government of Israel justified the new access regime, normally referred to as the blockade, as part of a campaign of 'economic warfare' against Hamas, in a letter to OCHA of 17 March 2011. http://www.ochaopt.org/documents/ocha_opt_fragmented_lives_annual_report_2012_05_29_english.pdf

As highlighted in multiple reports of the UN Secretary-General, the continued imposition of the blockade constitutes a form of collective punishment on the civilian population in Gaza contrary to Article 33 of the Fourth Geneva Convention, applicable to the occupied territory: Report of the Secretary General to the Human Rights Council A/HRC/24/30 (22 August 2013), at para. 22; most recently A/HRC/34/38 (16 March 2017), paras. 29 – 32. See also the two latest reports of the High Commissioner for Human Rights on the oPt, A/HRC/34/36, para. 36 and A/HRC/31/40, para. 36.

9. A/HRC/34/38, para. 30.

10. UN Department of Safety and Security figures, includes 2007 through 2009.

11. Palestine Trade Center (Paltrade), special report, 7 July 2009: "Gaza Strip – Two Years Through Siege", page 9: http://civilsociety-centre.org/sites/default/files/resources/palestinian%20trade%20center.pdf

12. UN Department of Safety and Security figures

13. UN Department of Safety and Security figures

14. In all of 2016, 178 truckloads of goods exited Gaza compared to 961 truckloads in the first 6 months of 2007.

15. GISHA: http://gisha.org/en-blog/2015/01/20/gaza-access-and-movement-2014-summary-2/

16. GISHA: http://www.gisha.org/UserFiles/File/publications/Rafah_Report_Eng.pdf

17. Decrease since 2005.

18. The number of civilian fatalities during this round of conflict has not been confirmed.

19. Report of the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East, 1 January – 31 December 2017, p 11/46; UN Secretary-General's Headquarters Board of Inquiry Letter dated 27 April 2015 from the Secretary-General addressed to the President of the Security Council, S/2015/286 (27 April 2015), containing a summary of the report of the Board of Inquiry, available at: http://www.un.org/en/ga/search/view_doc.asp?symbol=S/2015/286, UNRWA, Schools on the Front Line: the Impact of Armed Conflict and Violence on UNRWA Schools and Education Services, p.1, available at: https://www.unrwa.org/resources/reports/schools-front-line-impact-armed-conflict-and-violence-unrwa-schools-and-education.

20. Data excludes those parts of East Jerusalem annexed by Israel in 1967

21. The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, 13 April, 2011: http://siteresources.worldbank.org/INTWESTBANKGAZA/Resources/AHLCReportApril2011.pdf

22. Palestinian Central Bureau of Statistics: http://pcbs.gov.ps/Portals/_Rainbow/Documents/Poverty_2009_2011_e.htm

23. The World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, 19 September 2016: http://documents.worldbank.org/curated/en/474311473682340785/pdf/108205-V2-WP-PUBLIC-SEPT-14-2PM-September-2016-AHLC-World-Bank-Report.pdf

24. Palestinian Central Bureau of Statistics: http://pcbs.gov.ps/portals/_pcbs/PressRelease/Press_En_13-2-2017-lb-en.pdf

25. UNRWA, 2017 oPt Emergency Appeal, p. 5, available at: https://www.unrwa.org/resources/emergency-appeals/opt-emergency-appeal-2017.

26. UNFPA Palestine: Palestine 2030 - Demographic Change: Opportunities for Development: http://palestine.unfpa.org/publications/palestine-2030-demographic-change-opportunities-development#sthash.XBsKxTiU.dpuf

27. Palestinian Central Bureau of Statistics, Establishments Census Atlas of Palestine 2012 (November 2013)

28. UNDP Damage Assessment after the 2014 hostilities

29. World Bank, West Bank and Gaza, Investment Climate Assessment: Fragmentation and Uncertainty (Washington, D.C., September 2014), pp. 10-14.

30. UNDP, The Path from Zero-Minus to Economic Recovery in the Gaza Strip, to be published in 2017

31. Currently, the Israeli government allows 250 tons of tomatoes and 50 tons of eggplant to enter Israel from the Gaza Strip each month. Export of these two crop types does not always meet this ceiling, but the inability to export other crop types limits the incentives for Gaza's farmers to cultivate as the Israeli market provides a much higher return than selling on the Gazan or West Bank markets. There are currently no restrictions on the quantity or type of crops that can be sold in the West Bank.

32. OCHA: Access Restricted Areas in the Gaza Strip, July 2013: http://reliefweb.int/sites/reliefweb.int/files/resources/ocha_opt_gaza_ara_factsheet_july_2013_english.pdf

33. Before the fishing zone was restricted to a maximum of 6NM, sardine catch reached 2,500 metric tons (MT) during peak years. However, in 2011, at a 3NM restriction, the catch only reached 350 MT – or 14%. Given that a ton of sardines has a market value between 8-20,000 NIS (depending on the size of the sardines), the financial repercussions of this decline are on the order of millions of dollars each year.

34. UN Women - UN OCHA August 2015: Needs of women and girls in humanitarian action in Gaza: Gender Alert for the 2016 Response Plan

35. UN Women: Building Ties: Towards Integrated Strategies & Policies for Empowering Palestinian Women, 2014

36. UNFPA Rapid Assessment Report: Effects of the Gaza Crisis on Youth, 2014

37. GISHA: Hand on the Switch, January 2017: http://gisha.org/UserFiles/File/publications/infrastructure/Hand_on_the_Switch-EN.pdf

38. GISHA: Electricity Shortage in Gaza: Who Turned Out the Lights?, May 2010: http://www.gisha.org/userfiles/file/publications/ElectricitypaperEnglish.pdf

39. The Egyptian energy supply is paid through a deduction of Egypt's

contribution to the PA fund to the League of Arab States.

40. van den Berg MM, Madi HH, Khader A, Hababeh M, Zeidan W, Wesley H, et al. (2015) Increasing Neonatal Mortality among Palestine Refugees in the Gaza Strip. PLoS ONE 10(8): e0135092. https://doi.org/10.1371/journal.pone.0135092

41. WHO, Ministry of Health Gaza & UNRWA: Validation of UNRWA survey findings on Infant Mortality in Gaza:   Summary of Main Findings, August 2016 [unpublished]

42. WHO: Right to Health, Crossing barriers to access health in the oPt, 2016 (forthcoming)

43. The figures used in the original report were based on data collected through syndicate registries. However, many doctors and nurses registered with syndicates may work abroad or not actively work in Gaza.  This report therefore uses instead data from the Ministry of Health (MoH) in Gaza, which is based on the numbers of practitioners registered as working in health facilities in Gaza.

44. Educational Statistical report, MoEHE, Gaza http://www.mohe.ps/category/reports/

45. See ICJ 2004 Advisory Opinion on the Wall, para.101, Security Council (SC) resolutions (e.g. 1860(2009) and 2334(2016)), General Assembly (GA) resolutions (e.g. 62/181, 63/98); Human Rights Council resolutions (e.g. 10/18); Secretary-General's reports (e.g. A/HRC/34/38, para. 9 with references); claims by Israel that its disengagement from Gaza in 2005 amounted to the end of Gaza's occupation were rejected on the basis that the control that Israel retained on Gaza's air space, sea space and external borders continuously amounted to effective control (see Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, A/61/470, para. 7.)

46. Art. 59 Fourth Geneva Convention.

47. ICRC Study on Customary International Humanitarian Law, Rules 1-15; see Secretary-General report A/HRC/34/38, para. 10.

48. A/HRC/29/52.

49. A/HRC/28/45, para. 16.

50. International Crisis Group. Round Two in Gaza. Middle East Briefing N 24, Gaza city/Ramallah/Brussels. 11 September 2008, https://www.files.ethz.ch/isn/92030/b24_round_two_in_gaza.pdf

51. A/HRC/12/48, paras, 1359-1365 http://www2.ohchr.org/english/bodies/hrcouncil/docs/12session/A-HRC-12-48.pdf

52. PCHR Press Release, 13 August 2007: PCHR Calls upon the Executive Force to cancel the decision to ban demonstrations without official permission from the Force: http://pchrgaza.org/en/?p=2820

53. On 1 April 2014, the State of Palestine notably acceded to seven of the nine core human rights treaties.

54. Secretary-General report A/HRC/34/38, para. 5 and 75.

55. See SG report A/HRC/31/44 on freedom of movement and impact on ESCR rights.

56. Secretary-General report A/HRC/34/38, para. 6 - 8.

57. OCHA. Um an Naser: opportunities for 'building back better' in the Access Restricted Areas. May 2015: https://www.ochaopt.org/content/um-naser-opportunities-building-back-better-access-restricted-areas-gaza-strip

58. OCHA and WFP: "Between the Fence and a Hard Place", August 2010: https://www.ochaopt.org/sites/default/files/ocha_opt_special_focus_2010_08_19_english.pdf

59. UN chaired protection cluster figures documented by Al-Mezan Centre for Human Rights on 23 March 2017.

60. OCHA. Restricted Livelihood GAZA'S FISHERMEN, July 2013: https://www.ochaopt.org/documents/ocha_opt_gaza_fishermen_case_study_2013_07_11_english.pdf

61. https://www.idfblog.com/2014/03/27/weapons-smuggling-ships-attempt-reach-gaza-intercepted-israel-navy/

62. UNFPA/GBV Sub-Cluster: "The humanitarian impact of Gaza's electricity and fuel crisis on Gender-based violence and services", May 2017

63. UNRWA experience in GBV programming : lesson learned from the last five years, UNRWA, 2015

64. Gaza Gender Alert, UN Women-OCHA, August 2015



**United Nations Country Team in the occupied Palestinian territory**

# EXHIBIT
# B-6

A/HRC/53/59

# Advance unedited version

Distr.: General
9 June 2023

Original: English

---

**Human Rights Council**
**Fifty-third session**
19 June–14 July 2023
Agenda item 7
**Human Rights situation in Palestine and other occupied Arab territories**

## Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese*

*Summary*

In the present report, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese, finds that arbitrary and deliberate ill-treatment is inflicted upon the Palestinians not only through unlawful practices in detention but also as a carceral continuum comprised of techniques of large-scale confinement -physical, bureaucratic, digital- beyond detention. These violations may amount to international crimes prosecutable under the Rome Statute of the International Criminal Court and universal jurisdiction. Israel's occupation has been a tool of settler colonial conquest also through intensifying methods of confinement against an entire people who – as any people would – continuously rebel against their prison wardens.

---

\* The present report was submitted after the deadline in order to reflect the most recent developments.

# I.   Introduction

1.      In this report, Francesca Albanese, the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, presents concerns related to the widespread and systematic arbitrary deprivation of liberty in the occupied Palestinian territory.

2.      Despite being invited by the State of Palestine, the Special Rapporteur was unable to visit the occupied Palestinian territory before submitting this report due to Israel's continued refusal to facilitate her entry. She conducted a remote investigation over six months, including a visit to Jordan, and virtual meetings and tours in the occupied Palestinian territory.[1] The report draws upon these consultations, testimonies, stakeholders' contributions, and a comprehensive review of primary and public sources.

3.      A 10,700-word report cannot capture the scale and extent of the arbitrary deprivation of liberty in the occupied Palestinian territory. Nor can it convey the suffering of millions of Palestinians who have, directly or indirectly, been affected. The report provides a bird's-eye view of arbitrary deprivation of liberty as a key instrument of Israel's domination and oppression, addressing primarily structural issues and scale of the phenomenon.[2] International law violations by Palestinian authorities are assessed to the extent they contribute to tightening the grip of the regime imposed by the occupation.

4.      The report clarifies circumstances, norms and processes that lead to arbitrary deprivation of Palestinians' liberty. The reality captured is of an entire occupied population framed as a security threat, often presumed guilty, and punished with incarceration even when trying to exercise fundamental freedoms. This system presents features of persecution, which often involves ill-treatment behind bars and surveillance out of prison. While in-prison confinement is the most acute form of deprivation of liberty imposed on Palestinians, physical, bureaucratic and digital 'architectures' further restrict them spatially and psychologically. This wider carcerality, made of an array of laws, procedures and techniques of coercive confinement, transforms the occupied Palestinian territory into a constantly surveilled open-air panopticon.

5.      An examination of this carceral continuum - a system of control composed of multiple and interrelated levels of confinement - underscores the urgency to end it, as required by international law, and ensure both accountability for the architects of its most serious violations and reparations for the victims.

# II.   The rationale of investigating the arbitrariness of deprivation of liberty

## A.   Magnitude

6.      Deprivation of liberty has been a central element of Israel's occupation since its inception. Between 1967-2006 Israel has incarcerated over 800,000 Palestinians in the occupied territory.[3] Although spiking during Palestinian uprisings, incarceration has become a quotidian reality.[4] Over 100,000 Palestinians were detained during the First Intifada (1987-1993),[5] 70,000 during the Second Intifada (2000-2006),[6] and over 6,000 during the 'Unity

---

[1]   End of "Non-Visit" statement (14 February 2023)

[2]   Instances where criminalization and detention are not qualifiable as arbitrary, such as crimes under penal laws of all countries or offenses against civilians, by whoever committed, are not discussed in this report.

[3]   Ben-Natan, Smadar. "The boundaries of the carceral state: Accounting for the role of military incarceration." *Theoretical Criminology* (2023), p. 11. This figure may be a conservative estimate, as it has been used for years.

[4]   Nashif, Esmail. *Palestinian political prisoners: Identity and community*. Routledge, 2008.

[5]   Human Rights Watch, *Torture and Ill-Treatment: Israel's Interrogation of Palestinians in the Occupied Territories* (1994), p. 3

[6]   PCBS, Special Statistical Bulletin (May 2011), p. 4.

Intifada' (2021). [7] Approximately 7,000 Palestinians, including 882 children, were arrested in 2022.[8] Currently, almost 5,000 Palestinians, including 155 children, are detained by Israel, 1,014 of them without charge or trial.[9]

## B.    Gravity documented

7.    Serious abuses against Palestinians in Israeli custody have occurred throughout the Israeli occupation. Confinement in filthy and crowded cells, sleep and food deprivation, medical negligence, severe and prolonged beatings and other forms of ill-treatment, have been extensively documented.[10]

8.    The use of torture and ill-treatment against Palestinian detainees and prisoners has been reported.[11] Invoking the 'ticking bomb' and 'moderate physical pressure' doctrines, the Israeli executive has litigated in court the 'necessity' of using techniques that may amount to torture to allegedly deter attacks against Israeli civilians.[12] Torture remains an available method to intimidate and obtain confessions or information, primarily, although not exclusively, from "security suspects".[13]

9.    The UN Working Group on Arbitrary Detention, which has addressed cases of Palestinians since 1992, has repeatedly affirmed that widespread and systematic arbitrary deprivation of liberty may amount to a crime against humanity.[14]

10.    UN independent experts and leading human rights organizations have identified Israel's widespread and systematic use of arbitrary arrests, administrative detention, lack of due process, ill-treatment and torture, as foundational elements of the apartheid regime imposed upon the Palestinians.[15]

## C.    Layers of repression

11.    Since the signing of the Oslo Accords, Palestinian self-rule has added a layer of repression to Palestinian life under occupation. Arbitrary arrests and detention carried out by the Palestinian Authority in the West Bank and the de facto authorities in the Gaza Strip have contributed to stifling Palestinians' rights and freedoms.[16]

12.    The security coordination between the Palestinian Authority and Israel has pioneered a direct connection between Palestinian and Israeli detention apparatuses. This connection is illustrated by what the victims refer to as the 'revolving door policy': a nefarious cycle whereby Palestinians are first arrested, interrogated, detained and often subjected to ill-treatment by the Palestinian Authority and then, upon release, by the occupation forces,[17] or vice versa.

---

[7]    Addameer, "Prisoner's Institution: the Occupation Arrested about 8000 Palestinians from the Palestinian territories this year" (1 January 2022).

[8]    Addameer, 2022 in Review, (1 January 2023).

[9]    Addameer, Administrative Statistics (23 May 2023).

[10]    Al-Haq, *A Nation under Siege* (1990); B'Tselem, *The Interrogation of Palestinians during the Intifada, Ill-treatment, "Moderate Physical Pressure" or Torture?* (1991); HRW, *A Threshold Crossed - Israeli Authorities and the Crimes of Apartheid and Persecution* (2021), pp. 79-90.

[11]    fnX(HRW1994); CAT/C/ISR/CO/4 (2009); CAT/C/ISR/CO/5 (2016).

[12]    Israel, Landau Commission Report (1987); *The Public Committee Against Torture v. Israel* (1999); *Abu Gosh v. Attorney General* (2017).

[13]    Imseis, Ardi. "Moderate Torture on Trial: Critical Reflections on the Israeli Supreme Court Judgement concerning the Legality of General Security Service Interrogation Methods." *Berkeley J. Int'l L.* 19 (2001), pp. 336-338, 342-349.

[14]    A/HRC/WGAD/2021/61, para. 57.

[15]    A/HRC/49/87 (2022), para 50(a); Amnesty International, *Israel's Apartheid Against the Palestinians* (2022), p. 240-248.

[16]    HRW, *Two Authorities, One Way, Zero Dissent: Arbitrary Arrest and Torture Under the PA and Hamas* (2018), pp. 2, 23.

[17]    B'Tselem and Hamoked, *Backed by the System: Abuse and Torture at the Shikma Interrogation Facility* (2015), pp. 44-45.

### D.   Confinement behind and beyond bars

13.     The incarceration of Palestinians is only one element of a larger carceral landscape, extending beyond prison as a paradigm of governance of the occupied territory and confinement of its population.[18] This phenomenon has intensified alongside growing Israeli (military and civilian) presence in occupied territory.[19] The presence of illegal colonies exacerbates both discrimination and violence against Palestinians, and their criminalization and imprisonment.[20] In turn, stifling Palestinian movement and freedoms, while furthering fragmentation, surveillance and segregation of their living space, facilitates the expansion of the colonies.[21] This creates a suffocating environment that obliterates rights and, by rendering the occupied population arbitrarily punishable, erodes their status of protected civilians.[22]

## III.   Relevant International Law Framework

14.     The protection of individuals from the "arbitrary exercise of power" is one of the greatest achievements of the post-1945 international order.[23] Any authority exercising effective control over a population must respect the prohibition against arbitrary deprivation of liberty. In the occupied Palestinian territory, the unlawfulness of the Israeli occupation negates any legitimate title to exercise authority with respect to Gaza or the West Bank, including east Jerusalem.[24] However, when de facto control is exercised, it must comply with the applicable normative framework.

