# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN DOE I, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No. 02-1431 (JDB) |
| **STATE OF ISRAEL, et al.,** | ECF |
| Defendants. | |

**MEMORANDUM OPINION**

This matter comes before the Court on two related motions to dismiss plaintiffs' complaint. Plaintiffs include more than two dozen Palestinians and Palestinian-Americans, and scores of unnamed plaintiffs, living in Israel or the West Bank, who seek damages and injunctive relief against American and Israeli governmental entities, corporations, religious organizations, and financial donors for alleged human rights abuses and tortious injuries related to the Israeli-Palestinian conflict in the Middle East.  Defendants President George W. Bush and Secretary of State Colin Powell ("federal defendants"), in their official capacities, and defense contractors Boeing Co., McDonnell Douglas Helicopter Systems, Colt Manufacturing Co., Textron, and Bell Helicopter, together with present and former officers (collectively "defense contractors"), have moved to dismiss the claims against them.  Plaintiffs have also sued the State of Israel, Israeli Prime Minister Ariel Sharon, numerous Israeli cabinet and military officials, and the Israeli Defense Forces ("Israelis"), as well as the Jewish settlement of Halamish Neve Tzuf, religious congregations Rinat Yisrael and Christ Lutheran Church, the Neve Tzuf Foundation, the Central Fund for Israel, the One Israel Fund and several individuals.[1]  Plaintiffs seek compensatory and punitive damages

---

[1]  Because some of the motions filed regarding plaintiffs' claims against these other defendants are not ripe, they will be addressed in a separate ruling at a future date.

1

for their alleged injuries, and seek to enjoin the federal defendants from providing any further military or economic aid to Israel and to halt military sales and weapons contracts between Israel and the defense contractors. See Compl. ¶¶ 561-63. For the reasons stated herein, the Court grants the motions to dismiss of the federal defendants and the defense contractors.

### BACKGROUND

Plaintiffs have filed a sweeping 140-page complaint, with 564 separately enumerated paragraphs, raising a host of common law claims that run the legal gamut from negligence, conversion, trespass, and intentional infliction of emotional distress, to assault, battery, and wrongful death. They have also asserted claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., the Alien Tort Claims Act, 28 U.S.C. § 1350 et seq., and the Torture Victim Protection Act, 28 U.S.C. § 1350 et seq.[2] Plaintiffs broadly allege a series of violations of international law, including genocide, crimes against humanity, war crimes, extrajudicial killing, torture, false imprisonment, arbitrary arrest and detention, and cruel, inhuman and degrading treatment of Palestinians. Plaintiffs have also raised violations of the Arms Export Control Act (AECA), 22 U.S.C. § 2751 et seq., and the Foreign Assistance Act (FAA), 22 U.S.C. § 2151 et seq.

Plaintiffs assert that the Israeli defendants "intend[ed] to destroy, in whole or in part, a national, ethnic, racial and/or religious group, constitut[ing] genocide" against Palestinians, Compl. ¶ 427, and "[that] these acts occurred under the direction, encouragement or acquiescence of the Israeli government and military high command." Id. ¶ 431. Plaintiffs contend that President Bush and Secretary Powell have "allowed Israel to use United States financed and manufactured weapons to terrorize and collectively punish the entire civilian population based on their ethnicity," id. ¶ 228,

---

[2] In addition to their complaint, plaintiffs have also filed a separate 150-page package, including several affidavits, delineating their claims.

and demand "all military assistance to Israel [be] terminated." Id. ¶ 225. Plaintiffs further contend

that the defense contractors "actively participated in Israel's illegal use of [weapons] by modifying

the[m]" in order "to provide greater urban assault capabilities," and did so "with knowledge that the

weapon and other weapons would be used against a civilian, noncombatant Palestinian population."

Id. ¶¶ 46, 48, 57, 59, 63. Plaintiffs claim that President Bush, Secretary Powell, the defense

contractors, and the Israelis have acted jointly as "coconspirators or agents . . . through a pattern of

racketeering activity [and] have terrorized and intimidated plaintiffs into removing and leaving

from their property thus allowing defendant Israel to expand its borders and commercial influence

in the region." Id. ¶ 445.

