Marc Van Der Hout, Cal. Bar No. 80778
Johnny Sinodis, Cal. Bar No. 290402
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Maria C. LaHood, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,<br><br>Defendants. | Case No.: 23-cv-5829<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO MOTION TO DISMISS**<br><br>Hearing: January 26, 2024 at 9:00 am |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................................... 2

    A.  Since Filing Their Preliminary Injunction Motion, Plaintiffs Have Suffered More Harm and Loss as Evidence of Genocide Has Continued to Mount..................................... 2

    B.  Defendants Continue to Escalate Material Military, Financial, and Diplomatic Support to Israel........................................................................................................................................ 4

ARGUMENT .................................................................................................................................... 6

  I.    PLAINTIFFS STATE VALID CLAIMS UNDER FEDERAL QUESTION JURISDICTION AND THE ALIEN TORT STATUTE FOR VIOLATION OF LEGAL OBLIGATIONS TO PREVENT, NOT AID AND ABET, GENOCIDE. ............................... 6

  II.   PLAINTIFFS' CLAIMS ASSERTING VIOLATION OF OBLIGATIONS TO PREVENT, NOT FURTHER, GENOCIDE ARE JUSTICIABLE....................................... 11

    A.  The Political Question Doctrine is a "Narrow Exception" to Federal Jurisdiction. ......... 12

    B.  Contravention of the Legal Obligation to Prevent, Not Further, Genocide Can Never Be a "Policy Choice" for the Political Branches. .................................................................. 13

    C.  There are Judicially Manageable Standards to Assess Whether Defendants Have Breached their Legal Obligation to Prevent, Not Further, Genocide. ............................... 16

    D.  Plaintiffs' Requested Relief Does Not Run Afoul of the Political Question Doctrine...... 18

  III.  ALL PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS, AND THEIR INJURIES ARE FAIRLY TRACEABLE TO THE DEFENDANTS AND REDRESSABLE THROUGH THE RELIEF THEY SEEK. ................................................ 19

    A.  Plaintiffs' Harms Are Fairly Traceable to Defendants, and Redressable. ........................ 19

    B.  U.S.-based Plaintiffs Have Suffered Injury-in-Fact and Face Threat of Further Injury, Sufficient for Standing to Bring Claims on Behalf of Themselves and Their Family Members. ................................................................................................................................ 25

  IV.  A PRELIMINARY INJUNCTION IS URGENTLY REQUIRED AND WELL-FOUNDED. ..................................................................................................................27

    A.  Likelihood of Success on the Merits and Irreparable Harm. ............................................ 27

    B.  When a Genocide Is in Progress, the 'Balance of Hardships' Tips Sharply in Favor of an Injunction that Prohibits Providing the Means Used to Carry It Out. .................... 28

CONCLUSION................................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abusharar v. Hagel*,
   77 F. Supp. 3d 1005 (C.D. Cal 2014) ...................................................16

*Al Shimari v. CACI Premier Tech., Inc.*,
   840 F.3d 147 (4th Cir. 2016) ........................................12, 14, 15, 16, 17

*Al Shimari v. CACI Premier Tech., Inc.*,
   263 F. Supp. 3d 595 (E.D. Va. 2017) ..................................................9

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019).........................................9, 12, 15, 17

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .........................................................29

*Antoine v. BAE Sys., Inc.*,
   No. C 17-02231 SBA, 2017 WL 11715422 (N.D. Cal. July 20, 2017) ................25

*Baker v. Carr*,
   369 U.S. 186 (1962)..................................................11, 12, 14, 16, 18

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)...................................................................8

*Bennett v. Spear*,
   520 U.S. 154 (1997)..................................................................19

*Brill v. Chevron Corp.*,
   No. 15-cv-04916-JD, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)....................22

*Chaudhry v. City of Los Angeles*,
   751 F.3d 1096 (9th Cir. 2014) .......................................................25

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..................................................................24

*Cierco v. Mnuchin*,
   857 F.3d 407 (D.C. Cir. 2017) ......................................................24

*City of Emeryville v. Robinson*,
   621 F.3d 1251 (9th Cir. 2010) .......................................................25

*Coal. of Clergy, Lawyers, & Professors v. Bush*,
   310 F.3d 1153 (9th Cir. 2002) .......................................................26

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) .................................................................................. 13

*Corrie v. Caterpillar, Inc.*
    503 F.3d 974 (9th Cir. 2007) ........................................................... 13, 14, 15

*County of Oneida v. Oneida Indian Nation of N.Y. State*,
    470 U.S. 226 (1985) .................................................................................. 13

*Deutsch v. Turner Corp.*,
    324 F.3d 692 (9th Cir. 2003) ................................................................... 8, 17

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
    810 F.2d 1236 (D.C. Cir. 1987) ................................................................... 15

*Doe I v. Cisco Sys., Inc.*,
    73 F.4th 700 (9th Cir. 2023) ......................................................... 10, 11, 22

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ............................................................... 27, 28

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ..................................................................... 29

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) (en banc) .................................. 12, 15, 17

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................. 13

*In re Estate of Ferdinand E. Marcos Hum. Rts. Litig.*,
    978 F.2d 493 (9th Cir. 1992) ....................................................................... 8

*In re Estate of Ferdinand Marcos, Hum. Rts. Litig.*,
    25 F.3d 1467 (9th Cir. 1994) ....................................................................... 8

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ..................................................................... 27

*First Nat'l City Bank v. Banco Nacional de Cuba*,
    406 U.S. 759 (1972) ............................................................................ 29, 30

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .................................................................................. 23

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ............................................................................... 12, 13

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .................................................................................. 13

*Heckler v. Mathews*,
   465 U.S. 728 (1984) ................................................................................... 26

*Idaho Conservation League v. Bonneville Power Admin.*,
   83 F.4th 1182 (9th Cir. 2023) ............................................................... 23, 25

*Illinois v. City of Milwaukee*,
   406 U.S. 91 (1972) ........................................................................................ 7

*INS v. Chadha*,
   462 U.S. 919 (1983) ..................................................................................... 13

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ......................................................................... 15, 17, 24

*Kadić v. Karadžić*,
   70 F.3d 232 (2d Cir. 1995) ....................................................................... 9, 17

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) .................................................................................... 7, 9

*Krottner v. Starbucks Corp.*,
   628 F.3d 1139 (9th Cir. 2010) ..................................................................... 26

*Laub v. U.S. Dep't of Interior*,
   342 F.3d 1080 (9th Cir. 2003) ..................................................................... 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ..................................................................................... 19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 19, 23

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .................................................................. 1, 11

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ....................................................................... 27

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................... 19, 23

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ............................................................... 19, 22

*Mendia v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014) ............................................................... 19, 22

*Muslim Citizens of the State of Israel v. United States*,
   No. 8:23-cv-2697 (M.D. Fla. Nov. 27, 2023) ............................................... 9

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,*
   176 F.R.D. 329 (C.D. Cal. 1997) ............................................................................29

*The Nereide,*
   13 U.S. (9 Cranch) 388 (1815)...................................................................................8

*Nestlé USA, Inc. v. Doe,*
   141 S. Ct. 1931 (2021) ...............................................................................................9

*Ning Xianhua v. Oath Holdings, Inc.,*
   536 F. Supp. 3d 535 (N.D. Cal. 2021) ....................................................................22

*Nixon v. United States,*
   506 U.S. 224 (1993) .................................................................................................12

*The Paquete Habana,*
   175 U.S 677 (1900)............................................................................................8, 14

*Powell v. McCormack,*
   395 U.S. 486 (1969) .................................................................................................13

*Powers v. Ohio,*
   499 U.S. 400 (1991) .................................................................................................26

*Princz v. Federal Republic of Germany,*
   26 F.3d 1166 (D.C. Cir. 1994) ..................................................................................7

*Renee v. Duncan,*
   686 F.3d 1002 (9th Cir. 2012) .................................................................................23

*Republic of Marshall Islands v. United States,*
   79 F. Supp. 3d 1068 (N.D. Cal. 2015) ..............................................................16, 24

*Republic of Marshall Islands v. United States,*
   865 F.3d 1187 (9th Cir. 2017) .................................................................................16

*Rucho v. Common Cause,*
   139 S. Ct. 2484 (2019) .............................................................................................12

*Sarei v. Rio Tinto, PLC,*
   671 F.3d 736 (9th Cir. 2011) ...................................................................7, 9, 10, 17

*Serra v. Lappin,*
   600 F.3d 1191 (9th Cir. 2010) ...................................................................................7

*Siderman de Blake v. Republic of Argentina,*
   965 F.2d 699 (9th Cir. 1992) ...................................................................................10

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ......................................................................................... *passim*

*Talenti v. Clinton*,
   102 F.3d 573 (D.C. Cir. 1996) ........................................................................24

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ...........................................................................................8

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) .........................................................................................29

*United States v. Texas*,
   599 U.S. 670 (2023) ....................................................................................12, 13

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) .........................................................................................23

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004) .........................................................................................17

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) .............................................................................6

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ...........................................................................................13

