Marc Van Der Hout, Cal. Bar No. 80778
Johnny Sinodis, Cal. Bar No. 290402
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Maria C. LaHood, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,<br><br>Defendants. | Case No.: 23-cv-05829<br><br>**DECLARATION OF JOSH PAUL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: January 26, 2024 at 9:00 am<br><br>Honorable Jeffrey S. White<br>United States District Judge |

I, Josh Paul, pursuant to 28 U.S.C. § 1746, declare the following is true and correct:

1. For over 11 years, from April 2012 until October 2023, I served as Director of Congressional and Public Affairs in the U.S. Department of State's Bureau of Political-Military Affairs (PM). PM is responsible for the oversight and approval of U.S. arms transfers conducted via the Foreign Military Sales (FMS) and Direct Commercial Sales (DCS) processes, as well as for the obligation of the State Department's military grant assistance funding, including Foreign Military Financing (FMF). I was responsible for the Bureau's relationships with Congress, the media, and civil society, and represented the Assistant Secretary of State for Political-Military Affairs in briefings to Congress. In this capacity, my responsibilities included "clearing on"— i.e., being a part of the approval process for—all major arms transfers requiring congressional notification under the Arms Export Control Act (22 U.S.C. §2751 et seq.), and all military grant assistance notifications to Congress under the Foreign Assistance Act (22 U.S.C. §2151 et seq.). I also played a significant role in policymaking processes concerning broader U.S. arms transfer policy, including the drafting of the Conventional Arms Transfer (CAT) Policy that established the executive branch's priorities and framework for adjudicating the export of arms. In addition, between June and December 2021 I was detailed on a part-time basis to the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor (DRL), Office of Security and Human Rights, as a Special Advisor on Arms Transfers, where my responsibilities included assessing existing processes for the human rights review of proposed arms transfers, and making recommendations to strengthen those processes. I have previously served as a civil servant in the U.S. Department of Defense's Office of the Under Secretary of Defense for Policy (Office of the Deputy Assistant Secretary of Defense for the Middle East (DASD-ME), and as a National Security Consultant to the Government of Iraq as a civil servant for both the U.S. Department of Defense and Department of State. I have also held other roles in the

national security and international relations fields.

2. The United States military grant assistance to Israel on an annual basis has for decades exceeded the provision of U.S. military grant assistance to any other country except, during specific periods, to Ukraine, Iraq and Afghanistan.

3. In 2016, the United States and Israel signed a Memorandum of Understanding that established a 10-year baseline starting in 2018 of annual military assistance to Israel totaling no less than $3.3 billion in FMF, plus $500 million in Department of Defense funding for missile defense systems development. This annual baseline funding constitutes between 10–20 percent of Israel's annual military budget. For Israel, unlike for every other country in the world, the FMF portion of this funding is considered "obligated upon appropriation," and unlike every other country in the world which receives their FMF in installments, Israel receives its FMF in a lump sum, which, unlike every other country except for Egypt, is held in an interest-bearing account at the Federal Reserve Bank of New York.

4. The United States is the major foreign supplier to Israel of defense articles and services, funded both through FMF and through Israel's own defense budget. During my tenure in the Department of State, major arms sales notified to Congress for Israel via the FMS process have included, but not been limited to, CH-53K Heavy Lift Helicopters with support and related equipment notified to Congress for an estimated cost of $3.4 billion; Joint Direct Attack Munition (JDAM) Tail Kits, munitions, and associated equipment, parts and logistical support notified to Congress for an estimated cost of $1.879 billion; fuels and petroleum-based products notified to Congress at a total value of over $5 billion; and numerous other cases, including many below the congressional notification threshold. Between 1950 and 2022, Israel was the second greatest customer for U.S. arms by value globally, with combined FMS cases

totalling over $53 billion.[1]

5. During my tenure, the United States government notified Congress of the proposed issuance of export licenses via the DCS process for the provision of defense articles and services to Israel also valued in the billions of dollars, including to support the qualification, modification, test, repair, assembly, manufacture, and production of components and parts for integration into the Tamir Interceptor used in the Iron Dome system; M4 5.56mm automatic rifle barrels; for the installation, testing, maintenance, and repair of ASPRO–A (Trophy) anti-tank active protection systems for armored fighting vehicles; to support weapons integration, flight test, and hardware delivery of JDAM variants and Small Diameter Bomb Increment I variants; to support the design, development, engineering, integration, marketing, production, manufacturing, testing, depot level maintenance, modification, demonstration and processing of the Missile Firing Unit (MFU) and Stunner Interceptor Subsystems for the David's Sling Weapon System; to support the production, inspection, assembly, test and repair top-level assemblies, sub-assemblies, and components used in the SPICE Family of Gliding Bomb Assemblies; 5.56mm automatic rifles and major components; to support the performance of maintenance, repair and overhaul services of J52 and F100 engines to maintain readiness of the Israeli Air Force's fleet of A-4, F-15 and F-16 aircraft; to support the development, integration, and support for F–135 propulsion system; Organizational Level (O-Level) maintenance, field training, and services for the operation and sustainment of the F-35 Lightning II air systems operated by the Ministry of Defense in Israel; to support the manufacture, integration, installation, operation, testing, maintenance, and repair of the

---

[1] Defense Security Cooperation Agency, U.S. Dept. of Defense, Historical Sales Book, Fiscal Years 1950–2022, https://www.dsca.mil/sites/default/files/2023-01/FY%202022%20Historical%20Sales%20Book.pdf.

