DAN SIEGEL, SBN 56400
SARA BELADI, SBN 348987
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com

Attorney(s) for Amici
INTERNATIONAL HUMAN RIGHTS
ORGANIZATIONS

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEFENSE FOR CHILDREN
INTERNATIONAL – PALESTINE; AL-
HAQ; AHMED ABU ARTEMA;
MOHAMMED AHMED ABU ROKBEH;
MOHAMMAD HERZALLAH; A.N.;
LAILA ELHADDAD; WAEIL ELBHASSI;
BASIM ELKARRA; and DR. OMAR EL-
NAJJAR,

                    Plaintiffs,

        v.

JOSEPH R. BIDEN, JR., *President of the
United States,* ANTONY J. BLINKEN,
*Secretary of State,* LLOYD JAMES
AUSTIN III, *Secretary of Defense,* in their
official capacities,

                    Defendants.

Case No.: 23-cv-05829

**[PROPOSED] BRIEF OF AMICI
CURIAE INTERNATIONAL HUMAN
RIGHTS ORGANIZATIONS IN
SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION
AND OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Hearing: January 26, 2024 at 9:00 a.m.

1

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF *AMICI CURIAE* ........................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 1

ARGUMENT .............................................................................................................. 3

   I.   The Plaintiffs' Allegations Establish a Genocide or Serious Risk of Genocide of
   Palestinians in Gaza. ........................................................................................... 3

   II.   The Plaintiffs' Allegations Establish Violations of the United States' Duties to Prevent
   and Not be Complicit in Genocide. ...................................................................... 7

     A.   Violation of Duty to Prevent Genocide .................................................... 7

     B.   Complicity in Genocide ............................................................................ 9

   III.  As a Global Leader, the United States' Failure to Uphold the Norm Prohibiting
   Genocide Contributes to the Erosion of Long- and Widely-Held Norms of
   International Law ................................................................................................. 11

     A.   Erosion of Peremptory Norms Governing States' Use of Force .............. 12

     B.   Erosion of Peremptory Norms Governing Conduct in Armed Conflicts ............. 13

CONCLUSION ......................................................................................................... 15

APPENDIX ............................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Cases**

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)……………………………………………………….13

*In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160 (N.D. Cal. 2001)..3

**Executive Materials**

President George W. Bush, The National Security Strategy of the United States of America (Sept. 2002)……………………………………………………………………………………………12

**International Materials**

*Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro)*, Judgment, 2007 I.C.J. 43, ¶ 161 (Feb. 26)……………………………..*passim*

*Application of Convention on Prevention and Punishment of Crime of Genocide* (*Croat. v. Serb.*), Judgment, 2015 I.C.J. 3 (Feb. 3)………………………………………………………………….6

*Application of Convention on Prevention and Punishment of Crime of Genocide (Gam. v. Myan.)*, Order on Request for Indication of Provisional Measures, 2020 I.C.J. 3 (Jan. 23)……………...4, 5

Balakrishnan Rajagopal, *Rep. of the Special Rapporteur on adequate housing as a component to the right to an adequate standard of living and on the right to non-discrimination in this context*, U.N. Doc. A/77/190 (July 19, 2022)…………………………………………………………………..6

Comm'n on Human Rights, *Report of the Special Rapporteur on the Independence of Judges and Lawyers*, UN Doc. E/CN.4/2005/60 (Jan. 20, 2005)…………………………...............................14

Convention on Prevention and Punishment of Crime of Genocide, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277…………………………………………………...........................1, 2, 4, 7

Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Allegations of Genocide under Convention on Prevention and Punishment of Crimes of Genocide (Ukr. v. Russ.)*, I.C.J. (Sept. 7, 2022)……………………………………………………………7, 8

Fionnuala Ní Aoláin, *Rep. of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism,* U.N. Doc. A/78/520 (Oct. 10, 2023)…………………………………………………………...........................................14

International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts with Commentaries*, U.N. Doc. A/56/10, Supp. No. 10, (Nov. 2001)…………..*passim*

Permanent Rep. of Russ. to the U.N., *Letter dated 24 February 2022 from the Permanent Representative of the Russian Federation to the United Nations addressed to the Secretary-General*, U.N. Doc. S/2022/154 (Feb. 24, 2022)……………………………………………………………13

Permanent Rep. of the U.S. to the U.N., *Letter dated 20 March 2003 from Permanent Representative of the United States of America to the UN addressed to President of the Security Council*, U.N. Doc. S/2003/351 (Mar. 21, 2003)...............................................................................................12

*Prosecutor v. Al Bashir*, Case No. ICC-02/05-01/09, Second Decision of the Prosecution's Application for a Warrant of Arrest (Int'l Crim. Court July 12, 2010)...............................6

*Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Trial Judgement (Int'l Crim. Trib. for Rwanda Sept. 2, 1998)............................................................................................................9

*Prosecutor v. Bagilishema*, ICTR-95-1A-T, Trial Judgment (Int'l Crim. Trib. for Rwanda June 7, 2001)..........................................................................................................................4

*Prosecutor v. Blagojević & Jokić*, Case No. IT-02-60-T, Trial Judgement (Int'l Crim. Trib. for the former Yugoslavia Jan. 17, 2005)..........................................................................4, 5

*Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgement (Int'l Crim. Trib. for Rwanda Dec. 13, 2004)....................................10

*Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Trial Judgment (Int'l Crim. Trib. for the Former Yugoslavia Dec. 10, 1998)..............................................................................................10

*Prosecutor v. Jelisić*, Case No. IT-95-10-T, Trial Judgment (Int'l Crim. Trib. for the former Yugoslavia Dec. 14, 1999)...............................................................................................4

*Prosecutor v. Jelisić*, Case No. IT-95-10-A, Appeal Judgement (Int'l Crim. Trib. for the former Yugoslavia July 5, 2001)................................................................................................5

*Prosecutor v. Karadžić*, Case No. IT-95-5/18-T, Trial Judgement Vol. I, (Int'l Crim. Trib. for the former Yugoslavia Mar. 24, 2016).................................................................................2, 10

*Prosecutor v. Krstić*, Case No. IT-98-33-A, Appeal Judgement (Int'l Crim. Trib. for the former Yugoslavia Apr. 19, 2004)................................................................................................5

*Prosecutor v. Musema*, Case No. ICTR-96-13-T, Trial Judgement and Sentence, (Int'l Crim. Trib. for Rwanda Jan. 27, 2000)..............................................................................................10

*Prosecutor v. Nahimana et al.*, Case No. ICTR-99-52-A, Appeal Judgement (Int'l Crim. Trib. for Rwanda Nov. 28, 2007)..................................................................................................5

*Prosecutor v. Popović et al.*, Case No. IT-05-88-T, Trial Judgement (Int'l Crim. Trib. for the former Yugoslavia June 10, 2010)............................................................................................5

*Prosecutor v. Thaçi et al.*, Case No. KSC-BC-2020-06/F01536, Decision on Defence Motion for Judicial Notice of Adjudicated Facts with Annex I (Kosovo Specialist Chambers May 18, 2023).....4

*Prosecutor v. Tolimir*, No. IT-05-88/2-T, Trial Judgement (Int'l Crim. Trib. for the former Yugoslavia Dec. 12, 2012).........................................................................................4, 5, 6

*Reservations to Convention on Prevention and Punishment of Crime of Genocide*, Advisory Opinion, 1951 I.C.J. 15 (May 28)………………………………………………………………………..1

S.C. Res. 687 (1991)………………………………………………………………………………12

S.C. Res. 1441 (Nov. 8, 2002)……………………………………………………………………12

U.N. Charter…………………………………………………………………………………………12

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331…………………………………………………………………………………………………..3

**Other Authorities**

*Brief for Respondents*, at 37-40, 48-49, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (No. 05-184)…13

Ellen Nakashima et al., *U.S. prosecutors allege assassination plot of Sikh separatist directed by Indian government employee*, Wash. Post (Nov. 29, 2023)………………………………………15

Ewen MacAskill & Julian Borger, *Iraq War was Illegal and Breached UN charter, Says Annan*, The Guardian (Sept. 15, 2004)………………………………………………………………………12

Murtaza Hussain, *Indian Nationalists Cite Inspiration for Foreign Assassinations: U.S. "Targeted Killing" Spree*, The Intercept (Oct. 5, 2023)…………………………………………………...15

Phelim Kine, *How China hijacked the war on terror,* Politico (Sept. 9, 2021)…………...............14

Philip Alston, *The CIA and Targeted Killings Beyond Borders*, 2 Harv. Nat'l Sec. J. 283, 284 (2011)………………………………………………………………………………………...15

Press Release, *Civilian Deaths In Ukraine War Top 10,000, UN Says*, U.N. Ukraine Press Release (Nov. 21, 2023)..................................................................................................................13

Press Release, *Guantanamo Bay: "Ugly chapter of unrelenting human rights violations" – UN experts*, U.N. Human Rights Office of the High Comm'r Press Release (Jan. 10, 2022)…………...13

Press Release, *Myanmar: UN Fact-Finding Mission releases its full account of massive violations by military in Rakhine, Kachin and Shan States*, U.N. Human Rights Office of the High Comm'r Press Release (Sept. 18, 2018)………………………………………………………………………..15

Sean D. Murphy, *Assessing the Legality of Invading Iraq*, 92 Geo. L.J. 173 (2004)………………..12

William Schabas, *Genocide in International Law: The Crime of Crimes* (2009)……………………1

1

**INTEREST OF *AMICI CURIAE***

2

3       *Amici curiae*, listed in the Appendix, are national and international human rights

4   organizations, bar associations, and social justice movement lawyers from around the world with an

5   interest in upholding fundamental international legal norms. *Amici* represent groups committed to

6   upholding principles of equality, justice, and dignity, including impacted communities and

7   marginalized groups all over the world, many of whom are at risk of genocide. *Amici* are deeply

8   concerned that norms around the most heinous of crimes — genocide — are presently imperiled in

9   light of the massive, ongoing Israeli military attacks and humanitarian deprivations targeting

10  Palestinians in Gaza, with the full military and diplomatic support of the United States government.

11  They submit this brief to share their considerable collective expertise on the customary international

12  law norms regarding genocide, including the duties at stake in this case to prevent, and not aid and

13  abet, the continued destruction of the Palestinian people in Gaza. Observance of these fundamental

14  norms is essential to stave off further atrocities and avert the risks to international peace and security

15  that will continue to escalate if the United States fails to adhere to its fundamental obligations under

16  international law.  The stakes for the rule of law are exceedingly high.