15.     The applicable international legal framework comprises both treaty and customary international law, including international human rights law, whose protections "do not cease(...) in case of armed conflict"[25] and apply extraterritorially,[26] as well as international criminal law. Read together, these bodies of laws establish that detention is considered arbitrary when it is not grounded in any valid legal basis; it violates fundamental guarantees afforded by international law including to a fair trial; and it is used discriminatorily.[27]

### A.   International Humanitarian Law

16.     Deprivation of liberty in situations of belligerent occupation is governed by the Hague Regulations, the Third and Fourth Geneva Conventions, Additional Protocol I, and customary international humanitarian law. Israel's control over the West Bank, including east Jerusalem and the Gaza Strip, meets the tests for the existence of a military occupation.[28] The presence of Palestinian authorities does not alter the framework's applicability nor does it absolve Israel of its obligations as the occupying power.

17.     The Third and Fourth Geneva Conventions, integrated and supplemented by customary rules, respectively provide guarantees and procedures for captured combatants and protection for civilians arrested or detained in occupied territory. The internment of protected persons is permitted only if "absolutely necessary" for the security of the occupying power[29]

---

[18]   Khalidi, Rashid I. "From the Editor: Israel: A Carceral State." *Journal of Palestine Studies* 43.4 (2014), p.7.

[19]   FnXAI(2022), p.265.

[20]   Weizman, Eyal. *Hollow land: Israel's architecture of occupation*. Verso books, 2012, pp.162-168.

[21]   Korn, Alina. "The ghettoization of the Palestinians." in *Thinking Palestine*, ed. Lentin, Ronit. London, Zed Books: 2008, p.6.

[22]   Gordon, Neve, and Nicola Perugini. *Human shields: A history of people in the line of fire*. Univ of California Press, 2020, pp.81-84.

[23]   Antonio Cassese, *International Criminal Law,* Oxford University Press, 2003, p.1.

[24]   Ralph Wilde, "Is the Israeli occupation of the Palestinian West Bank (including east Jerusalem) and Gaza 'legal' or 'illegal' in international law?" (2022), para 111.

[25]   ICJ, Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion (2004), paras 102-106.

[26]   ICJ (2004), paras 109 -113.

[27]   Human Rights Committee, General comment No. 35 (2014).

[28]   A/HRC/29/CRP.4 (2015), para 30.

[29]   Fourth Geneva Convention, article 42.

or for "imperative reasons of security," and it must comply with relevant provisions of the Convention.[30] Protected persons can only be deprived of liberty after fair and impartial trial or appropriate administrative proceedings that respect the presumption of innocence and their right to legal defense. Once detained, they must not be subjected to corporal punishment and must have access to medical care, nutrition and hygiene.[31] Customary international humanitarian law strengthens these minimum guarantees, imposing respect for penal safeguards and prohibiting discrimination, torture, cruel treatment, and forced labour.[32] The deliberate violation of these obligations, both through acts and omissions, can amount to a 'grave breach' of the Geneva Conventions.[33]

## B.   International Human Rights Law

18.     International human rights law establishes the most comprehensive protection against arbitrary deprivation of liberty. The International Covenant on Civil and Political Rights protects individuals from arbitrary arrest, detention, ill-treatment, torture, and guarantees the rights to humane treatment, fair trial (including through an independent and impartial tribunal), effective legal defense, privacy and reputation.[34] Derogations from civil and political rights in time of war or public emergency, where permitted, must be limited to "the extent strictly required by the exigencies of the situation", be non-discriminatory, and consistent with other international legal obligations.[35]

19.     The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment prohibits the use of torture (infliction of severe physical or mental suffering to extract information, confession or inflict punishment) in all circumstances, including during war or states of emergency.[36] States must ensure accountability for alleged incidents of torture.[37]

20.     The Convention on the Rights of the Child prohibits deprivation of liberty for children unless as a last resort, for the shortest period necessary, and it establishes greater safeguards than for adults.[38] These include access to physical, psychological and social assistance to recover from abuses, neglect or situations of armed conflict.[39]

21.     The prohibition against arbitrary deprivation of liberty is a peremptory norm of international law, that cannot be derogated from, together with the prohibitions of torture, racial discrimination and apartheid.[40] Procedural rights instrumental to the lawfulness of detention and fair trial "must also be respected in all circumstances".[41]

## C.   International Criminal Law

22.     Unlawful deprivation of liberty and the denial of the right to a fair trial may amount to crimes against humanity and war crimes under certain circumstances.

23.     Under the Rome Statute of the International Criminal Court, "imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law" constitutes a crime against humanity when committed as part of a widespread or systematic attack against the civilian population.[42] To establish liability for this crime, the unlawful deprivation of liberty must be part of an attack against a civilian population, defined as a

---

[30]   Ibid, article 78 and Part III, sections III-IV.
[31]   Ibid, articles 31-33, 71-73, 89-92; AP I, article 75
[32]   ICRC Customary IHL study, Rules n. 87-91, 99-103, 118-137.
[33]   GC III, article 130; GC IV, article 147.
[34]   ICCPR, article 7, 9, 14, 17; HRC, General Comment No. 32 (2007).
[35]   ICCPR, article 4(1).
[36]   CAT, article 2(2).
[37]   Ibid., articles 4, 9-10.
[38]   CRC, article 37(b), 40.
[39]   Ibid., article 39.
[40]   A/CN.4/L.960/Add.1 (2022), Annex (e) and (g).
[41]   FnX(HRC/43/35), para 14.
[42]   Rome Statute (1998), article 7(1)(e).

"course of conduct involving the multiple commission of [prohibited] acts".[43] These acts must also be carried out "pursuant to or in furtherance of a State or organizational policy to commit such attack".[44]

24.     When this attack targets an identified group or its members, the Rome Statute qualifies the "intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or collectivity" as persecution, which is a crime against humanity.[45]

25.     International criminal law establishes individual criminal responsibility for "grave breaches" of the Geneva Conventions as war crimes, when "committed as part of a plan or policy or as part of a large-scale commission."[46] Such breaches include willfully depriving protected persons of the "rights of fair and regular trial."[47] This war crime punishes the deprivation of "one or more persons of a fair and regular trial by denying judicial guarantees as defined, in particular, in the Third and Fourth Geneva Conventions."[48]

# IV.    Mass Incarceration Governance

26.     Israel has denied the applicability of international law in the occupied Palestinian territory since the outset. By maintaining that the territory is *disputed*, rather than occupied,[49] Israel has rejected the sole international legal basis for establishing such a system.[50] This has led to violations of fundamental principles governing situations of occupation, including the non-acquisition of sovereignty, duties to administer the occupied territory for the benefit of the protected population, and temporariness.[51] By alleging that international human rights law does not apply to the occupied territory, Israel derogates from its international obligations to ensure access to a fair trial, to uphold the jus cogens prohibition against torture or cruel, inhuman or degrading treatment or punishment and predictable criminal sanction.

## A.    Jurisdictional fragmentation

27.     The rules underpinning the detention of Palestinians in the occupied territory are rooted in remnants of Ottoman, British Mandate, Jordanian and Egyptian laws. This system includes British emergency and counter-insurgency legislation,[52] Palestinian-enacted laws (in areas where Palestinian authorities operate),[53] and Israeli-enacted laws applied to non-citizens.[54]

28.     Concerning the Palestinian authorities, the Palestinian Basic Law (amended in 2003) protects fundamental rights and freedoms, yet the outdated Penal Code of 1960 and the Decree-Law on Cybercrime of 2018 define some crimes broadly. For example, defamation, as criminalized by the Penal Code, may include insulting or slandering a public official or a higher authority, libel in print, or establishing "sectarian strife."[55] The Penal Procedure Law

---

[43]   ICC, Elements of Crimes, articles 7, para 3 and 7(1)(e), para 3
[44]   Ibid., paras 4-5.
[45]   Rome Statute (1998), article 7(2)(g)
[46]   Ibid, article 8(2)(a).
[47]   GC IV, article 147; Ibid., article 8(2)(a)(vi).
[48]   ICC, Elements of Crimes, article 8(2)(a)(vi).
[49]   Blum, Yehuda Z. "The missing reversioner: reflections on the status of Judea and Samaria." *Israel Law Review* 3, no. 2 (1968): 279-301, pp. 283, 293.
[50]   Ben-Naftali, Orna, Michael Sfard, and Hedi Viterbo. *The ABC of the OPT: A legal lexicon of Israeli control over the Occupied Palestinian Territory*. Cambridge University Press, 2018, pp. 147-149, 524.
[51]   A/72/556 (2017), paras 45-63.
[52]   British Defence (Emergency) Regulations (1945).
[53]   Jordanian Penal Code and Palestinian Basic Law (2002).
[54]   Internment Unlawful Combatant Law (2002), applicable to Palestinians from the Gaza Strip, and the Counter-terrorism Law (2016).
[55]   Penal Code (1960), articles 144, 150, 189, 191, 195.

of 2001 applies to both the West Bank and the Gaza Strip, where the Penal Code of 1936 British Ordinance is also in force.

29.    Concerning the Israeli occupying forces (hereinafter "Israeli forces"), the adoption of British emergency regulations entrenched colonial methods into post-1967 military legislation.[56] Since 1967 the occupying forces have passed 2,500 orders controlling every minutia of Palestinians' life, including public order and security, natural resource management, education, transportation, administration of justice, fiscal administration, taxation, and planning and zoning.[57] Military orders have been discontinued in occupied east Jerusalem, where remnants of British emergency regulations (still enforced in Israel) apply throughout Israel's annexation of the city, and partly in the Gaza Strip where, since 2005, military orders enforce the illegal blockade.[58]

30.    This jurisdictional fragmentation subjects Palestinians to various modes of oppression across different parts of the occupied territory. Israeli forces enforce this system by patrolling Palestinian villages, roads, and movement through Israeli checkpoints in the West Bank, including east Jerusalem and monitoring Gaza's fence, land, sea waters, and airspace. By gathering intelligence and directing undercover operations, the Israeli General Security Service (Shin Bet), forms an integral part of the Israeli security establishment.[59] Palestinian authorities' security apparatuses operate in the West Bank (mostly Palestinian cities in 'Area A' under the Oslo Accords) and the Gaza Strip. Consequently, in the West Bank, Palestinians can be arrested by Israeli forces or the Palestinian Authority; in east Jerusalem, they can only be arrested by Israel; in the Gaza Strip, they can be arrested by the *de facto* authorities and by Israel in the border area and at Gaza sea.[60] Hence, the fate of Palestinians is determined by their location, who apprehends them, and for whom their actions are considered a 'threat'.

31.    For Palestinians in the occupied territory, and them only, the Israeli forces concentrate in their hands legislative, executive, and judicial functions, with the military promulgating, reviewing, and enforcing the laws on deprivation of liberty.[61] In a structure of institutionalized discrimination, military courts enforce military laws against Palestinians while Israeli courts apply domestic civil law to Israelis, including settlers, who thus become vectors of annexation.[62] The Israeli military law enforcement system, based on this inherent racial dualism, constitutes the pillar of Israel's settler-colonial apartheid regime, targeting Palestinian people only, depriving them of fundamental rights, including equality before the law.[63]

## B.   Offenses under military laws: criminalizing fundamental freedoms

32.    Israel's practice of legislating through military orders beyond the limits of an occupying power under international law[64] has resulted in the enforcement of thousands of unlawful restrictions on Palestinians. Deprivation of liberty is regulated by emergency regulations and, *inter alia*, Military Order 101 of 1967 (incitement and hostile propaganda), and Military Order 1651 of 2009 (security). These orders create two main offense categories: security offenses, 'threatening' Israel's military presence in occupied territory, and public order offenses, disrupting public order from unauthorized demonstrations to traffic disturbances. Both carry severe sentences.

---

[56]   Berda, Yael. *Colonial Bureaucracy and Contemporary Citizenship*. Cambridge University Press, 2022, pp. 162-167.
[57]   ARIJ, Database of Israeli Military Orders in the Occupied Palestinian Territory.
[58]   Benvenisti, Eyal. *The international law of occupation*. Oxford University Press, 2012, pp. 363-365, 373.
[59]   Breaking the Silence [BtS], *Military Rule* (2021), pp. 7, 16, 24.
[60]   PCHR, *Annual Report* (2021), p.45.
[61]   Daniele, Luigi. "Enforcing illegality: Israel's military justice in the West Bank." *Questions of International Law* 44 (2017), pp.25-29.
[62]   Ben-Naftali et al., 2018, pp. 371-372, 377.
[63]   FnXAI(2022), p. 31.
[64]   Boutruche, Theo and Sassoli, Marco "Expert Opinion on the Occupier's Legislative Power over an Occupied Territory Under IHL in Light of Israel's On-going Occupation", 2017.

33.      Intentionally vague definitions result in distinctively authoritarian offenses, which are enforceable at the discretion of Israeli soldiers, military prosecutors and judges.[65] This system has allowed punishment of Palestinians for merely expressing their opinions or dissent, or peacefully opposing the occupation. For example:

a.      Exercising freedom of assembly is criminalized with <u>ten years' imprisonment</u>.[66] This offense targets gatherings of ten or more persons "in which a speech is being made on a political subject, or which may be construed as political."[67] This punishment concerns any person organizing or even just encouraging holding a "procession, assembly or vigil without a permit".[68]

b.      Forms of civic and political participation including "flying a flag, displaying a symbol [...] voicing a slogan, or any similar explicit action clearly expressing sympathy" for one of the innumerable "hostile organizations" (*infra,* para 33.f) are subject to <u>ten years' imprisonment</u>.[69]

c.      Membership in any group in which other members commit specific offenses (such as holding a weapon without a permit) is punishable by <u>life imprisonment</u>.[70] Palestinians thus endure the harshest form of deprivation of liberty solely based on affiliation, without consideration of their actions, knowledge, or ability to anticipate the actions of others. This violates the fundamental principle that criminal liability should be based on individual responsibility.

d.      Any "act or omission which entails harm, damage, danger" to the "security of the region", or simply its "disturbance" is punishable with <u>life imprisonment</u>.[71]

e.      Contacts and solidarity among Palestinians are criminalized, and duties of denouncing someone based on mere suspicion are imposed.[72] Military orders punish whoever provides "information, shelter, [...] supplies, means of transport" in any manner to "any person" when "there is a reasonable basis to suspect" that this person might be "engaged in any action aimed at harming" public order.[73] Imprisonment also threatens whoever "does not immediately" denounce to the occupying forces any other person when there might be "reasonable grounds to suspect" that this other person "is planning to commit an offense."[74]

f.      Criminalizing incitements vaguely defined as "any attempt to influence public opinion in a manner which may harm public peace or public order", results in crushing any form of political speech and expression. This reaches the paradox of sentencing to <u>ten years' imprisonment</u> for even the "intention of facilitating the execution of an attempt to influence public opinion."[75] This may include expressing opinions (including on social media),[76] attending peaceful demonstrations, displaying flags or emblems of any political significance, possessing banned books or any publication deemed adverse by the occupying forces, and expressing sympathy for the activities or purposes of any "hostile organization."[77]

g.      Expressing sentiments against the occupation constitutes an offense, imposing on Palestinians deferential obeisance to Israeli occupation and reverence for their symbols. "Offending" in any way a soldier's "honour",[78] or behaving in an "insulting manner" towards

---

[65]   FnXDaniele (2017), pp. 36-37. Kretzmer, David. *The Occupation of Justice: the Supreme Court of Israel and the Occupied Territories*, SUNY: 2002.

[66]   Military Order 101 (1967) [as amended by following orders], article 10.

[67]   Ibid, article 1.

[68]   MO 101 (1967), article 10(a).

[69]   MO (2009), article 251 (B)(4).

[70]   Ibid, article 231.

[71]   MO 1651 (2009), article 222.

[72]   Ibid, article 261.

[73]   Ibid, article 245.

[74]   Ibid, article 261.

[75]   Originally MO 101 (1967) art. 7; penalty at MO 1651 (2009), art. 251(b)(2); see Daniele (2017), p. 34.

[76]   Facebook Bill (2019).

[77]   HRW, *Born Without Civil Rights: Israel's Use of Draconian Military Orders to Repress Palestinians in the West Bank* (2018), p.37.