## ANALYSIS

### I.    The Federal Defendants' Motion to Dismiss

The federal defendants move to dismiss plaintiffs' complaint on a number of justiciability

grounds, including lack of a private cause of action under either AECA or FAA, nonjusticiable

political questions, and lack of standing.

#### A.    Arms Export Control Act and Financial Aid Act

Plaintiffs seek to prevent the United States from providing any further military or economic

aid to Israel absent compliance with AECA and FAA, which plaintiffs claim require the President

and Secretary of State to report to Congress if any country receiving arms supplied by the United

States has misused the arms or has committed human rights abuses. See Compl. ¶¶ 559-563. The

federal defendants argue that neither AECA nor FAA provides plaintiffs with a private cause of

action, and therefore the Court is without jurisdiction to hear those claims. The Court agrees.

The United States provides aid to Israel in two principal ways, through foreign military

financing under 22 U.S.C. § 2763 of AECA, which authorizes appropriations to procure American

defense weapons, or through economic support funding under 22 U.S.C. § 2346(a) of FAA, which

grants financial aid to purchase other goods and services and generally support economic needs. According to plaintiffs, in 2002 the United States provided nearly $3 billion in such aid to Israel, which plaintiffs contend amounts to 17 percent of all foreign aid disbursed.  Compl. ¶ 219.

AECA provides that "[i]n furtherance of world peace and security and foreign policy of the United States, the President is authorized to control the import and export of defense articles and defense services."  22 U.S.C. § 2778(a)(1).  The Act authorizes sales of defense articles by the United States to "friendly countries," id. § 2751, and authorizes the President to sell munitions from U.S. stocks, enter into military sales contracts with other nations, and provide funds and aid to other countries to make such purchases, id. §§ 2761-63.  AECA also governs the private -- that is, non-governmental -- sale and export of weapons, and authorizes the President to compile the "United States Munitions List," which prohibits the export of such weapons without a license.  Id. §§ 2778(a)(1)-(2), (b)(2).

AECA explicitly implicates the President's role in directing the nation's foreign policy.  "It is the sense of the Congress that all such [military] sales [by the United States government] be approved only when they are consistent with the foreign policy interests of the United States."  Id. § 2751.  "No defense article or defense service shall be sold or leased by the United States Government" unless "the President finds" that the sale "will strengthen the security of the United States and promote world peace."  Id. § 2753(a)(1).

At the heart of plaintiffs' claims against President Bush and Secretary Powell are §§  2753 and 2754 of AECA.  Covered defense articles must be sold "solely for internal security, for legitimate self-defense, for preventing or hindering the proliferation of weapons of mass destruction."  Id. § 2754.  It is a "prerequisite" under AECA that any arms sold under the Act "will strengthen the security of the United States and promote world peace."  Id. § 2753(a)(1).  No credits or guarantees can be issued to a country that uses the arms sold under the Act for purposes not

authorized by the Act, or that violates any agreement entered into pursuant to the Act. Id. §

2753(c)(1)(A). If a country uses arms in an unauthorized manner, or otherwise violates an

agreement entered into under AECA, "[t]he President shall report to the Congress promptly upon

the receipt of information that a violation described in paragraph (1) of this subsection may have

occurred." Id. § 2753(c)(2).

Plaintiffs claim that President Bush has violated this reporting requirement because the

military aid provided to Israel has neither strengthened the security of the United States nor

promoted world peace. Compl. ¶ 223. Similarly, plaintiffs assert that military aid provided to

Israel has not been used for internal security or self defense, "but instead for offensive military

purposes against a civilian Palestinian population in violation of AECA." Id. ¶ 224. Plaintiffs thus

assert that:

> George W. Bush and Colin Powell are in receipt of information that a substantial
> violation of the AECA may have occurred by Israel's use of U.S. military assistance
> against the civilian Palestinian population and are therefore required to promptly
> report the same in writing to Congress. Defendant Bush has not so reported and has
> deprived the Congress of information necessary to fulfill its constitutional role. . . .
> Defendant Bush's failure to suspend American arms sales to Israel or at least report
> to Congress that Israel is in substantial violation of the AECA has allowed Israel to
> use United States financed and manufactured weapons to terrorize and collectively
> punish an entire civilian population based on their ethnicity. Defendant's failure to
> comply with the AECA is the direct and proximate cause of the injuries to persons
> and property suffered by plaintiffs.