*Zivotofsky ex rel Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ....................................................................................12, 13

**Constitution**

U.S. Const. art. VI, cl. 2 ..........................................................................................14

**Statutes**

18 U.S.C. § 1092 ......................................................................................................9

18 U.S.C. § 2340 ......................................................................................................9

18 U.S.C. § 2441 ......................................................................................................9

28 U.S.C. § 1331 .............................................................................................. *passim*

Alien Tort Statute, 28 U.S.C. § 1350 ............................................................... *passim*

Declaratory Judgment Act, 28 U.S.C. § 2201 .......................................................6

Elie Wiesel Genocide and Atrocities Prevention Act of 2018, Pub. L. No. 115-441,
   132 Stat. 5586 (2019) ......................................................................................15

Genocide Convention Implementation Act, 18 U.S.C. § 1091 ........................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................................6

Fed. R. Civ. P. 12(b)(6) .................................................................................................6

**International Materials**

*Application of Convention on Prevention and Punishment of Crime of Genocide*
   (*Bosn. & Herz. v. Serb. & Montenegro*), Judgment, 2007 I.C.J. 43 (Feb. 26) .................10, 18

Convention on Prevention and Punishment of Crime of Genocide,
   Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 ....................................... *passim*

Declaration of Intervention Under Article 63 of Statute Submitted by the United
   States of America, *Allegations of Genocide under Convention on Prevention and
   Punishment of Crime of Genocide (Ukr. v. Russ.)*, I.C.J. (Sept. 7, 2022).........................17, 18

**Other Authorities**

Supplemental Br. for United States as Amicus Curiae in Partial Support of
   Affirmance, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013),
   (No. 10-1491), 2012 WL 2161290 ............................................................................7

**INTRODUCTION**

At the time of this filing, undersigned counsel have not been able to communicate with one of the Gaza-based Plaintiffs in this case for 11 days, and have no way of knowing if he is alive or dead. Other Gaza-based Plaintiffs have continued to endure the unimaginable conditions and threat of trying to survive under Israel's siege, and U.S.-based Plaintiffs have had more family members in Gaza killed, harmed and displaced since this Motion for Preliminary Injunction was filed. Al Haq's legal researcher and advocacy officer, Ahmed Abofoul, has lost at least 60 members of his extended family, including more than 50 people since this case was filed, through Israeli airstrikes. Despite dramatic evidence of the Israeli government's genocidal intent toward Palestinians in Gaza and in the face of the increasingly apocalyptic death, destruction and intentional starvation of them, the United States has with one hand funneled multiple-billions of dollars worth of bombs and other harrowing instruments of destruction to the Israeli military, with full knowledge they are being used for the mass slaughter of tens of thousands of Palestinians, while with the other hand repeatedly and single-handedly thwarting United Nations resolutions calling for a ceasefire and otherwise insulating Israel from any international accountability or measures to stop the genocide.

The Defendants offer no legal – let alone moral – defense on the merits of their conduct, the evidence of which demonstrates violations of their duties to prevent, and to not further, genocide. Instead, they assert this Court lacks jurisdiction because the question presented would require assessment of policy decisions of the U.S. government, and also argue that Plaintiffs cannot show causation and redressability because Israel's genocidal actions are somehow wholly independent of U.S. facilitation and support. But Plaintiffs do not seek review of some discretionary foreign-aid policy choice; they invoke the Court's mandatory jurisdiction to hear violations of a firm legal duty regarding the most serious crime, genocide – the essence of the judicial function since *Marbury v. Madison*. Defendants' standing objections are likewise meritless. The suggestion that the U.S. does not or cannot

influence Israel borders on the absurd, not least because the Israeli government acknowledges its actions could not happen without U.S. license and support, and Defendants have boasted about their coordination with and influence over Israel. In any event, causation is not an onerous burden and the facts make plain that Plaintiffs' injuries are "fairly traceable" to the actions of the U.S. government, even if the United States is not the last step in the causal chain.

Defendants also assert that Plaintiffs fail to state a claim because the Genocide Convention provides no cause of action. But Plaintiffs do not base their cause of action directly on the Convention or the domestic criminal statute implementing it; their claims are based on the well-established customary international law obligations to prevent, prohibit and punish genocide, which is indisputably part of federal common law, and is enforceable in this Court under both 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1350 (Alien Tort Statute).

Given "serious questions going to the merits and a balance of hardships that tips sharply towards" Plaintiffs, as well as the absolute certainty of irreparable injury and the overwhelming public interest in stopping genocide, this Court should accept its constitutional responsibility and declare Defendants' actions to be in violation of their obligations to prevent genocide and to not be complicit in it, and enjoin Defendants from further supporting this genocidal campaign against Palestinians in Gaza that has already killed an estimated 20,000 people, more than 8,000 of whom are children. Absent judicial relief, the continued, wanton destruction of Palestinian life will only accelerate, in spite of the mandatory legal norms that were long-ago put in place to stop it.

## FACTUAL BACKGROUND

### A. Since Filing Their Preliminary Injunction Motion, Plaintiffs Have Suffered More Harm and Loss as Evidence of Genocide Has Continued to Mount.

Since the filing of Plaintiffs' Complaint and Motion for Preliminary Injunction, Israel has escalated its genocidal campaign in Gaza. As of December 21, 2023, Israel has killed approximately 20,000 Palestinians in Gaza, more than 8,000 of whom are children. Declaration of Sadaf M. Doost,

annexed hereto, (hereinafter "Doost Decl."), Ex. A-1. About 52,586 have been injured, and more than 1.9 million have been displaced – about 85 percent of the population. *Id*. Ex. A-2, A-3. Israel has continued to target refugee camps and schools. *Id*. Ex. A-21. Reports detail accounts of the Israeli Defense Forces detaining – en masse – thousands of Palestinians between the ages of 12 and 70, many of whom were stripped, blindfolded, handcuffed, and filmed or photographed. *Id.*

Due to the siege and bombardment, and as described by the World Health Organization's General Director, "Gaza's health system is on its knees and collapsing." *Id*. Ex. A-18. Israeli forces have forcefully evacuated hospitals, leaving premature infants to die and their bodies decompose, and raided, detained, and beat medical staff. *Id*. Exs. A-16, A-19. Half of the population of Gaza is starving, 90 percent is regularly deprived of food for an entire day, access to clean water remains obstructed, and infectious diseases have spread rapidly. *Id*. Exs. A-12, A-13, A-23, A-24. UNICEF has warned that "without sufficient safe water, food and sanitation that only a humanitarian ceasefire can bring – child deaths due to disease could surpass those killed in bombardments." *Id*. Ex. A-22. The United Nations Office for the Coordination of Humanitarian Affairs' (OCHA) Humanitarian Coordinator for the Occupied Palestinian Territory stated: "[T]he conditions required to deliver aid to the people of Gaza do not exist. If possible, an even more hellish scenario is about to unfold, one in which humanitarian operations may not be able to respond." *Id*. Ex. A-13.

Since filing their request for a Preliminary Injunction, Plaintiffs' harms have only increased. They have had more relatives killed, Elkarra Decl. ¶ 3; Al Haq Decl. ¶¶ 6-7, and injured, Elbhassi Decl. ¶¶ 3-4; Doost Decl. ¶ 2 ("we have learned through [Plaintiff Abu Rokbeh's] colleagues that his mother sustained a gunshot in the leg"). Plaintiffs or their relatives have been displaced, in some cases more than once. Elkarra Decl. ¶ 2; Elhaddad Decl. ¶¶ 3, 8; A.N. Decl. ¶ 3-4; Elbhassi Decl.¶ 6; Al Haq Decl. ¶¶ 8-9. The full extent of the harms is not yet known due to the difficulties of communicating with those in Gaza. Gaza-based Plaintiffs have been subjected to continued bombardment, siege and

lack of access to food or clean water. Al-Najjar Decl. ¶¶ 4-11, 17-20. U.S.-based Plaintiffs have continued to suffer additional harms as a result of witnessing the dehumanization of their people who have been subjected to a genocidal campaign with Defendants' complicity. Elbhassi Decl. ¶¶ 13-17; Elkarra Decl. ¶¶ 5-8; Elhaddad Decl. ¶¶ 10-22; A.N. Decl. ¶¶ 15-24.

**B. Defendants Continue to Escalate Material Military, Financial, and Diplomatic Support to Israel.**

Defendants' close coordination with and unconditional material assistance to Israel for its assault on Gaza has continued in the past month,[1] with Israeli officials acknowledging their reliance on U.S. weapons and Defendants' influence over their military decisions in Gaza. Between November 24-30, Israel temporarily paused its near-constant bombardment of Palestinians in Gaza and permitted the limited entry of humanitarian aid, while some Palestinians held in Israeli prisons and hostages held in Gaza were released. Doost Decl., Exs. A-9, A-11. During this time, and while Palestinians in Gaza searched for the bodies of their loved ones underneath the rubble and buried the dead, *id*. Ex. A-6, Prime Minister Netanyahu declared that once the humanitarian pause ceased, Israel "will go to realizing [its] goals with full force" including by "ensuring that Gaza will not go back to being what it was." *Id*. Ex. A-7. As Defendants concede, they used their influence to help obtain the seven-day pause in the fighting, Defs.' Br. 4, while they made clear that they continued to support Israel's genocidal campaign. On November 30, for example, National Security Council Coordinator of Communications John Kirby conveyed that Israeli officials stated "very clearly" that they intend to "go back at it. And as they make that decision [Israel] will continue to find support from the United States in terms of tools and capabilities, the weapons systems that they need . . . and advice[.]" Doost Decl., Ex. C-5.