DECLARATION OF JOSH PAUL                                      Case No. 23-CV-05829

3

120mm GPS Phase 1 and (SAL/GPS) Phase 2 Dual Mode Mortar; to support the installation, testing, maintenance, and repair of Trophy anti-tank active protection systems; 2000 lb. Tritonal-filled MK84 bombs; for the manufacture of F-15 aircraft structural components; to support the manufacture, maintenance, repair and overhaul of the J79-GE-J1E and J79-17 aircraft engines; for MK80 Series/BLU-109 weapons; the JDAMs and Small Diameter Bomb (SDB), and numerous other cases below the congressional notification threshold.

6. During my tenure, the U.S. has also provided to Israel, via grant and sale, over 500 transfers of excess defense articles (EDA) from Department of Defense stocks including, but not limited to, cargo and tanker trucks of multiple types, armored mobile guard towers, camouflage and deception equipment, parachutes, firefighting equipment, F-15 aircraft, CH-53 and SH-60F helicopters, communications equipment, barrels for grenade launchers, periscopes for armored vehicles, M1064 Mortar Carriers, aircraft parts, components and accessories, aircraft launching, landing and ground handling equipment, medical, dental, and veterinary equipment and supplies, M109A5 self-propelled howitzers, M270 Multiple Launch Rocket System launchers, ammunition of various calibers, rifles of various types, and Lantirn Targeting Pods.

7. Many of these systems transferred via FMS, DCS, and EDA rely on proprietary U.S. technologies, meaning they could not be sourced from any supplier other than a U.S. entity or via the U.S. government.

8. Under existing U.S. law, the United States may also make available to Israel, upon authorization of the Secretary of Defense, defense articles present in the War Reserve Stockpile for Allies-Israel (WRSA-I) (alternatively known as the War Reserve Stockpile Ammunition-Israel). Withdrawals of weapons, munitions, and equipment by Israel from WRSA-I do not go through the regular arms transfer approval process. Rather, upon approval of the Secretary of Defense, Israel may draw from the stockpile, and an accounting is performed later, which is

then typically built into a retroactive FMS case. This means that it has not been possible for the State Department to apply existing and applicable laws for transfers from WRSA-I, nor to conduct any review, as it would for FMS, DCS, or EDA transfers, as required by law. As such, not only does the Executive Branch not apply the Conventional Arms Transfer Policy on WRSA-I items being provided to Israel, but there is no formal means whatsoever for the Secretary of State to conduct the "continuous supervision…of economic assistance, military assistance, and military education and training programs, including but not limited to determining whether there shall be a military assistance (including civic action) or a military education and training program for a country and the value thereof, to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby," as required under the Foreign Assistance Act (22 U.S.C. § 2382). The United States has publicly acknowledged, including in Department of Defense press briefings on October 23 and November 21, 2023, that it has been providing defense articles from WRSA-I to Israel since after October 7, 2023.

9. I resigned from my position by October 20, 2023, because I believed that, in the wake of the October 7th attack by Hamas, the United States was authorizing transfers of arms to Israel of weapons that would be used to commit human rights abuses and lead to significant civilian casualties, and that the policies, laws, and processes in place to prevent the transfer of arms into such a circumstance were not being adequately followed in the authorization process.

10. Since October 7, the United States has provided extensive weapons, munitions, and equipment to Israel including, according to public reporting, over 57,000 artillery rounds and over 15,000 air-to-ground munitions of various types. It has also been widely reported that Israel is using U.S.-origin weapons in its current attacks in Gaza, including but not limited to fighter jets, attack helicopters, and various munitions including 155mm artillery shells, JDAMs, MK84

bombs, Hellfire missiles, and tank ammunition. Indeed, it would be impossible for Israel to have conducted the past two months of military operations as it has without utilizing a vast amount of U.S.-origin weaponry.

11. I believe it is clear that the U.S. government is failing not only to execute the due diligence required under existing U.S. laws, but is actively creating and utilizing processes that help insulate Israel from accountability or sanctions in accordance with existing U.S. laws and policies. In my experience, the U.S. government is aware that U.S.-origin weapons, munitions, and equipment will be used by Israel in ways that are contrary to U.S. law, including applicable provisions of the Foreign Assistance Act, Arms Export Control Act, Leahy Laws, the Conventional Arms Transfer Policy (NSM-18) of February 2023, among others, and Israel's own commitments to the United States under applicable processes and agreements, and other requirements that their end use of U.S.-origin weapons, munitions, and equipment be used in accordance with international law. The failure to execute meaningful due diligence or adequately apply existing U.S. laws permits the unfettered flow of military assistance to Israel forces with minimal oversight that leads to unnecessary civilian harm, gross violations of human rights, and impunity for violations of international law.