17

**SUMMARY OF ARGUMENT**

18

19      Characterized as the "crime of crimes,"[1] genocide is the "denial of the right of existence of

20  entire human groups, a denial which shocks the conscience of mankind and results in great losses to

21  humanity." *Reservations to Convention on Prevention and Punishment of Crime of Genocide*,

22  Advisory Opinion, 1951 I.C.J. 15, at 23 (May 28) [hereinafter *Genocide Convention Advisory*

23  *Opinion*]. Genocide is seeking to "destroy, in whole or in part, a national, ethnical, racial or religious

24  group, as such." *See* Convention on the Prevention and Punishment of the Crime of Genocide, art. II,

25  Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 [hereinafter Genocide Convention]. It

26

27

28  ───────────────

[1] *See*, *e.g*., William Schabas, *Genocide in International Law: The Crime of Crimes* (2009).

is the "as such" element that "makes genocide an exceptionally grave crime." *Prosecutor v. Karadžić*, Case No. IT-95-5/18-T, Trial Judgement Vol. I, ¶ 551 (Int'l Crim. Trib. for the former Yugoslavia Mar. 24, 2016).

The customary international law norm prohibiting genocide is reflected in the Genocide Convention, the first human rights treaty adopted by the General Assembly of the United Nations ("U.N.") on December 9, 1948. The Genocide Convention represents the international community's commitment to "never again" after the atrocities committed by the Nazi regime against millions of Jewish, Roma and other minority peoples. Given the historic context from which the Genocide Convention emerged, coupled with the exceptional gravity of the crime, the peremptory legal norm (from which no State may derogate or suspend compliance) prohibiting genocide imposes obligations on *all* States to ensure "the co-operation required 'in order to liberate mankind from such an odious scourge.'" *Genocide Convention Advisory Opinion* at 23. These obligations include the specific duties to prevent genocide and avoid complicity in its commission. Genocide Convention, arts. I, III(e). The international community set bright-line standards for these obligations to ensure that allegations of genocide elicit a response that eliminates any possibility of genocide or even a serious risk of genocide. Accordingly, it is vital for all judicial institutions to ensure accountability and redress for such violations by actors subject to their jurisdiction.

Each obligation is clearly justiciable; international courts and tribunals have routinely applied well-defined and judicially manageable standards to address whether particular conduct runs afoul of these obligations. Moreover, in the present proceedings, federal courts in the United States offer the only meaningful forum available to the Plaintiffs to seek enforceable redress for the alleged violations. The Plaintiffs' Complaint provides the Court with allegations sufficient to demonstrate that a genocide, or, at the very least, a serious risk of genocide, of Palestinians in Gaza is unfolding, and the United States' failure in its duty to prevent genocide as well as its complicity.

Critically, world leaders are closely watching the United States' conduct. History teaches that impunity for grave violations, particularly by a central actor in the international community like the United States, results in and facilitates their duplication elsewhere. This was most acutely seen in the consequences of the United States' contribution to the erosions of peremptory norms of international law in its 2003 invasion of Iraq and conduct in its "War on Terror." The failure to hold the executive branch accountable to the law would embolden other world leaders to seize on the United States' substantial breach of international law in its unconditional support for the Israeli attacks on Palestinians in Gaza, and use this breach as a license to violate other fundamental customary international law norms in a manner that threatens vulnerable communities across the globe and that can harm U.S. moral and strategic interests.

## ARGUMENT

### I.    The Plaintiffs' Allegations Establish a Genocide or Serious Risk of Genocide of Palestinians in Gaza.

The Genocide Convention codifies the peremptory norm prohibiting genocide. *See, e.g.*, *Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro)*, Judgment, 2007 I.C.J. 43, 111, ¶ 161 (Feb. 26). Binding on all States, peremptory norms, such as those prohibiting genocide, torture, slavery, and wars of aggression, are "accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted." Vienna Convention on the Law of Treaties, art. 53, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331. They may not be modified by domestic law or treaties. *See, e.g.*, *In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001). Indeed, no circumstances — not even the existence of an armed conflict nor the exercise of the right of self-defense under the laws governing States' use of force — can preclude the wrongfulness of violating peremptory norms. *See* International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts with Commentaries*, 84-85, U.N. Doc.

A/56/10, Supp. No. 10, (Nov. 2001) [hereinafter ILC Articles on State Responsibility] (Article 26);

*Application of Convention on Prevention and Punishment of Crime of Genocide (Gam. v. Myan.)*,

Order on Request for Indication of Provisional Measures, 2020 I.C.J. 3, 27, ¶ 74 (Jan. 23);

*Prosecutor v. Thaçi et al.*, Case No. KSC-BC-2020-06/F01536, Decision on Defence Motion for

Judicial Notice of Adjudicated Facts with Annex I, ¶ 24 n. 52 (Kosovo Specialist Chambers May 18,

2023).

      The Genocide Convention prohibits certain enumerated acts that are "committed with intent

to destroy, in whole or in part, a national, ethnical, racial or religious group, as such." Genocide

Convention, art. II. The determination of whether a "national, ethnical, racial, or religious" group

was targeted takes into account (1) objectively, the "particular political, social, historical, and

cultural context" giving shape to the group's identity, *Prosecutor v. Bagilishema*, ICTR-95-1A-T,

Trial Judgment, ¶ 65 (Int'l Crim. Trib. for Rwanda June 7, 2001), and (2) subjectively, "the

stigmatisation of a group as a distinct national, ethnical or racial unit by the community." *Prosecutor

v. Jelisić*, Case No. IT-95-10-T, Trial Judgment, ¶ 70 (Int'l Crim. Trib. for the former Yugoslavia

Dec. 14, 1999). Because a group is comprised not only "of its individuals, but also of its history,

traditions, the relationship between its members, the relationship with other groups, the relationship

with the land," the physical or biological destruction of a group may, in addition to killings, also

include acts such as forcible transfer "conducted in such a way that the group can no longer

reconstitute itself." *Prosecutor v. Blagojević & Jokić*, Case No. IT-02-60-T, Trial Judgement, ¶ 666

(Int'l Crim. Trib. for the former Yugoslavia Jan. 17, 2005). The reference to "in whole or in part"

makes clear that genocide may be committed against only a "significant enough [portion] to have an

impact on the group as a whole," *Prosecutor v. Tolimir*, No. IT-05-88/2-T, Trial Judgement, ¶ 749

(Int'l Crim. Trib. for the former Yugoslavia Dec. 12, 2012) (internal quotations omitted), such as

when the population targeted is "emblematic of the overall group, or is essential to its survival."

*Prosecutor v. Krstić*, Case No. IT-98-33-A, Appeal Judgement, ¶ 12 (Int'l Crim. Trib. for the former Yugoslavia Apr. 19, 2004). As such, the group targeted may be limited to a certain geographic area, *see Bosn. & Herz.*, 2007 I.C.J. at 126, ¶ 199, and, in times of armed conflict may also include military personnel "belonging to a protected group because of their membership in that group." *Prosecutor v. Popović et al.*, Case No. IT-05-88-T, Trial Judgement, ¶ 833 (Int'l Crim. Trib. for the former Yugoslavia June 10, 2010).

The requisite intent for genocide may be inferred from a totality of circumstances, including the overall context and systematic nature, scale, or repetition of attacks directed against the same group, *Prosecutor v. Jelisić*, Case No. IT-95-10-A, Appeal Judgement, ¶ 47 (Int'l Crim. Trib. for the former Yugoslavia July 5, 2001); the use of "dehumanizing narratives and rhetoric" in officials' public statements, *Gam. v. Myan.*, 2020 I.C.J. at 22-23, ¶¶ 55-56 (internal quotations omitted); *Prosecutor v. Nahimana et al.*, Case No. ICTR-99-52-A, Appeal Judgement, ¶ 539 (Int'l Crim. Trib. for Rwanda Nov. 28, 2007); and "the existence of a plan or policy." *Jelisić* Appeal Judgment, ¶ 48. While genocide requires the physical or biological destruction of a group, facts demonstrating the requisite intent to destroy a group may also focus on the "intangible" characteristics that cohere a group, *Blagojević & Jokić*, ¶ 659, such as deliberate destruction of "cultural and religious property and symbols of the targeted group." *Bosn. & Herz.*, 2007 I.C.J. at 186, ¶ 344.