[78]   MO (2009), article 215.

the Israeli army or "one of its symbols" is punishable with <u>one-year imprisonment</u>.[79] The occupied population is indirectly subjected to a paradoxical and unlawful duty of allegiance to the occupation itself.[80]

h.      Throwing any "object," including a "stone,"[81] is subject to <u>ten years' imprisonment</u>. Throwing objects "at a moving vehicle with the intent to harm it" (even without any intent to harm the driver, and even against armored military vehicles) is punished with <u>twenty years' imprisonment</u>.[82]

i.      Entering "restricted areas" in the West Bank[83] (i.e. 'closed military zones')[84] including east Jerusalem, is subject to heavy constraints. Breaking such regulations leads to <u>seven to ten-years' imprisonment</u>. This arbitrarily and severely restricts Palestinians' movement within the occupied territory, including across their own communities. A case in point is the designation of Masafer Yatta as "Firing Zone 918", a restricted military area for exclusive use of Israeli soldiers. As a result, around 1,200 Palestinians, half of them children, risk unlawful forcible transfer.

j.      Membership in, having "contacts" with, or possessing materials "related to" a "hostile organization", is punishable with <u>ten-years' imprisonment</u>.[85] Since 2020, leadership of such groups can be punished with <u>twenty-five years, or life imprisonment</u>.[86] Hostile organizations are referred to as "any group of persons whose aim it is to harm [...] the public order in Israel or in a held region".[87] The category explicitly encompasses "unlawful associations" under the 1945 Defence (Emergency) Regulations, defined as "any body of persons, whether incorporated or unincorporated and by whatsoever name (if any) it may from time to time be known, which (a) by its constitution or propaganda or otherwise advocates, incites or encourages" a number of acts considered unlawful, including "the exciting of disaffection" against the occupying forces.[88] Built around colonial premises, the category of 'hostile organization' has been deployed ubiquitously, criminalizing any organizations that may oppose Israel's occupation. 411 organizations are criminalized, including all major Palestinian political parties, civil society groups and charities.[89]

34.     Israel's *Counter-Terrorism Law* of 2016 further expanded the broad grounds to designate Palestinian groups as 'terrorist organizations',[90] on the basis of vaguely defined conduct, or mere intentions, labeled as 'terrorist acts'.[91] Identifying with, being a member of, and directing such an organization can be sentenced to <u>three, five to seven</u> and <u>25 years' imprisonment</u>[92] respectively. In 2021, this law was invoked to outlaw six Palestinian human rights organizations, revealing its repressive functions against civil society.[93]

35.     This coercive environment has significantly impacted Palestinian students and the academic community. Across Palestinian universities, traditional hubs of national-political activities and cultural development,[94] student groups have been outlawed.[95] The Palestinian

---

[79]   Ibid, article 219.
[80]   FnXHagueReg, article 45.
[81]   MO (2009), article 212(1-2).
[82]   Ibid, article 212(3).
[83]   Ibid, articles 299-301.
[84]   Ibid, article 242(A).
[85]   Defense (Emergency) Regulations 1945, arts. 84 (1)(a), (f), and (j).
[86]   MO 1827 (2020), art. 237(a).
[87]   MO 1651 (2009), Art. 238.
[88]   Defense (Emergency) Regulations 1945, art. 84.
[89]   Israel's Ministry of Defense, Unlawful associations and terrorist organizations [Accessed April 2023].
[90]   Adalah, "Israel's 2016 Counter-Terrorism Law and 1945 Emergency Regulations Regarding the Outlawing of Six Palestinian Human Rights and Civil Society Groups" (November 2021), p. 14.
[91]   E.g. the "intention of promoting" a "threat" to commit a "political act" posing an "actual risk" of "serious harm to property". Counter-terrorism Law (2016), Chapter 1, article 2.
[92]   Counter-terrorism Law (2016); sections 20-24.
[93]   A/77/356 (2022), para 60.
[94]   Law for Palestine, Israel's Arrest Policy Against Palestinian University Students (2023), p. 23.
[95]   Israel's Ministry of Defense fn90; Defence Emergency Regulations (1945), articles 84-85.

Authority in the West Bank has mirrored this pattern, albeit to a lesser extent, detaining students and others for dissenting political opinions, including those shared on social media.[96]

## C.   Purpose of the military laws: suppressing the right to self determination

36.     Criminal offenses and sentences must adhere to the principle of legality and its inviolable human rights corollaries, and not compromise the safety and dignity of the occupied population. While a Palestinian may actually threaten safety and public order in the occupied territory, Israel's all-encompassing criminalization shows that the military legislation, rather than safeguarding security, renders every single Palestinian potentially subject to imprisonment for ordinary acts of life.

37.     Palestinians in the occupied territory constantly risk being imprisoned: this risk extends to farmers working their land, children going to school across closed military areas, political leaders exercising their mandates, and civil society advocating for human rights. Criminalization and incarceration strip Palestinians of their rights to move freely, work, gather peacefully, express their identity, culture, opinions, pursue their education, live their economic, social and political life. The Palestinian people's right to self-determination that these restrictions ultimately target, appears as the ultimate 'threat' to be suppressed.

# V.   Mass Incarceration Procedures

38.     Within this authoritarian regime, the evidence of abuse Palestinians endure throughout the process of deprivation of liberty, reveals multiple unlawful patterns. The following sections shed light on the 'lawless law' that governs Palestinian life. This coercive environment, accompanied by unwarranted violence, places Palestinians in a permanent state of vulnerability and subjugation that ultimately facilitates their dispossession and displacement.

## A.   Administrative Detention

39.     In addition to arresting and detaining Palestinians based on all-encompassing criminal offenses, Israeli forces often detain individuals without charge or trial.[97] Approximately 500 Palestinians have been detained 'administratively' every year since 1989,[98] including children, human rights defenders, students, and political leaders.[99]

40.     Administrative detention is permissible only when "absolutely necessary," for "imperative reasons of security,"[100] and must be in line with the protection afforded under international law.[101]

41.     Instead, in the occupied Palestinian territory, Israeli military commanders order administrative detention whenever they have "reasonable grounds to presume that the security of the area or public security require detention."[102] The pervasive control over (and unlawful alteration of) the area that is internationally recognised as occupied territory, undermines Israel's security claims and the 'necessity' to arrest Palestinians.

42.     The widespread administrative detention of Palestinians presents other grounds of illegitimacy. First, the vagueness of the concept of 'security' provides military commanders with substantial discretionary powers in imposing administrative detention that can be

---

[96]   HRW (2018), p. 23.
[97]   In the West Bank, this is regulated by Military Order 1651 (2009), article 285(A); in the Gaza Strip by the Internment Unlawful Combatant Law (2002); in east Jerusalem Emergency Powers (Arrests) Law (1979).
[98]   Average calculated based on B'Tselem (Administrative Detention Statistics) (last updated: 2023).
[99]   Addameer, *Violations of Palestinian Prisoners Rights in Israeli Prisons 2017* (2018), pp. 23, 30, 38
[100]   GC IV, articles 42, 78.
[101]   *Supra* section 3.
[102]   Military Order 1651, article 285(A) (emphasis added).

renewed indefinitely.[103] Second, administrative detention quashes international law protections related to arrest, judicial review and custodial conditions (*infra* section 5.6).[104] Once arrested, interrogation frequently involves coercive methods to extract information, possibly amounting to ill-treatment under international law and sometimes, torture.[105] The detainee is not informed of the reasons for detention. Orders are in Hebrew and not translated into Arabic.[106] Lawyers rarely access the "secret" evidence, thus cannot challenge it, or cross-examine witnesses.[107] Hearings are typically not open to the public.[108] Judicial review is ineffective both for the impossibility of appealing against secret evidence[109] and the lack of separation of powers within the military judicial system (*infra* section 5.5). Ultimately, the classification of 'security threat' leading to administrative detention appears to be a pretext to persecute specific individuals who may challenge the occupation.[110]

43.      While a case-by-case determination is warranted, the violations associated with Israeli forces' widespread use of administrative detention may amount to a grave breach of the Fourth Geneva Convention and the war crimes of unlawful confinement of a protected person and willful deprivation of their right to a fair trial.[111] The uncertainty faced by the arrested for an unforeseeable period in the absence of charge, known evidence or trial, may amount to ill-treatment.[112] Administrative detention may also constitute a form of persecution since this procedure discriminates against Palestinians who are presumed guilty and punished as a collectivity.[113] Illustrative is the case of Salah Hammouri, French-Palestinian human rights defender from Jerusalem: arbitrarily arrested and placed under administrative detention multiple times since 2000, he was eventually forcibly deported to France for alleged 'breach of allegiance'.[114]

## B.   Arrest

44.      Arrest starts when Israeli forces apprehend Palestinians, as part of their (military or civilian) system of control. Palestinians can be arrested during 'law enforcement operations' but also at checkpoints, on the street, on their way to school, while farming their land or in the quiet of their homes. Lacking arrest warrants and charges, the Israeli forces generally fail to inform Palestinians of the reasons for their arrest. Beating, verbal abuse, humiliation are recurrent practices during arrest,[115] in addition to the increasing number of killings during 'search-and-arrest operations'.[116]

45.      Proximity to colonies increases the chance for arrest.[117] Crossing 'red-line' zones -i.e. (not always visible) settler-engineered demarcations- may lead to Palestinians (often while farming their land) being arrested by soldiers upon settlers' notification.[118]

---

[103]   Langford, Peter and Triestino Mariniello. Israel's *Administrative Detention in the Occupied Palestinian Territories: an Assessment of the Applicable Norms of International Law and Possibilities for Enforcement* (2019), pp. 17-18.
[104]   Langford and Mariniello, (2019), p. 13.
[105]   CCPR/C/ISR/CO/3, para 11.
[106]   *Khaled El Araj et al. v. The Military Commander in the West Bank*, HCJ 2775/11 (2013).
[107]   Addameer, Administrative Detention in the Occupied Palestinian Territory A Legal Analysis Report (2016), pp. 33-34.
[108]   MO 1651, article 291(A).
[109]   Between 2000 and 2012, only one appeal was accepted by a court, yet it was suspended and no detainee was released. Krebs, Shiri. "Lifting the veil of secrecy: Judicial review of administrative detentions in the Israeli Supreme Court." *Vand. J. Transnat'l L.* 45 (2012): 639, p. 673.
[110]   FnX(AI Apartheid), p. 241.
[111]   Rome Statute, article 8(2)(a)(vii).
[112]   A/HRC/37/42 (2018), para 17.
[113]   Langford and Mariniello. (2019), p. 165.
[114]   UN experts, "Israeli deportation of Salah Hammouri could constitute war crime", 2 December 2022.
[115]   BtS, Physicians for Human Rights - Israel, and Yesh Din. *A Life Exposed: Military Invasions of Palestinian Homes in the West Bank* (2020), p. 31.
[116]   OCHA, Protection of Civilian Reports, 2022-2023.
[117]   Military Court Watch [MCW], Annual Report 2021/2022, p. 8.
[118]   BtS, "We were told: you have to listen to them" (2014).

46.     Mass arrest campaigns are common occurrences, particularly during military raids and incursions, often targeting specific groups, including activists and students.[119] In 2022 alone, Israeli forces conducted over 9,000 operations in the West Bank, including east Jerusalem, over 700 of which occurred in or around refugee camps at an average rate of 15 per week.[120]

47.     Night raids have become a common tactic to arrest or simply harass and terrify Palestinians.[121] Dozens of armed soldiers raid villages, enter homes breaking doors, ransack, seize property and arrest individuals, including children, without a warrant.[122] According to soldiers' testimonies, disrupting the intimacy of Palestinian households, terrifying the residents, is to "make [their] presence felt".[123] These practices may amount to cruel, inhuman or degrading treatment.

48.     Less than one per cent of the complaints against these raids get investigated and prosecuted.[124] Similarly, Israel does not provide compensation to individuals who have been arbitrarily arrested or for the extensive property destruction that occurs during raids.[125]

49.     There have also been incidents of Palestinian authorities arbitrarily arresting political opponents, including for non-violent speech.[126] Arbitrary deprivation of liberty may result, among others, from monitoring critical comments on social media.[127]

## C.   Interrogations

50.     Once arrested by the occupying forces, Palestinians may be taken to Ofer Prison (the only Israeli prison located inside the occupied territory) or to prisons and interrogation centers inside Israel. Eighty percent of Palestinian detainees are transferred to Israel, violating the international prohibition to detain protected persons outside the occupied territory.[128] This may amount to the war crime of deportation.[129]

51.     During interrogations, Palestinians are rarely informed of their rights, including the right to remain silent. A typical interrogation involves practices that may amount to ill-treatment, and even torture, especially if security charges are involved.[130] Israeli forces physically and psychologically abuse the detainee, through methods like invasive body searches, beatings, insults and threats.[131] They isolate the detainee, prohibiting contact with relatives, attorneys, or ICRC representatives.[132] They may confine the detainee through solitary confinement as a form of psychological pressure.[133] They physically weaken the detainee by preventing physical activity, adequate nutrition and sleep.[134]

---

[119]   FnX L4P(2023), p. 21 ; FnXAmnesty International(2022), p. 17.
[120]   OCHA, Protection of Civilians Report, 10 January - 15 May 2023.
[121]   FnX(A life exposed), pp.7, 10.
[122]   FnXMO(2009),article 31.
[123]   BtS, "To create a sense of the IDF's presence in the villages" (2017).
[124]   Only 0,87%; see Yesh Din, Law enforcement against Israeli soldiers suspected of harming Palestinians (2022).
[125]   FnX(A life exposed), p. 57.
[126]   FnX(HRW2018), pp. 1-5.
[127]   Joint Submission by HRW and Lawyers for Justice to [CAT], 30 June 2022.
[128]   FnX, (GCIV)article 49, 66.
[129]   FnX(RomeStatute), article 7(1)(d).
[130]   Sfard, Michael. *The wall and the gate: Israel, Palestine, and the legal battle for human rights*. Metropolitan Books, 2018, pp. 254-256.
[131]   PCATI and FIDH, *Communication to the Office of the Prosecutor of the [ICC], Situation in the State of Palestine*, "War Crimes in the Interrogation Chambers - The Israeli Systematic Policy of Torture, Inhuman and Degrading Treatment, Unlawful Deportation, and Denial of Fair Trial of Palestinian Detainees" (June 2022), p.35.
[132]   Ibid, pp.18, 42.
[133]   Addameer, "I've Been There: A Study of Torture and Inhumane Treatment in Al-Moscobiyeh Interrogation Center," (March 2018).
[134]   FnX(PCATIFIDH), pp.38-39.

52.     Forced confessions, inadmissible under international law, are ordinarily used in Israeli proceedings against Palestinian alleged 'security' or 'terror' suspects[135] (*supra* section 4.2). The percentage of confessions in Shin Bet interrogations is close to 100 percent, and the number of those indicted is much higher than among those investigated by the police.[136]

## D.    Pretrial detention

53.     International law requires that unless defendants represent a threat to public safety or risk obstructing the proceedings, they must not be detained.[137] Instead Palestinians are detained regardless of whether the "public safety or risk" threshold is met or whether they will be charged. Pre-trial detention is common until the end of proceedings, which can last for years.[138]

54.     Pre-trial detention for interrogations (without charge) can last up to 90 days,[139] renewable every 30 days upon request.[140] Remand hearings lack substantive examinations and last approximately three minutes. These processes predominantly occur in the absence of legal counsel.[141]

55.     This form of pre-trial detention violates both the presumption of innocence and the right to be free from arbitrary and prolonged detention.

## E.    (Semblances of) Trial

56.     Palestinian detentions are reviewed by Israeli military courts. Their personnel, including judges and prosecutors, are members of the same army and often of the same units enforcing the occupation and involved in "hostilities" with the Palestinian people. Even the military court of appeal operates under the supervision of the Military Advocate General. These courts can neither be independent nor impartial.[142] In fact, military courts are considered unsuitable to try civilians.[143]

57.     The exclusive jurisdiction of military courts over Palestinians, who are arrested under military orders that solely apply to them and take precedence over Israeli civil and international law, solidifies the discriminatory legal dualism inherent in apartheid.[144]

58.     Trials in military courts lack transparency, limit public access and afford proceedings in Hebrew, usually without interpretation. Lawyers from the occupied territory cannot attend court sessions in Israel as they lack entry permit.

59.     The existence of judges, prosecutors, an appeal court (since 1989) and juvenile military courts (since 2009) create a façade of rule of law that conceals the oppressive nature of the occupation.[145] High conviction rates (99 percent)[146] and the high reliance on plea bargains in military courts (95 percent)[147] seem to corroborate the failure to uphold the

---

135   FnX(PCATI and FIDH), pp.20, 27.
136   Ramati, Nery & Karin Hibler. "The Cooperation between the Police and the Israeli Security Agency in Investigating Security Offenses" [in Hebrew], November 2021.
137   HRC, General Comment No. 32 (2007), para 30.
138   Yesh Din, *Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories* (2007).
139   MO 1651 (2009), article 37.
140   Ibid., article 38.
141   Ibid., articles 57-58, grant detainees access to legal counsel after 15 days. Yet legal counsel is rarely admitted before detainee's first court appearance. See PCATI & FIDH (2022), p. 54.
142   Hajjar, Lisa. *Courting conflict: The Israeli military court system in the West Bank and Gaza*. University of California Press, 2005.
143   HRC, General Comment No. 32 (2007), para 22.
144   FnX(AI2022), p. 18.
145   B'Tselem, *Presumed Guilty: Remand in Custody by Military Courts in the West Bank* (2015), p.61.
146   Addameer, Military Courts in the Occupied Palestinian Territory (2018), [Accessed May 2023].
147   Ibid.; FnX(Hajjar), p. 3.

presumption of innocence, among other apparent violations of due process and related guarantees (*supra* section 3).

## F.   Custodial Conditions

60.    Israeli forces commonly detain Palestinians inside Israel. This 'unlawful deportation' triggers a domino effect of violations ranging from restrictions on family visits to denial of access to legal counsel. The security classification assigned to many Palestinians leads to harsher treatment and is another manifestation of the discriminatory regime applied to them.[148]

61.    Within the prison walls, Palestinian prisoners endure relentless abuse. Removed from contact with the outside world, in overcrowded and unsanitary realms, they typically face deprivation (they are often forced to purchase their own sustenance), medical negligence,[149] limited opportunity for education and physical exercise alike.[150] Documented instances of torture, cruel, inhumane or degrading treatment include sexual assaults; being hooded and blindfolded, forced to stand for long hours, tied to a chair in painful positions, deprived of sleep and food, or exposed to loud music for long hours; and being punished with solitary confinement.[151] Such practices may go unreported due to lack of access to legal representation or fear of retaliation.[152]

62.    Palestinian prisoners often use hunger-strikes to protest Israel's arbitrary detention policies and practices.[153] This is exemplified by Khader Adnan's fifth hunger-strike to protest Israel's arbitrary detention of Palestinians, which eventually led to his death in prison on 2 May 2023. Adnan had been detained an astounding 12 times within eight years, mostly without trial or charge.

63.    This oppressive picture is exacerbated by custodial conditions in prisons managed by the Palestinian authorities in the West Bank and Gaza, where human rights groups have documented abusive practices, taunts, solitary confinement, and beatings often to elicit confessions, punish, and intimidate activists.[154] Palestinians suspected of collaborating with Israel face even more severe treatment, and, in the Gaza Strip they can be punished with the death sentence.[155]

## G.   'No Minor Matters'

64.    The gravity of abuses against Palestinians in Israeli custody is an alarming reality. Certain groups face even greater vulnerability which warrant particular attention.