Compl. ¶¶ 226-228. Plaintiffs contend that President Bush was obligated under the Act to report to

Congress Israel's violation of section 2753(c)(1)(a), and that all future sales and military aid must

be terminated. Id. ¶ 225.

Similarly, the Foreign Assistance Act authorizes financial assistance to countries through

non-military aid. The FAA "recognizes that . . . the national interests of the United States may

require economic support," authorizing "the President . . . to furnish assistance to countries . . . on

such terms and conditions as he may determine." 22 U.S.C. § 2346(a). The Act also authorizes the

5

President to provide, "on such terms and conditions as the President may determine," financial "assistance to foreign countries in order to enhance the ability of their enforcement personnel to deter terrorists and terrorist groups." Id. § 2349aa. However, assistance under FAA is prohibited to "any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights." Id. § 2304(a)(2). The Act requires the Secretary of State to submit an annual report to Congress regarding the human rights practices of countries receiving security assistance. Id. § 2304(b). Plaintiffs claim that Secretary Powell's report did not properly contain "information regarding Israel's commission of war crimes and crimes against humanity . . . as well as information regarding Israel's failure to cooperate with and active impeding of the legitimate investigation of the conditions of the Palestinians by international organizations." Compl. ¶ 232.[3]

Plaintiffs attempt to assert a private cause of action against the federal defendants to enforce the reporting provisions of AECA and FAA. However, neither of these statutes creates a substantive private cause of action. "Section 2304 [of the FAA] does not create standing for any taxpayer or any private party to sue for its enforcement . . . [and] was clearly enacted to effect the relationship between Congress and the President over disbursing foreign aid funds in light of an official policy of concern for human rights." Clark v. United States, 609 F. Supp. 1249, 1251 (D. Md. 1985). A reading of the text of these two statutes confirms that they do not create a private cause of action for individuals to sue the President or the Secretary of State. As the Supreme Court recently emphasized:

> [P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it

---

[3] Although Secretary Powell has in fact filed such a report on practices in Israel, the report apparently does not contain the kind of language or information that plaintiffs believe is needed in order accurately to depict the extent of human rights abuses they claim are occurring in Israel. See http://www.state.gov/g//drl/rls/hrrpt/2001/nea/8262.htm.

> displays an intent to create not just a private right but also a private remedy.
> Statutory intent on this latter point is determinative. Without it, a cause of action
> does not exist and courts may not create one.

Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).

Not only do AECA and FAA lack any distinct provision allowing causes of action, both statutes also manifest Congress's intent that the complex issues surrounding the reporting provisions should be resolved between Congress and the Executive Branch -- not by the courts. See, e.g., 22 U.S.C. § 2753(c)(3)(B) ("Notwithstanding a determination by the President of ineligibility [under AECA] . . . sales and deliveries . . . may be made if the President certifies in writing to the Congress that a termination thereof would have significant adverse impact on United States security, unless the Congress adopts . . . a joint resolution . . . with respect to such ineligibility."); 22 U.S.C. § 2304(a)(2) (under FAA "no security assistance may be provided to any country . . . which engages in a consistent pattern of gross violations of internationally recognized human rights . . . unless the President certifies in writing to the [Congress] that extraordinary circumstances exist warranting provision of such assistance . . ."). In other words, both statutes incorporate mechanisms to allow the political branches to override one another, rather than authorizing the courts to referee. As plaintiffs put it, they "ask of [President Bush and Secretary Powell] only one thing -- obey the law." Pl. Opp. at p. 2. Plaintiffs' gross oversimplification notwithstanding, they have not pointed to any provision within either AECA or FAA that allows for a private cause of action. See Touche Rosse & Co. v. Redington, 442 U.S. 560, 568 (1979) ("the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person"). Indeed, plaintiffs cannot cite a case that stands for the proposition that either statute permits private individuals to sue the President or Secretary of State. As the only other court looking at this issue has put it:

> The only parties with standing to seek adjudication under Section 2304 [of the FAA] are the executive and legislative branches. One need only read the plain language of the section to reach that conclusion.