---

[1] U.S. officials continue to meet and coordinate with Israeli officials, speaking "daily" throughout the duration of Israel's onslaught. Doost Decl., Exs. C-3, C-5, C-10, C-11, C-20. The United States continues to refuse to place any conditions on military support to Israel. *Id.* Ex. C-8.

On December 1, Israel's relentless bombardment on Gaza resumed, and access to humanitarian aid was again severely restricted. *Id*. Exs. A-11, A-12, A-13, A-14, A-15. OCHA reported that between December 1-5, "at least 1,207 Palestinians were killed, 70 per cent of whom were women and children." *Id*. Ex. A-14. Still, Defendants continued to support Israel's onslaught: on December 5, Kirby declared that "we have done everything we can — and we'll continue to do it — not just in terms of weapons and capabilities, but advice and counsel and perspective and lessons learned from our own experience in this kind of warfare." *Id*. Ex. C-11. Around that time there were reports that Netanyahu had stated to local government officials: "We need three things from the US: munitions, munitions, and munitions." *Id*. Ex. C-9.

On December 6, in a rare move not seen in decades, United Nations Secretary-General António Guterres invoked Article 99 of the UN Charter to warn of the "irreversible" implications for Palestinians and regional security, urging a humanitarian ceasefire while declaring "[n]owhere is safe in Gaza." *Id*. Ex. B-1. Following the Secretary-General's letter, on December 8, the UN Security Council held an emergency meeting on the situation in Gaza during which the United States, represented by Ambassador Robert Wood, used its veto to single-handedly block a resolution calling for an immediate humanitarian ceasefire. *Id*. Exs. C-12, C-13. Israeli Minister of Defense Yoav Gallant thanked the United States for its "bold leadership." *Id*. Ex. C-13.

Also on December 8, Secretary Blinken invoked an emergency authority to bypass Congressional review and approve the immediate sale and delivery to Israel of nearly 14,000 120-millimeter tank munition cartridges and related equipment worth $106.5 million. *Id*. Ex. C-14. The next day, the Washington Post reported that, according to intelligence figures provided to Congress, Israel had dropped 22,000 U.S.-supplied guided and unguided bombs on Gaza in the first month and a half since October 7. *Id*. Ex. C-15. It also reported that in that time period, the United States had transferred at least 15,000 bombs, and "more than 50,000 155mm artillery shells" to Israel, *id.,* Ex. C-

15 the latter of which humanitarian and rights organizations have warned Defendants to be "inherently indiscriminate." *Id*. Ex. C-2. According to recent reports, "experts are confident that the vast majority of bombs dropped on [Gaza] are U.S.-made." *Id*. Ex. C-22.

On December 10, Netanyahu, during his weekly cabinet meeting, thanked President Biden "for his administration's vetoing of a UN Security Council resolution urging a ceasefire, and for its approval of an urgent shipment of some 14,000 tank shells" reportedly set to arrive that same day. *Id*. Exs. C-12, C-13, C-16. *See also id.* Ex. C-20.

On December 12, Netanyahu stated that, after "an intensive dialogue with President Biden and his team, [Israel] received full backing for the ground incursion and blocking the international pressure to stop the war." *Id*. Ex. C-17. That same day, Defendant Biden acknowledged the risk of Israel losing international support due to its "indiscriminate bombing" of Gaza, but reaffirmed that "Israel's security can rest on the United States," and that the United States is "not going to do a damn thing other than protect Israel in the process. Not a single thing." *Id*. Ex. C-19.

## ARGUMENT

## I.     PLAINTIFFS STATE VALID CLAIMS UNDER FEDERAL QUESTION JURISDICTION AND THE ALIEN TORT STATUTE FOR VIOLATION OF LEGAL OBLIGATIONS TO PREVENT, NOT AID AND ABET, GENOCIDE.

In asserting that Plaintiffs fail to state a claim under Fed. R. Civ. P. 12(b)(6),[2] Defendants ignore—or fundamentally misapprehend—the jurisdictional basis asserted by Plaintiffs for their claims of violations of customary international law, namely federal question jurisdiction, 28 U.S.C. § 1331, and the Alien Tort Statute, 28 U.S.C. § 1350. Compl. ¶ 33 ("Jurisdiction and Venue").[3] Plaintiffs do not seek to directly enforce the Convention on the Prevention and Punishment of the Crime of

---

[2] In assessing the legality of Defendants' conduct, the Court must accept all the factual allegations in the Complaint as true pursuant to Federal Rule of Civil Procedure 12(b)(6). *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008). Defendants did not object to jurisdiction on this basis under Federal Rule of Civil Procedure 12(b)(1).
[3] Jurisdiction is also proper pursuant to 28 U.S.C. § 2201 *et seq*. (Declaratory Judgment Act).

Genocide ("Genocide Convention"), Dec. 9, 1948, 78 U.N.T.S. 277, nor do they assert a cause of action under the Genocide Convention Implementation Act, 18 U.S.C. § 1091. Thus, the cases Defendants rely on pertaining to attempts to directly enforce non-self-executing treaties or conventions are inapposite. Defs.' Br. 16-17.

It is well-settled that both the Alien Tort Statute ("ATS") and 28 U.S.C. §1331 provide jurisdiction for claims arising under federal common law. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004) (finding the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law"); *id*. at 729 ("post-*Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way"); *Illinois v. City of Milwaukee*, 406 U.S. 91, 99-100 (1972) (in discussing federal question jurisdiction, holding "laws" in § 1331 "will support claims founded upon federal common law as well as those of a statutory origin"); *Sarei v. Rio Tinto, PLC,* 671 F.3d 736, 751 (9th Cir. 2011), *vacated on other grounds sub nom. Rio Tinto PLC v. Sarei,* 569 U.S. 945 (2013) (courts permitted to "develop the federal common law by incorporating into it certain claims that derive from norms of international law").[4] Moreover, both the ATS and federal question provide district courts with jurisdiction over certain violations of customary international law, which, contrary to Defendants' suggestion, Defs.' Br. 6,[5] is part of federal common law. *See, e.g., Sosa*, 542 U.S. at 724-25 (federal courts can

---

[4] Defendants' reliance on *Serra v. Lappin*, 600 F.3d 1191 (9th Cir. 2010), for the proposition that customary international law is not a source of judicially enforceable private rights is misplaced. Defs.' Br. 16. To the extent that *Serra* relies upon *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), that case pre-dates the Supreme Court's confirmation in *Sosa* that the ATS is a jurisdictional statute for certain common law violations of international law. *Sosa*, 542 U.S. at 712. There, the claim was brought not by noncitizens, but also involved a violation – entitlement to higher wages for prison labor – that lacked the specificity, universality and obligatory nature required for norms under the ATS. *See Serra*, 600 F.3d at 1199-1200.

[5] The Executive Branch has previously affirmed that international law is part of federal common law. *See, e.g.,* Supplemental Br. for United States as Amicus Curiae in Partial Support of Affirmance, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), (No. 10-1491), 2012 WL 2161290, at *2 ("The ATS does permit courts to create a federal common-law cause of action for violations of international law in certain limited circumstances.").

REPLY IN SUPPORT OF MOTION FOR          7          Case No. 23-CV-5829
PRELIMINARY INJUNCTION AND OPPOSITION TO MOTION TO DISMISS

"recognize[e] a claim under the law of nations as an element of common law"); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (recognizing that "international disputes implicating . . . our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist); *In re Estate of Ferdinand E. Marcos Hum. Rts. Litig.*, 978 F.2d 493, 502 (9th Cir. 1992) ("It is also well settled that the law of nations is part of federal common law"). *See also Deutsch v. Turner Corp.*, 324 F.3d 692, 718 (9th Cir. 2003) (in action for slave labor during World War II, finding it was "indisputable" that "claims [asserted] under international law" can be brought under 28 U.S.C. § 1331).

In *Sosa*, the Court confirmed that federal common law prohibits and penalizes certain conduct that violates international law, and directed courts to look to international law for guidance in construing federal common law, particularly for "any international norm intended to protect individuals." *Sosa*, 542 U.S. at 724, 729-30 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)); *The Paquete Habana*, 175 U.S. 677, 700 (1900); *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815); *Tex. Indus., Inc*, 451 U.S. at 641). The Court underscored that only those international laws that are well-established and defined with specificity qualify for incorporation into federal common law, and held that federal courts may hear claims that rest on international norms "with a specificity comparable to the features of the 18th-century paradigms." *Id.* at 725, 729 (the ATS provides jurisdiction over "a narrow class of international norms"). The Court held, therefore, that modern federal courts could identify justiciable claims by looking to the "customs and usages of civilized nations," "albeit cautiously." *Id*. at 733-34 (quoting *The Paquete Habana*, 175 U.S. at 700). It adopted the Ninth Circuit's test from *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994) in holding that any such claims must be "specific, universal, and obligatory." *Sosa*, 542 U.S. at 732.