12. For instance, the Leahy Laws prohibit the provision of military assistance to any unit if the Secretary of State has credible information that such unit has committed a gross violation of human rights. For almost every country in the world, this means that all potential recipients of U.S. military grant assistance, including training, are vetted prior to receiving U.S. weapons, equipment, or training, down to the unit level, or in some cases, the individual level. For Israel, however, the United States provides military assistance, and then gathers reports of potential gross violations of human rights through the Israel Leahy Vetting Forum (ILVF). The Department of State has received and reviewed multiple reports of potential gross violations

of human rights (GVHRs) in this forum that human rights experts in the Department of State find credible. For the vast majority of countries that receive U.S. military assistance, a single stakeholder can raise concern on a specific unit and prevent assistance to that unit, however, the ILVF first requires consensus from multiple stakeholders, including the Bureau of Near East Affairs (NEA) and the U.S. Embassy in Jerusalem and then, unlike the regular Leahy process, approval at the Deputy Secretary of State level. Importantly, the ILVF has never come to consensus that an Israeli unit should be sanctioned under the Leahy Laws due to a gross violation of human rights. For Egypt and Ukraine, the two partners where a similar process exists, there have been no such obstacles to making determinations concerning GVHRs in the Leahy Vetting Forum process, in some cases with even less compelling evidence than in the case of Israel. In one case under active consideration by the Department of State during my period of involvement in the ILVF, involving reporting of the sexual assault of a 15-year-old Palestinian child in Israeli custody by their interrogators, the Department of State requested information from the Government of Israel via email on July 28, 2021 – a clear indicator that the Department considered this allegation to be likely credible. On July 29, 2021, the Government of Israel raided the offices of the charity that had first reported these allegations, and confiscated their computers. No sanction has been applied under Leahy vetting or any other policy or law to the unit involved. Based on my experience, I agree with the assessment of Tim Rieser, a longtime senior adviser to former Sen. Patrick Leahy and a key architect and drafter of the Leahy Laws, who recently stated, "The Israelis too often seem to act as though international law does not apply to them. And our government has acted as though the Leahy Law doesn't apply to [the Israelis]."

13. Similarly, in the Fiscal Year 2014 and 2015 State and Foreign Operations Appropriations Bills, Congress included, via the Senate Report, reporting requirements on crowd control items

provided to foreign security forces. The same bills contained a requirement in Section 7010 that "[f]unds appropriated by this Act should not be used for tear gas, small arms, light weapons, ammunition, or other items for crowd control purposes for foreign security forces that use excessive force to repress peaceful expression, association, or assembly in countries undergoing democratic transition." The Department of State never complied with that congressional reporting directive because the report would have drawn attention to the significant amount of such materiel that the United States was providing to Israel, and may have prevented the further provision of such materiel under Section 7010 given that it was being used, in part, to repress protests calling for equality for Palestinian citizens of Israel and Palestinians under Israeli rule. After I informed the Senate Appropriations Committee of this reason for the report not being submitted, the requirement was dropped from future Appropriations language passed by Congress from Fiscal Year 2016 onwards.

14. More broadly, the United States does not simply provide weapons to independent actors with no further consequences or concern for their use, but takes into account, and organizes itself to address, U.S. intent as to how those weapons are expected to be used—and can and does step in even after transfers have occurred, to address the ways in which other partners are using U.S.-origin weapons. For example, the United States takes a Total Package Approach (TPA) to FMS. As the Department of Defense explains, a "TPA ensures that FMS purchasers can obtain support articles and services, to include construction of necessary support facilities, required to introduce and sustain equipment and to operate in a responsible and effective manner *consistent with U.S. intent* in approving the transfer" (italics added).[2]

15. In conclusion, and based on my over 11 years of working within the United States Government

---

[2] Defense Security Cooperation Agency, *Targeting Infrastructure Policy, DSCA Policy 19-58 [SAMM E-Change 461]*, Nov. 27, 2019, https://samm.dsca.mil/sites/default/files/DSCA%2019-58.pdf.

on arms transfers and security assistance, it is my testimony that the United States provides and transfers to Israel a vast amount of military critical technologies and capabilities; that the United States is aware that these military critical technologies and capabilities will be used in ways that are contrary to U.S. law and Israel's own commitments to the U.S. under applicable processes and agreements, and other requirements including international law; that the U.S. is willing and able to address such violations when they arise, or could arise, with other partners; and, that should the court direct the suspension of such military transfers and assistance to Israel, it would—"more likely than not," to borrow a phrase from the Biden Administration's own Conventional Arms Transfer Policy—have an impact on the Israeli military operations of concern to the Plaintiffs in this case.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 22, 2023, in Chevy Chase, Maryland.

JOSH PAUL