In addition to acts of violence such as killings, torture, and other assaults, *see*, *e.g.*, *Tolimir*, ¶ 737, genocide may be carried out through other acts "causing serious bodily or mental harm," such as forcible transfer of persons not merely as "a temporary displacement for their immediate safety," but rather as "a critical step in achieving the ultimate objective of the attack…to eliminate" them as a group, *Blagojević & Jokić*, ¶ 650, and actions that leave survivors unaware of the whereabouts of their loved ones or the circumstances of their death. *Id*. at ¶ 653.

1    Acts of genocide also include those that "deliberately inflict[ ] on the group conditions of life

2  calculated to bring about its physical destruction in whole or in part," such as "deprivation of food,

3  medical care, shelter or clothing," *Application of Convention on Prevention and Punishment of*

4  *Crime of Genocide* (*Croat. v. Serb.*), Judgment, 2015 I.C.J. 3, 70, ¶ 161 (Feb. 3); "systematic

5  expulsion from homes," *id.*; contamination of water, *Prosecutor v. Al Bashir*, Case No. ICC-02/05-

6  01/09, Second Decision of the Prosecution's Application for a Warrant of Arrest, ¶ 38 (Int'l Crim.

7  Court July 12, 2010); and "domicide," defined as "the massive and deliberate destruction of homes

8  in order to cause human suffering" and that undermines the right to return home. Balakrishnan

9  Rajagopal, *Rep. of the Special Rapporteur on adequate housing as a component to the right to an*

10 *adequate standard of living and on the right to non-discrimination in this context*, ¶¶ 5, 8, 41, U.N.

11 Doc. A/77/190 (July 19, 2022). Moreover, when forcible transfers are used as a "means by which to

12 ensure the physical destruction of a group," *Tolimir*, ¶ 741, even "deportations or expulsions [that]

13 may be justified under the Geneva Conventions" during an armed conflict are prohibited acts of

14 genocide. *Bosn. & Herz.*, 2007 I.C.J. at 181-82, ¶ 334. Absent direct evidence of whether

15 "conditions of life" were calculated to bring about a group's physical destruction, international

16 tribunals have relied on "the *objective probability* of" such destruction. *Popović*, ¶ 816 (emphasis

17 added).

18    The Complaint sets forth allegations that establish an ongoing genocide, or at least, the

19 serious risk of genocide, under these well-establish standards. Allegations describing the targeted

20 group as Palestinians in Gaza, two-thirds of whom are refugees from prior forcible displacements

21 carried out by Israel, establish a targeted national, ethnical, or racial group. *See* Compl., dkt. 1, at

22 ¶¶ 38, 251. *Compare Popović*, ¶ 865 (finding, in the context of the Bosnian genocide, that the

23 targeting of "Muslims of Eastern Bosnia" was sufficient even though they constituted only a "small

24 percentage" of the overall population of Bosnian Muslims since Muslims had "sought refuge in the

---

Srebrenica enclave," and thus, the elimination of the enclave would eliminate "the Muslim presence

in the entire region" and "demonstrate…the fate of all Bosnian Muslims"). The Complaint further

sets forth numerous allegations that demonstrate intent on the part of Israel's public officials to

destroy this group "as such." *See* Compl., dkt. 1, at ¶¶ 66-248. Finally, the Complaint's allegations

describe how Israel's actions since October 7, 2023 — including its current siege and extensive

military assault of Gaza occurring in the context of a more than decade-long "land, sea, and air

closure" and "repeated military assaults" *see id*. at ¶¶ 47-55 — resulted, in a matter of weeks, in

deaths of more than 10,000 Palestinians (a figure which, as of this filing has at least doubled, *see* dkt.

44 at 2), destruction of a significant portion of critical civilian infrastructure, and displacement of 1.6

million (now nearly two million, approximating 85 percent of the population, *see id*. at 3). *See*

Compl., dkt. 1, at ¶¶ 3, 70-165.

## II. The Plaintiffs' Allegations Establish Violations of the United States' Duties to Prevent and Not be Complicit in Genocide.

As a peremptory norm, the norm prohibiting genocide imposes binding obligations not only

on the State perpetrating the genocide, but also on all States in the international community — to

prevent genocide and avoid complicity in its commission. *See* Genocide Convention, art. IX; *Bosn.*

*& Herz.*, 2007 I.C.J. at 111, ¶ 162; *id*. at 114 ¶ 167.

### A. Violation of Duty to Prevent Genocide

States' duty to prevent genocide, a standalone obligation, is an "overriding legal imperative."

*Bosn. & Herz.*, 2007 I.C.J. at 111-13, ¶¶ 162-65; *id*. at 220, ¶ 427; *id*. (Joint Declaration of Judges

Shi and Koroma) at 282, ¶ 5. This duty arises not only after the genocide "begins," but also — "since

the whole point of the obligation is to prevent, or attempt to prevent, the occurrence of the act" —

"at the instant that the State learns of, *or should normally have learned of*, the existence of *a serious*

*risk* that genocide will be committed." *Id*. at 221-22, ¶ 431 (emphasis added). *See also* Declaration of

Intervention Under Article 63 of Statute Submitted by the United States of America, *Allegations of*

*Genocide under Convention on Prevention and Punishment of Crimes of Genocide (Ukr. v. Russ.)*, I.C.J., at ¶ 22 (Sept. 7, 2022). "From that moment onwards," where the State "has available to it means likely to have a deterrent effect on those suspected of preparing genocide, or reasonably suspected of harbouring specific intent [ ], it is under a duty to make such use of these means as the circumstances permit." *Bosn. & Herz.*, 2007 I.C.J. at 222 ¶ 431. Thus, "a State may be found to have violated its obligation to prevent even though it had no certainty, at the time when it should have acted, but failed to do so, that genocide was about to be committed or was under way." *Id.* at 223, ¶ 432.

This duty to prevent is "one of conduct and not one of result," or in other words, a duty of due diligence, in that "the obligation of States parties is [ ] to employ all means reasonably available to them, so as to prevent genocide so far as possible." *Id*. at 221, ¶ 430. While a State "does not incur responsibility simply because the desired result is not achieved," responsibility is "incurred if the State manifestly failed to take all measures to prevent genocide which were within its power, and which might have contributed to preventing the genocide." *Id*. at 221, ¶ 430. Determining the level of a State's responsibility to prevent genocide depends on its "capacity to influence effectively the action of persons likely to commit, or already committing, genocide," which in turn depends on, for example, "the strength of the political links, as well as links of all other kinds, between the authorities of that State and the main actors in the events." *Id*. at 221, ¶ 430. Thus, unlike many other international law norms, the obligation of each State to prevent genocide is not territorially bound, but instead delimited by each State's "capacity to influence" the relevant actors. *See id*. at 120, ¶ 183; *See also* Declaration of Intervention Under Article 63 of Statute Submitted by the United States of America, *Ukr. v. Russ.*, ¶ 10.

Finally, assertions that even if a State carrying this duty to prevent "had employed all means reasonably at its disposal, they would not have sufficed to prevent the commission of genocide" are

irrelevant "since the possibility remains that the combined efforts of several States, each complying

with its obligation to prevent, might have achieved the result — averting the commission of

genocide — which the efforts of only one State were insufficient to produce." *Bosn. & Herz.*, 2007

I.C.J. at 221, ¶ 430.

The Complaint provides detailed allegations of the United States' violations of these

judicially-manageable standards. Such allegations include the United States' "significant influence

over Israel," in particular through its "unparalleled [ ] support for Israel's military" and "political and

diplomatic cover to Israel" generally, Compl., dkt. 1, at ¶¶ 167-171, and specifically, since October

7, 2023, "meeting regularly and coordinating with Israeli officials and expressing their unrestrained

support" and "unconditional military financial assistance, equipment, and personnel to support and

further its assault on Gaza." *Id*. at ¶¶ 172-195. These allegations establish a uniquely strong

"capacity to influence effectively the action of persons likely to commit, or already committing,

genocide," entailing a heightened level of responsibility to prevent genocide in this case. Moreover,

as violations of the duty to prevent result from omission, the Complaint further details the United

States' refusal to "call for a ceasefire" and successful efforts to prevent other States from carrying

out their duty to prevent genocide through the U.N. despite knowledge of, at the very least, a "grave

risk of genocide" and facts on the ground establishing an unfolding genocide. *Id*. at ¶¶ 203-248.

## B.     Complicity in Genocide

"[P]articipation by complicity in the most serious violations of international humanitarian

law was considered a crime as early as Nuremberg." *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T,

Trial Judgement, ¶ 526 (Int'l Crim. Trib. for Rwanda Sept. 2, 1998). Under customary international

law governing both State Responsibility and individual criminal liability, the requisite *mens rea* for

complicity via aiding and abetting is knowledge of the perpetrator's genocidal intent, rather than

shared genocidal intent. *See* ILC Articles on State Responsibility, at 65 (Article 16) (State

Responsibility); *Prosecutor v. E. Ntakirutimana & G. Ntakirutimana*, Cases Nos. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgement, ¶¶ 500-501 (Int'l Crim. Trib. for Rwanda Dec. 13, 2004) (individual criminal liability). Awareness that crimes of genocide "would probably be committed, and one of these crimes is in fact committed" is sufficient to establish an individual's "knowledge." *Karadžić*, ¶ 577. A State's liability for complicity requires that "the relevant State organ or agency providing aid or assistance [ ] be aware of the circumstances making the conduct of the assisted State internationally wrongful" and "intended, by the aid or assistance given, to facilitate the occurrence of the wrongful conduct." ILC Articles on State Responsibility, at 66, ¶¶ 3, 5.