### Children

65.    Israel treats Palestinian children with the same lawlessness as adults.[156] Over a span of 20 years, approximately 500-700 children yearly, aged 12 to 17, have been subjected to the Israeli detention system.[157] Approximately 10,000 Palestinian children have experienced

---

[148]   Law for Palestine, Israel's Arrest Policy against Palestinian University Students (2023).
[149]   Addameer, *Deterioration in Detention Conditions: Suffocating Prisoners* (2018); *Medical Negligence* (2016).
[150]   Addameer, *Opened - Books on Cuffed - Hands. The Cultural and Educational Life of Palestinian Political Prisoners in Israeli Prisons and Detention Centers,* (2020).
[151]   FnX(PCATI and FIDH,(2022)), p. 6
[152]   Addameer, *In the case of The Palestinian People vs. Military Courts* (2021).
[153]   Addameer, *Administrative Detention* (2022).
[154]   Submission by HRW and Lawyers for Justice to the Committee Against Torture (30 June 2022).
[155]   FnX(PCHR AnnualReport), pp. 67-69.
[156]   B'Tselem, *No Minor Matter: Violations of the Rights of Palestinian Minors Arrested by Israel on Suspicion of Stone Throwing* (2011).
[157]   DCI-P, Number of Palestinian Children (12-17) in Israeli Military Detention (updated on 14 April 2023).

institutionalized ill-treatment during arrests, prosecutions and sentencing and the consequent traumas on themselves and their families.[158]

66.     Children are commonly arrested (often at night) for stone-throwing or to gather information about other Palestinian 'wrongdoers'. Arrests involve transferring children to interrogation facilities like dangerous criminals: blindfolded and hand-tied in military jeeps. In 2013, UNICEF had already begun documenting the terror of Palestinian children violently taken from their homes, particularly during bedtime.[159]

67.     During interrogation, Palestinian children endure severe ill-treatment: they are strip-searched, kept blindfolded and tightly bound for long hours, insulted and ridiculed, physically abused and denied basic needs including access to toilets and medical care, despite injuries they may have sustained during arrest.[160] A recent study reported eighty-two percent of Palestinian children are interrogated without a parent or legal representation.[161] Parents are rarely informed of their children's whereabouts upon arrest, which may amount to enforced disappearance.[162] Nearly half of the children detained for interrogation between 2021-2022, were subjected to solitary confinement for an average of 12.5 days, in windowless cells, constantly illuminated, causing immense physical and psychological distress.[163] Self-harm and suicide attempts among Palestinian children in Israeli custody are not rare.[164]

68.     After abusive arrest and interrogation, children appear before military courts in prison uniforms, chains and shackles. The trial lasts three minutes on average. This is when they may see their family and lawyer for the first time.[165]

69.     Detained Palestinian children are often coerced into becoming informants or collaborators.[166] This practice can have long-lasting negative effects on them, leading to feelings of shame and guilt, tarnishing their future. The widespread nature of this practice also creates mistrust towards children who have been detained, compromising their rehabilitation and development.[167]

70.     The juvenile justice procedures introduced in 2009 did not alter the system's abusiveness: the term 'juvenile military court' is an oxymoron.

71.     These unlawful practices deeply traumatize child detainees, their families and communities.[168] Children report anxiety, depression and other disorders after being detained.[169] The haunting case of Ahmad Manasra exemplifies these harrowing practices. Sentenced to imprisonment as a 14-year-old for allegedly participating in attempted murder of Israeli citizens, Manasra has been imprisoned since 2016: despite having developed schizophrenia following violent arrest and detention, he has been held in solitary confinement since November 2021, where his mental state continues to deteriorate.[170]

72.     The mistreatment of Palestinian children, epitomized by these cruel practices, contributes to subjugating the Palestinian people, severing the prospects for healthy development of future generations.[171]

---

[158]  DCI-P, Military Detention [Consulted May 2023].
[159]  UNICEF, *Children in Israeli Military Detention: Observations and Recommendations* (2013), p. 10.
[160]  FnX(MCW,AnnualReport(2021/2022), p. 14; CRC/C/15/Add.195 (2002), para 35; Save the Children, *Defenceless: Impact of the Israeli military detention system on children* (2020), p 15-18.
[161]  FnX(MCW,AnnualReport(2021/2022), pp. 15-16.
[162]  Convention on Enforced Disappearance (2010), article 2.
[163]  FnX((MCW,AnnualReport(2021/2022), p. 18.
[164]  Ibid., p. 19.
[165]  FnX B'Tselem (2011), p. 50.
[166]  DCI-Palestine, Recruitment and Use of Palestinian Children in Armed Conflict (2012).
[167]  Viterbo, Hedi. *Problematizing Law, Rights, and Childhood in Israel/Palestine*. Cambridge University Press, 2021.
[168]  Gwyn, Daniel. "'The strong do what they can and the weak suffer what they must': Palestinian families under occupation", *Context 164*, 2019, p. 49.
[169]  Save the Children, *Isolated* (2022), pp. 12-13.
[170]  UN experts urge Israel to free Ahmad Manasra, 14 July 2022.
[171]  Shalhoub-Kevorkian, Nadera. *Incarcerated childhood and the politics of unchilding*. Cambridge University Press, 2019, pp.16-17.

**Gender and sexual orientation**

73.     Similarly to their male counterparts, Palestinian women and girls are also detained by Israel without trial, exposed to discrimination, harassment, and degrading treatment. This includes invasive strip searches, sexual abuse and threats,[172] as well as inhumane custodial conditions even during pregnancy.[173] Some women are arrested, threatened, and mistreated *just* to obtain information or exert pressure on their husbands.

74.     Allegations of coercion on gay Palestinian men by Israeli forces, including threats of exposing their sexual orientation, are also of serious concern.[174] These forms of coercion would place these men at serious risk of physical and psychological harm, and violate their fundamental human rights.

**Detaining the deceased**

75.     The deprivation of liberty haunts Palestinians beyond their life. Israeli forces often withhold the bodies of Palestinians deceased in custody or killed for alleged 'security reasons'.[175] This practice, which the Israeli High Court of Justice has condoned,[176] applies to the bodies of adults and children alike.[177] By May 2023, Israeli forces reportedly withheld 125 Palestinian bodies, including 13 deceased detainees. Similarly, the de facto authorities in Gaza reportedly withhold the bodies of two deceased Israelis.

76.     For decades, the bodies of Palestinians who were not returned to their families were buried in graves near military zones known as "cemeteries of numbers" (as each body was assigned a number).[178] In recent years, Israeli forces have withheld bodies in fridges, impeded identification by relatives, and imposed restrictions on their burial upon returning the bodies.[179] Reports suggest that the bodies are often maintained in "poor and inhumane conditions".[180]

77.     The denial to perform funerary rituals for the beloved ones is yet another trauma families are forced to experience. This is heightened when one's body is returned severely damaged.

78.     International law protects burial rituals and gravesites in line with the deceased's religious and cultural customs and requires restitution of mortal remains.[181] Concealing the detention, whereabouts, and fate of a person or body may amount to enforced disappearance; this applies to living and deceased persons alike.[182]

# VI.     Open-air Prison: a multilayered architecture of confinement

79.     Carcerality, conceived as a large-scale system of deprivation of liberty that forces into a condition of captivity entire populations, who are also dispossessed of their lands, is an essential feature of settler-colonialism.[183] Israel's practices of collective confinement in the

---

[172]   OMCT and PCATI, *Violence Against Palestinian Women* (2005), pp 26-30.

[173]   CEDAW/C/ISR/CO/5 (2011), para 40.

[174]   Alqaisiya, Walaa. *Decolonial Queering in Palestine*, Routledge: London, 2023, pp. 30, 31.

[175]   Al-Haq, *Field Report on Human Rights Violations* (2020); Jerusalem Legal Aid and Human Rights Centre (JLAC), *The Warmth of Our Sons: Necropolitics, Memory and the Palestinian Questo for Closure*, (2019), p.28.

[176]   E.g. Supreme Court in Additional Hearing 10190/17, Israeli military commander of Judea & Samaria (West Bank) v. Muhammad Eliyan (2018).

[177]   DCI-P, *Withheld Bodies: No Closure for Palestinian Families Waiting for Their Child's Remains* (2020).

[178]   FnX(JLAC,2019), p.47.

[179]   Earakat, Noura and Rabea Eghbariah, "The Jurisprudence of Death: Palestinian Corpses & the Israeli Legal Process", *Jadaliyya* (8 February 2023).

[180]   UNSCIP, End of Mission Statement (6 May 2016).

[181]   GC IV, article 130; AP I, article 34.

[182]   FnX(EnforcedDisappearanceConv), article 1; UN WGEID, UA ISR 2/2019 (2019).

[183]   Veracini, Lorenzo. *Settler colonialism: a theoretical overview,* Houndmills, UK: Palgrave Macmillan, 2010, p. 46. Nethery, Amy. "Incarceration, classification and control: Administrative detention in settler colonial Australia", Political Geography (2021), pp.3-4

occupied Palestinian territory reproduce this pattern.[184] Over time, Israel has expanded its multifaceted hold over the Palestinians as-a-people through physical, bureaucratic and digital mechanisms. Behind-bars imprisonment dovetails with confinement techniques that envelop the entire occupied Palestinian territory, accompanying and enabling arbitrary seizure of land and Palestinians' forcible displacement.

80.     This has turned Palestinian life into a *carceral continuum*,[185] where different levels of captivity co-exist: from the micro-level of individual deprivation of liberty described so far, through mass incarceration, to population entrapment in strictly controlled enclaves in which the occupied population is confined as a collective security threat, and any form of resistance to the occupation's territorial expansion and dispossession is repressed.

## A.    Physical carcerality

81.     Physical segregation has historically been used as a settler colonial tool to control and manage native populations, acquire their lands, and displace them.[186] Within the fragmented occupied Palestinian territory, Israel has entrapped the Palestinians within a physical architecture that resembles a prison, but on a much larger territorial and societal scale.

82.     The illegal blockade of the Gaza Strip is the most well-known example of this physical entrapment, with over two million Palestinians subjected to collective punishment since 2007. The heavily militarized fence surrounding the Gaza Strip and its 'no-go zone' further shrink the enclave by 17 percent and the agricultural area by 35 percent, while access to the maritime area is reduced by 85 percent as a result of the heavily-patrolled sea blockade.[187]

83.     In the West Bank - 60 percent of which is under full Israeli military and civil control - the carceral architecture comprises: 270 colonies and military bases encircling Palestinian cities, town and villages, preventing their expansion; closed military zones, constituting 18 percent of the West Bank;[188] a 700 kilometer-long Wall largely built *inside* the West Bank; including in and around east Jerusalem, annexing an additional 10 percent of Palestinian territory; approximately 64 checkpoints, 76 partial checkpoints, thousands of flying checkpoints, 72 roadblocks; 17 segregated roads, for a total of 400 kilometers, for Israelis only; and Israeli-controlled exit and entry points of the occupied Palestinian territory.

84.     Within this maze, the city of Hebron has reportedly served as a 'model' to advance colonization via harsh occupation strategies.[189] To 'make space' for 600 settlers living in heavily fortified areas of the city, Israel has put in place a system of 20 checkpoints with thousands of soldiers, prohibiting Palestinians from accessing their city's main streets and markets.[190] The system is being replicated in Jerusalem's neighborhoods targeted for settlement expansion (e.g. the Old City and Silwan).[191]

85.     More than a spatial by-product of the colonies, walls or checkpoints, the physical architecture of the occupation is functional to shrinking Palestinian physical space and erasing their civic and political space.

## B.    Bureaucratic carcerality

86.     Within the physical boundaries of their confinement, Palestinians must also navigate a maze of bureaucratic barriers made of requirements, permissions and restrictions in the form of Israeli-issued "permits" and "bans". Dictating much of Palestinian existence, permits

---

[184]   FnX(Nashif).
[185]   Foucault, Michel. *Discipline and Punish. The Birth of the Prison.* Vintage books, 1995, p. 297.
[186]   Anthony, Thalia, and Harry Blagg. "Hyperincarceration and indigeneity." *Oxford Research Encyclopedias criminology and criminal justice* (2021).
[187]   FnX(AI,2022), pp. 28.
[188]   OCHA oPt, *West Bank Firing Zones* (2012).
[189]   *H2: The Occupation Lab* (2023), Documentary by Idit Avrahami and Noam Sheizaf.
[190]   B'Tselem, *Hebron City Center* (updated May 2019).
[191]   Al-Haq, *Occupying Jerusalem's Old City: Israeli Policies of Isolation, Intimidation and Transformation* (2019), pp.7-12, 15.

and bans transform basic freedoms into privileges arbitrarily granted or denied by the occupying power.[192]

87.    Over a hundred permits regulate essential activities such as leaving the West Bank and Gaza, building and even residing in certain areas, working, visiting family, receiving medical treatment, worshipping, entering east Jerusalem, let alone Israel.[193] While the Israeli Civil Administration issues the permits, the ultimate decision rests with Israel's Shin Bet, which determines the security classification of every Palestinian.

88.    Conversely, bans restrict Palestinians' ability to receive a permit. Bans can be issued by the Shin Bet on "security suspicions", by the police for suspected criminal activity; or by the Israeli Civil Administration, often indiscriminately.[194]

89.    The permit system is not only arbitrary, but also lacks transparency, resulting in frequent denials and no meaningful avenues for appeal.[195] The lack of permit confines Palestinians and even their relatives, preventing them from working, receiving life-saving medical treatment, traveling, studying abroad or visiting family. Lack of permit can also lead to arrest; this affects for example Palestinians working inside Israel or colonies, or Palestinians from Gaza living in the West Bank. This deepens the collective captivity of Palestinians, rendering them vulnerable and exploitable.[196]

90.    In 2022, new regulations further restricted entry to and residency in the West Bank, including east Jerusalem, to foreign nationals, including Palestinians from the diaspora.[197] These regulations introduce quotas for foreign students and academics, impose limitations on family unification, and allow the Israeli Civil Administration to assess even the sincerity of intimate relationships. These appear as attempts to further isolate and disconnect Palestinians in the occupied Palestinian territory from the outside world.

## C.    Digital carcerality

91.    Under international law, interference with the right to privacy, such as the use of surveillance technologies, must be prescribed by law, only when strictly necessary, proportionate to achieve a legitimate, non-discriminatory, and respect fundamental rights.[198] Instead, digital surveillance pervasively entrenches Israeli forces' control over the spaces and life of the occupied population.[199] Palestinians are constantly monitored through CCTV and other devices at checkpoints, in public places, social gatherings and protests. Their private spaces are often intruded without their knowledge, through monitoring of online platforms like Facebook, calls, and online conversations considered "threatening,"[200] and tracking the location and connections of mobile phones to establish networks and potential associations, or even through their medical records.

92.    Digital surveillance and automated policing intensify near Israeli colonies and military infrastructure. Colonies are equipped with technologies that enhance identification, arrest, and detention of Palestinians engaging in protests or resisting the expansion of colonies.[201] Digital surveillance ultimately serves to facilitate colonization.

---

[192]   BerdaFnX, p.162.
[193]   FnXBtS(2022), p. 15.
[194]   Ibid., p. 22 and Testimony 4.
[195]   HRW, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (2021), p. 174.
[196]   FnXBtS(2022), p.23.
[197]   COGAT, "Procedure for Entry and Residence of Foreigners in the Judea and Samaria Area", 21 December 2022.
[198]   ICCPR, article 17; HRC General comment No. 16; A/HRC/39/29, para. 10.
[199]   Yuval Noval Harari statement, World Economic Forum (2018).
[200]   Santos, Madalena. "Settler colonial surveillance and the criminalization of social media: contradictory implications for Palestinian resistance." In *Protests in the Information Age*, Routledge, 2018, p. 102.
[201]   Amnesty International, *Automated Apartheid* (2023), p. 75.

93.     In addition to extensive control, the occupation has advanced Israel's development of powerful surveillance technologies, including facial recognition, drones, and social media monitoring.[202] Examples of these programs include the 'Blue Wolf,' an app connected to the Wolf Pack, an Israeli database containing imagery, personal information and security ratings of Palestinians in the West Bank; and the 'Red Wolf', a system of cameras equipped with facial recognition that identify Palestinians at checkpoints, interact with and feed information into Blue Wolf and Wolf Pack. This has created a "gamified surveillance" whereby Israeli military units photograph Palestinians without consent, and even engage in disturbing competitions. In Hebron, the so-called "Smart City Initiative" has led to audio-visual surveillance of Palestinians across town.[203] Similar forms of control are being deployed in east Jerusalem neighborhoods (e.g. Silwan and Sheikh Jarrah), enhancing restrictions and ultimately widespread carcerality.