Clark, 609 F. Supp. at 1251; see also AT&T v. United States, 307 F.3d 1374, 1377 (Fed. Cir. 2002) (reporting requirement under Defense Department appropriations bill "envisions enforcement, if any, through legislative procedures" and "does not create a cause of action inviting private parties to enforce the provisions in courts"). Accordingly, the Court concludes that it does not have jurisdiction under either AECA or FAA over the claims asserted by plaintiffs against the federal defendants.[4]

Lastly, the Court notes that while plaintiffs have sued President Bush and Secretary Powell in both their official and individual capacities, they have only been served in their official capacities. See Compl. ¶¶ 39-40; Fed'l Defs.' Motion to Dismiss Official Capacity Claims at p. 1 n.1. President Bush and Secretary Powell correctly point out that plaintiffs' remaining claims seek damages -- for RICO violations and common law tort theories of emotional distress, negligence, and negligent infliction of emotional distress -- that can only be asserted against them in their individual capacities. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (distinguishing between claims asserted in official and individual capacities). Monetary claims brought against the President or the Secretary of State in their official capacities are, in effect, actions against the United States, and are viable only to the extent that the United States has waived its sovereign immunity, such as under the Federal Tort Claims Act, 28 U.S.C. § 1346. Plaintiffs concede that these remaining claims must be asserted against President Bush and Secretary Powell in their

---

[4] Indeed, the Court doubts plaintiffs would have standing to raise their claims under AECA or FAA in any event. As the complaint acknowledges, any failure to satisfy the reporting requirements under either Act would directly injure Congress -- not individual private plaintiffs like the Palestinians here. See Compl. ¶ 226 ("Bush has not so reported and deprived Congress of information necessary for Congress to fulfill its constitutional role.") (emphasis added). However, because the Court resolves the federal defendants' motion on lack of jurisdiction and justiciability grounds, it is not necessary to resolve the standing issue as well.

individual capacities. See Pl. Opp. to Fed'l Defs.' Motion to Dismiss Official Capacity Claims at p. 11 n. 6. However, plaintiffs request "[l]eave . . . to clarify this in the Complaint and to serve Mr. Bush and Mr. Powell, individually." Id.

The Court denies this request. First, plaintiffs have not even attempted to satisfy Fed.R.Civ.P. 15, which governs motions to amend. Second, plaintiffs' complaint explicitly states that President Bush and Secretary Powell are sued in both their official and individual capacities. See Compl. ¶¶ 39-40. In other words, plaintiffs are not seeking leave to amend, but rather are seeking more time to serve President Bush or Secretary Powell in their individual capacities. See Fed.R.Civ.P. 4(i)(2)(B). Again, plaintiffs have not set forth any justification for their failure to effect service to date. Indeed, plaintiffs brought their suit on July 16, 2002, and under Fed.R.Civ.P. 4(m) service must be made within 120 days of filing of a complaint. Plaintiffs have had well over a year to serve the federal defendants in their individual capacities, but have failed to do so. Third, the Court denies any request to allow plaintiffs an additional opportunity to serve President Bush and Secretary Powell as futile. See, e.g., Eveland v. Director of CIA, 843 F.2d 46, 49 (1st Cir. 1988) (affirming dismissal of RICO claim under the political question doctrine where complaint alleged RICO conspiracy between Secretary Kissinger and the government of Israel).

**B.    Nonjusticiable Political Question**

Even if AECA or FAA created private causes of action, or if plaintiffs could otherwise raise actionable claims, the Court nevertheless concludes that plaintiffs' claims present nonjusticiable political questions best left for resolution by the political branches. At its base, the political question doctrine is concerned with the separation of powers between the branches of government, and limits the jurisdiction of the federal courts to "Cases" and "Controversies." See U.S. Const. Art. III, § 2; Powell v. McCormack, 395 U.S. 486, 518 (1969); Baker v. Carr, 369 U.S. 186, 210

(1962).  In Baker, the Supreme Court outlined six criteria to determine whether a dispute presented

a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217; see also Chicago & Southern Airlines v. Waterman S.S. Corp., 333 U.S. 103, 111-

12 (1948).  The presence of any one of these factors indicates the existence of a political question.