It is beyond dispute that the prohibition against genocide qualifies as a "specific, universal and obligatory" norm that is part of the federal common law enforceable under the ATS and § 1331 jurisdiction. *See, e.g., Sarei*, 671 F.3d at 759 ("[c]laims of genocide . . . fall within the limited category of claims constituting a violation of internationally accepted norms for ATS jurisdiction"); *Al-Tamimi v. Adelson,* 916 F.3d 1, 11-12 (D.C. Cir. 2019). Indeed, the prohibition against genocide is one of the most well-established international law norms, and is codified and defined in both the Genocide Convention and U.S. domestic criminal law, 18 U.S.C. § 1091.[6] *See* Compl. ¶¶ 255-64 (collecting sources and defining genocide); *Sarei*, 671 F.3d at 759 ("the status of genocide as a *jus cogens* norm remains undisputable"); *see also id.* (finding any modifications in the definition of genocide in the Convention and § 1091 to be "insignificant"). Notably, the treaty ratification and the criminal statute codify and reaffirm the pre-existing legal prohibition against and right of action for genocide under customary international law. *Kadić v. Karadžić,* 70 F.3d 232, 242, 242 n.6 (2d Cir. 1995) (finding that a private remedy for genocide pre-existed and continued after ratification of Genocide Convention and enactment of criminal statute); *Sarei,* 671 F.3d at 758-59 (the enactment of § 1092 "did not, however, affect the availability of an ATS claim" for genocide).[7]

---

[6] Such borrowing from – and not seeking to directly enforce – federal criminal statutes has been done in similar contexts. *See, e.g., Kadić*, 70 F.3d at 242 (federal common law developed using criminal statute prohibiting genocide); *Al Shimari v. CACI Premier Tech., Inc.*, 263 F. Supp. 3d 595, 600-02, 605 (E.D. Va. 2017) (looking to 18 U.S.C. § 2340 as source for prohibition against torture for ATS claims and same to 18 U.S.C. § 2441 for war crimes). At the same time, Plaintiffs' case is clearly distinguishable from *Muslim Citizens of the State of Israel v. United States*, No. 8:23-cv-2697 (M.D. Fla. Nov. 27, 2023), relied upon by Defendants, Defs.' Br. 17-18, not only because Plaintiffs in this case have standing, *see* Sec. III, but because Plaintiffs here do not seek to "invoke or compel enforcement of criminal law." ECF No. 38-2 at 3.

[7] For this reason, Defendants' reliance on Justice Scalia's separate opinion in *Sosa* to argue that 18 U.S.C. § 1092 should bar the recognition of genocide as an actionable norm under the *Sosa* test falling under the ATS jurisdictional grant is misplaced. Defs.' Br. 17. Justice Scalia wrote only for himself and Justice Thomas in rejecting the very framework adopted by the majority for recognizing modern international causes of action. In the twenty years since, the Supreme Court has repeatedly affirmed that framework, and, as cited above, numerous courts have applied it to find genocide an actionable norm under the ATS. *See, e.g., Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013); *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1935 (2021).

Under customary international law, as codified in the Genocide Convention, Defendants have a duty to prevent genocide. Genocide Convention art. I; Schabas Decl. ¶¶ 18-25. Critically, Defendants have not disputed the existence of that obligation—nor could they. The duty to prevent genocide is recognized as a *jus cogens* norm, meaning that no derogation is permitted. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 716 (9th Cir. 1992) ("the supremacy of *jus cogens* extends over all rules of international law"). As the International Court of Justice explained, this undertaking to prevent genocide is not a passive obligation, but rather "is one of conduct and not one of result" where States are obligated "to employ all means reasonably available to them . . . to prevent genocide." *Application of Convention on Prevention and Punishment of Crime of Genocide* (*Bosn. & Herz. v. Serb. & Montenegro*), Judgment, 2007 I.C.J. 43, 221, ¶ 430 (Feb. 26).[8]

Likewise, complicity in genocide is recognized as a violation of customary international law. *See* Genocide Convention art. III(e); Compl. ¶¶ 271-73. Again, Defendants have not disputed that the prohibition against complicity in genocide is a specific, universal and obligatory norm of customary international law—nor could they. Moreover, it is well-established that aiding and abetting liability is recognized under international law, and has repeatedly been recognized as a "specific and universal form of liability" satisfying the *Sosa* standard. *See Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 718 (9th Cir. 2023); *id*. at 724 (customary international law recognizes aiding and abetting liability when knowing assistance, encouragement or moral support is provided that has a substantial effect on an international law violation).[9] Plaintiffs have properly pled violations of customary international law

---

[8] The Ninth Circuit found the International Court of Justice judgment interpreting obligations under the Genocide Convention in *Bosnia & Herzegovina v. Serbia & Montenegro* to be "an instructive frame of reference" for interpreting and applying both obligations around and the elements of genocide. *Sarei*, 671 F.3d at 762.

[9] Indeed, the Ninth Circuit found that "recognizing aiding and abetting liability, particularly for U.S. defendants, well serves the original goals of the ATS: to provide a forum for violations of international law that, if lacking, could cause foreign relations strife or 'embarrass[ment]' to the United States" and failure to provide a "forum in which U.S. citizens and corporations can be held liable for violating

for norms which are binding on Defendants and enforceable under the ATS and the Court's federal question jurisdiction.

## II.     PLAINTIFFS' CLAIMS ASSERTING VIOLATION OF OBLIGATIONS TO PREVENT, NOT FURTHER, GENOCIDE ARE JUSTICIABLE.

Defendants misapprehend the essence of Plaintiffs' claims and of Defendants' legal duties in arguing that the political question doctrine bars this case. Defs.' Br. 8. Contrary to Defendants' assertion, Plaintiffs do not seek to question a *bona fide* discretionary policy choice made by the executive branch, such as a run-of-the-mill decision to allocate foreign aid that the cases Defendants rely upon typically classify as a non-justiciable political question. Instead, Plaintiffs' claims challenge Defendants' violations of a non-discretionary legal duty—the specific, universal and non-derogable legal mandate to prevent, not further, genocide. The executive branch has no more discretion to violate this *jus cogens* international law norm than it would to violate the *jus cogens* norm against torture.

As the Supreme Court advised in *Baker v. Carr*, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance" and thus instructed courts to conduct "a discriminating analysis" in the "specific case" to determine if there is a nonjusticiable political question. 369 U.S. 186, 211 (1962). A "discriminating analysis" of Plaintiffs' "specific case" shows the question presented is a purely legal one, fully capable of judicial review: whether Defendants are in breach of their clearly-established, unambiguous and non-derogable obligations to prevent, and to not aid and abet, genocide, under customary international law, and as codified in the Genocide Convention and the Genocide Statute, 18 U.S.C. § 1091. Plaintiffs' claims do not require the Court to second-guess *discretionary* judgments or policy *choices*—but rather whether Defendants' conduct violates the law. It is the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

---

well-defined and universal norms, including aiding and abetting liability" could lead to scrutiny by the international community. *Id. at* 720-21.

Courts have observed this critical distinction and found it within their Article III mandate to review alleged violations of legal duties, including the very duty invoked in this case. In *Al-Tamimi*, 916 F.3d at 11, 13, the D.C. Circuit found that whether genocide is being committed is a "purely legal issue" and "not a jurisdiction-stripping political question." And in *Al Shimari v. CACI Premier Technology, Inc.*, 840 F.3d 147, 158 (4th Cir. 2016), the Fourth Circuit, in deciding whether torture and war crimes claims were justiciable, found that the "separation of powers rationale underlying the political question doctrine" does not apply when challenged conduct is "contrary to settled international law or applicable criminal law." Indeed, "[t]he Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations. Never." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring); *see also United States v. Texas*, 599 U.S. 670, 684 (2023) ("the Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive").