The *actus reus* for complicity by aiding and abetting requires "acts or omissions specifically directed to assist, encourage or lend moral support to the perpetration of a certain specific crime," which "have a substantial effect upon the perpetration of the crime," a "fact-based inquiry." *Karadžić*, ¶ 575-576 (internal quotations omitted). *Accord* ILC Articles on State Responsibility, at 66, ¶ 5. Such conduct may include "practical assistance, encouragement, or moral support," *Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Trial Judgment, ¶ 249 (Int'l Crim. Trib. for the former Yugoslavia Dec. 10, 1998), such as "providing an essential facility or financing the activity in question," ILC Articles of State Responsibility, at 66, ¶ 1, or procuring "weapons, instruments or any other means to be used in the commission of an offence." *Prosecutor v. Musema*, Case No. ICTR-96-13-T, Trial Judgement and Sentence, ¶ 178 (Int'l Crim. Trib. for Rwanda Jan. 27, 2000). Whether such conduct has a "substantial effect" on the perpetration of a crime does not require geographic proximity, nor must it be established that "the crime would not have been committed without the contribution of the aider and abettor." *Karadžić*, ¶ 576. *Accord* ILC Articles on State Responsibility, at 66, ¶ 5; *Bosn. & Herz.*, 2007 I.C.J. at 120, ¶ 183.

The Complaint alleges sufficient conduct by the United States to establish each clearly defined legal element of complicity in genocide. The allegations present actions taken by the United

States that would "have a substantial effect upon the perpetration" of genocide, including allegations that enumerate the United States' meetings and statements reflecting moral encouragement through "their unrestrained support" of Israel in its assault on Gaza and describe in detail the United States' "unconditional military financial assistance, equipment, and personnel to support and further its assault on Gaza." Compl., dkt. 1, at ¶¶ 172-248. Such allegations are accompanied by descriptions of numerous instances when the United States would have become aware of an unfolding genocide. *Id.*

### III. As a Global Leader, the United States' Failure to Uphold the Norm Prohibiting Genocide Contributes to the Erosion of Long- and Widely-Held Norms of International Law.

Seventy-five years ago, the United States acted as a drafter of both the Genocide Convention and the Universal Declaration of Human Rights and assumed a key role on the U.N. Security Council to ensure that a rule of law would protect humanity from the worst atrocities committed prior to and during World War II, including genocide. The United States' singularly impactful role in shaping and enforcing international law — in part due to its veto power in the U.N. Security Council — gives it an outsized influence on how legal standards are applied. Accordingly, the United States' breaches of its duties to prevent and not be complicit in genocide, left unremedied, substantially increase the risk of degrading the rule of law and emboldening the commission of grave atrocities all around the world.

Examples demonstrating how the United States' actions can contribute to the erosion of peremptory norms include its use of force in its 2003 invasion of Iraq and conduct in its prosecution of the "War on Terror," which has led to a global proliferation of State misuse of the counter-terrorism framework for political ends. These examples show how failure to immediately redress breaches of fundamental human rights norms not only increases the danger to communities at risk of being targeted for human rights abuses in the short term, but may also result in unanticipated

consequences that undermine international peace and security, and the United States' own interests, in the long term.

### A.       Erosion of Peremptory Norms Governing States' Use of Force

Despite a clear legal framework prohibiting the use of force unless either expressly authorized by the U.N. Security Council or in accordance with the strict requirements of self-defense against imminent attack, *see* U.N. Charter, arts. 2(4), 42, 51, the United States bypassed the U.N. Security Council process for authorization of the use of force prior to its 2003 invasion of Iraq. Instead, the United States invoked past U.N. Security Council Resolutions 687 and 1441 that did not authorize the use of force for the stated purposes of disarming Iraq of its alleged weapons of mass destruction. *See* Permanent Rep. of the U.S. to the U.N., *Letter dated 20 March 2003 from Permanent Representative of the United States of America to the UN addressed to President of the Security Council*, U.N. Doc. S/2003/351 (Mar. 21, 2003); S.C. Res. 687 (1991); S.C. Res. 1441 (Nov. 8, 2002); Sean D. Murphy, *Assessing the Legality of Invading Iraq*, 92 Geo. L.J. 173, 179-229 (2004). It further advanced a novel notion of "preemptive self-defense" as justification for the invasion. *See* President George W. Bush, The National Security Strategy of the United States of America (Sept. 2002). Declaring the United States' military action "illegal," then-U.N. Secretary General Kofi Annan warned that the notion of "preemptive self-defense" could lead to a breakdown of the international order. *See* Ewen MacAskill & Julian Borger, *Iraq war was illegal and breached UN charter, says Annan*, The Guardian (Sept. 15, 2004).

Nearly twenty years later, Russia's invocation of the United States' justifications for its 2003 invasion of Iraq shows how the United States' conduct has in fact facilitated similar behavior by other States that threatens international peace and security. Namely, Russia expressly invoked the United States' justifications of its 2003 invasion of Iraq to claim that its 2022 invasion of Ukraine was an act of preemptive self-defense against the threat of NATO expansion — a claim that, like the

United States' justification for invading Iraq, did not meet the requirement that the use of force in self-defense only be deployed against attacks that are occurring or imminent. *See* Permanent Rep. of Russ. to the U.N., *Letter dated 24 February 2022 from the Permanent Representative of the Russian Federation to the United Nations addressed to the Secretary-General*, U.N. Doc. S/2022/154 (Feb. 24, 2022); *see also id.* at Annex, p. 3 (referring to the "lack of any legal basis" for the United States' 2003 invasion of Iraq). The result has been disastrous: Russia's 2022 invasion of Ukraine has resulted in the deaths of at least 10,000 civilians and presents an ongoing, grave threat to international peace and security. Press Release, *Civilian Deaths In Ukraine War Top 10,000, UN Says*, U.N. Ukraine Press Release (Nov. 21, 2023).

### B. Erosion of Peremptory Norms Governing Conduct in Armed Conflicts

In the aftermath of the September 11, 2001 attacks, the United States spearheaded a global "War on Terror" that utilized counter-terrorism tactics that undermined norms governing armed conflict, including peremptory norms, and catalyzed the establishment of a global counter-terrorism framework. As a result, the long-established legal norms — including the prohibitions against arbitrary detention, torture, and extrajudicial killings — have been materially degraded.

For example, the United States asserted that a *sui generis* legal regime must govern its conflict with Al Qaeda to justify its indefinite definition of detainees in the Guantánamo Bay detention camp. *See Brief for Respondents*, at 37-40, 48-49, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (No. 05-184). The Supreme Court squarely rejected this argument, holding that the minimum international legal protections afforded to those detained during an armed conflict must apply. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 629-31 (2006). Despite this ruling, however, U.N. experts have decried Guantánamo as "a site of unparalleled notoriety, defined by the systematic use of torture, and other cruel, inhuman or degrading treatment against hundreds of men brought to the site and deprived of their most fundamental rights." Press Release, *Guantanamo Bay: "Ugly chapter of*

*unrelenting human rights violations" – UN experts*, U.N. Human Rights Office of the High Comm'r Press Release (Jan. 10, 2022). Consequently, these experts have also expressed concern that "[w]hen a State fails to hold accountable those who have authorized and practised torture and other cruel inhuman or degrading treatment it sends a signal of complacency and acquiescence to the world." *Id.*

Successive U.N. human rights experts on counter-terrorism since the start of the United States-led "War on Terror" have also raised alarms about States' rampant misuse of counter-terrorism measures to target specific groups and silence human rights defenders around the world. One expert warned that "[b]ased on the doctrine of counter-terrorism and sometimes even taking inspiration from the status of 'enemy combatant', the governments of many States have adopted or strengthened legal instruments giving them powers of detention beyond all judicial control...." Comm'n on Human Rights, *Report of the Special Rapporteur on the Independence of Judges and Lawyers*, at ¶ 36, UN Doc. E/CN.4/2005/60. A global study on the impact of counter-terrorism measures on civil society and civic space revealed that "misuse is often discriminatory, directed against religious, ethnic and cultural minorities, women, girls and LGBT and gender-diverse persons, indigenous communities, and other historically discriminated against groups in society." *See* Fionnuala Ní Aoláin, *Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism,* at 2, U.N. Doc. A/78/520 (Oct. 10, 2023). The resulting "playbook of misuse" has included such serious human rights violations as judicial harassment, forced disappearances and arbitrary detentions, "misuse and misapplication" of "terrorist" designations and sanctions, and surveillance and targeting the financing of civil society groups, all under the guise of countering terrorism. *Id.* at 4.

Crackdowns on specific ethnic groups in the name of the "War on Terror," including mass detentions and other abuses of the Uyghurs in the Xinjiang province by China, *See* Phelim Kine, *How China hijacked the war on terror,* Politico (Sept. 9, 2021), and what are considered to have

been acts of genocide by the Myanmar military against Rohingya Muslims, *See* Press Release, *Myanmar: UN Fact-Finding Mission releases its full account of massive violations by military in Rakhine, Kachin and Shan States*, U.N. Human Rights Office of the High Commissioner (Sept. 18, 2018), demonstrate how specific groups are at heightened risk of human rights abuses when international norms erode. These are instructive antecedents for the present case.