# VII.  Conclusions

94.     **Under Israeli occupation, generations of Palestinians have endured widespread and systematic arbitrary deprivation of liberty, often for the simplest acts of life. Since 1967, over 800,000 Palestinians, including children, have been detained based on an array of authoritarian rules enacted, enforced and adjudicated by the Israeli military. Palestinians are often presumed guilty without evidence, arrested without warrants, and detained without charge or trial. Physical and psychological abuse are distressingly common. Without condoning crimes that Palestinians have committed during decades of illegal occupation, most criminal convictions of Palestinians have been the result of a litany of violations of international law, including due process violations, that taint the legitimacy of the administration of justice by the occupying power. Many such convictions concern legitimate expressions of civil and political rights, and the right to resist an illegal foreign occupier.**

95.     **By depriving Palestinians of the protections afforded by international law, the occupation reduces them to a 'de-civilianized' population, stripped of their status of protected persons and fundamental rights. Treating the Palestinians as a collective, incarcerable threat erodes their protection as 'civilians' under international law, deprives them of their fundamental freedoms, and expropriates their agency and ability to unite, self-govern and develop as a polity. Any Palestinian opposing this regime, from peaceful protesters to farmers trying to cultivate their lands, is perceived as a menace and considered detainable.This forces Palestinians into a permanent state of vulnerability.**

96.     **Mass incarceration reinforces the power imbalance between the Palestinians and Israeli institutions and settlers, facilitating settler-colonial encroachment. By shifting from 'the security of the occupying power' to 'the security of the occupation itself', Israel has disguised 'security' as the permanent control over the territory it occupies and tries to annex. Law enforcement has served as a tool to ensure the imposition of Israel's occupation and racial domination and the furtherance of its settler-colonial project. This has entrenched segregation, subjugation, fragmentation and, ultimately, the dispossession of Palestinian lands and Palestinians' forced displacement. Intended primarily to secure colonies' establishment and expansion, this system suffocates Palestinian life and undermines Palestinians' collective existence.**

97.     **Through an array of physical, bureaucratic, and digital mechanisms, the Israeli regime has turned the occupied territory into a 'panopticon', where Palestinians are constantly surveilled and disciplined. Within this system, typical of settler-colonial regimes, widespread and systematic arbitrary deprivation of liberty and cruel and degrading treatment on a large scale, appear to form part of Israel's state policy of domination of the Palestinians as-a-people enforced also through beyond-prison confinement.**

---

[202]   7amleh, "What is the Facebook Bill?" (2022).
[203]   FnX(Automated Apartheid), pp.40-45, 69 .

98.     **The widespread and systematic arbitrariness of the occupation's carceral regime is yet another manifestation of Israel's inherently illegal occupation and strengthens the need to hold it accountable, while bringing it to an end. It is critical that the international community recognizes that the unlawfulness of Israel's occupation cannot be remedied, or humanized, by reforming some of its most brutal consequences. Under the UN Charter and international law, particularly the law of state responsibility, third States have a duty not to contribute or condone Israel's settler-colonial apartheid, which criminalizes Palestinians for (re)claiming or refusing to forsake their collective right to exist as a people, and act to realize all conditions that would allow the Palestinian people to realise their rights including their inalienable right to self-determination.**

# VIII.   Recommendations

The Special Rapporteur recommends that:

99.     **Israel's system of arbitrarily depriving Palestinians of their liberty in the occupied Palestinian territory, emanating from an irredeemably unlawful occupation, be abolished tout court, because of its inherent incompatibility with international law.**

100.    To achieve this goal, Third States:

(a)     **Use diplomatic, political and economic measures afforded by the Charter of the United Nations without discrimination.**

(b)     **Not recognize as lawful, aid or assist Israel's occupation given its commission of internationally wrongful acts and possible international crimes, and call for their cessation and reparations.**

(c)     **Prosecute the commission of international crimes alleged in this report under universal jurisdiction.**

101.    **The State of Israel, as a first step towards long-term remedies for decades of arbitrary deprivation of liberty of the Palestinian people, take the following measures:**

(a)     **Declare a moratorium on the detention of minors.**

(b)     **Release all Palestinian detainees, especially children, detained for acts devoid of offensiveness under international law.**

(c)     **Release all withheld bodies of deceased Palestinians and guarantee dignified burials.**

102.    **The Palestinian authorities fully comply with international norms on the deprivation of liberty. This includes:**

(a)     **Ceasing any form of arbitrary detention, as well as torture and ill-treatment of detainees, ensuring both accountability and reparations to the victims. This includes the release of the bodies of deceased Israeli withheld in Gaza.**

(b)     **Interrupting security arrangements that may lead to violating fundamental rights and freedoms under international law.**

(c)     **Ensuring effective oversight and accountability measures including by strategically engaging local human rights organisations.**

103.    **Independent and thorough investigation(s) into the possible commission of international crimes arising from the systematic arbitrary detention of Palestinians be opened, including through universal jurisdiction. In particular, the Prosecutor of the International Criminal Court should examine, as part of the investigation into the Situation in Palestine, the possible commission of the international crimes of:**

(a)     **willful deprivation of protected persons' right to fair and regular trial,**

(b)     **widespread and institutionalized use of torture and cruel, inhuman or degrading treatment or punishment,**

(c)     **unlawful deportation or transfer or unlawful confinement,**

(d)     **imprisonment or severe arbitrary deprivation of liberty in violation of fundamental rules of international law,**

(e)     **persecution against an identifiable group or collectivity by reason of its identity,**

(f)     **apartheid.**

**The likelihood of these offenses being cumulatively committed as part of a policy of 'de-Palestinization' of the occupied territory and of a plan to incrementally annex it must be urgently investigated: such a plan would threaten the right of an entire people to exist as a national group, challenging the very foundations of the international legal order.**

―――――――――

# EXHIBIT
# B-7

A/78/545

Distr.: General
20 October 2023

Original: English

# Advance Unedited Version

Seventy-eight session
Item 73 (c) of the provisional agenda*
**Promotion and protection of human rights: human rights situations
and reports of special rapporteurs and representatives**

## Situation of human rights in the Palestinian territories occupied since 1967**

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the General Assembly
the report of the Special Rapporteur on the situation of human rights in the
Palestinian territories occupied since 1967, Francesca Albanese,
in accordance with Human Rights Council resolution 5/1.

### Report of the Special Rapporteur on the situation of Human Rights in the Palestinian territories occupied since 1967, Francesca Albanese

*Summary*

Children comprise half of the Palestinian population under Israel's 56-year-old settler-colonial occupation. As a party to the Convention on the Rights of the Child and the Occupying Power in the occupied Palestinian territory, Israel is obliged to prioritise the best interests of all children under its jurisdiction. Yet, Israel subjects Palestinian children to severe physical and psychological trauma, burdening them with fears and challenges that no child should bear. The absence of accountability for Israel's actions has emboldened its disregard for international obligations.

Israel's occupation, designed to illegally annex occupied land, stifles Palestinians' civil, political, economic, social and cultural rights. Land confiscation, resource expropriation, and confinement contribute to Palestinian de-development, impacting the development of children. Every year Israeli forces kill, maim, orphan and detain hundreds of children of all ages. The resulting trauma is often unaddressed. This coercive environment critically violates the right to life of Palestinian children, preventing them from exercising the right of every child to grow up in safety and dignity. This experience has been characterised as 'unchilding', meaning depriving children of the normalcy, lightness and innocence of childhood.

For Palestinian children, life under occupation is a daily struggle; from witnessing the heartbreak of their parents watching their confiscated land being cultivated by settlers, to their grandparents longing to reunite with their land and homes behind walls; from unfinished homes self-demolished, leaving only a mortgage to pay; to their schools perpetually at risk

---

\* A/78/150.
\*\* The present report was submitted after the deadline in order to reflect the most recent information.

Please recycle 

of destruction. The deliberate violations of Palestinian children's rights call for urgent investigation, deployment of protective measures and a durable political solution that addresses the root causes. This aligns with the broader goal of realising the Palestinian people's right to self-determination and safety and security for everyone in the region.

# I.   Introduction

1.      In her 2023 report to the Human Rights Council, the Special Rapporteur exposed how Israel has turned the occupied Palestinian territory (oPt) into an open-air prison, where Palestinians are constantly confined, subjected to surveillance and punished.[1] This has aided Israel's illegal dispossessing Palestinians of their lands and furthered their forced displacement.[2] Children make up almost half of the Palestinian population in this coercive environment,[3] while 30 percent of the population under occupation is under the age of 15.

2.      This report focuses on the rights of Palestinian children and the meaning of life under Israel's 'forever occupation.'[4] Despite the legal framework applicable to them, Palestinian children are simultaneously hypervisible in terms of the violence they experience and invisible in terms of their suffering. While Palestinian authorities in the West Bank and Gaza Strip are also responsible for violating children's rights,[5] this report examines the overarching impact of the Israeli occupation on children, in line with the Special Rapporteur's mandate.

3.      All children must be able to enjoy their childhood in a healthy, safe and nurturing environment, where human rights are both valued and safeguarded, regardless of identity, race, religion or background. That is the foundational premise of this report.

4.      This report does not include reference to the crimes that have taken place since 7 October, as they unfolded while the report was being finalised. The Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel is conducting an investigation and the Special Rapporteur will also dedicate further analysis to this umpteenth tragic turn in the history of the longest occupation in history.

# II.   Methodology

5.      This report has been written without the benefit of a field visit as Israel failed to facilitate the Special Rapporteur's access to the oPt. It is based on extensive desk review, submissions, virtual tours, and online meetings with Palestinian, Israeli and international stakeholders. The research relied on the advice of psycho-social experts with specialised knowledge of children's mental health.

6.      The Convention on the Rights of the Child (CRC or 'the Convention') is foundational to this report, guiding the research from the formulation of interview questions to the benchmark for evaluation of local policies and practices. In line with the best interest of the child and the 'do no harm' principle, the Special Rapporteur relied on existing recent children's testimonies to the fullest extent possible. Her own interviews with children spanning various age groups and their families enhanced her overall understanding. Profound gratitude is expressed to all children and adults who shared their testimonies, as well as the organisations who helped hold the meetings. Throughout the report, names were changed to safeguard the children's privacy. Quotation marks indicate interviewees' words reported verbatim.

7.      The Special Rapporteur witnessed the harrowing trauma that Palestinian children face and carry with them; visible on their bodies, speech and movement. While the children's assertiveness in advocating for their rights was remarkable, the Special Rapporteur noted that their preoccupations were atypical for their age, placing them with adult-like responsibilities conflicting with carefree childhood. Some children feel that "the world ignores them". Others used the expression: "if only they knew", referring to countries they view as powerful. They urged the Special Rapporteur to convey their pleas to the world.

---

[1]   A/HRC/53/59 (2023), para 4.
[2]   Ibid., paras 79-93.
[3]   Palestinian Central Bureau of Statistics, updated 5 April 2023. This data only refers to the Palestinian children population in the West Bank and the Gaza Strip.
[4]   A/HRC/47/57 (2021), para 74.
[5]   CRC/C/PSE/CO/1, para 24.

## III.  Setting the Context: Children under settler-colonial military occupation

8.     Since 1967, the Israeli military occupation has violated international law, whether by disregarding or distorting it, to justify its unlawful practices. By treating the occupied territory as "disputed" rather than "occupied," Israel has granted itself latitude to violate its obligations toward the occupied people,[6] including children. With their status as protected persons deliberately denied, Palestinian children have been made vulnerable without redress.[7]

9.     To advance the illegal colonisation of the occupied territory, Israel has been subjecting the occupied population to a combination of daily deprivations, restrictions and modular levels of violence. The establishment of over 300 illegal colonies in the occupied territory has meant denial of Palestinians' rights to land, livelihood, denial of the right to adequate housing and health, and restrictions on education and employment. Treated as a collective threat, Palestinians are stripped of their individual and collective rights, denying children the ability to thrive.

10.     While consolidating its presence in the oPt, Israel has deployed variable uses of force against the population under occupation, obfuscating the legal distinction between law enforcement operations and the conduct of hostilities.[8] In addition to the macro-violence of state-engineered lethal force and collective punishment against Palestinians, Palestinians also endure persistent acts of micro-violence, including military raids and settler violence, destruction and pillage of property and resources, humiliation, arrest and detention regardless of their age.[9]

11.     Palestinian children live in segregated spaces and hostility-striken communities. Their families' livelihood, access to employment, healthcare, opportunities for leisure, future prospects and mobility are all controlled by Israel.[10] Palestinian children are aware of the challenges they face "as Palestinians." Feeling alienated in their own land, children ask questions: "Why is it so? Are we less human?" or "Are we less worthy?"

12.     Israel's settler colonial enterprise also impacts Jewish Israeli children. They are affected by the decisions of their State or, for those living in the colonies, their families' choice and ideologies. Some have tragically lost their lives and others typically grow up in an environment saturated with fear, hostility and racism toward Palestinians.[11] The prevailing atmosphere may contribute to the structural violence directed at Palestinians. In the words of a former Israeli soldier: "I don't remember children. When you are in your uniform, it's us and them."[12]

13.     It is well documented that from a young age Israeli children are taught narratives that frame Palestinians as threats, falsely tying them to the Holocaust and characterizing them as invaders bent on eliminating the Jewish people.[13] This rhetoric sustains a narrative of a "permanent emergency" justifying the colonization of occupied territories while dehumanizing Palestinians.[14] In 2023, Israel's ultranationalist government has exacerbated violence against Palestinians, inciting hatred and settlers' attacks on Palestinian communities. Radicalized settler youth, often enlisted in the military, contribute to severe abuses against Palestinians.

---

[6]  Ben-Naftali, Orna, Michael Sfard, and Hedi Viterbo. The ABC of the OPT: A legal lexicon of Israeli control over the Occupied Palestinian Territory, Cambridge University Press: 2018.

[7]  Gordon, Neve, and Nicola Perugini. *Human shields: A history of people in the line of fire*. University of California Press: 2020, pp.81-84.

[8]  Diakonia, *The Use of Force in Law Enforcement in the Occupied Palestinian Territories* (2021), pp. 7-9.

[9]  HRW, Israel: Collective Punishment against Palestinians (2023).

[10]  Shalhoub-Kevorkian, Nadera. *Incarcerated childhood and the politics of unchilding*. Cambridge University Press: 2019. p. 33.

[11]  Peled-Elhanan, Nurit. Palestine in Israeli school books: Ideology and propaganda in education. Bloomsbury Publishing: 2013.

[12]  Stone Cold Justice: Israel's torture of Palestinian children - ABC Australia (2014)

[13]  Nirit Peled

[14]  A/HRC/53/59 (2023)

14.     This reality is unsustainable, both for the Palestinians and the Israelis. Today's children are tomorrow's adults. In a world committed to child protection, it is imperative to examine how this commitment is realised in the oPt.

## IV.     Child Protection: International Legal Framework

15.     The international legal framework applicable to the oPt comprises international human rights law, international humanitarian law, and international criminal law.[15] This legal framework sets forth the rights and freedoms of children as protected persons and human beings, as well as the obligations of relevant authorities.

16.     Within this framework, the CRC, including the Optional Protocol on the Involvement of Children in Armed Conflict, establishes the most comprehensive framework for safeguarding children's rights. The Convention, ratified by Israel in 1991 and the State of Palestine in 2014, is applicable in the oPt. Signatories must respect, protect and fulfil the rights of children within their jurisdiction or subject to their effective control.[16] The State of Palestine's accession to the Convention and other international human rights treaties does not absolve the Israeli occupying authorities of their responsibilities toward Palestinian children under occupation.[17]

17.     The Convention is a vital instrument for promoting and defending the rights and dignity of every child. It enshrines four guiding principles underpinning all other rights:[18] the principle of non-discrimination, the principle of safeguarding the best interests of the child, the right to life that spans from survival to development, and the right to participate in decisions and actions that affect them.[19] The Convention guarantees children the right to a name, nationality and family, shielding them from discrimination, exploitation, ill-treatment and violence.[20] It ensures access to education, healthcare, and a nurturing environment conducive to their physical, mental and emotional growth. It affords special psychosocial support to children exposed to abuse, neglect or armed conflict.[21]

18.     International humanitarian law, the Hague Regulations, the Fourth Geneva Convention, Additional Protocol I and customary international humanitarian law, reinforces the protections afforded by human rights treaties to children in situations of armed conflict and occupation. Furthermore, these instruments establish a framework for ensuring the safety and security of schools and hospitals, emphasising their vital role as civilian objects that should not be subjected to attack or military use during armed conflicts, siege and bombardment.[22] The recruitment of children for military purposes is prohibited.[23]

19.     The occupying power is obliged to ensure public order and civil life, and has responsibility for the welfare of the occupied population including children. This encompasses respecting private property, which cannot be confiscated, and administering public property in the occupied territory as a mere custodian.[24]

20.     Fundamental to ensuring the enjoyment of childhood is the prohibition of forcible transfer or deportation of the occupied population outside the occupied territory; extensive destruction and appropriation of property not justified by military necessity, including of hospitals;[25] intentional killing and injury,[26] torture or inhumane treatment;[27] violations of fair

---

[15]  A/HRC/53/59 (2023), paras 14-15.
[16]  CRC, article 4.
[17]  *Ibidem*.
[18]  Committee on the Rights of the Child, General Comment 5 (2003).
[19]  CRC, articles 2, 3(1), 6, 12.
[20]  *Ibidem*, articles 2, 5, 7, 19, 32, 34, 36, 37.
[21]  *Ibidem*, articles 23(3-4), 24, 27, 28, 29, 39.
[22]  HRC art 27, art 12 AP I. GC IV, art 18.
[23]  CRC, article 38.
[24]  Hague Regulations of 1907, articles 43, 45 and 55.
[25]  GCIV, articles 49, 18-19, 53.
[26]  Customary IHL, rules 1-2, 11, 14.
[27]  GCIV, article 32; Customary IHL, rule 90.

trial rights;[28] unlawful confinement of the population;[29] and child recruitment.[30] Intentionally violating any of these obligations is a grave breach of the Fourth Geneva Convention.[31]

21.    Such breaches also constitute war crimes,[32] especially "when committed as part of a plan or policy or as part of a large-scale commission of such crimes."[33] Under international criminal law, some of these violations may amount to crimes against humanity, such as deportation or forcible transfer of population, arbitrary deprivation of liberty, apartheid, torture,[34] and persecution against an identifiable group,[35] or other inhumane acts,[36] when carried out "as part of a widespread and systematic attack directed against the civilian population."[37] While these crimes do not specifically refer to children, the International Criminal Court's Office of the Prosecutor recognises that crimes against or affecting children are "regarded as particularly grave, given the commitment made to children in the Statute, and the fact that children enjoy special recognition and protection under international law."[38]

# V.    'Enjoying' Rights in a Militarised Settler-colonial Occupation

22.    Violations of children's rights in the oPt have been widely documented.[39] Given the scale and severity of these violations, this report places primary focus on the "inherent right to life" for every child,[40] a right to be interpreted broadly.[41]

23.    As "*the prerequisite for the enjoyment of all other human rights*", the right to life must be effectively protected.[42] Its protection embraces all facets of a child's existence, with the best interest of the child taking precedence[43] in any matter impacting their safety, dignity and freedom.[44] Upholding the right to life requires state authorities to ensure the survival and well-being of children, protecting them from arbitrary loss of life and promoting an "environment that respects human dignity and ensures the holistic development of every child."[45]

24.    This includes preserving families' roles in realising children's rights, ensuring adequate housing, access to education, the highest attainable standard of health, shielding children from any form of physical and psychological harm, and nurturing their holistic development, physically, mentally, spiritually, morally and socially. This includes ensuring opportunities for leisure, play, and engagement in cultural and social activities, as well as involving children in decision-making processes, especially when their rights and freedoms are at stake.[46]

The following sections explore the structural violence experienced by Palestinian children in the occupied territory, impacting their lives and collective well-being. This, in turn,

---

[28]   GCIV, article 78 and Part III, sections III-IV; Customary IHL, rules 87-91, 99-103, 118-137
[29]   GCIV, article 42; Customary IHL Rule 99.
[30]   Rome Statute (RS), articles (8)(2)(a)(i)-(vii), (8)(2)(b)((xxvi).
[31]   GCIII, article 13; GCIV, article 147.
[32]   RS, article 8(2)(a); ICTY Statute, article 2; International Court of Justice, *Legality of the Threat or Use of Nuclear Weapons* [Advisory Opinion] (1996), paras 79, 82; GCIV, article 147.
[33]   RS, article 8(1).
[34]   RS, art 7(1)(d), 7(1)(e), 7(1)(f), 7(1)(j).
[35]   Ibid art. 7(1)(h)
[36]   Ibid, art 7(1)(k)
[37]   Ibid, article 7(1).
[38]   ICC-OTP, Policy on Children (2016).
[39]   UNICEF, Children in Israeli Military Detention: Observations and Recommendations (2013); Defense for Children International-Palestine (DCI-P), Palestinian child prisoners: The systematic and institutionalised ill-treatment and torture of Palestinian children by Israeli authorities (2009).
[40]   CRC, article 6(1), 6(2), UDHR 3.
[41]   General comment No. 21 (2017), para 29
[42]   CCPR/C/GC/36 (2019), para 2
[43]   CRC, CRC/C/GC/20 (2016) on the implementation of the rights of the child during adolescence.
[44]   CRC, Preamble
[45]   CRC, CRC/C/GC/14 (2013)
[46]   CRC, articles 5, 12, 19, 23(1), 24, 27(1), 27(3), 28, 31-36, 37(a).

undermines the realisation of the right to self-determination of the Palestinian people, and their very existence.