Baker, 369 U.S. at 217; Made in the USA Foundation v. United States, 242 F.3d 1300, 1312 (11th

Cir. 2001).  If a claim or issue involves a nonjusticiable political question, courts will not have

subject matter jurisdiction to consider those claims.  See Animal Defense Legal Defense Fund v.

Glickman, 154 F.3d 426, 446 (D.C. Cir. 1998).

Clearly, issues directly impacting United States foreign and military aid to other countries

are distinctly the province of the political branches.  First and foremost, foreign policy is

constitutionally committed to the political branches, and disputes over foreign policy are

nonjusticiable political questions.  Haig v. Agee, 453 U.S. 280, 292 (1981) ("[T]he conduct of

foreign relations . . . [is] exclusively entrusted to the political branches . . . [and] immune from

judicial inquiry or interference."); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 (D.C. Cir.

1984) ("Questions touching on the foreign relations of the United States make up what is likely the

largest class of questions to which the political question doctrine has been applied."); Luftig v.

McNamara, 373 F.2d 664, 665-66 (D.C. Cir. 1967) ("[T]he fundamental division of authority and

power established by the Constitution precludes judges from overseeing the conduct of foreign policy.").  Indeed,

> the very nature of executive decisions as to foreign policy is political, not judicial. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility and have long been held to belong to the domain of political power not subject to judicial intrusion or inquiry.

Waterman S.S. Corp., 333 U.S. at 111; see also Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 386 (2000) ("the nuances of the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court") (citation omitted); Kucinich v. Bush, 236 F. Supp. 2d 1, 15 (D.D.C. 2002).

Furthermore, several courts have specifically ruled that challenges to foreign aid to Israel raise nonjusticiable political questions.  See Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975) (dismissing as nonjusticiable challenge to statute authorizing military assistance to Israel); Mahorner v. Bush, 224 F. Supp. 2d 48, 49 (D.D.C. 2002) (rejecting plaintiff's claim for injunctive relief against military and economic assistance to Israel on political question grounds).  The D.C. Circuit has also ruled that challenges to military aid to other countries raise nonjusticiable political questions.  Crockett v. Reagan, 720 F.2d 1355, 1356-57 (D.C. Cir. 1983) (per curiam) (dismissing challenge to legality of U.S. military aid to El Salvador on political question grounds).  As Judge Jackson recently explained, lawsuits over foreign aid are especially political in nature:

> [Plaintiff's] complaint raises non-justiciable political questions by attempting to curtail Executive Branch discretion in what is essentially a matter of foreign policy. Foreign aid, including monetary loans for economic development abroad, is an integral component of this country's international relations.  To grant or deny a loan to a foreign nation is a decision fraught with foreign policy implications. Congress clearly did not confer the power to make such decisions upon aggrieved private citizens . . . without regard to the national interest.

Atlantic Tele-Network v. Inter-American Development Bank, 251 F. Supp. 2d 126, 131 (D.D.C. 2003).  In the related context of the "disposition of military power," the D.C. Circuit has stressed:

It is difficult to think of an area less suited for judicial action . . . . The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive.

Luftig, 373 F.2d at 665-66.

Plaintiffs' reliance on Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984), and Linder v. Portocarrero, 963 F.2d 332, 336-37 (11th Cir. 1992), is misplaced. In Ramirez, the D.C. Circuit held that the taking by the government of an American's land in Honduras for a military training center did not present a nonjusticiable political question because it did not call into question the legality of the American military presence in Honduras. 745 F.2d at 1515. Similarly, in Linder, the Eleventh Circuit held that the political question doctrine did not bar decision on a claim that alien individuals acting in the United States, as part of a civil war, ordered the torture and summary execution of the plaintiffs' decedent, because there was no direct challenge to United States foreign policy or any need to rule on aspects of the civil war. Unlike the claims asserted in Ramirez and Linder, however, plaintiffs' claims here directly affect United States foreign policy.[5] There is no doubt whatsoever that plaintiffs are attempting to stop the United States from providing foreign and military aid to Israel. Their pleadings make that intent patent: "To be clear, Plaintiffs desperately want the United States to stop providing Israel with the military means to oppress them." Pl. Opp. to Fed'l Defs.' Motion to Dismiss Official Capacity Claims, at p. 3.