**A.  The Political Question Doctrine is a "Narrow Exception" to Federal Jurisdiction.**

Defendants' overbroad and simplistic characterization of the political question doctrine—that courts must reflexively dismiss cases that sound in foreign policy or international relations, Defs.' Br. 8-13—is inconsistent with the repeated admonition of the Supreme Court that the doctrine represents a "narrow exception" to a federal court's "responsibility to decide cases properly before it." *Zivotofsky ex rel Zivotofsky v. Clinton,* 566 U.S. 189, 194-95 (2012)*; see also El-Shifa Pharm. Indus. Co.*, 607 F.3d at 856 (Kavanaugh, J., concurring) ("The political question doctrine has occupied a more limited place in the Supreme Court's jurisprudence than is sometimes assumed."). In the 61 years since *Baker v. Carr*, only thrice has a Supreme Court majority identified a case presenting a wholly non-justiciable political question—in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (partisan gerrymandering); *Nixon v. United States*, 506 U.S. 224 (1993) (Senate impeachment trials); and *Gilligan v. Morgan*, 413

U.S. 1 (1973) (training of Ohio National Guard). In case after case in which the political question doctrine was urged as a bar, the Court has refused. *See, e.g., Zivotofsky*, 566 U.S. 189 (2012); *County of Oneida v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226 (1985); *INS v. Chadha*, 462 U.S. 919 (1983); *Elrod v. Burns*, 427 U.S. 347 (1976); *Powell v. McCormack*, 395 U.S. 486 (1969); *Williams v. Rhodes*, 393 U.S. 23 (1968).

These cases illustrate the Supreme Court's reluctance to evade the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). The Court has long understood that it is just as important to the separation of powers to carefully circumscribe its scope, lest courts use the doctrine to abdicate their constitutional responsibility to serve as a check on those same institutions. *See, e.g., Zivotofsky*, 566 U.S. at 195-96; *United States v. Texas*, 599 U.S. at 684. Notably, the Court has cautioned that even a "state of war is not a blank check for the President." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004).

### B. Contravention of the Legal Obligation to Prevent, Not Further, Genocide Can Never Be a "Policy Choice" for the Political Branches.

Defendants misunderstand the nature of this case: it is not one about the exercise of "foreign relations" or "diplomatic affairs," nor is it asking the Court to decide whether to provide "foreign aid" to Israel or if such aid is "necessary." *See* Defs.' Br. 8, 10 (citing *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007)). This case asks the Court to do what the judiciary is obligated to do: apply the facts to clearly-established law, and make a determination as to whether Defendants have violated a legal duty, here the *jus cogens* duty to prevent and not further genocide. *None* of the cases Defendants cite apply to circumstances where a U.S. official is alleged to have violated a non-derogable duty under customary international law. As the Supreme Court recently affirmed, conducting a "textual, structural, and historical" examination of a statute or treaty "is what courts do," and applying a set of facts against a legal norm is a "familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196, 201. Indeed,

"[t]he fact that the President—let alone a significantly inferior executive officer—opines that certain conduct is lawful does not determine the actual lawfulness of that conduct. The determination of specific violations of law is constitutionally committed to the courts, even if that law touches military affairs." *Al Shimari,* 840 F.3d at 162 (Floyd, J., concurring).

Defendants nowhere deny that they have legal duties to prevent and to not further genocide. Nor could they. Since the Founding of the Republic, treaties and customary international law have been recognized as "part of" U.S. law. *The Paquete Habana*, 175 U.S. at 700; U.S. Const. art. VI, cl. 2. Indeed, Plaintiffs' allegations go to conduct that, if proven, would violate the federal genocide statute, 18 U.S.C. § 1091, and *jus cogens* norms of customary international law that the Supreme Court has held to be enforceable under the ATS, 28 U.S.C. § 1350, *see Sosa*, 542 U.S. at 724-25, and is also enforceable under federal question jurisdiction, 28 U.S.C. § 1331. *See* Sec. I.

Accordingly, far from being "dispositive," *Corrie* illuminates the distinction between those cases that run afoul of the political question, and those—like this one—that are justiciable. In *Corrie*, plaintiffs did not assert any violation of a firm legal duty against the United States; instead, they asked the court to examine the sale of bulldozers "by the executive branch pursuant to a congressionally enacted program calling for *executive discretion* as to what lies in the *foreign policy and national security interests* of the United States" that would require judicial review of the "political branches' *decision* to grant extensive military aid to Israel." Defs.' Br. 11 (quoting *Corrie*, 503 F.3d at 982 (emphasis added)). The Ninth Circuit found that to review the discretionary decision to provide Israel with military aid is "a political decision inherently entangled with the conduct of foreign relations"— a matter committed by the Constitution to the "Federal Government" and barred under the first *Baker* factor. *Corrie,* 503 F.3d at 983. The D.C. Circuit, sitting *en banc,* elaborated on this critical distinction between policy and law as it relates to the judicial role: "we have distinguished between claims requiring us to decide whether taking military action was "wise"—"a 'policy choice[] and value

determination [] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch'"—and claims "[p]resenting purely legal issues," such as whether the government "had legal authority to act." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 842 (quotations omitted).

In contrast to *Corrie*, this case is clearly on the justiciable side of this jurisdictional line: it does not ask the Court to review the wisdom of *permissible* and *discretionary* ministerial decisions or "policy choices" and "value determinations" committed to the political branches, *see Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230 (1986), but rather acts and omissions that violate clearly-established and well-defined legal obligations regarding genocide, which constitute clear *jus cogens* peremptory norms from which no derogation is permitted. *See DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987) (challenge to legality of implementation does not require examination of the political or social wisdom of the policy and is not a political question); *see also Al-Tamimi,* 916 F.3d at 11-12 (distinguishing between non-justiciable political questions (who has sovereignty over disputed territory) and purely legal questions capable of adjudication (are Israeli settlers committing genocide)). Unlawful conduct by the Executive is not constitutionally permissible, let alone "textually committed" to the political branches. Indeed, the political branches—including then-Senator Biden in his role on the Judiciary Committee—*eliminated* any executive discretion to engage in acts furthering genocide when they ratified the Genocide Convention and adopted the Genocide Statute, 18 U.S.C. § 1091.[10] Accordingly, courts are required to "draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed." *Al Shimari*, 840 F.3d at 158. As the Fourth Circuit held when considering whether

---

[10] The Elie Wiesel Genocide and Atrocities Prevention Act of 2018, enacted to "help prevent acts of genocide and other atrocity crimes, which threaten national and international security," declared as a matter of federal policy that prevention of atrocities including genocide is in the "national interest." Pub. L. No. 115-441, § 3(1), 132 Stat. 5586 (2019).

interrogation techniques used on detainees at Abu Ghraib in Iraq were discretionary or in violation of the international-law prohibition on torture, "[t]he commission of unlawful acts . . . is not a function committed to a coordinate branch of government" and therefore "fall[s] outside the protection of the political question doctrine." *Id.*

Reliance on *Republic of Marshall Islands v. United States*, 865 F.3d 1187 (9th Cir. 2017), is similarly misplaced. Defs.' Br. 11-12. There, the court was asked to dictate the parameters of treaty negotiations and the developments of policies regarding nuclear disarmament—matters that squarely fall within the enumerated powers of the Executive Branch. 865 F.3d at 1200-01; *see also Republic of Marshall Islands v. United States*, 79 F. Supp. 3d 1068, 1073-74 (N.D. Cal. 2015) (White, J.) (enforcing an obligation for Executive to "initiate discussions" with foreign nations within one year irrespective of "willingness of other nations" runs afoul of *Baker* factors 1 and 4). Here, the Court is not tasked with questioning the discretionary policy choices of the Executive, but to make a legal determination. The Court is thus being asked to do what Article III of the Constitution requires it to do: assess the legality of conduct against clearly-established laws—and not simply "exert its own judgment over a sensitive area of foreign policy." *Abusharar v. Hagel*, 77 F. Supp. 3d 1005, 1006 (C.D. Cal 2014); *see* Defs.' Br. 8. Acting in violation of the law can never be a policy choice— including for the President of the United States. *Al Shimari,* 840 F.3d at 162 (Floyd, J., concurring). Plaintiffs call upon the Court to review the legality of Defendants' actions against the legal obligations to prevent, not aid and abet, genocide. Plaintiffs' claims are justiciable.

### C. There are Judicially Manageable Standards to Assess Whether Defendants Have Breached their Legal Obligation to Prevent, Not Further, Genocide.

This case does not "turn on standards that defy judicial application," *see Baker*, 369 U.S. at 211, but instead requires the Court to apply the facts to clearly defined legal obligations. In determining that claims of unlawful acts are justiciable, Courts of Appeal have "emphasize[d] the long-standing principle that courts are competent to engage in the traditional exercise of determining whether the

particular conduct complied with applicable law." *Al Shimari,* 840 F.3d at 158; *see also El-Shifa Pharm. Indus. Co.*, 607 F.3d at 842. Cases invoking legal norms necessarily present judicially manageable standards, allowing courts to draw the line between lawful and unlawful conduct. *See Vieth v. Jubelirer*, 541 U.S. 267, 301 (2004); *see also Japan Whaling Ass'n*, 478 U.S. at 230 (no political question issue when decision requires "applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented"). The legal standards governing genocide are just like other customary international law standards the judiciary routinely interprets and applies to claims brought under the ATS or 28 U.S.C. § 1331. *See, e.g., Sarei*, 671 F.3d at 758-763 (applying the elements of genocide to the facts of the case); *Kadić*, 70 F.3d at 249 ("[U]niversally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act."). *See also Deutsch*, 324 F.3d at 713 n.11 (in wartime reparations case, holding that "no political question, however, is raised by the simple application of the requirements of a treaty to which the United States is a party"). Because the ATS provides that district courts shall have jurisdiction over torts "committed in violation of the law of nations," 28 U.S.C. § 1350, "[a]n ATS claim, then incorporates the law of nations" and "it is well settled that genocide violates the law of nations." *Al-Tamimi,* 916 F.3d at 11.