Another example draws from the United States' covert program of extraterritorial targeted killings of its own citizens and foreign nationals. *See, e.g*., Philip Alston, *The CIA and Targeted Killings Beyond Borders*, 2 Harv. Nat'l Sec. J. 283, 284 (2011). These targeted killings have contravened both domestic law and the United States' international legal obligations. *Id*. The United States' violations have emboldened similar violations by other States. For example, the United States and Canada recently acknowledged that India's counter-terrorism tactics included ordering the extraterritorial targeted killing of a Canadian citizen in Canada and an American citizen in New York. *See, e.g.,* Ellen Nakashima et al., *U.S. prosecutors allege assassination plot of Sikh separatist directed by Indian government employee*, Wash. Post (Nov. 29, 2023). This tactic has been widely justified in India by invoking the United States' "War on Terror" targeted killings program. *See*, *e*.*g*., Murtaza Hussain, *Indian Nationalists Cite Inspiration for Foreign Assassinations: U.S. "Targeted Killing" Spree*, The Intercept (Oct. 5, 2023).

## CONCLUSION

This case is of exceptional importance, for the gravity of the harms involved, the compelling need to prevent and protect against genocide, and for what is at stake in terms of maintaining well-established norms of international law that serve as the foundation of our present world order. The allegations satisfy the legal elements of the genocide-related claims. The Court has a duty to adjudicate these claims so as to avoid, at all costs, the unfolding genocide against the Palestinian people in Gaza.

Dated: December 29, 2023                    Respectfully submitted,

                                            SIEGEL, YEE, BRUNNER & MEHTA
                                            MEENA JAGANNATH*
                                            JEENA SHAH*

                                            By: */s/ Dan Siegel*
                                                    Dan Siegel

                                            **Attorneys for Amici**
                                            **INTERNATIONAL HUMAN RIGHTS**
                                            **ORGANIZATIONS**

* Pro Hac Vice status pending

1
2
3
4
5
6
7
8

# APPENDIX OF SUPPORTING INTERNATIONAL

# HUMAN RIGHTS ORGANIZATIONS

1.  **Academics for Palestine** is organization based in Ireland and committed to equality, justice and freedom in Palestine and for Palestinians, particularly through supporting Palestinian scholars, students and institutions of higher education. A number of Academics for Palestine members, including several on its steering committee, are international legal academics and human rights scholars who have been actively engaged in legal research and analysis in recent months on issues and questions similar to those raised in this case and in supporting litigation and advocacy efforts in other forums.

2.  **African Bar Association** (AfBA) was established in 1971 as a professional body uniting individual lawyers and national legal associations in Africa. AFBA was designed to be a federation of national legal associations, corporate and unincorporated legal entities, and individual lawyers. The Association seeks amongst other objectives to foster the exchange of opinions and experiences among members, formulation of policies that would better reposition the continent's socio-economic and political development and advancement with the law as the bedrock for these developments, and lastly breaking new legal frontiers. The Association brings together the five African sub-regional Lawyers, their respective National Associations spread over the AFBA continent. Membership of AfBA is opened to lawyers

and legal practitioners from other parts of the world who adhere to, and share the objectives of AfBA and its universal goals.

The African Bar Association has signed cooperation agreements with several professional law associations among them, the National Conference of Black Lawyers of the United States of America,(NCBL). The International Association of Democratic Lawyers (IADL) and The International Criminal Court Bar Association (ICCBA). AfBA supports and provides expertise towards transitional justice in Africa mechanisms and is a leader in the fight for justice for victims of colonial crimes, victims of international human rights violations, victims of atrocity crimes and for the promotion of the universal rule of law and fundamental human values. AfBA supports the international multilateral treaty system for the resolution of world conflicts and the regulation of international relations.

3. **Alternative Information and Development Centre** is a human rights advocacy organization based in South Africa.

4. **Alternative ASEAN Network on Burma** (ALTSEAN-Burma) is a Southeast Asian based human rights organization working for the prevention of atrocity crimes and genocide. The presence of Palestinian refugees in its region, as well as evidence pointing to intent to commit genocide of Palestinians, are the basis of its interest.

5. The **American Association of Jurists** (AAJ) is an international, nongovernmental organization of lawyers and jurists, founded in Panama in 1975. Since 1989, AAJ has had consultative status with the Economic and Social Council of the United Nations. AAJ also

has permanent representatives at the United Nations headquarters in New York and Geneva.

AAJ has duly constituted national chapters and affiliates in Argentina, Brazil, Colombia,

Costa Rica, Cuba, Ecuador, El Salvador, Honduras, Puerto Rico, and Venezuela, as well as

individual associates or coordinating committees in Chile, Panama, Paraguay, and the United

States. AAJ is a regional affiliate of IADL. Since its founding, AAJ has organized many

activities in the American Continent and issued statements, on behalf of itself and its chapter

affiliates consistent with its objectives, among them, supporting the right to self-

determination; opposing imperialism, fascism, colonialism and neocolonialism, racism and

discrimination against women, indigenous peoples and national minorities; defending and

promoting human rights; and mobilizing jurists of the American Continent to develop

activities to contribute to the juridical sciences. Throughout its history, AAJ has issued

statements expressing support of the inalienable right to self-determination of the people of

Palestine and opposing the prolonged occupation and apartheid regime imposed to the

Palestinian people by Israel. In its most recent General Assembly in November 2023, AAJ

reaffirmed the right to self-determination of the Palestinian people; demanded an immediate

ceasefire and unconditional access of fuel and humanitarian aid, including water, food and

medical supplies to the Gaza Strip to alleviate the serious humanitarian crisis; expressed its

solidarity and support to put an the end of the occupation and the apartheid regime, the

dismantling of settlements; demanded the right of return of Palestinians, and the freedom of

all political prisoners. To prevent the crime of genocide, war crimes, and crimes against

humanity, AAJ has demanded that the United States, a country that has considerable

influence over Israel, end all financial and military aid to Israel. The American Association of

Jurists is concerned with the prevention and punishment of genocide. AAJ's interest to

intervene through amicus curiae in the present proceedings, is for the defendants to take all

measures to prevent and deter Israel from committing genocide, by enforcing the Convention on the Prevention and Punishment of the Crime of Genocide of 1948, and customary international law, as part of federal common law.

6. **Arab Lawyers Union** (ALU) is an non-governmental, pan-Arab confederation of bar associations and law societies based in Cairo. ALU is in consultative status with ECOSOC, an observer at UNESCO national, regional and international Organizations (such as; UIA, IADL, ILAC) and a member in several UN committees. ALU was engaged in founding the Arab Institute for Human Rights (AIHR) at Tunis. The ALU is constituted of bar associations, organizations and law societies in Arab countries and individual Arab practice lawyers. ALU currently has a membership of bar associations in 15 countries and 34 affiliated organizations, with a membership of more than 200,000. The 15 countries are: Algeria, Bahrain, Egypt, Iraq, Jordan, Kuwait, Lebanon, Libyan Arab Jamahiriya, Mauritania, Morocco, Palestine, Sudan, Syrian Arab Republic, Tunisia, and Yemen. Its mission is to develop the profession of lawyer in the Arabic countries to make it a true auxiliary of justice; work for the independence of the judiciary power; contribute to the development of the law and to the unification of laws and legal nomenclature in Arab countries; promote and protect human rights, basic freedoms and the primacy of law; and participate in the decolonization of the Arab Countries, to their liberation and the establishment of social justice.

As a union of Arab lawyers, ALU directly represents and includes Palestinian lawyers who are being subjected to the ongoing genocide in occupied Palestine. ALU has consistently advocated as a key priority for the full rights of the Palestinian people, including an end to

colonization and occupation in Palestine and the right to return of the Palestinian refugees in exile. The genocide that is currently being carried out in Palestine by the occupation forces is a key priority for all Arab lawyers, and it is urgent for us to join this action to bring an end to this genocide and the ongoing impunity and war on the Arab region and Arab people.

7. **Arab Lawyers Association** (United Kingdom) ("ALA") is a British nongovernmental association of lawyers and practitioners founded on 2 April 1996 with the aim to contribute, educate, defend and assert the rule of law on national and international levels. ALA has participated yearly in many UN Human Rights Council meetings in Geneva. ALA is affiliated to the International Association of Democratic Lawyers and to the International Bar Association. ALA firmly believes that the United Nations as well as the major powers in the world have a positive duty to uphold the rule of international law. The Judiciary is the ultimate arbiter.

8. **Associação Portuguesa de Juristas Democratas** (Portuguese Association of Democratic Lawyers, or APJD) was founded in the 10th of December 1948, the date of the enactment of the Universal Declaration of Human Rights. The Association is affiliated with IADL. APJD had to operate in a clandestine fashion from its founding until April 1974 when democracy was restored in Portugal, and as such, takes very seriously the responsibility of the courts to prevent international crimes, such as the crime of genocide as is currently taking place in Palestine with the direct assistance and involvement of the United States, including through weapons sales and military aid, the transport of aircraft carriers to the region, and the use of the veto in the United Nations Security Council to prevent the imposition of a ceasefire.