## A.  Right to live in safety

26.     Preserving the right to life involves preventing the arbitrary loss of a child's life, without derogations.[47] In the oPt, the fundamental right to life is under threat, as indicated by mortality rates of Palestinian children: the neonatal mortality and infant mortality rates in the oPt are respectively 9.3 and 12.7, rising to 14.8 for children under 5, while in Israel they are 1.7, 2.7 and 3.4 per 1,000 live births.[48] In addition to direct attacks on the right to life, Palestinians also endure structural violence and racial discrimination that impedes their full development.[49]

***'I am afraid they will kill me'***

27.     In the context of occupation, the excessive use of force not only has outcomes but appears to be a functional component of Israel's policies. This dehumanising approach deprives Palestinians of their protected status as civilians, irrespective of their age, location or background, placing them (in the eyes of Israel) in the category of legitimate military targets rather than protected persons under international law. This strategy, which also covers extrajudicial killings and arbitrary executions,[50] contributes to removal and suppression of any impediment to Israel's territorial objectives.

28.     Since 2008, over 1,434 Palestinian children have been killed and another 32,175 injured, mostly by Israeli forces.[51]  In the same period, 25 Israeli children have been killed, mostly by Palestinian individuals, and 524 injured.[52] The devastating loss of human life reflects a pattern of documented 'use of excessive force' against the Palestinians[53]. The spectre of death looms as a dominant element in the lives of Palestinian children. This reality exerts a psycho-social toll on those who manage to survive, as poignantly expressed by Ouadia, 14: "fearing death does not prevent you from dying but it prevents you from living."

29.     The Israeli occupying forces justify such killings on the basis of "self-defence",[54] "counter-terrorism"[55] and, in the context of hostilities in Gaza, the consequence of attacking legitimate targets,[56] or of Palestinian armed groups purportedly using civilians as 'human shields'.[57] Recently, an Israeli occupation lieutenant asserted that the number of Palestinian children "incidentally killed" during operations aimed at "eliminating terrorists" is "irrelevant".[58] Such a statement is not isolated and may reflect broader operational ethics and a legal culture within the Israeli occupation forces that devalues Palestinian civilian life.[59]

30.     Israel's attacks against the Gaza Strip, where Palestinians have endured 16 years of unlawful blockade and six large military assaults (2008-2009, 2012, 2014, 2021, 2022, and

---

[47]  HRC, General Comment No. 36, para 2.

[48]  UNICEF Data, State of Palestine and Israel (last updated: 2021).

[49]  CERD 2019.

[50]  Amnesty International, Israel/OPT: Increase in unlawful killings and other crimes highlights urgent need to end Israel's apartheid against Palestinians (2022).

[51]  OCHA, Palestinian fatalities and injuries [Database]. [up to 31 August 2023]

[52]  OCHA, Israeli fatalities and injuries [Database]. [up to 31 August 2023]

[53]  A/HRC/40/74 (2019); A/77/328 (2022).

[54]  Noura Erakat, Justice for Some 178, 182, 186

[55]  Khalidi, Muhammad Ali. "'The Most Moral Army in the World': The New 'Ethical Code' of the Israeli Military and The War on Gaza." Journal of Palestine Studies 39, no. 3 (2010): 8-13

[56]  IDF https://www.idf.il/en/mini-sites/hamas/meet-the-officers-responsible-for-the-counterterrorism-efforts-against-the-hamas-underground-tunnel-network/

[57]  Gordon, Neve, & Perugini, Nicola. (2016). "The politics of human shielding: On the resignification of space and the constitution of civilians as shields in liberal wars." *Environment and Planning D: Society and Space*, *34*(1), 182-183.

[58]  IDF Lieutenant, Mauriche Hirch, https://twitter.com/MauriceHirsch4/status/1655840611704897536, 9 May 2023.

[59]  https://www.haaretz.com/2006-10-19/ty-article/asa-kasher-we-cant-let-israelis-get-killed-in-order-to-save-palestinian-civilians/0000017f-e0de-d38f-a57f-e6de252e0000

2023), have denied and threatened the right to life of its Palestinian people. Rockets and missiles fired by armed groups in Gaza have also denied and threatened the right to life of Israelis, including children.

31.     Jointly, these Israeli military attacks have killed 4,269 Palestinians in Gaza, including 1,025 children, and injured 41,348, including 7,588 children.[60] Over the same period, rockets launched by Palestinian armed groups have killed 212 Israelis and injured 2,930. Such violent events terrorise children on both sides.

32.     During four of these operations against Gaza,[61] the Israeli forces attacked Palestinian life-sustaining medical structures, services and personnel[62]:  the military carried out 180 attacks on hospitals and medical clinics in Gaza, targeted 80 ambulances, killed 41 medical workers and injured 104.[63]  Attacks on health workers, ambulances, and facilities have also occurred in the West Bank, including east Jerusalem, where severely wounded Palestinians have been unable to receive medical treatment.[64]

33.     Amid these hostilities, both Israeli forces and Palestinian armed groups can be found in violation of international law. The illegality of the 1967 occupation, including the blockade of Gaza, does not exempt Palestinian armed groups from their own obligations. Their use of rudimentary rockets targeting areas in Israel, endangering civilians including children, may also amount to a war crime. This does not justify Israel's indiscriminate attacks in densely-populated residential areas in Gaza,[65] including at night when entire Palestinian families are sleeping,[66] with limited or no opportunity to seek refuge, and the targeting of entire residential buildings and other essential infrastructure. Pre-warnings have not proven effective at sparing civilian life: entire families have lost their lives in night attacks.[67] Furthermore, in Israel's targeted assassinations, there are no warnings and children become 'collateral damage'. Palestinians in Gaza have been imprisoned for 16 years and have few if any places to hide when bombs fall upon them; even UNRWA schools proved to be not safe. Children from Gaza describe life after military assaults as an act of mourning: "even when one survives, life becomes unbearable".

34.     The Israeli military often claims that the Palestinians use their children as "human shields" on the front lines.[68] However, already in 2009 a UN Commission of Inquiry identified a practice that continues  today: while Palestinians killed by the Israeli occupying forces, including children, are sometimes posthumously labelled as "martyrs" by political factions, this is not proof of involvement in armed activities, but is part of a collective consciousness and is accepted by the families who receive financial support from armed groups.[69] The same Commission also raised concerns about potential fabrications of Israel's accusations that schools and hospitals were used by armed groups; as Israel itself conceded, the images it provided to the fact-finding mission were not from the 2008-2009 war.[70]

---

[60]  OCHA oPt, Data [last updated 31 August 2023].

[61]  In 2008/9, 2012, 2014 and 2021.

[62]  MAP, 2017. Health Under Occupation, 16. Bachmann, et al "Gaza 2014: Findings of an Independent Medical Fact-Finding Mission." p. 34-35. Mahase, Elisabeth. 2008. "Gaza: Israeli airstrikes kill doctors and damage healthcare facilities." *BMJ* 373; Medical Aid for Palestinians. 2021.

[63]  Perugini, Nicola and Neve Gordon, "Medical Lawfare: The Palestinian Nakba and Israel's Attacks on Healthcare," forthcoming.

[64]  Interview with WHO.

[65]  A/HRC/49/83 (2022). paras, 9-10

[66]  Amnesty International, Civilian deaths and extensive destruction in latest Gaza offensive, (2023).

[67]  B'Tselem, *Black Flag* (2015).

[68]  2009 https://www.idf.il/en/mini-sites/wars-and-operations/operation-cast-lead/ ; 2012 https://web.archive.org/web/20121117052226/http://www.idfblog.com/hamas/2012/10/29/hamas-uses-its-own-civilians-as-human-shields-when-launching-rockets-at-israel/ 2014 https://www.idf.il/en/mini-sites/wars-and-operations/operation-protective-edge/operation-protective-edge 2021 https://www.idf.il/en/mini-sites/wars-and-operations/operation-guardian-of-the-walls/operation-guardian-of-the-walls-1/ Gordon, Neve and Nicola Perugini, *Human Shields: A History of People in the Line of Fire*, University of California Press: 2020. pages 22, 170-179, 214-216.

[69]  A/HRC/12/48 (2009). para. 423

[70]  (Goldstone p 114 report)

35.    Independent Commissions of Inquiry found that Israeli military attacks against Palestinian civilians were unnecessary or disproportionate, amounting to arbitrary deprivation of life.[71] On documented occasions, Palestinians, who were not posing any kind of threat, have been attacked with unnecessary force,[72] even as they were standing "in front of a clinic while attempting to leave the village holding white flags"[73] or while playing football on the beach[74] or while gathered around their grandfather's grave.[75]

36.    The violence of these multiple lethal attacks is highly traumatic for children in Gaza, where over half of them may be affected by post-traumatic stress disorder.[76] With very few qualified child and adolescent psychiatrists in Gaza, access to mental health services for children is almost non-existent. The children have inconsolable pain and "fears of dying or losing [their] beloved ones."[77]

37.    In the West Bank, including east Jerusalem, Israel's assaults on Palestinians have not spared Palestinian children. Since the Second Intifada in 2000, the frequency, toll, and brutality of Israel's military assaults have persisted. Attacks on cultural spaces and activities have increased, including the violence against worshippers in Al-Aqsa Mosque during Ramadan in 2021, 2022 and 2023. The experience of Jenin refugee camp, an area of 0.42 square kilometres hosting about 24,000 refugees,[78] is an example of this structural violence. Beyond the incursions and military operations that Israel considers routine, Jenin has been attacked seven times in 2023[79], killing 40 Palestinians, including nine children. "They were bombing us from everywhere, they were everywhere, we were so scared that our parents may die," said Yasmine, 16, referring to the assault occurred on 3-5 July 2023. The children observing the assaults from outside the camp were scared for their friends and for 'their' Freedom Theatre, "the only place where we enjoy our life and we are not scared." Jenin children spoke fondly of 15-year-old Sadeel Naghniyeh, killed by an Israeli sniper in the head while in her courtyard, during the withdrawal of the occupation forces from Jenin camp.[80]

38.    Repeated exposure to death and violence under Israeli occupation result in high levels of mental and emotional distress among Palestinian children. One teenager in the Dheisheh refugee camp: "if this is what life looks like at 15, I swear death is more merciful." Recently, Palestinian children in the West Bank started to carry farewell letters in their pockets.[81]

39.    When asked to describe their main source of fear, Palestinian children referred to the Israeli soldiers and "*al-mustawtinin*" (the settlers).[82] The gruesome killings by Israeli settlers of Muhammad Abu Khdeir, 16, in Shu'fat in 2014 and the Dawabsheh family killing in Duma in 2015 are still vivid for Palestinian children. Israeli settlers, including children and the youth, have become increasingly aggressive, coordinating mass assaults on Palestinian towns in the West Bank.[83] Since 2017, the UN has documented 3,244 such incidents, resulting in 920 Palestinian casualties and damage to 2,324 properties.[84] Extreme forms of settler violence include incursions in Palestinian property including at night, regular 'pogroms', the torching of infrastructure and physical assaults against Palestinian residents[85] – all under the eyes of the Israeli occupation forces, with some of it publicly praised by some senior Israeli

---

[71]   A/HRC/49/83 (2022). para 25; A/HRC/12/48(2009), para. 1431; A/HRC/29/52, para. 71; A/HRC/22/35/Add.1, para. 10
[72]   A/HRC/28/80/Add.1 (2014), para. 43
[73]   A/HRC/49/83 (2022). Para 59
[74]   OCHA, Occupied Palestinian Territory: Gaza emergency Humanitarian Snapshot (as of 17 July 2014
[75]   A/HRC/52/75, para.8.
[76]   WHO, A72/33, 2019, para 15.
[77]   Interview with children in the Gaza Strip, August 2023.
[78]   UNRWA, Jenin camp [Factsheet].
[79]   In January, March, June and July.
[80]   Adra, Basel. "Her smile never left her face", +972mag (2023).
[81]   https://www.newarab.com/features/how-nakba-continues-take-lives-palestinians , confirmed by DCI.
[82]   Interviews with children in West Bank August 2023, and Jerusalem, February 2023.
[83]   NRC, Attribution of settler-violence to the State of Israel (2023).
[84]   UN, Image 1 from Increase in Settler Violence, Displacement – Remarks by OCHA Spokesperson Jens Laerke (2023)
[85]   Mohar, Avishay. "Settlers have a very effective system for forcing Palestinians out of their homes", *Haaretz* (2023).

officials.[86] Within these incidents, children are targeted even when running away from the soldiers, such as Ramzi Fathi, 17, fatally shot in the chest and abdomen.[87] "The life of children should be sacrosanct," says a mother of three from Jenin. Instead, "our children are killed, threatened, intimidated; it is an entire system designed for it."[88]

40.    As a 13-year-old child in Gaza lamented, "Even when we protest, they kill us," referring to the Israeli forces' open-fire policy during the weekly protests in the Gaza Strip during the 2018-2019 Great March of Return, which killed 223 Palestinians, including 46 children, and injured 36,100, including 8,800 children.[89] The UN Commission of Inquiry on the Gaza protests concluded that "Israeli security forces used lethal force against children who did not pose an imminent threat of death or serious injury to its soldiers. Four of the children were shot as they walked or ran away from the fence"[90] and "Israeli snipers shot them intentionally, knowing that they were children."[91] A shoot to kill policy[92] is deployed against Palestinian adults and children alike in the occupied territory. Irrespective of whether these children are directly targeted, these attacks cast a profound effect on children.

41.    Beyond arbitrarily taking lives, Israel has forced Palestinian children to be at the frontline of military operations, including toddlers.[93] Since 2000, at least 31 children have been forced to stand in front of a military tank or a soldier, witnessing the destruction of their surroundings.[94] One of these children recalls:  "I was trembling and crying and shouting to the soldiers to remove me because the bullets were passing over my head, but one of them ordered me in Arabic through a small window in the military vehicle, "Stay where you are and don't move. You're a terrorist. Stand in your place until you say goodbye to your brother.'[95]

*Maiming*

42.    "When they do not kill [our children], they may remain ruined forever," says a Palestinian mother, reflecting how many children have been maimed by Israeli forces and settler violence.[96] Between 2019 and 2022, 1,679 Palestinian children and 15 Israeli children suffered lasting physical injury.[97]

43.    Medical personnel in the Gaza Strip and the West Bank report a "shoot to cripple" policy, manifested in the shift from "traditional means" to disperse protests, to "firing at protestors' knees, femurs, or aiming for their vital organs" to pre-emptively debilitate the capacity for any other form of opposition to Israel's oppression.[98] During the 2018 protests in Gaza, Israeli forces permanently disabled many of the 940 children shot during the demonstrations, including 20 children left maimed,[99] and through other lifelong disabilities,

---

[86]   Smotrich https://www.timesofisrael.com/israel-should-wipe-out-palestinian-town-of-huwara-says-senior-minister-smotrich/ Ben Gvir https://www.thenationalnews.com/mena/2023/06/23/far-right-israeli-minister-ben-gvir-calls-for-killing-of-thousands-of-terrorists/

[87]   DCI-P, 17-year-old Palestinian boy succumbs to gunshot wounds from Israeli settlers (2023).

[88]   Interview with Palestinian women from Northern West Bank.

[89]   B'Tselem and Palestinian Centre for Human Rights, *Unwilling and Unable: Israel's Whitewashed Investigation of the Great March of Return Protests* (2021). https://www.un.org/unispal/document/two-years-on-people-injured-and-traumatized-during-the-great-march-of-return-are-still-struggling/

[90]   A/HRC/40/74, para 67

[91]   Ibid, para 68

[92]   Amnesty International, "Israel: 'Deliberate attempts' by military to kill and maim Gaza protesters continues" (2018); B'Tselem & Palestinian Centre for Human Rights, *Unwilling and Unable*, p. 6.