---

[5] The ruling in Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49-50 (2d Cir. 1991), does not support a different result, even though plaintiffs have asserted tort claims against President Bush and Secretary Powell. There, plaintiffs brought tort claims against the Palestinian Liberation Organization for seizing a cruise liner and murder of a passenger. The court found that the claims did not raise nonjusticiable political questions because tort laws provided clear judicial standards, and no prior political decisions were called into question. In that case, there was no potential for embarrassment from multifarious pronouncements, since the other branches of government believed judicial resolution was appropriate -- which is certainly not the Executive Branch's view here. Id. Nor was there any attempt to stop or delay financial aid in Klinghoffer, which lies at the very heart of plaintiffs' claims here.

Other <u>Baker</u> factors are also at play here.  Again, given the undeniably delicate situation in the Middle East, any pronouncements by United States courts regarding foreign economic and military aid may risk embarrassment to the United States government's commitments to Israel -- financial and otherwise.  The United States' relationship with Israel presents "an unusual need for unquestioning adherence to a political decision already made" on foreign and military aid, especially in light of the ongoing war on terrorism.  <u>See</u> <u>DKT Memorial Fund v. AID</u>, 887 F.2d 275, 291 (D.C. Cir. 1989) (quoting <u>Baker</u>, 369 U.S. at 217).  Directly on point to the challenge asserted here, the Fifth Circuit emphasized in <u>Dickson</u> that

> [b]oth the Congress and the President have determined that military and economic assistance to the State of Israel is necessary . . . [and] a determination of whether foreign aid to Israel is necessary . . .  is a question uniquely demand[ing] [of a] single-voiced statement of the Government's views.

521 F.2d at 236.  Although the Court agrees that the Judiciary "cannot shirk [its constitutional] responsibility merely because a decision may have significant political overtones," <u>Japan Whaling Ass'n v. American Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986), here the intrusion into the domain of the political branch is obvious.  As plaintiffs' complaint makes clear, the essence of their claims revolves around Israel's expansion of settlements into the disputed territories of the West Bank, Lebanon and the Gaza Strip.  <u>See</u> Compl. ¶ 25 (asserting Israel's "decade long territorial expansion at the expense of plaintiffs and all other Palestinian civilian noncombatants and in violation of international law"); ¶¶ 27-36.  It is difficult to conceive of a more sensitive and volatile foreign policy context -- one that cries out for unyielding deference to the political branches -- than Palestinian citizens appealing to United States courts to stop or delay military and financial aid to Israel.  This is particularly true in light of the ongoing Iraqi conflict, the Palestinian Intifada, al Qaeda terrorism, and efforts to locate Saddam Hussein and Osama Bin Laden -- all of which exacerbate the trip-wire tensions of the Middle East in general.

13

Even a sampling of the allegations raised in plaintiffs' complaint underscores the highly contentious political nature of their claims. "Israel is a terrorist state." Compl. ¶ 76. "[T]he United States government has been complicit in and indeed has underwritten with taxpayer funds, Israel's torture, killing and maiming . . . ." Id. ¶ 80. "Israel has . . . encouraged the development of Israeli settlements on Palestinian land confiscated in violation of international law." Id. ¶ 83. "[Israel] ignites and ignores international opprobrium in its pursuit of ever-elusive 'security' goals while brutally occupying as an invader the West Bank and Gaza." Id. ¶ 94. "Israel [runs a] campaign of terror against the Palestinians." Id. ¶ 96. "[T]he United States government has known for at least 24 years that Israel uses torture during interrogations of Palestinians and that the practice was widespread." Id. ¶ 208. As the D.C. Circuit has stated, "[t]hese are political judgments, 'decisions of a kind for which the judiciary has neither the aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion.'" People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (quoting Waterman S.S. Corp., 333 U.S. at 111).

The Court concludes that plaintiffs' claims against President Bush and Secretary Powell raise nonjusticiable political questions, and therefore this Court is without subject matter jurisdiction to address them. Accordingly, the claims against the federal defendants must be dismissed for that reason as well.