Contrary to the cases relied upon by Defendants, Defs.' Br. 13, the crime of genocide has a universally recognized legal definition against which the Court can assess the facts alleged in the Complaint and Defendants' conduct. *See* Genocide Convention art. II; 18 U.S.C. § 1091(a). *See also* Compl. ¶¶ 257-73. Likewise, the duty to prevent genocide is clearly established under customary international law and has been readily applied by international courts. *See* Genocide Convention art. I; Schabas Decl. ¶¶ 8, 18-31; Compl. ¶¶ 267-70. *See generally* Declaration of Intervention Under Article 63 of Statute [of International Court of Justice] Submitted by the United States of America, *Allegations of Genocide under Convention on Prevention and Punishment of Crime of Genocide (Ukr.*

*v. Russ.)*, I.C.J. (Sept. 7, 2022); *id*. at ¶ 22 (citing *Bosn. & Herz. v. Serb. & Montenegro*, Judgment, 2007 I.C.J. at 222, ¶ 431) (a State's "obligation to prevent, and the corresponding duty to act, arise at the instant that the State learns of, or should normally have learned of, the existence of a *serious risk* that genocide will be committed.") (emphasis in original)).

Notwithstanding the above, were the Court to determine that additional facts are necessary to assess the legality of Defendants' conduct, it should permit Plaintiffs to undertake limited jurisdictional discovery to further ascertain the factual basis underlying their claims. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quotation omitted) ("discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.").

**D.  Plaintiffs' Requested Relief Does Not Run Afoul of the Political Question Doctrine.**

Plaintiffs seek both declaratory and injunctive relief for their two claims (violation of the duty to prevent genocide, and complicity in genocide). Neither form of relief, which can be granted either in the alternative or cumulatively, is precluded by the political question doctrine. The Court may issue an order declaring that Defendants are in violation of their legal obligations and enjoining them from further enabling genocide. It may also, consistent with the Court's broad, inherent equitable powers, issue injunctive relief mandating cessation of the specific prohibited actions that Plaintiffs identified to come into compliance with Defendants' obligations under customary international law, *e.g.*, transferring of weapons and other forms of military support. After finding Defendants violated their legal obligations, the Court could identify in subsequent proceedings different or additional prohibitory steps they must take. Furthermore, because the doctrine requires dismissal only if a political question is "inextricable from the case," *Baker*, 369 U.S. at 217, it is permissible for the Court to allow certain claims or aspects of a case to proceed, even while determining that other aspects of the case are nonjusticiable.

The issuance of the relief Plaintiffs request is not the substitution of the Court's policy preferences for those of the Executive. *See* Defs.' Br. 12. Declaring what the law is and whether it has been breached is a core function of the courts. That is what Plaintiffs ask for here.

### III.   ALL PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS, AND THEIR INJURIES ARE FAIRLY TRACEABLE TO THE DEFENDANTS AND REDRESSABLE THROUGH THE RELIEF THEY SEEK.

#### A.   Plaintiffs' Harms Are Fairly Traceable to Defendants, and Redressable.

Defendants' primary challenge to Plaintiffs' standing rests on an incorrect premise – that Plaintiffs' injuries result solely from the actions of "Israel . . . an independent actor not before the Court" making "unfettered choices," and therefore cannot be traced to any of Defendants' actions. Defs.' Br. 14 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). Defendants are wrong legally and factually. First, the Supreme Court has made clear that a defendant's actions do not have to be "the very last step in the chain of causation" in order to satisfy the traceability requirement. *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014) ("[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct"). Even when an injury is "the result of the independent action of some third party not before the court," traceability may be found when the injury has been "produced by determinative or coercive effect upon the action of someone else." *Bennett,* 520 U.S. at 167, 169. Causation exists even when there are "multiple links in the chain," *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014), so long as the chain is not "hypothetical or tenuous." *Maya v. Centex Corp.,* 658 F.3d 1060, 1070 (9th Cir. 2011) (quotation omitted). Even "tentative" and "small incremental step[s]" in the chain of causation are sufficient to satisfy the traceability requirement. *Massachusetts v. EPA,* 549 U.S. 497, 523-24 (2007) (finding EPA's failure to regulate carbon emissions was fairly traceable cause of global warming-related injuries, even where independent sources substantially contribute to that injury).

1  The factual allegations show that Defendants' actions are not "tentative," "small" or
2  "incremental." They have been intentional, extensive, and essential – even shocking in the face of so
3  much killing. Far from simply making "unfettered choices," even Israeli officials acknowledge that
4  U.S. support has been "determinative" of the conduct of the Israeli government and military. *See, e.g.,*
5  Compl. ¶ 211; Spees Decl., Ex. E-29 (quoting Israeli Defense Minister Yoav Gallant as saying "[t]he
6  Americans insisted and we are not in a place where we can refuse them. We rely on them for planes
7  and military equipment."); Paul Decl. ¶ 10 ("it would be impossible for Israel to have conducted the
8  past two months of military operations as it has without utilizing a vast amount of U.S.-origin
9  weaponry."); Doost Decl., Ex. C-9 (quoting Prime Minister Netanyahu stating to Israeli government
10  officials, "[w]e need three things from the US: munitions, munitions, and munitions."). If Israeli
11  admissions were not enough, Plaintiffs also detail in their Complaint and exhibits accompanying their
12  Preliminary Injunction Motion the extensive involvement and influence Defendants have on Israeli
13  officials. Compl. ¶¶ 224-26, 230, 232 (quoting statements by U.S. officials, including Defendants,
14  admitting their own close coordination and influence); *see also* Paul Decl. (describing the
15  government's extensive arms transfers to and preferential treatment for Israel).
16
17          Defendants' support is determinative because it is so significant. The United States is *the* major
18  foreign supplier of military articles and services to Israel to the tune of billions annually, and Israel is
19  greatly dependent upon the United States for its defense capabilities, including technologies and
20  systems it would not be able to acquire from other sources. Paul Decl. ¶¶ 4-8; Compl. ¶¶ 167-170;
21  Doost Decl. Exs. C-5, C-7, C-11, C-14, C-15, C-20 (reporting on the massive amount of munitions
22  that the United States has already provided to Israel, including since October 7: "at least 15,000 bombs,
23  including 2,000-pound bunker busters, and more than 50,000 155mm artillery shells," and the
24  Administration's efforts to transfer still more).
25
26
27
28

The connection between U.S. support and harms to Plaintiffs is, accordingly, significant. Since the filing of the Complaint, it has been confirmed that the United States supplied the *22,000 bombs* dropped by Israel on the densely-populated Gaza Strip in the first six weeks of the assault. Doost Decl. Ex. C-15. *See also id*., Ex. C-22 (reporting that "experts are confident that the vast majority of bombs dropped on [Gaza] are U.S.-made"), Ex. C-21 (reporting that "[d]uring the first six weeks of the war in Gaza, Israel routinely used" 2,000-pound bombs in Gaza, "one of its biggest and most destructive bombs"); Paul Decl. ¶ 10 (describing the "extensive weapons, munitions, and equipment" that the United States has sent to Israel since October 7). And as the already harrowing death toll rises, and plans for Israeli destruction of Gazan life proceed uninterrupted, the U.S. has actually accelerated weapons transfers. Defendants have tapped a "Tiger Team" and an "Israel Significant Initiatives Group" to rush weapons to Israel and overcome transfer barriers. Doost Decl., Ex. C-20. The United States has placed no conditions on the otherwise indiscriminate use of these munitions, *id*., Ex. C-8, greenlighting on the diplomatic stage the continued mass slaughter of civilians, including over 8,000 children.

On December 8, 2023 – the same day the Government filed its motion to dismiss this case – Defendants prominently displayed their knowing enabling of Israel's continued killing of Palestinian civilians in Gaza. On that day, even as Gaza's estimated death toll surpassed 17,000, including over 7,000 children, Deputy United States Ambassador Robert Wood cast the sole veto of a United Nations Security Council resolution that would have required an immediate ceasefire. *Id*., Ex. C-12. Then, shortly before midnight, Defendant Blinken approved the immediate sale and transfer of nearly 14,000 120-mm tank munition cartridges to Israel, using an "emergency authority" that allowed the State Department to bypass congressional review. *Id*., Ex. C-14. For Defendants, providing U.S. diplomatic license for Israeli mass killings of Palestinians operates hand-in-hand with the U.S. supply of the weapons necessary to carry out those killings on such a mass and long-term scale. This necessary

facilitation not only violates the international law duty to prevent, it ultimately constitutes complicity in genocide. *See Doe I v. Cisco Sys., Inc.*, 73 F.4th at 725-26 (quotations omitted) (under international law, courts consider the cumulative contribution a defendant makes and have found furnishing of "'weapons and ammunition, vehicles and fuel or personnel,' or other resources relied on in the commission of the crimes" and "operational support and advice" to have a substantial effect on the commission of the crimes).