It is clear that for law to have meaning, it must apply equally to all. The urgency of this case cannot be understated, particularly for the Palestinian people in Gaza, but also for all of those, including APJD, who care to see a society in which law will still intervene to halt an ongoing genocide. As international lawyers, the impunity of US officials and the Israeli regime for the ongoing genocide being carried out poses a direct threat to the maintenance of any system of international law. APJD expresses its interest before the court to join as amici curiae to uphold these critical international norms and bring an end to the ongoing genocide in occupied Palestine.

9.  **Association Démocratique des Femmes du Maroc** (Women's Democratic Association of Morocco) is an association based in Morocco that defends women's human rights and advocates for gender equality and full citizenship for women.

10. **Association Marocain des Droits Humains** (Moroccan Human Rights Association) is an organization whose mission it is to protect human rights.

11. **Australian Centre for International Justice** (ACIJ) works with Palestinian human rights organisations on attempts to suspend arms litigation and other Palestine related advocacy in Australia. ACIJ is using this case in its submissions and writings related to this advocacy.

12. **Ayuda Legal Puerto Rico** is an organization of legal empowerment and human rights advocates, working from a colonized territory.

13. **Bahrain Center for Human Rights** is dedicated to the documentation of human rights violations.

14. **Bahrain Human Rights Society** (BHRS) is a national NGO focussing on achieving, maintaining, and promoting human rights and fundamental freedoms contained in the charters of the United Nations, foremost of which is the International Covenant on Human Rights, covenants, charters, declarations, and protocols issued by the United Nations and other international organizations concerned with human rights.

15. **Buffalo Human Rights Center** is an academic center at the University at Buffalo School of Law, SUNY, dedicated to promoting awareness and protection efforts for the human rights of all people, both locally and globally.

16. **Çağdaş Hukukçular Derneği** (Progressive Lawyers' Association, or ÇHD) was originally founded in 1974 in Turkey to protect and promote democracy, human rights and human dignity. Like many other associations, the ÇHD was shut down after the military coup d'état on 12th September 1980. Re-established in 1990, ÇHD continues to defend students, workers, trade unionists, journalists, writers, Kurdish people, and other victims of political repression and judicial persecution in front of the State Security Courts. After the State of Emergency in Turkey in 2016, the ÇHD was closed once again by an emergency degree. However, in 2021 it has opened again and organized its General Assembly in January 2022. ÇHD is the union of more than 300 lawyers. The lawyers of ÇHD are specialized in defending victims of torture, arbitrary detentions, extrajudicial executions, police brutality and other human rights violations. They also provide legal assistance in such sensitive fields

as political oppression under terrorism-related charges, freedom of expression, protection of refugees, freedom of assembly and association, protection of the environment and natural resources, labour rights. Both in its activity in Turkey and as a member of International Association of Democratic Lawyers (IADL), ÇHD promotes initiatives for the defense of the human and civil rights of the Palestinian people, against the de facto expropriation of their lands and for the cessation of the ongoing military attacks against them.

17. **Cátedra UNESCO de Desarrollo Humano Sostenible, Universidad de Girona** (UNESCO Chair of Sustainable Human Development, University of Girona-Spain) is an entity belonging to the University of Girona that promotes sustainable human development and the defense of human rights.

18. **Centre for Human Rights and Development (CHRD-Mongolia)** works for protection of human rights and promote for peace and non-violence approach for solution of any challenges.

19. **Centre for Palestine Studies, SOAS University of London**, is a centre concerned with the academic and critical study of Palestine.

20. **Confederation of Lawyers of Asia and the Pacific (COLAP)** was founded in 2016 and is composed of democratic lawyers from 11 countries in the Asia-Pacific region. Since its founding, COLAP has been committed to the realization of peace, human rights, and democracy and has engaged in various activities, including compliance with international

law, equal sovereignty, and pursuit of war crimes. It is also an affiliate of IADL.

21. **Colectivo de Abogados y Abogadas "José Alvear Restrepo"** (CAJAR) CAJAR is a human rights organization with 45 years of experience representing victims at the national and international level. CAJAR is a part of the International Federation of Human Rights (FIDH) and the World Organization Against Torture (OMCT). CAJAR works for the unrestricted respect of International Human Rights Law and International Humanitarian Law and agrees in emphasizing the importance of preventing the commission of genocide in all parts of the world.

22. **Community Resource Centre** (Thailand) is a legal empowerment organization that supports grassroots communities to ensure access to justice and protect and promote human rights. It seeks to support the victims of genocide and those whose rights have been violated in any manner.

23. **Community Justice Project (CJP)** is a Miami, Florida-based group of movement lawyers, artists and researchers providing innovative legal and strategic support to social justice movements fighting for racial justice and human rights. CJP represents base-building organizations defending the right to protest and advocating for divestment from policing and warfare.

24. **Consejo de Pueblos Wuxhtaj** (Council of the Wuxtaj Peoples) facilitates processes of continuous strengthening and promotion of the democratic and inclusive organization and participation of communities; creating discussion, analysis, and viable proposals for the

construction of social welfare and a plurinational State. It is deeply concerned about the violations of human rights anywhere.

25. **Coordinación Colombia Europa Estados Unidos** (Colombia Europe United States Coordination, or CCEEU) is a network of organizations for the defense of human rights in Colombia. It is a platform of human and social rights organizations, whose mandate includes work of an international and national nature, and seeks to contribute to the promotion, dissemination and defense of human rights with an emphasis on civil and political rights, the fight against impunity, the validity of the social rule of law, the construction of peace and the search for a negotiated political solution to the armed conflict.

26. **Corporación Colectivo de Objetores y Objetoras por Conciencia: Quinto Mandamiento (**Collective Corporation of Conscientious Objectors: Fifth Commandment) is an organization based in Santander, Colombia, that defends human rights and objects to all types of violence. The organization is nonviolent.

27. The **Center of Research and Elaboration on Democracy (CRED)** is an Italian non-governmental association of lawyers and activists founded on September the 25th,1998, with the aim to contribute to the assertion of the rule of law in national and international affairs. We are affiliated to the International Association of Democratic Lawyers and to the European Association of Lawyers for World Human Rights. CRED is convinced that the role of United Nations is ever more important due to the interdependence among different countries and peoples determined by globalization and by the vital challenges confronting nowadays

humankind, especially in the fields of human rights protection.

28. **Dibeen For Environmental Development** is a non-governmental organization based in Jordan. It works in the environmental and social field, and defends human rights.

29. **DITSHWANELO, the Botswana Centre for Human Rights,** is an advocacy organization with a key role in the promotion and protection of human rights in Botswana society. It shows its solidarity with the Palestinian people.

30. **Egyptian Initiative for Personal Rights** (EIPR) is an Egyptian national human rights organization based in Cairo working for 22 years to promote accountability and fight impunity.

31. **Elseidi Law Firm** is a is environmental public interest law firm based in Egypt.

32. **Equal Education** (EE) is a youth-led social movement in South Africa. EE organises secondary school students and young people on issues related to education justice and social justice, more broadly. EE is committed committed to the principles of constitutionalism and the Universality of International Human Rights. EE recognises and uses the law as part of its organising, as one tool in its struggle for social change. EE is committed to the dignity, best interest, freedom and protection of all children and young people worldwide. EE's standing National Congress resolutions affirm its solidarity to the children and people of Palestine.

33. **European Center for Palestine Studies, University of Exeter,** is first academic center offering post graduate studies in Palestine studies.

34. **FAIR Law Firm** is based in Indonesia providing legal assistance, including services to Palestinian refugees in Indonesia.

35. **Falana and Falana's Chambers** was established in Nigeria in 1991. Falana & Falana's Chambers is a leading law firm in constitutional law and human rights services. It condemns the violations of the basic principles of humanitarian law by Israel.

36. **Forum Tunisien pour les Droits Economiques et Socia**ux (Tunisian Forum for Economic and Social Rights) is a Tunisia-based organization that defends economic and social rights.

37. **Fundación Enlace Social (Social Link Foundation)** works with children and wants the boys and girls of the world to be protected.

38. The **Giniw Collective** is an Indigenous rights & environmental advocacy collective. It believes there is still time to stop the genocide of Palestinian relatives and that must stop repeating history and learn from the genocides of our peoples and others. Never again.

39. **Giuristi Democratici** (Democratic Jurists) is an Italian association founded in 2004 and active in Italy and abroad with a focus on the issue of human rights, respect for democratic principles and justice, consists of hundreds of members who practice law (lawyers and magistrates, legal practitioners), teachers and researchers in legal subjects. Both in its activity in Italy and as associates of European (ELDH) and international (IADL) organizations,

Giuristi Democratici promotes initiatives for the defense of the human and civil rights of the Palestinian people, against the de facto expropriation of their lands and for the cessation of the ongoing military attacks against them.

40. **The Haldane Society** was founded in 1930 and named for Viscount Haldane, the first Lord Chancellor appointed by the first British Labour Government. Its members comprise practicing barristers and solicitors, law professors, students and legal workers and past members include numerous senior judges and government ministers. The Haldane Society affiliated to the International Association of Democratic Lawyers (IADL) in 1947 and throughout the past six decades Haldane's members have participated in and contributed to many of the IADL's conferences, seminars, missions and publications. Numerous Haldane members have worked on issues relating to Palestine and have visited Palestine on human rights fact-finding missions. Some members have represented Palestinian and Israeli asylum seekers in relation to the conflict between Palestine and Israel in British courts. Haldane's President, Michael Mansfield KC, sat on the Russell Tribunal on Palestine.