[93]   DCI, *Israel forces use five Palestinian children as human shields* (May 18, 2023)

[94]   Ibid.

[95]   https://www.dci-palestine.org/israeli_forces_use_palestinian_girl_as_a_human_shield_in_jenin

[96]   Interview with Palestinian mothers in Jenin, August 2023.

[97]   CAAC reports 2022-2023: A/77/895-S/2023/363 para. 89; A/76/871-S/2022/493, para 88; A/75/873–S/2021/437 para 79; A/74/845–S/2020/525, para 86

[98]   Blumenthal, Max. "Evidence Emerges of Israeli 'Shoot to Cripple' Policy in the Occupied West Bank." *Alternet*, (2014).

[99]   HRC(CoI)- A/HRC/40/74 (2019)

such as blindness.[100] Israel's use of force against the protesters was found to be "neither necessary nor proportionate, and therefore impermissible".[101]

44.     Deliberately maiming children and young people reflects the level of dehumanisation they are subjected to.[102] Children embody this existential cruelty: it allows life to continue, yet it perpetuates fear and vulnerability[103] and makes life "something resembling an incomplete death".[104]

**Arbitrary arrest and detention**

45.     Since 2000, an estimated 13,000 Palestinian children have been detained, interrogated, prosecuted, and imprisoned by Israeli occupation forces,[105] with an average of 500-700 children detained yearly.[106] Between 2022-2023, the number of children detained without charge or trial has risen, with currently 20 children in administrative detention.[107] Cruel, inhuman and degrading treatment is widely reported[108] and their tribulation through arrest and detention is covered elsewhere.[109] Palestinian children can be arrested anywhere, at checkpoints, on their way to school, during operations in towns and camps, or even in their own beds.  One mother recounted the night arrest of her son: "They forcefully dragged him, hit him (...), they hooded him while I was standing there screaming 'He is a child... have mercy, a child,' and he was calling me, 'Yamma, yamma [mom, mom],' and I could not do anything… Seeing him vomiting while he was being hooded with their bag…"[110]

46.     The majority of children are charged with stone throwing[111] at Israeli forces' armoured vehicles, which may result in sentences from 10 to 20 years. For example, Naveen, nine, recounts: "I started picking up stones, trash from the street, and even my juice bottle and screamed loudly to prevent them from arresting my father."[112]

47.     In over a decade, at least 1,598 Palestinian children have been subjected to ill-treatment upon arrest and detention.[113] Allegations of torture have been widely documented.[114]

48.     Upon arrest, 77 percent of children are denied access to a lawyer prior to interrogation[115] and nearly 60 percent of them are deported to Israel.[116] Detainees transfer outside the oPt constitutes a war crime.[117] It hinders family visits, due to difficulties obtaining Israeli-issued permits. Typically, a child receives just one sporadic visit from family members, further isolating them from family and community. Parents are rarely informed of their children's whereabouts upon arrest, which not only violates the CRC but also may

---

[100]  DCI-P, Israeli forces blind 3 Palestinian children with live ammunition, stun grenade (2023).
[101]  A/HRC/40/CRP.2, (2019) para 96
[102]  www.haaretz.com/israel-news/2020-03-06/ty-article-magazine/.highlight/42-knees-in-one-day-israeli-snipers-open-up-about-shooting-gaza-protesters/; https://mondoweiss.net/2020/03/i-remember-the-knee-in-the-crosshairs-bursting-open-israeli-snipers-boast-of-shooting-ducks-in-gaza
[103]  Puar, Jasbir K. "The 'Right' to maim: Disablement and inhumanist biopolitics in Palestine." *Borderlands* 14, no. 1 (2015): 1-27, pp 7-8.
[104]  Fanon, Frantz. *A Dying Colonialism* (1965), p. 128.
[105]  DCI-P, Arbitrary by Default, Palestinian Children in the Israeli Military Court System (2023), p. 20
[106]  Ibid., p. 20
[107]  Addameer, Statistics [last update September 2023].
[108]  DCI-P, *Arbitrary by Default*, pp. 29-30; B'Tselem, *No Minor Matter* (2011), pp. 37-38; CRC/C/15/Add.195 (2002), para 36.
[109]  A/HRC/53/59 (2023), paras 65-72.
[110]  Kevorkian, 2019, p. 74
[111]  Nicoll/Save the Children (StC), Injustice: Palestinian children's experience of the Israeli military detention system, 2023, p. 8
[112]  Kevorkian, 2020, p. 89
[113]  CAAC reports 2010-2023; Nicoll/StC, *Injustice*, p. 13
[114]  Nicoll/StC, Defenceless, The Impact of Israeli Military Detention on Palestinian Children; DCI-P, Arbitrary by Default.
[115]  Military Court Watch/MCW, Annual Report (2021/2022), pp. 15-16.
[116]  Nicoll/StC, *Defenceless*, p. 9
[117]  RS, Article 8(2)(b)(viii).

amount to enforced disappearance,[118] which, in the context of a widespread or systematic attack directed at the civilian population, constitutes a crime against humanity.[119]

49.     Palestinian children often experience solitary confinement in windowless cells, constantly lighted.[120] This prohibited practice,[121] very common during interrogation, has increased from 12.5 average days in 2022 to 16.5 in 2023.[122] The irreparable effect of solitary confinement on young people at such a critical stage of their neurological, physiological, and social development, has a serious risk of long-term developmental impairment and psychological harm.[123] The practice is associated with increased risk of suicide and self-harm and creates problems with reintegration, failing to tackle the root causes of disruptive or violent behaviour. Reflective of this troubling reality is the case of Ahmad Manasra, who has been in solitary confinement since November 2021, despite developing schizophrenia.[124] Cases of Palestinian children in Israeli custody resorting to self-harm and attempting suicide are not rare.[125]

50.     Trials last three minutes on average, during which children may see their family and lawyer for the first time since arrest after protracted periods apart.[126] Parents recount the horror of seeing their young children appearing before a martial court for a few seconds, surrounded by guards and with "the judge not even looking at [their] children [while] taking one minute to sentence them to imprisonment.[127]

51.     This calvary deeply traumatises Palestinian children, their families and communities.[128] Most of the children, like Bassam, aged 11 when arrested, cannot comprehen all this: "What right do they have to arrest me and put me in prison for 100 days, threaten to arrest my father, and hit my mother? I was exposed to torture and spent ages without food or sleep."[129]

52.     Israel's concept of 'military juvenile justice' runs counter to fundamental protections for children during arrest and detention, including their right to a fair trial, breaching the obligations to: only detain children as a last resort, for the shortest possible duration, with the assistance of a legal representative; respect the presumption of innocence and privacy; and never subject children to torture or cruel treatment. Extra-judicial killings of children deprive them of the right to even a trial, as with Ahmad Manasra's cousin Hassan who was armed with a knife, not a gun, but killed immediately.

53.     In addition, these practices include instances of house arrests, where parents are compelled to act as the guardians for their detained children within their own homes.[130] "I became my son's jailer, I felt he resented me", said a mother of a 17-year-old sentenced to house arrest after six months in detention.[131] Contrary to the principles of humane treatment and the preservation of family integrity,[132] this disrupts the developmental trajectory of the child and family life. Jamal, detained at 15, explained: "You have your whole life planned out but then you get arrested, and it ruins everything... It's as if this experience robs you of your time and your future."[133] Requiring parents to act as the arm of the occupying power

---

[118]  Convention on Enforced Disappearance (2010), article 2.
[119]  RS, Article 7(1)(i).
[120]  MCW, Annual Report (2021/2022), p. 18
[121]  CRC, article 37.
[122]  DCI-P, Arbitrary by Default, p. 2.
[123]  Lancet 2018.
[124]  UN experts urge Israel to free Ahmad Manasra, 14 July 2022.
[125]  Ibid., p. 19.
[126]  B'Tselem (2011), p. 50
[127]  Interview with mothers in Jerusalem, February 2023.
[128]  Gwyn, Daniel. "'The strong do what they can and the weak suffer what they must': Palestinian families under occupation", Context 164, 2019, p. 49.
[129]  Nicoll/StC, *Defenceless*, p. 17
[130]  MIFTAH, Locked in: Israel's house arrest policy against Palestinian children, April 11, 2020
[131]  Interview with parents and former child detainees, Jerusalem, February 2023.
[132]  CRC, articles 3,9,16.
[133]  Nicoll/StC, Injustice, 2023, p. 3

can also produce irreparable rifts in family life, as children may view it as collusion rather than a desire to protect them from prison.

54.     Children who have experienced detention report anxiety, depression and personality change.[134] Parents report noticeable changes in their children's behaviour, including increased clinginess, isolation and a lack of interest in ordinary or enjoyable activities.[135] Children are constantly haunted by the fear of being re-arrested, with 59 percent thinking about this possibility daily. As one mother recalled, "my son became angrier, but he does not want to talk about it."

## B.     Right to Live in Dignity

55.     "How can children ever be happy under occupation?" asks Adnan, father of four, from Jenin. In the occupied West Bank, the expansion of Israeli-Jewish colonies, discriminatory zoning and planning, and the exploitation of Palestinian land and other resources at the expense of Palestinian sovereignty have confined Palestinians into impoverished and densely-populated 'enclaves', making the achievement of life in dignity unattainable.[136]

56.     The Gaza Strip, under illegal siege and blockade, is the most obvious example of the restrictions on movement and access. But the West Bank, including east Jerusalem, has many areas where Palestinians are effectively corralled in towns and villages surrounded by colonies, military encampments, hundreds of fixed and mobile checkpoints, 400 kilometres of segregated roads, "military zones" inaccessible to Palestinians, and the Wall and the separation it entails.

57.     Children feel this physical segregation keenly. It is compounded by bureaucratic obstacles requiring Palestinians to obtain Israeli-issued permits for even basic aspects of life, including travel within the West Bank and Gaza Strip (Jerusalem being inaccessible to most Palestinians) for construction, work, education, and healthcare. Mass surveillance technologies, including cameras, drones and social media monitoring further augment this control, infringing on privacy and leading to arrests for minor infractions. These controls create formidable barriers to communication, movement, and development, depriving families, and especially children, of essential resources for social and economic growth, and the opportunity to live in dignity and reach their full potential.

### *Coerced Poverty and De-Development*

58.     Israel's settler colonial occupation is costing $11 billion to the Palestinian economy,[137] and has driven the 'de-development' of the occupied territory, forcing 2.1 million Palestinians in the territory, half of whom are children, below the poverty line.[138] Unequal access to natural resources, including water,[139] together with the consequent gradual erosion of family livelihoods,[140] self-sufficiency in agriculture, industry and fishing[141] entrench economic instability and income decline.[142] Born and growing deprived of critical resources and land, Palestinian children have to rely on foreign aid for basic necessities.[143] Some half a million Palestinian children are food insecure, lacking reliable access to nutritious and

[134] Nicoll/StC, *Defenceless*, p. 20
[135] Nicoll/STC, *Injustice*, p. 16
[136] A/72/556 (2018); B'Tselem, Expel and Exploit: The Israeli Practice of Taking Over Palestinian Land (2016).
[137] UNCTAD, Economic costs of the Israeli occupation for the Palestinian people (2021); The Gaza Strip under closure and restrictions (2020).
[138] IMF, West Bank and Gaza: Ad Hoc Liaison (2022).
[139] Al-Haq, Corporate Liability: The Right to Water and the War Crime of Pillage (2022); A/HRC/48/43 (2021).
[140] NRC, Area C is Everything (2023), p. 2.
[141] UNCTAD, Economic cost of the Israeli occupation for the Palestinian people, A/71/174 (2016).
[142] Roy, Sara "De-development revisited: Palestinian economy and society since Oslo", *Journal of Palestine Studies*, vol. 28, No. 3 (1999), pp. 64–82.
[143] Turner, Mandy (Ed.), Achilli, Luigi, & Buttu, Diana. *From the River to the Sea: Palestine and Israel in the Shadow of Peace*. Lexington Books: 2019. Introduction.

sufficient food.[144] This affects their mental, physical, and behavioural health, their education, and consequent life opportunities.[145]

59.     A quarter of childhood diseases in Gaza may be linked to water contamination[146] as 75 percent of Gaza's sustainable groundwater is taken  by the occupying power,[147] with most of the remainder not fit for human consumption.[148]  In the West Bank, where Israel controls 87 percent of the mountain water, a Palestinian child has access to only a quarter of the water amount available to a neighbouring Israeli settler.[149] To Palestinian children in the water-scarce Jordan Valley, this 'water apartheid'[150] manifests itself through their families being forced to buy (their own) drinking water from Israeli companies,[151] give up traditional herding practices and witness their crops withering, while Israeli children in illegal colonies "enjoy lush, well-watered lawns, swimming pools and aqua-parks."

60.     Witnessing the erosion of their parents' livelihood and dignity hurts children the most: "It is sad to see our fathers having lost everything they had, now they spend most of their time at home," say children in Jenin. The decreasing household income[152] has been connected to increased level of domestic violence,[153] school dropout, and child labour.[154] Children above 10 in the West Bank and the Gaza Strip (nearly one percent of them in the latter) are forced into full-time labour,[155] including in Israel itself or in the illegal colonies, where they face exploitative labour conditions,[156] humiliations by Israelis, and stigmatisation by other Palestinians.[157] "Many of us have to support our families, but finding jobs in Israel is dangerous: we have to enter illegally and accept to be mistreated all the time by them," children from the West Bank told the Special Rapporteur.

*Coerced Homelessness*

61.     Homes are essential for children to grow, thrive, and feel safe. The right to adequate housing includes secure tenure, protection against forced evictions and expulsions, access to services like drinking water and energy, along with the protection of privacy and the freedom to choose one's residence.[158] Homes should be highly protected including under occupation or during hostilities: wanton destruction of civilian property not justified by military necessity and carried out unlawfully, as well as destroying or seizing the property amount to war crimes.[159]

62.     For many Palestinian children, the safety and stability of their home remain an aspiration "under the rubble."[160] Since 1967,[161] as a deliberate tool of erasing Palestinian

---

[144] OCHA oPt, Humanitarian Needs Overview 2023 (2022), pp. 45-46.
[145] Muhareb, Rania, et al. "Beyond statelessness:'Unchilding' and the health of Palestinian children in Jerusalem." *Statelessness & Citizenship Review* 4, no. 1 (2022): 88-112, pp. 106-107.
[146] OCHA oPt, Humanitarian Needs Overview 2023 (2022).
[147] Communications of Special Procedures, *AL ISR 13/2020* (2021)
[148] UNICEF, Water, Sanitation and Hygiene Assessment at the Household Level in the Gaza Strip (2017), p. 4.
[149] Amnesty International, *The occupation of water* (2017).
[150] Al-Haq, Water for One People Only: Discriminatory Access and 'Water Apartheid' in the OPT (2013).
[151] Al-Haq, Corporate Liability: The Right to Water and the War Crime of Pillage (2022).
[152] Unemployment rates are 13% in the West Bank and 45% in the Gaza Strip, PCBS, Labour Force Survey (2022).
[153] de Olarte, et al. Does poverty cause domestic violence?: Some answers from Lima. PUCP. CISEPA, 1999. Better source needed -check with DCI and Al haq
[154] OCHA oPt, Child labour increasing in Gaza (2019); HRW, Ripe for Abuse (2015).
[155] Mason/StC, Trapped: the impact of 15 years of blockade on the mental health of Gaza's children (2022).
[156] ILO, The situation of workers of the occupied Arab territories (2022), p. 10.
[157] Al-Haq, Captive Markets, Captive Lives: Palestinian Workers in Israeli Settlements (2021).
[158] CESCR, General Comment No. 4, para 9.
[159] GCIV, articles 53; 147; Rome Statute, article 8(2)(a)(iv).
[160] Nicoll/StC, Hope Under the Rubble.
[161] Khalidi, Rashid. The hundred years' war on Palestine: A history of settler colonialism and resistance, 1917–2017. Metropolitan Books: 2020.

presence,[162] Israel has demolished 56,500 Palestinian homes through military operations, discriminatory zoning and planning[163] and as collective punishment.[164]

63.     Large-scale forced evictions, home demolitions and forced displacement have directly impacted children. In the West Bank, Israel has allocated 0.24 per cent of the land (in Area C) for Palestinians' growth and development[165] with 99.76 per cent allocated for the growth and development of illegal Israeli colonies.[166] Most Palestinians are forced to build without Israeli permits, routinely denied. As a result, some 10,000 Palestinian houses have demolition orders pending.[167] In east Jerusalem, where at least a third of Palestinian homes lack a permit, 2,020 houses have already been destroyed since 2004[168] and 20,000 houses have pending demolition orders,[169] placing over 100,000 residents, the majority of them children, at risk of forced displacement.

64.     Palestinian children often witness their parents coerced into self-demolishing their homes to avoid facing steep fines.[170] The accompanying feelings of failure and depression have a direct impact on parenting and on parents' ability to support their children.