## II.    The Defense Contractors' Motion to Dismiss

The Court likewise finds that plaintiffs' claims against the five defense contractors named in their complaint -- Boeing, McDonnell Douglas, Textron, Bell Helicopter, and Colt Manufacturing -- as well as several CEOs of defense contractors, also raise nonjusticiable political questions. Plaintiffs allege that these defense contractors either knew or should have known that the weapons and munitions provided to Israel, under AECA, were not being used for purposes of self-defense,

14

but rather were being modified and used to harm Palestinians.  See Compl. ¶¶ 45, 48, 56, 63, 67, 82.
As with their claims asserted against the federal defendants, plaintiffs seek to enjoin the defense
contractors from selling or transferring military equipment and arms to Israel until President Bush
and Secretary Powell have reported to Congress under AECA and FAA, and until Israel commits
"not to use such weapons systems directly or indirectly against the Palestinian civilian
noncombatant population."  See Compl. ¶ 562.

  The Court has concluded that claims involving arms sales to Israel -- which occur pursuant
to a sensitive and detailed statutory and regulatory scheme inextricably intertwined with critical
foreign policy decisions -- are nonjusticiable political questions better left to consideration by the
political branches.  Although the Court recognizes that the political question doctrine is typically
invoked by governmental entities or actors, the important role of defense manufacturers in
providing arms and weapons to Israel, particularly in light of the broad, overlapping claims raised
in plaintiffs' complaint, makes application of the doctrine warranted in this context as well.  Indeed,
this is not the first time that courts have employed the political question doctrine as to claims
asserted against defense contractors.  See, e.g., Bentzlin v. Hughes Aircraft, 833 F. Supp. 1486,
1497 (C.D. Cal. 1993) (action against defense contractors dismissed under political question
doctrine where military personnel killed in a friendly fire accident in Iraq); Zuckerbraun v. General
Dynamics Corp., 755 F. Supp. 1134, 1141-42 (D. Conn. 1990) (political question cannot be avoided
because claims against defense contractors for wrongful death inevitably touch on military
decisions committed to the executive branch); Nejad v. United States, 724 F. Supp. 753, 755 (C.D.
Cal. 1989) (denying on political question grounds claims for wrongful death against defense
contractors who supplied arms to a naval ship that downed a commercial airliner); cf. Koohi v.
United States, 976 F.2d 1328, 1331 (9th Cir. 1992) (declining to dismiss claims against defense

contractor on political question grounds where plaintiff raised design defects in defense system that targeted a civilian aircraft).

The claims here do not involve simple allegations of design defects in a particular weapon; instead, plaintiffs assert sweeping allegations that various, unrelated munitions and weapons systems sold pursuant to detailed arms export regulations have been knowingly modified to allow Israel to conduct war against Palestinians. Arms sales and arms transfers to Israel by the United States are implemented through two primary statutory programs: the Foreign Military Sales Act ("FMSA"), 22 U.S.C. § 2302, authorizes the United States government to sell surplus defense articles to, or procure such articles for, foreign countries, whereas AECA permits defense contractors to sell arms directly to foreign countries under the permission and oversight of the President or Congress. Under both programs, the Department of Defense authorizes the proposed sale, and must abide by the U.S. Munitions List, a congressionally-approved list of military equipment authorized for export to other countries.

Thus, in the context of ongoing United States policy of military and financial support for Israel, the role of the defense contractors in producing and selling arms to Israel is tightly intertwined with United States foreign policy, and hence with plaintiffs' challenges to that policy. The Court would, of necessity, need to adjudicate various considerations about, and even the propriety of, providing arms to Israel if claims against the defense contractor defendants were allowed to go forward. Because arms sales are an integral part of foreign policy, the government's authorization of sales by defense contractors as a means to execute foreign policy cannot be challenged in the courts. Under the detailed scheme of AECA and FMSA, it is not possible (or at least lawful) for defense contractors to sell weapons to Israel of their own volition. See Comm. of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 946 (D.C. Cir. 1988) (despite providing assistance and aid, United States government cannot be liable for military conduct and independent

16

actions of Nicaraguan Contras); United States v. Martinez, 904 F.2d 601 (11th Cir. 1990)

(dismissing as a political question claims under AECA that certain defense articles on the U.S.