As a result of U.S. support and complicity, the harms Plaintiffs suffer are directly traceable to Defendants and satisfy the standing inquiry. Courts in this circuit have found traceability under circumstances that are far more attenuated, including cases involving actions by foreign sovereigns not before the court. *See, e.g., Brill v. Chevron Corp.*, No. 15-cv-04916-JD, 2017 WL 76894, at *1-*3 (N.D. Cal. Jan. 9, 2017) (injury arising from terrorist attack was fairly traceable to company that made surcharge payments to Iraqi leader who provided significant payments to families of terror suspects, even if company's payments only "increased the ability" of leader to do so and where there were two steps in the causal chain following defendant's conduct); *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535, 549-551 (N.D. Cal. 2021) (arbitrary arrest and torture of plaintiff by Chinese authorities was traceable to Yahoo's disclosure of Plaintiff's communications). In *Mendia*, 768 F.3d at 1012-13, the Ninth Circuit held that "what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain" (internal quotations omitted). *See also Maya*, 658 F.3d at 1070 (quotation omitted) (causal chain does not fail, provided links are not "hypothetical or tenuous"). Tragically, the horrific causal chain here between Defendants' provision of the means to kill Palestinian civilians and the killing of those civilians is not very long. It is not hypothetical or tenuous; it is direct and concrete, particularly as i) Defendants have been on notice of the Israeli government's statements reflecting their clear genocidal intent since day 1; ii) they have observed and acknowledged that the Israeli military is carrying out indiscriminate slaughter of

Palestinians and destroying the possibility of civilian life in Gaza; and iii) they have provided and continue to provide unprecedented, unconditioned military aid that assists in the ongoing destruction, along with unqualified diplomatic license.

Plaintiffs' harms are also redressable through the relief they seek. A plaintiff's burden in this regard is "relatively modest," *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quotation omitted), requiring a showing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotations omitted). In addition, a plaintiff does not need to demonstrate that the relief requested would completely remedy the harm, nor "relieve his every injury." *Massachusetts v. EPA*, 549 U.S. at 524-26 (quotation omitted) (damage to Massachusetts coastline redressable by nominally decreasing U.S. greenhouse gasses, even where predominant cause of harm is by foreign countries); *see also Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1191 (9th Cir. 2023) (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021)) ("full redress" of the injury is not required, as "the ability 'to effectuate a partial remedy' satisfies the redressability requirement"). Moreover, as the Supreme Court has explained, "[i]t can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to the illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000).

Because the majority of the weapons used by Israel in carrying out the attacks and killings of civilians – including 22,000 bombs dropped on the densely populated Gaza Strip – have come from the United States, Doost Decl. Exs. C-15, C-22 (reporting that "experts are confident that the vast majority of bombs dropped on [Gaza] are U.S.-made"), a declaration that the United States is failing in its duties to prevent, and to not aid, the commission of genocide, and an injunction ordering Defendants to refrain from further transfers of arms to Israel, would undoubtedly restrict the Israeli

1  government's ability to continue its genocidal attacks on Palestinian people in Gaza and provide

2  judicial redress for Plaintiffs' injuries. In these circumstances, this standing assessment does not require

3  "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty*

4  *Int'l USA,* 568 U.S. 398, 413 (2013).

5

6      Defendants cite several cases they suggest cut against standing "where the third party upon

7  whose conduct redressability depends is a foreign sovereign." Defs.' Br. 15, 15 n.19. Again, Plaintiffs

8  do not seek an injunction against a foreign sovereign's action. Were an injunction granted,

9  Defendants—not Israel—would be required to refrain from aiding and abetting genocide. Moreover,

10  the only Ninth Circuit case Defendants cite is inapposite: in *Marshall Islands,* the requested relief –

11  that the United States negotiate in good faith on effective measures relating to nuclear disarmament –

12  could not be meaningfully fashioned because it would require the "specific performance" of other state

13  parties that were not before the court. 79 F. Supp. 3d at 1072. Similarly, in *Cierco v. Mnuchin,* 857

14  F.3d 407 (D.C. Cir. 2017), plaintiffs failed to adduce any facts that would allow the court to infer that

15  the Andorran government would respond to the injunction and undo a unilateral action.

16

17      None of the cases cited by Defendants in footnote 19 turn on the third-party's status as a foreign

18  sovereign alone in conducting their redressability analyses. *Talenti v. Clinton*, 102 F.3d 573 (D.C. Cir.

19  1996) actually supports the redressability of Plaintiffs' claims. The court found the plaintiff's injury

20  could not be redressed by enforcing a statute that did not mandate withholding aid, and because Italy

21  received no direct financial assistance from the United States. Most significantly, the court noted that

22  there was no track record suggesting such an order or threat of withholding would impact Italy's

23  behavior and thereby redress plaintiff's harm. *Id.* at 577-78. *Talenti* distinguished *Japan Whaling*

24  *Ass'n*, in which the Supreme Court found standing where plaintiffs sought to enforce a statute that

25  mandated sanctions against Japan, and where there was a "track record" of U.S. sanctions effectively

26  compelling Japanese compliance with whaling agreements. *Id*. at 578. Here, enforcing the absolute

27

28

prohibition on aiding and abetting genocide would require Defendants to stop furnishing aid, which to Israel is a substantial amount, and there is a clear track record that U.S. pressure on Israel impacts its behavior.[11] *See Idaho Conservation League*, 83 F.4th at 1191 (quotation omitted) ("it is 'a reasonable inference from the historical record' that petitioners' injuries would be at least partially redressed by a favorable decision on the merits").

**B.  U.S.-based Plaintiffs Have Suffered Injury-in-Fact and Face Threat of Further Injury, Sufficient for Standing to Bring Claims on Behalf of Themselves and Their Family Members.**

Defendants suggest in a footnote[12] that U.S.-based Plaintiffs "have not alleged that they face an imminent future threat of harm to themselves." Defs.' Br. 16 n.20. This is incorrect, and also incomprehensible in the face of the allegations in the Complaint that these Plaintiffs have family members who have already been harmed and killed and are so worried for remaining family members that they bring *this case* against *these Defendants* to try to save them. Compl. ¶¶ 25-29; *see also* A.N. Decl. ¶¶ 3-12, 17-19; Elkarra Decl. ¶¶ 5-7; Elhaddad Decl. 10-16; Elbhassi Decl. ¶¶ 8, 11-16 (describing additional harms to their relatives, including death and injuries, displacement, and loss of homes, since the Complaint was filed on November 13, and the anxiety and fear caused by the threat of future harm and death).

This type of emotional harm and fear is more than sufficient to confer Article III standing on U.S.-based Plaintiffs. *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1109 (9th Cir. 2014)

---

[11] Just this month, after warnings by U.S. officials that Israel was in violation of the terms of a bilateral visa-waiver program, Israel took remedial measures and allowed U.S. citizens who are Palestinian West Bank I.D. holders to enter Israel. Doost Decl., Ex. D-3. In 2019, pressure by U.S. officials resulted in the Israeli government delaying forced evacuation of a Bedouin village in the West Bank. *Id*., Ex. D-2. Perhaps the most dramatic example arose when President Ronald Reagan placed a phone call to Israeli Prime Minister Menachim Begin demanding that Israel discontinue its bombing campaign in Lebanon in 1982. Reagan's call resulted in a ceasefire within 30 minutes. *Id*., Ex. D-1.

[12] A statement, "relegated to a footnote, is insufficient to bring this issue before this Court." *Antoine v. BAE Sys., Inc.*, No. C 17-02231 SBA, 2017 WL 11715422, at *5 (N.D. Cal. July 20, 2017) (citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) (party waived issue "[b]y failing to address the issue in its opening brief except in a footnote")).

("emotional harm" caused by City's failure to timely notify plaintiffs that their sibling had been shot and killed by police was sufficient injury-in-fact to confer Article III standing); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) ("'generalized anxiety and stress' as a result of the laptop theft" is sufficient injury-in-fact to confer Article III standing). Moreover, even though they reside in the United States, all of these Plaintiffs belong to a group that has been targeted by the Israeli government for destruction – Palestinians in Gaza. Thus, they are additionally experiencing serious mental harm due to the threatened and imminent destruction of their families, communities, people, culture, history, and identity, which has been enabled by the highest office holders of their government. *Heckler v. Mathews,* 465 U.S. 728, 739–40 (1984) (internal quotation omitted) (cognizable injury from "stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community"). *See* Elbhassi Decl. ¶¶ 13-17; Elkarra Decl. ¶¶ 5-8; Elhaddad Decl. ¶¶ 10-22; A.N. Decl. ¶ 18-24 (describing mental, emotional, and psychological harm stemming from watching their government's complicity and participation in dehumanizing statements towards, and destruction of, their people, and signaling that Gazan Palestinian lives do not matter, or are less valuable than Israeli lives).