41. **The Indian Association of Lawyers** founded in 1968, affiliated to the International Association of Democratic Lawyers, is one of the leading organizations of lawyers in India, with membership open to lawyers, members of the judiciary, law teachers, researchers and law students, representing a majority of states of the Indian Union. Judges of the Supreme Court of India have been Presidents of the Association. The Association has been in the vanguard of the defense of human rights, the right to equality , the right to development , the rights of workers, farmers, socially and economic weaker sections of society and minorities; and actively participated in the worldwide anti-colonial and anti-imperialist movements,

including the struggle against racism and apartheid in South Africa, in support of the right to self-determination of the people of Palestine, and opposed racism and apartheid imposed on the people of Palestine by the Zionist government of Israel and Zionist colonial settlers. Office bearers of the Association recently participated in International Criminal Tribunals convened by jurists and lawyers on the continuing occupation by Israel assisted by the United States, of the territories of the State of Palestine established by the 1948 United Nations General Assembly Resolution, and the ethnic cleansing and genocide of the Palestinian people from 1948 to date.

42. **Instituto de Estudios Legales y Sociales del Uruguay** (The Institute for Legal and Social Studies of Uruguay, or IELSUR) is a non-profit NGO established to defend and achieve full realization of human rights by applying domestic and international legal instruments, and doing related interdisciplinary research and advocacy. IELSUR's aim is to bring forward legal actions based on the perspective of individuals or groups whose human rights have been violated to achieve the full realization of human rights.

43. The **International Association of Democratic Lawyers** (IADL) is an international organization of lawyers and jurists with member associations and individual members in over 90 countries. IADL has consultative status in the United Nations, at Economic and Social Council, (ECOSOC), the United Nations Educational Scientific and Cultural Organization (UNESCO), and the United Nations Children's Emergency Fund (UNICEF). IADL was founded in 1946 by a large group of lawyers, many of whom served as prosecutors at the Nuremberg trials. The first President of IADL was Rene Cassin, the French jurist who is a main author of the Universal Declaration of Human Rights (UDHR), whose 75th

Anniversary was celebrated on December 10 this year. IADL was formed specifically to support the goals of the UN Charter to promote peace and justice. More specifically, IADL was founded to uphold the command in the UN Charter that countries solve their disputes peacefully in a manner that promotes respect for international law and treaties such as the UN Charter itself and the international conventions and agreements promulgated by the international community. IADL promotes the many human rights treaties which have been promulgated since the founding of the UN. IADL supports the goals of the current litigation. Based on IADL's history and work trying to bring peace to the world, IADL has an interest in this current litigation to participate as one of the international NGO Amici.

44. The **International Centre for Ethnic Studies** is an independent think-tank in Sri Lanka and works on issues of diversity, human rights, constitutional reform and gender.

45. **Japan Lawyers International Solidarity Association** (JALISA), founded in 1957 in Japan, far from Gaza and the US court, engages in demonstrations to protest against Israeli aggression and genocide being intensified day by day. It believes the prohibition of Genocide, as stipulated in the gravest international treaty adopted in the early-day United Nations, should be most strictly observed.

46. **Kashmir Law and Justice Project** (KLJP) is a legal advocacy organization that seeks to bring attention to, and to redress, historic and ongoing rights violations in Indian-administered Jammu and Kashmir. While KLJP mandate is regionally specific, its broader project is freedom, justice and dignity for all. It views international legal norms as critical to that project and is deeply invested in the establishment and/or re-establishment of those

norms. KLJP is deeply invested in the project of achieving freedom, justice and dignity for marginalized people (including its own) globally.

47. **Labá - Direito, Espaço & Política** (Labá-Rights, Space and Politics) is a research group with a community-focused approach whose actions focus on the production of law in its co-constitution with the production of space. Based at the National Law School of the Federal University of Rio de Janeiro (UFRJ), Labá is an inter-institutional research group, also linked to the Federal University of Paraná (UFPR) and the Federal University of São Paulo (UNIFESP).

48. **La Ligue Algérienne pour la Défense des Droits de l'Homme** (Algerian League for the Defense of Human Rights, or LADDH) is dedicated to the protection of human rights and the fight against impunity.

49. L**eague for the Defence of Human Rights in Iran** (LDDHI) fights against human rights violations in Iran and stands in full solidarity with Palestinian people.

50. **Minority Rights Group International** campaigns worldwide with almost 300 partners in 60 countries to ensure that disadvantaged minorities and indigenous peoples, often the poorest of the poor, can make their voices heard.

51. **Mississippians for Palestine** is a United States-based multi-racial, multi-generational group of Mississippians standing in solidarity with Palestinians, calling for an immediate end to

their genocide, and fighting for their right to live in freedom and dignity.

52. The **Movement for Black Lives** (M4BL) is a national network of more than 150 leaders and organizations creating a broad political home for Black people to learn, organize and take action. M4BL includes activists, organizers, academics, lawyers, educators, health workers, artists and more, all unified in a radical vision for Black liberation and working for equity, justice and healing. Like Black freedom seekers before us, M4BL remains unequivocally committed to a decolonized and self-determined Palestine. It is unyielding in its demand for an immediate end to Israel's lethal settler-colonial project and its enforced displacement, human-rights desecration, cultural erasure, and outright genocidal agenda against the Palestinian people and spirit. The fight for Palestinian sovereignty isn't a choice; it's a mandate for universal human rights.

53. **Movement Law Lab** (MLL) is a United States-based non-profit organization that brings the power of lawyers to social justice movements. It stands in solidarity with the Palestinian people. MLL acts as the coordinating hub of the **Global Network of Movement Lawyers**, a network of organizations and lawyers across 25 countries that work alongside social movements and organized communities. Its members represent communities that work with and rely on international legal frameworks and human rights mechanisms for protection and prevention of human rights abuses. The network has a distinct interest in upholding the integrity of fundamental international norms, including and especially, the norms requiring states to prevent and not be complicit in genocide.

54. **Mwatana for Human Rights** is a human rights organization based in Yemen, supporting and standing with human rights of those all around the Middle East.

55. **National Association of Democratic Lawyer**s (NADEL) was formed in 1988 as an Association of progressive Lawyers in South Africa, whose primary responsibility was to fight against Apartheid injustice and brutality and to work for a South Africa that is free of oppression and injustice. The current situation in Gaza is a direct affront to International Law and cannot be condoned under any circumstances. Should the situation persist, International Law will be irrelevant and have no effect. Such a state of the law of the jungle is even more dangerous for weaker countries of the world, who rely on International Law to protect their interests and their people.

South African Lawyers know too well the effects of Apartheid violence, wanton detentions, killings of innocent civilians and children and therefore have no choice but to add its strong voice in support of this brief of *amici*. This position is a consistent position of South Africa, as repeatedly stated by the first President of Democratic South Africa, Nelson Mandela, when he stated that *"South Africa's own Freedom will remain incomplete as long as Palestine is not free"*.

56. **The National Lawyers Guild** is a non-profit corporation formed in 1937 as the nation's first racially integrated voluntary national bar association, with a mandate to advocate for the protection of constitutional, human, and civil rights. As one of the non-governmental organizations selected to officially represent the American people at the founding of the United Nations in 1945, its members helped draft the Universal Declaration of Human

Rights. The National Lawyers Guild is also a member organization of the International

Association of Democratic Lawyers, which enjoys consultative status with the United

Nations Economic and Social Council. Through its International Committee, it is actively

engaged in promoting and developing international peace and human rights through law. The

National Lawyers Guild seeks to intervene in these proceedings through Amicus Curiae, as

the United States government that instead of preventing genocide by Israel, financially,

militarily and diplomatically enables Israel to perpetrate the ongoing genocide. Through

various efforts in the past 20 years, the NLG has called for adherence to international law for

the Protection of the Palestinian people and accountability for Israeli violations of

international law. The National Lawyers Guild is committed to the enforcement of the 1948

Convention on the Prevention and Punishment of the Crime of Genocide and seeks to

intervene in these proceedings due to the serious nature of the ongoing genocide in Gaza.

57. The **National Union of Peoples' Lawyers** (NUPL) was founded in the Philippines in 2007

as a voluntary nationwide association of pro bono human rights lawyers and law students in

the Philippines that aims to defend, protect and promote human rights and national

sovereignty. Consistent with the fourth point of its General Program of Action that it shall

"campaign, advocate and lobby for the liberties, freedoms and rights of the Filipino people as

well as those of other peoples of the world," it hereby manifests its interest and supports and

joins the case filed by the Center for Constitutional Rights (CCR) before the District Court in

California against US President Biden, Secretary of State Blinken, and Defense Secretary

Austin in the matter of the present situation in Gaza. Being staunch advocates of democratic

rights and fundamental freedoms anywhere, NUPL is concerned of the detrimental impact on

international norms if the genocidal actions of Israel in Gaza are allowed to continue without

consequence. These actions, in NUPL's view are historically, morally, politically and legally

unacceptable. NUPL notes as well the increasing isolation before the international

community of the US government's role and complicity in the horrendous carnage of

civilians and the collective punishment against the Palestinian people. The NUPL, therefore,

respectfully expresses keen interest and deep concern over the matter and its implications in

international law and norms and joins all efforts to stop and prevent the genocidal actions in

Gaza. In the concrete, amicus joins the legal efforts to compel the US to live up to its duties

to prevent genocide and/or not be complicit in it when it is clear a genocide or a grave risk of

genocide is occurring in Gaza.