65.     Children are severely traumatised by this all-encompassing destruction and violence.[171] "All I have are sad memories," says Ghassan, 15. "I still feel traumatised by the soldiers and their dogs attacking and injuring my father [during the demolition]. I have nightmares about the bulldozers ripping away every stone in our house, and the sounds of the explosions still haunt me."[172]

66.     Israel also resorts to 'punitive' home demolitions against Palestinians accused of having attacked Israeli civilians or forces.[173] Samer, 11, said: "My father was killed by soldiers who claimed that he was violent around a settlement [colony]… Not only did I lose the most important person in my life, but then they came for our house. First, they made me an orphan, then they made me homeless."[174]

67.     In the Gaza Strip, Israel's attacks on residential areas have destroyed 18,507 houses and damaged 26,338 since 2000, affecting half a million Palestinians, half of them children.[175] Israel has justified these actions purportedly for security land clearance or punishing alleged 'terrorists'.[176] Approximately 200 children were affected by the nearly 300 punitive home demolitions.[177]

68.     Even if their own home is not demolished, children live with the daily risk that it may be at any time. Witnessing it happening to friends, they constantly receive the message "you are living on borrowed time", as an interviewee said. Forced eviction and home demolitions rekindle the trauma endured by their parents. This intergenerational impact is likely to continue for future generations.[178]

69.     Israel's ban on importing essential building supplies has made repair and recovery exceedingly difficult.[179] In 2009, the UN Commission of Inquiry found that "destruction by the Israeli armed forces of private residential houses, water wells, water tanks, agricultural

[162]   Amnesty International, *Israel's Apartheid against Palestinians* (2022), pp. 24-26,30
[163]   ICAHD, Statistics on House Demolitions [last updated: 2022].
[164]   A/HRC/44/60 (2020).
[165]   PeaceNow, State Land Allocation in the West Bank- for Israeli only ( 2018).
[166]   Ibidem.
[167]   ICAHD, Israel's Demolition of Palestinian Homes: A Fact Sheet (2021)
[168]   B'tselem, House demolition database (accessed on 12/09/2023)
[169]   B'tselem, Maintaining a Jewish majority (2019)
[170]   Nicoll Claire/Save the Children (StC), *"Hope under the rubble": The impact of Israel's home demolition policy on Palestinian children and their families* (2021).
[171]   Ibid., p. 4.
[172]   Ibid., p. 12
[173]   B'Tselem, House Demolitions as Collective Punishment (2017).
[174]   Nicoll/StC, *Hope under the Rubble*, p. 10
[175]   Al Mezan, Destruction of Residential Houses between 2000 - 28 Feb 2023."
[176]   Btselem, Database on Fatalities and House Demolitions, Accessed September 2, 2023.
[177]   Btselem, Database on Fatalities and House Demolitions,  para 55, p. 13
[178]   CoI (para 55)
[179]   OCHA, Gaza Strip: Import restrictions impede delivery of services and humanitarian (2015).

land and greenhouses [...] (served) a specific purpose of denying sustenance to the population of the Gaza Strip."[180]

70.     These policies have led to long-lasting emotional distress.[181] Children recount the desperation of their "dreams for the future disappearing overnight."[182] After experiencing home loss, most children experience feelings of hopelessness and defeatism, social isolation and disconnection from their community. They feel abandoned by the world, and lose focus on their education.[183] Fadi, 16, asks: "why should I even entertain the idea of envisioning a brighter future?"[184]

### Deprivation of Education

71.     Central to a child's psycho-social development and well-being are education and leisure time.[185] Education is a standalone human right,[186] cultivating the human personality's 'sense of dignity,' and a pivotal means to realise other rights and the child's full potential.[187] Schools must serve as a secure space for a child's development, promoting a *continuum* with the child's family life.[188] Intentionally directing attacks on education facilities constitutes a war crime.[189]

72.     Palestinian children in the occupied territory express a particular love for education, viewing their schools as respite from the day-to-day oppression, granting them a sense of "freedom" and fostering the imagination of "a brighter future".[190] However, attacks on schools, including the military use of schools, is another grave violation committed against Palestinian children.

73.     In the West Bank, including east Jerusalem, the primary challenge to education is Israel's discriminatory permit-system constraining Palestinians' ability to construct, improve, or even maintain existing schools.[191] 11 Palestinian schools have been demolished since 2010, while demolition orders hang over 59 schools (51 in Area C of the West Bank and eight in east Jerusalem)[192] serving 6,800 students. In November 2022, Israeli occupying authorities demolished the only primary school in Masafer Yatta (Isfey al-Faqa) while children were still inside, forcing them to flee from bulldozers through the school's windows and then confiscating all their textbooks and school furniture.[193] In this environment, schools are unable to modernise or upgrade.[194] In the Gaza Strip, there are not enough class rooms and 70 percent of UNRWA schools and 63 percent of government-run schools have to operate through double or triple shifts.[195]

74.     In the West Bank, going to school becomes "physically exhausting",[196] because "sometimes, we have to run away from danger such as soldiers," says Aladdin, 14, from Bethlehem.[197] Checkpoints and intimidating soldiers and settlers affect 80 percent of students.[198] "I can never get to my destination on time. It takes hours because [the soldiers]

---

[180]  A/HRC/12/48 (2009) para 73.
[181]  Nicoll/StC, *Hope Under the Rubble*, p. 12
[182]  Various reports, including NRC's "Learning on the Margins," page 32.
[183]  Ibid.
[184]  Nicoll/StC, Hope Under the Rubble.
[185]  CRC Articles 28 and 29
[186]  ICESCR Article 13,
[187]  CRC, art. 29(1)
[188]  CRC/C/GC/14, para 70.
[189]  RS Art. 8(2)(b)(ii), 8(2)(b)(v) and 8(2)(b)(ix).
[190]  Group of girls in Rafah, NRC, *Learning on the margins*, page 30
[191]  OCHA oPt, Humanitarian Needs Overview 2023 (2022), page 50.
[192]  West Bank Protection Consortium, *Education Under Attack* (2023).
[193]  OCHA. Demolitions and Displacement: An Overview (2023).
[194]  West Bank Protection Consortium, *Education Under Attack* (2023).
[195]  UNICEF, Education Cluster Strategy oPt, 2020-2021 (2020).
[196]  NRC, *Area C is Everything* (2023), p. 11.
[197]  Nicoll/Save the Children (StC), Danger is our reality - The Impact of Conflict and the Occupation on Education in the West Bank of the Occupied Palestinian Territory (2020). page 16
[198]  Ibid, p13

search us and check our identity cards", says Rima, 13, from Bethlehem.[199] Abir, 14, saw on her way to school "a Palestinian boy walking in the street. The soldiers stopped him, body-searched him, hit him, and arrested him because he refused to take off his pants for their strip search."[200]Ali, from Masafer Yatta,[201] was escorted to school by the Israeli military for 17 years, as the children of Masafer Yatta continue to be, to avoid physical attacks by settlers; he says: "it is unconscionable that the cost of going to school can mean coming back home with a broken body and losing the whole school year."

75.   Since 2012, over 300 children and teachers have faced arrest and detention while in or going to school.[202] Another 481 had their school equipment confiscated at checkpoints.[203] Military attacks on schools are also frequent, with 1,826 incursions or direct shelling/attacks by the Israeli occupying forces recorded over 12 years.[204] "Soldiers attacked my school three or four times last year. They threw tear gas and shot live ammunition. Some teachers and students couldn't breathe," says Farea', 12, Hebron.[205] Tear gas, stun grenades, rubber-coated bullets, live ammunition, and other weapons are used against schools, resulting in hundreds of students and teachers sustaining injuries, and the disruption of the education routine for thousands.[206] Israeli soldiers "break into schools whenever they want," says Jamal 14, Bethlehem. "The soldiers are always present in front of the school. They could attack us and take us away at any time. They might hit us or arrest us," says Rima.[207]

76.   In the Gaza Strip, at every military operation, school activities are suspended. Moving to online classes is ineffective due to lack of resources[208] and Israel's constraints on electricity (available around 10-12 hours per day but down to 4-5 hours during offensives).[209] When there are no offensives, "the drones used to enforce the siege of Gaza are our soundtrack," says Jinan, 14.[210] Over 1,434 schools and kindergartens have been totally or partially destroyed.[211] The construction of underground facilities and the takeover of a school by the de facto authorities in the past[212] have exposed schools to risks of being targeted. However, even in the case of military use of a school by armed groups, a proportionality and military necessity test must be met and civilian protection remains crucial.[213]

77.   Amidst these adversities, school drop-out rates have     risen to 32 per cent among secondary school children in the West Bank,[214] mostly owing to the lack of safety.[215] Children with disabilities have disproportionately low school enrolment (51 percent in the West Bank and 43 percent in the Gaza Strip).[216] In east Jerusalem, at least 13 percent of Palestinian children are excluded from education due to residency and registration hurdles.[217]

[199]  Ibid page 16.
[200]  Kevorkian, 2020, p. 128
[201]  Operation Dove, Right to Education in the South Hebron Hills: At-Tuwani School Study Case (2019).
[202]  SRSG CAAC 2012-2021.
[203]  Nicoll/Save the Children (StC), *Danger is our reality*, p.16
[204]  SRSG CAAC (2010-2022).
[205]  Nicoll/Save the Children (StC), *Danger is our reality*,  p. 17
[206]  Global Coalition to Protect Education from Attack. *Measuring the Impact of Attacks on Education in Palestine*, (2022). page 6
[207]  Nicoll/Save the Children (StC), *Danger is our reality*, p.17
[208]  OPT Education Cluster. Education Cluster Strategy - Palestine 2020-2021 (2020).
[209]  ICRC, *Gaza: ICRC Survey Shows Heavy Toll of Chronic Power Shortages on Exhausted Families*, Multimedia Newsroom (2021).
[210]  Children's Council Gaza Strip.
[211]  SRSG CAAC (2010-2022); A/HRC/12/48 (2009). OCHA Reports 2009, 2012, 2014, 2021.
[212]  UNRWA; UNRWA reiterates the inviolability of its installations must be respected at all (2021).
[213]  API, article 51(6), 53, 54(4), 55(2), 56(4).
[214]  UNICEF, *Palestine Education Fact Sheets* (2022), p.17.
[215]  OCHA oPt, Humanitarian Needs Overview 2023 (2022), p. 50.
[216]  PCBS, Press Release on the Occasion of the International Day of Persons with Disabilities (2021).
[217]  Ghaith, Ali. "The Politics of Education in East Jerusalem." openDemocracy, (2018).

# VI.   Unchilding environment

78.     Israeli settler colonialism deprives children of their rights and innocence, prematurely subjecting them to adult-like challenges, responsibilities and preoccupations. This intergenerational every-day experience for Palestinian children, termed "unchilding" by Professor Nadera Shalhoub-Kvorkian [218], is a reality perpetuated through a system of socio-legal claims, economic exploitation and political control that treats Palestinian children as worthless.

## A.   The scars of never-ending harm

79.     This chronic exposure to violence places children in a perpetual state of heightened stress, anger, isolation, and hyper-alertness.[219] Many show signs of trauma and profound depression, heightened nervousness with manifestations including constant shouting, irritability and fear of darkness, and feelings of acute loneliness.[220] Opportunities for post-trauma recovery are extremely limited, a lack compounded by continued exposure to traumatic events.  The result is what Dr. Jess Ghannam terms as "continuous traumatic stress disorder''.

80.     This ongoing trauma significantly disrupts child development, debilitating generational progress.[221]  It also has a predictably devastating impact on the development of Palestinian children and may be sowing the seeds for aggression in later life.[222] Over 90 percent of Palestinian children aged 8-14 grapple with insecurity and anxiety.[223] An increasing number suffer from insomnia,[224] bed-wetting and distress especially at time of heavy bombardment[225] and uncontrolled urination.

*"No one to protect us"*

81.     Despite their obligation to protect the human rights of the occupied population and guarantee public order and safety,[226] Israeli officials at different levels all play an active role in victimising Palestinian children. The occupation has eroded the very foundations of Palestinian society, in particular the family unit. Extensive killing and "long term imprisonment of thousands have left children orphaned," says a mother from the West Bank. Even "when a father returns after many years in prison, the bond with his children is undermined", says a Palestinian mother. The stress faced by family heads, as they are unable to provide stability, protection and security for their families is significant.[227] The Israeli permit system regularly prevents parents from securing, or accompanying children through, medical treatment. This affects 32 percent of children in the Gaza Strip who need treatment but cannot obtain it there.[228]  Palestinian children can find themselves undergoing kidney dialysis or chemotherapy without the presence of a parent.[229]

[218]  Shalhoub-Kevorkian, Nadera. *Incarcerated childhood and the politics of unchilding*. Cambridge University Press: 2019.
[219]  Bailey, Teresa. The Terror of Childhood in Palestine (2023).
[220]  UNICEF, The Situation of Palestinian Children in the Occupied Palestinian Territories, Syria and Jordan (2010).
[221]  Gerhardt, Sue. Why Love Matters: How Affection Shapes a Baby's Brain. Routledge: 2004.
[222]  WHO report, p. 13 cited in A/HRC/12/48 (2009), Human Rights in Palestine and other Occupied Arab Territories Report of the United Nations Fact-Finding Mission on the Gaza Conflict, para. 1282
[223]  UNICEF, The Situation of Palestinian Children in the Occupied Palestinian Territories, Syria and Jordan (2010); Abu Hein, F., "Emotional and Behavioural Problems of Palestinian Children and their Parents under Siege: Gaza Experience", in WHO and Gaza Community Mental Health Programme, Siege and Mental Health...Walls vs Bridges (pre-conference report), 2008, p. 32.
[224]  StC-Defenceless.
[225]  Mason/StC, *Trapped* (2023).
[226]  API, articles 63, 69, 72-79; GCIV, articles 47-78; Hague Regulations (1907), articles 42-56.
[227]  A/HRC/12/48 (2009) para 1266.
[228]  WHO, Right to Health (2022), p. 42.
[229]  Gwyn, Daniel. "'The strong do what they can and the weak suffer what they must': Palestinian families under occupation", Context 164, 2019, p. 49.

82.     In the occupation's fraught and dangerous environment, 65 percent of parents often exhibit violent behaviour toward each other and their children.[230] The level of corporal punishment in school is also reportedly very high. "Everyone beats us here," a group of Palestinian children from Jenin cheerfully reported.

83.     Parents do not feel able to protect their children. In the words of a father: "...I feel helpless when they arrest my children; all the parents here in our neighbourhood try our utmost to protect them... they are the most precious thing we have, and we try to protect them in any way possible, but nothing is safe here. My son was arrested while sleeping in bed. His bed [was] not safe."[231] The diminution of parental authority through the inability to protect children profoundly impacts parents and children alike.[232] The absence of protection leaves Palestinian children feeling profoundly isolated and disillusioned. "There is nothing that I or my family can do. Not the Palestinian government, not the international organisations, not my parents. No one protects my rights," says Nadia, 17 (east Jerusalem), echoing a sentiment shared by other children.[233]

84.     Among continuous threats to their safety, children may come to perceive violence as their only recourse against a harsh reality.[234] As Rawan, 11, asserts: "We must fight for our right to breathe, to be here, to stay in our city without the daily pain," while her older sister, 15, asks: "Do you understand why we should fight with our bodies? No Palestinian leaders, no international activists are able to help us in preventing the occupation's criminality. We can do it with our bodies and lives…" [235]

85.     In their increasingly insecure environment, children often feel driven to assume more active roles in the national struggle, even conflicting with their parents' wishes,[236] choosing to formally align themselves with political groups in search of a semblance of protection.[237] Children, particularly those who have lost parents and their sense of security, begin to view "martyrs" and armed group members as adult role models. As armed resistance has re-emerged in recent years, the appeal these groups may exert on children cannot be underestimated. Families live in fear as they struggle to prevent their children from becoming involved with military groups. A mother from Jenin reported: "Parents here fear for their children, no matter their choices. Once they join the resistance their fate is sealed. If they remain within the resistance, they become targets [of the occupation]. If they leave the group, they remain targets, without the protection of the group."

## VII.    Conclusions and Recommendations

86.     **As politics cannot be separated from childhood, the violent politics of a militarised settler-colonial occupation cannot be separated from how the children of the subjugated group experience it. In the oPt, settler-colonial violence and state violence are intertwined due to normalised dispossession. An inevitable accompaniment to settler colonialism, violence against the subjugated group will at some point risk to be met by violence, because no people will willingly cede their land, livelihood, dignity and right to exist in perpetuity. There is only one way to secure a peaceful and dignified future between the Jordan river and the Mediterranean sea, and it is by ensuring**

[230] *Ibid;* see also Abu Hein, F., "Emotional and Behavioural Problems of Palestinian Children and their Parents under Siege: Gaza Experience", in WHO and Gaza Community Mental Health Programme, Siege and Mental Health.Walls vs Bridges (pre-conference report), 2008, p. 32.

[231] Kevorkian, 2020, p. 73

[232] Daniel, Gwyn, Arlene Healy, and Mohammad Marie. "Families in Chronically Unsafe Community Environments." In *The Handbook of Systemic Family Therapy*, p. 197. John Wiley & Sons Ltd, 2020.

[233] Nicoll/StC, Hope Under the Rubble, p. 13

[234] Pietromarchi, Virginia "Why do some Palestinian teens in Jenin dream of 'martyrdom'?" *Al Jazeera* (2023)

[235] Kevorkian, 2020, p. 82

[236] Qouta, Samir, et al "Child Development and Family Mental Health in War and Military Violence: The Palestinian Experience," *International Journal of Behavioral Development* 32, no. 4 (2008). p. 317.

[237] Albanese; Francesca & Al Husseini, Jalal. "Voices of Palestinian refugee youth across the near East: socio-political participation and aspirations' ' (2020), p. 22

recognition and respect for equal rights, dignity and freedom of both Israelis and Palestinians.

87.     **The Special Rapporteur recommends that:**

(a)     **The State of Israel abide by the UN Charter and international law halting all abusive practices against Palestinian children, and prioritising the best interest of all children in the oPt; this can only be realised by dismantling its settler-colonial occupation cum apartheid, which stands in the way of realising the full spectrum of rights of Palestinian children and of Palestinians as a people.**

(b)     **The Special Representative of the Secretary-General on Children and Armed Conflict to not delay any further the listing of Israel/oPt in the list of parties that commit grave violations affecting children of the Security Council.**

88.     **In order to ensure this goal, Third States should:**

(a)     **Use diplomatic, political and economic measures afforded by the UN Charter without discrimination.**

(b)     **Not recognize as lawful, aid or assist Israel's occupation given its commission of internationally wrongful acts and international crimes, and call for their cessation and reparations.**

(c)     **Prosecute the commission of international crimes, prioritising atrocity crimes alleged in this report, under universal jurisdiction.**

(d)     **Set up a task force to dismantle the settler-colonial occupation and advance a political solution that respect human rights, dignity and freedom of both Israelis and Palestinians, as the only paradigm to ensure safety and peace.**

_____