Munitions List were unnecessarily lethal); Karn v. Dep't of State, 925 F. Supp. 1, 2 (D.D.C. 1996)

(dismissing challenge to designation of item on U.S. Munitions List as nonjusticiable political

question, "a classic example of how courts . . . can become needlessly involved . . . in litigation

involving policy decisions within the power of the President or another branch of government").[6]

By wading into the thicket of plaintiffs' claims, the Court would entangle itself in questions

involving United States policy concerning Israel's self-defense and internal security, matters about

which the Court has absolutely no expertise.

Simply put, the defense contractors' actions are, to a considerable degree, dictated by

policies set forth by the President and Congress. If the arms sales in question were purely between

a private corporation and Israel, the political question doctrine might not be as relevant. Here,

however, the United States strictly controls and regulates the sale of arms, and any intrusion into

these arms sale agreements would clearly implicate national foreign policy interests. See, e.g., 22

U.S.C. § 2751 (arms sales under AECA shall "be approved only when they are consistent with the

foreign policy interests of the United States"; relevant considerations include military requirements,

economic and financial status of the foreign country, and the impact of the sales on social and

economic development); 22 U.S.C. § 2753(a)(1) (prohibiting defense sales unless "the President

finds that furnishing of defense articles . . . to such country or international organization will

strengthen the security of the United States and promote world peace"). Issues involving AECA

directly impact, if not challenge, United States foreign policy, an area that is hardly the proper

province of the courts. Given the backdrop that plaintiffs challenge arms sales to Israel within the

highly-charged context of the Middle East, the political nature of plaintiffs' claims cannot be

---

[6]  The placement of items on the U.S. Munitions List is explicitly exempt from judicial review.
See 22 U.S.C. § 2778(h).

overstated. Judicial intervention into foreign policy decisions reflected in arms sales by the United States to a country in such a volatile region of the world would intrude into delicate and complex political considerations. Thus, plaintiffs' claims against the defense contractors constitute nonjusticiable political questions that must be dismissed as well.

## **CONCLUSION**

The Court finds that plaintiffs have not shown that they have a private cause of action under either the Arms Export Control Act or the Financial Assistance Act. Plaintiffs' claims against President Bush and Secretary Powell in their official capacities, as well as the claims against the defense contractors, are nonjusticiable political questions, and thus the Court lacks subject matter jurisdiction to consider those claims. Furthermore, the Court concludes that in light of plaintiffs' failure personally to serve President Bush or Secretary Powell, all claims against them in their individual capacities must be dismissed. Accordingly, the federal defendants' motion to dismiss is granted and the motion to dismiss filed by the defense contractors is also granted. A separate order accompanies this Memorandum Opinion.


Signed this 3rd day of October, 2003.


                                    /s/   John D. Bates
                                    JOHN D. BATES
                                    United States District Judge

Copies to:

Stanley Cohen
351 Broadway
Suite 300
New York, NY 10013

Maher H. Hanania
Hanania, Khader & Nawash
6066 Leesburg Pike
Suite 101
Falls Church, VA 22041
E-mail: mhanania@hknlaw.com

Jean Engelmayer Kalicki
Arnold & Porter
5555 12th Street, N.W.
Room 1197
Washington, D.C. 20004
E-mail: Jean_Kalicki@aporter.com

Robert Neil Weiner
Arnold & Porter
5555 12th Street, N.W.
Room 1251
Washington, D.C. 20004
E-mail: Robert_Weiner@aporter.com

Ori Lev
Untied States Department of Justice
Civil Division/Federal Programs Branch
Post Office Box 883
Washington, D. C.  20044
E-mail: ori.lev@usdoj.gov

David Bickart
Kaye Scholer
901 15th Street, N.W.
Suite 1100
Washington, D.C. 20005
dbickart@kayescholer.com

Kurt Hamrock
McKenna Long Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
khamrock@mckennalong.com

Stephen B. Shapiro
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D. C.  20006
E-mail: sshapiro@hklaw.com