In addition to the injuries each has suffered, these Plaintiffs easily satisfy the requirements of bringing an action on behalf of third parties. *See Powers v. Ohio,* 499 U.S. 400, 410–11 (1991). The lead case cited by Defendants, *Coalition of Clergy, Lawyers, & Professors v. Bush,* actually supports Plaintiffs' third party standing. 310 F.3d 1153 (9th Cir. 2002). There, the court held Plaintiffs, a coalition whose members were not related or connected in any way to the third parties detained at Guantanamo Bay, could not show the first two factors necessary for third party standing, i.e. a concrete injury in fact and a close relation with the third party, even if the plaintiffs there could meet the last factor (hindrance to the third party's ability to protect their interest). *Id*. at 1163-64. Plaintiffs here meet all three factors: in sum, they are facing the injury from loss of and mental and emotional stress

1  about family members who cannot protect their own interests while they struggle to survive a total

2  assault on Gaza, and a humanitarian crisis of unprecedented proportions, enabled by the Defendants

3  in this case.

### IV.   A PRELIMINARY INJUNCTION IS URGENTLY REQUIRED AND WELL-FOUNDED.

In the Ninth Circuit, the four traditional preliminary injunction factors are evaluated "on a

sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.'"

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* 82 F.4th 664, 684 (9th

Cir. 2023) (quotation omitted). Moreover, the Ninth Circuit has repeatedly affirmed that "[w]hen the

balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions'

on the merits—a lesser showing than likelihood of success." *Id.* at 684, 695 (quotation omitted). Since

Plaintiffs' Motion was filed, more evidence of genocide, and Defendants' failure to comply with their

legal duties to prevent it and to not aid and abet it, has continued to mount. Serious, irreparable harms

to Plaintiffs have also continued – further underscoring the urgent need for an injunction from this

Court.

Defendants incorrectly cast the relief Plaintiffs seek at this point as mandatory, a form of relief

that requires a party to take "affirmative" action and a plaintiff to show that "the law and facts clearly

favor his or her position" in order to obtain a preliminary injunction. Defs.' Br. 7 (citation omitted).

To the contrary, the injunctive relief they seek is prohibitory as it would *prohibit* Defendants from

transferring more weapons and support to the Israeli government, and thus "freeze[] the positions of

the parties until the court can hear the case on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos

Pharma GmbH & Co.,* 571 F.3d 873, 879 (9th Cir. 2009) (quotation omitted).

### A.  Likelihood of Success on the Merits and Irreparable Harm.

While in this Circuit, "'likelihood' of success per se is not an absolute requirement," *see

Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1085 (9th Cir. 2014), Plaintiffs have in fact

demonstrated a likelihood that they would prevail on the merits of their claims that the Defendants are failing in their duties to prevent, and to not further, an unfolding genocide, including by continuing to supply the Israeli government with the means and opportunity to carry it out. Indeed, Defendants do not even attempt to argue that no genocide is actually occurring, or that they are taking any measures to prevent or stop it. Plaintiffs have raised "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff[s]," which is sufficient in this Circuit to support issuance of an injunction. *Id.* (quotation omitted).

Likewise, Plaintiffs' pleadings as to the likelihood that they would continue to suffer irreparable harm have – tragically – been borne out. When they filed the Complaint and Preliminary Injunction Motion, Plaintiffs had a combined 115 family members who had been killed in Israel's assault on Gaza. As predicted, this horror and loss has continued. Since the November 16th filing of their Preliminary Injunction Motion, several Plaintiffs in this action have had family members in Gaza killed or injured by Israeli forces. *See* Elkarra Decl. ¶ 3; Al-Haq Decl. ¶ 6; Elbhassi Decl. ¶¶ 3-4; Al-Haq Decl. ¶ 6; Doost Decl. ¶ 2. The killings of and harms to Plaintiffs' family members occurred in the context of the overall death toll that has now risen to an estimated 20,000, including more than 8,000 children. An estimated 1.9 million are now displaced and attempting to survive in a humanitarian situation described by United Nations officials as a "catastrophe" and "irreversible disaster," Doost Decl., Exs. A-15, B-1, a situation that is by design and intended by Israeli officials. This is harm that is inherently irreparable and horrific – all the more so because it is also avoidable.

**B. When a Genocide Is in Progress, the 'Balance of Hardships' Tips Sharply in Favor of an Injunction that Prohibits Providing the Means Used to Carry It Out.**

In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public

interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This balancing urgently requires injunctive relief from this Court.

In the face of the ongoing mass killings of Palestinian civilians and overwhelming genocidal destruction, enabled by Defendants' violation of fundamental legal and moral obligations, i.e. to prevent, and to not further, genocide, Defendants urge that undefinably abstract public concern for "maintaining the constitutional separation of powers" tips the balance of equities in the Government's favor. Defs.' Br. 18. Defendants ignore the overwhelming global interest in preventing genocide – the "crime of crimes" – and the mass slaughter and starvation of a civilian population; an interest which United States officials, including Defendant Biden, have themselves explicitly affirmed. Pls.' Prelim. Inj. Mot. 11 (Senate Judiciary Committee's report stated that adoption of genocide law "would reaffirm the values upon which our society was founded and which have been woven into the Convention: respect for the dignity and freedom of each individual and the preservation of human rights for all").

Defendants also ignore well-settled case law, *see* Pls.' Prelim. Inj. Mot. 10-12, demonstrating that injunctions that confine the government's unlawful behavior are necessarily in the public interest. *See, e.g., E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 679 (9th Cir. 2021) (public interest in ensuring that executive follows statute and principles of the 1951 Refugee Convention, especially when prohibiting violations of *jus cogens* norms); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,* 176 F.R.D. 329, 354 (C.D. Cal. 1997) ("it would be difficult to contend that . . . alleged *jus cogens* violations of international human rights were 'in the public interest'").[13]

---

[13] The two cases offered by Defendants do not advance their argument. Neither case addresses the balancing of hardships for purposes of injunctive relief, nor violations of *jus cogens* norms, the prohibition against genocide or other serious and widespread violations of human rights. In *United States v. Munoz-Flores,* 495 U.S. 385 (1990), a person convicted of federal misdemeanors challenged his order to pay a special monetary assessment. The Supreme Court rejected the government's argument that the defendant had no "right to demand that the Judiciary ensure the integrity of [the constitutional] system." *Id.* at 393. *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759

1   Plaintiffs have already shown that there is a likelihood of irreparable injury – the further loss

2   of family members and staff and/or harm to themselves, which is severe and profound, and the

3   continued destruction of the Palestinian people in Gaza. Moreover, at a minimum, they have shown

4   that they have raised "serious questions going to the merits." There could hardly be a clearer case

5   where the balance of hardships tips more sharply in Plaintiffs' favor. This balancing requires an

6   injunction ordering Defendants to comply with one of the most basic and fundamental laws that exist

7   – the legal obligation to prevent, and not further, genocide.

8

9                                    **CONCLUSION**

10   For the foregoing reasons, this Court should grant Plaintiffs' Preliminary Injunction Motion,

11   and deny Defendants' Motion to Dismiss.

12

13   Dated: December 22, 2023                    Respectfully submitted,

14                                               _Katherine Gallagher_

15   Johnny Sinodis, Cal. Bar No. 290402         Katherine Gallagher, admitted *pro hac vice*
     Marc Van Der Hout, Cal. Bar No. 80778       Sadaf M. Doost, Cal. Bar No. 346104
16   Van Der Hout LLP                            Baher A. Azmy, admitted *pro hac vice*
     360 Post Street, Suite 800                  Maria C. LaHood, admitted *pro hac vice*
17   San Francisco CA 94108                      Astha Sharma Pokharel, admitted *pro hac vice*
     (415) 981-3000                              Samah Sisay, admitted *pro hac vice*
18   ndca@vblaw.com                              Pamela C. Spees, admitted *pro hac vice*
                                                 Center for Constitutional Rights
19                                               666 Broadway, 7th Floor
                                                 New York, NY 10012
20                                               (212) 614-6455
                                                 kgallagher@ccrjustice.org
21                                               mlahood@ccrjustice.org
                                                 sdoost@ccrjustice.org
22                                               bazmy@ccrjustice.org
                                                 asharmapokharel@ccrjustice.org
23                                               ssisay@ccrjustice.org
                                                 pspees@ccrjustice.org

24   _____

25   (1972), involved a dispute between the petitioner and respondent over the sale of excess collateral
     after the bank had been nationalized by the Cuban government, and whether the act of state doctrine
26   barred judicial inquiry. Defendants cite *First National* to suggest that the Court may not inquire into
     the "propriety of what may be done in the exercise of [the Executive's] political power." Defs.' Br.
27   19. However, the inquiry here is not into the propriety of an otherwise lawful act or policy choice; the
     judicial inquiry here is into the legality of the Executive's actions in light of universal prohibitions
28   against the crime of genocide and the legal obligation to prevent it.