58. **Ndifuna Ukwazi** is a non-profit activist organisation and law centre that combines research,

organising and litigation in campaigns to advance urban land justice in Cape Town. Its

primary mission is to expand and protect access to affordable housing and build an integrated

and inclusive city. Over the last seven years, Ndifuna Ukwazi has been involved in legal,

research and organising work around evictions, relocations, rental housing, the allocation of

state-subsidised housing, the management of public land in a manner that prioritises socio-

economic needs and the promotion of social, transitional and inclusionary housing. Ndifuna

Ukwazi has published several resource guides and research reports on these issues. Ndifuna

Ukwazi has also been involved in a series of important court cases dealing with land

occupations, evictions, the provision of alternative accommodation, and the state's

constitutional and legislative obligation to combat spatial apartheid and promote spatial,

economic and racial justice and equality through expanding access land and affordable

housing. Ndifuna Ukwazi's interest in the case is to highlight the use of mass eviction and

displacement and inordinate violent destruction of homes and deprivation of shelter as a

means of enforcing genocide as was done in the South African context by the apartheid regime there.

59. **Observatori DESCA** is a Barcelona-based civil organization of human rights addressing, especially, economic, social, cultural and environmental rights, at local, national and international level. The interest in this case is to preserve and guarantee the basic human rights and peremptory norms that are currently being breached in Gaza.

60. **Palestinian Bar Association** was established in 1997, and regulates all practicing lawyers approximately 12000 (Gaza & West Bank). The Palestinian Bar Association always works to promote the rule of law, human rights, peace and justice. The members of the Association are always at the forefront in the struggle for justice, human rights, peace and democracy. The Palestinian Bar Association pays great attention to this lawsuit and reiterates its continuous demand for justice for the Palestinians. The Palestinian Bar association expresses its deep concern about the recent atrocities committed by the Israeli army against Palestinian civilians and children. On 9 October 2023, Israeli warplanes launched a missile strike that destroyed the Palestinian Bar Association (PBA) headquarters located in Al Rimal neighborhood, Gaza City, Palestine. The attack resulted in the destruction of the upper floors of PBA headquarters, severe damage to the lower floors, and the destruction of the PBA's contents and lawyers' records. Tens of Palestinian Lawyers were killed by Israeli Army bombing on Gaza. Hundreds of Palestinian Lawyers were injured including one board member.

61. The **Palestinian Centre for Human Rights (PCHR)** The Palestinian Centre for Human Rights (PCHR) was founded in 1995 by its Director Raji Sourani and many others who are

committed to protecting human rights and promoting the rule of law in accordance with international standards. PCHR is committed to developing democratic institutions and an active civil society, while promoting democratic culture within Palestinian society.  PCHR is has worked to support the Palestinian people's rights to self-determination consistent with international law and UN resolutions.

Since its founding PCHR has documented violations of human rights, sought to enforce Israeli obligations under the Fourth Geneva Convention and brought claims of numerous Palestinians to the International Criminal Court.     PCHR's work has been internationally recognized and Raji Sourani and the Centre have received numerous awards for their human rights work. PCHR has a direct interest in this case as the home of Mr. Sourani was bombed and he and his family barely escaped with their lives. There was no legitimate military reason for Mr. Sourani's home to be targeted.

PCHR colleague Ayman Lubbad, a researcher in the Economic, Social, and Cultural Rights Unit at the Palestinian Centre for Human Rights (PCHR), was arbitrarily detained by Israeli occupation forces on 7 December 2023, and was released at the Kerem Shalom crossing south of the Gaza Strip on 14 December 2023 after a week of being held with no information on his whereabouts. During his detention, he was subjected to inhumane and degrading treatment. One of our colleagues lost her daughter and another lost his son in Israeli airstrikes. In addition, PCHR's office is located in a 12-story building. Several floors, including PCHR's, were damaged by Israeli bombing.

62. The **Palestine Institute for Public Diplomacy** (PIPD) is an independent, non-governmental organization that aims to shift discourse and policy with movements and decision-makers around the world through people's engagement and advocacy. PIPD is based in Palestine and is led by a board of prominent Palestinians from the private sector, academia, and civil society, spread internationally between Palestine, the United States, Canada, and Jordan.

63. The **Palestinian Human Rights Organization** (PHRO) is an independent non-governmental organization, works for promoting, protecting and defending the human rights of the Palestinian refugees in the Middle East and North Africa region.

64. **Plenaria Memoria y Justicia** (Full Memory and Justice) is a human rights organization in Uruguay that has solidarity with the people of the world as one of its work areas. Particularly since the first day of the aggression suffered by the Palestinian people, together with other organizations the organization has promoted public actions for a ceasefire.

65. **Proyecto de Derechos Económicos, Sociales y Culturales** (Economic, Social, and Cultural Rights Project, or ProDESC) is a Mexican intersectional feminist human rights defense organization founded in 2005. ProDESC's main goal is to defend and promote Economic, Social, and Cultural Rights (ESCRs) in order to contribute to their enforcement, justiciability (the possibility to demand compliance in the courts of justice) and claimability, thus constructing a more just and equitable society.

66. **Project South** is a social justice organization based in Atlanta, Georgia. Project South supports social justice movements in the United States South and the Global South, including

1   in Palestine.

2

3   67. The **Rachel Corrie Foundation for Peace and Justice** continues the work that Rachel

4       Corrie began and hoped to accomplish, and carries out that work with her vision, spirit, and

5

6       creative energy in mind. The foundation conducts and support programs that foster

7       connections between people, that build understanding, respect, and appreciation for

8       differences, and that promote cooperation within and between local and global communities.

9       The foundation encourages and supports grassroots efforts in pursuit of human rights and

10      social, economic, and environmental justice, which its views as prerequisites for world peace.

11      Genocide in Gaza is a criminal assault on those values, in a part of the world where it has

12      focused its efforts during the past twenty years.

13

14

15  68. **Rising Majority** is a United States-based coalition of social justice organizations fighting for

16      genuine democracy and an economy based on centering human and planetary needs.

17

18  69. **Rural Women's Assembly** is an organization based in South Africa that stands for human

19      rights and against the violence against women and children. It calls for an end to genocide

20      now.

21

22

23  70. The **Salt River Heritage Society** is a community-based organisation in South Africa and has

24      a history of solidarity with those who are oppressed worldwide. The Salt River Heritage

25      Society therefore stands against all forms of Apartheid and stand in solidarity with the

26      Palestinian people.

27

28

71. **SECTION27** is a public interest law organization based in South Africa interested in the rule of law.

72. The **Socio-Economic Rights Institute of South** Africa (SERI) is a non-profit human rights organisation. SERI works with communities, social movements, individuals and other non-profit organisations in South Africa and beyond to develop and implement strategies to challenge inequality and realise socio-economic rights. SERI joins the case to safeguard the protections available in international human rights instruments and ensure that State parties do not undermine the universal application of these instruments to all people especially Palestinians as they form part of people of color.

73. The **Syrian Center for Media and Freedom of Expression** (SCM) is an organization committed to ensuring that fundamental legal norms are upheld and respected by all states.

74. **Terra de Direitos** is a human rights organization based in Brazil working to defend, promote and seek enforcement of rights, especially economic, social, cultural and environmental rights (ESCER, or Dhesca in Portuguese). The organization came into being in Curitiba (PR) in 2002, to work in situations of collective conflicts related to access to land and to rural and urban territories. Terra de Direitos is currently involved nationally and internationally in human rights issues and has offices in Santarém (PA), Curitiba (PR) and Brasília (DF). The organization's actions are developed through four areas of work: Land, Territory and Spatial Justice; Human Rights Policy and Culture; Biodiversity and Food Sovereignty; and Democratization of Justice.  Terra de Direitos uses public interest law as an action strategy. As such, it develops capacity building as well as working on strategic litigation and

advocacy. With regard to public interest law, the organization works with collective and community demands, in partnership with social movements, recognizing them as active subjects of social processes and fights for rights. It prepares legal opinions, studies and reports to inform analyses of public policies, legislation and other strategies. It undertakes strategic litigation in human rights, with the aim of building theses and jurisprudence capable of benefitting collective struggles for rights in Brazil. It takes part in spaces of civil society articulation, both national and international, in addition to promoting actions aimed at human rights capacity building, advocacy and accountability. As a Human Rights Organization Terra de Direitos is committed to solidarity with the Palestinians.

75. **Women's Legal Centre** is a South Africa-based organization committed to substantive equality and the rights of women and girl children to be free from violence.

76. **Yayasan Lembaga Bantuan Hukum Indonesia** (Indonesia Legal Aid Foundation, or YLBHI) is a legal aid institution working for human rights, rule of law and democracy. Currently, YLBHI has 18 LBH offices in 18 different provinces across Indonesia. Since its establishment, YLBHI focuses on advocacy relating to human rights issues, including natural resources issues.

77. **Zabalaza Pathways Institute** is a South Africa-based political education institute, which has as part of its interest to build an international solidarity movement with Palestine.