Marc Van Der Hout, Cal. Bar No. 80778
Johnny Sinodis, Cal. Bar No. 290402
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Maria C. LaHood, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Diala Shamas, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
mlahood@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

Attorneys for Plaintiffs DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE, et al.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; A.N.; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR | Case No.: 23-cv-5829-JSW |
| | **STATEMENT OF RECENT DECISION** |
| | Hearing: January 26, 2024, at 9:00 am |
| Plaintiffs, | |
| v. | |
| JOSEPH R. BIDEN, JR., *President of the United States,* ANTONY J. BLINKEN, *Secretary of State,* LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities, | |
| Defendants. | |

1
2
3
4
5
6
7

PLEASE TAKE NOTICE that pursuant to Civil Local Rule 7-3(d)(2), Plaintiffs hereby notify the Court and Defendants' counsel that today the International Court of Justice delivered its Order on the Request for the indication of provisional measures submitted by South Africa in the case concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (*South Africa v. Israel*). The Order is attached as an Exhibit hereto, and Plaintiffs will make copies of the case available at the hearing.

8   Dated: January 26, 2024                          Respectfully submitted,

9

10
11
12
13
14
15
16
17
18
19

Johnny Sinodis, Cal. Bar No. 290402
Marc Van Der Hout, Cal. Bar No. 80778
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000
ndca@vblaw.com

/s/ Maria LaHood
Maria C. LaHood, admitted *pro hac vice*
Sadaf M. Doost, Cal. Bar No. 346104
Baher A. Azmy, admitted *pro hac vice*
Katherine Gallagher, admitted *pro hac vice*
Astha Sharma Pokharel, admitted *pro hac vice*
Diala Shamas, admitted *pro hac vice*
Samah Sisay, admitted *pro hac vice*
Pamela C. Spees, admitted *pro hac vice*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6430
mlahood@ccrjustice.org
sdoost@ccrjustice.org
bazmy@ccrjustice.org
kgallagher@ccrjustice.org
asharmapokharel@ccrjustice.org
ssisay@ccrjustice.org
pspees@ccrjustice.org

20
21
22
23
24
25
26
27
28

**26 JANUARY 2024**

**ORDER**

**APPLICATION OF THE CONVENTION ON THE PREVENTION AND PUNISHMENT OF THE CRIME OF GENOCIDE IN THE GAZA STRIP**

**(SOUTH AFRICA *v.* ISRAEL)**

———————

**APPLICATION DE LA CONVENTION POUR LA PRÉVENTION ET LA RÉPRESSION DU CRIME DE GÉNOCIDE DANS LA BANDE DE GAZA**

**(AFRIQUE DU SUD c. ISRAËL)**

**26 JANVIER 2024**

**ORDONNANCE**

TABLE OF CONTENTS

*Paragraphs*

CHRONOLOGY OF THE PROCEDURE                                    1-12

I.  INTRODUCTION                                               13-14

II.  PRIMA FACIE JURISDICTION                                  15-32

   1.  Preliminary observations                          15-18

   2.  Existence of a dispute relating to the interpretation, application or fulfilment of the Genocide Convention                19-30

   3.  Conclusion as to prima facie jurisdiction           31-32

III.  STANDING OF SOUTH AFRICA                                 33-34

IV.  THE RIGHTS WHOSE PROTECTION IS SOUGHT AND THE LINK BETWEEN SUCH RIGHTS AND THE MEASURES REQUESTED                   35-59

V.  RISK OF IRREPARABLE PREJUDICE AND URGENCY                  60-74

VI.  CONCLUSION AND MEASURES TO BE ADOPTED                     75-84

   OPERATIVE CLAUSE                                     86

———————

INTERNATIONAL COURT OF JUSTICE

YEAR 2024

**2024**
**26 January**
**General List**
**No. 192**

26 January 2024

APPLICATION OF THE CONVENTION ON THE PREVENTION
AND PUNISHMENT OF THE CRIME OF GENOCIDE IN THE GAZA STRIP

(SOUTH AFRICA *v.* ISRAEL)

REQUEST FOR THE INDICATION OF PROVISIONAL MEASURES

ORDER

*Present:*  *President* DONOGHUE;  *Vice-President* GEVORGIAN;  *Judges* TOMKA,  ABRAHAM, BENNOUNA, YUSUF, XUE, SEBUTINDE, BHANDARI, ROBINSON, SALAM, IWASAWA, NOLTE, CHARLESWORTH, BRANT;  *Judges* ad hoc  BARAK,  MOSENEKE; *Registrar* GAUTIER.

The International Court of Justice,

Composed as above,

After deliberation,

Having regard to Articles 41 and 48 of the Statute of the Court and Articles 73, 74 and 75 of the Rules of Court,

*Makes the following Order:*

- 2 -

1. On 29 December 2023, the Republic of South Africa (hereinafter "South Africa") filed in the Registry of the Court an Application instituting proceedings against the State of Israel (hereinafter "Israel") concerning alleged violations in the Gaza Strip of obligations under the Convention on the Prevention and Punishment of the Crime of Genocide (hereinafter the "Genocide Convention" or the "Convention").

2. At the end of its Application, South Africa

"respectfully requests the Court to adjudge and declare:

(1) that the Republic of South Africa and the State of Israel each have a duty to act in accordance with their obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to the members of the Palestinian group, to take all reasonable measures within their power to prevent genocide; and

(2) that the State of Israel:

(a) has breached and continues to breach its obligations under the Genocide Convention, in particular the obligations provided under Article I, read in conjunction with Article II, and Articles III *(a)*, III *(b)*, III *(c)*, III *(d)*, III *(e)*, IV, V and VI;

(b) must cease forthwith any acts and measures in breach of those obligations, including such acts or measures which would be capable of killing or continuing to kill Palestinians, or causing or continuing to cause serious bodily or mental harm to Palestinians or deliberately inflicting on their group, or continuing to inflict on their group, conditions of life calculated to bring about its physical destruction in whole or in part, and fully respect its obligations under the Genocide Convention, in particular the obligations provided under Articles I, III *(a)*, III *(b)*, III *(c)*, III *(d)*, III *(e)*, IV, V and VI;

(c) must ensure that persons committing genocide, conspiring to commit genocide, directly and publicly inciting genocide, attempting to commit genocide and complicit in genocide contrary to Articles I, III *(a)*, III *(b)*, III *(c)*, III *(d)* and III *(e)* are punished by a competent national or international tribunal, as required by Articles I, IV, V and VI;

(d) to that end and in furtherance of those obligations arising under Articles I, IV, V and VI, must collect and conserve evidence and ensure, allow and/or not inhibit directly or indirectly the collection and conservation of evidence of genocidal acts committed against Palestinians in Gaza, including such members of the group displaced from Gaza;

(e) must perform the obligations of reparation in the interest of Palestinian victims, including but not limited to allowing the safe and dignified return of forcibly displaced and/or abducted Palestinians to their homes, respect for their full human rights and protection against further discrimination, persecution, and other related acts, and provide for the reconstruction of what it has destroyed in Gaza, consistent with the obligation to prevent genocide under Article I; and

- 3 -

    *(f)* must offer assurances and guarantees of non-repetition of violations of the Genocide Convention, in particular the obligations provided under Articles I, III *(a)*, III *(b)*, III *(c)*, III *(d)*, III *(e)*, IV, V and VI."

    3. In its Application, South Africa seeks to found the Court's jurisdiction on Article 36, paragraph 1, of the Statute of the Court and on Article IX of the Genocide Convention.

    4. The Application contained a Request for the indication of provisional measures submitted with reference to Article 41 of the Statute and to Articles 73, 74 and 75 of the Rules of Court.

    5. At the end of its Request, South Africa asked the Court to indicate the following provisional measures:

    "(1) The State of Israel shall immediately suspend its military operations in and against Gaza.

    (2) The State of Israel shall ensure that any military or irregular armed units which may be directed, supported or influenced by it, as well as any organisations and persons which may be subject to its control, direction or influence, take no steps in furtherance of the military operations referred to [in] point (1) above.

    (3) The Republic of South Africa and the State of Israel shall each, in accordance with their obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to the Palestinian people, take all reasonable measures within their power to prevent genocide.

    (4) The State of Israel shall, in accordance with its obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to the Palestinian people as a group protected by the Convention on the Prevention and Punishment of the Crime of Genocide, desist from the commission of any and all acts within the scope of Article II of the Convention, in particular:

    *(a)* killing members of the group;

    *(b)* causing serious bodily or mental harm to the members of the group;

    *(c)* deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and

    *(d)* imposing measures intended to prevent births within the group.

(5) The State of Israel shall, pursuant to point (4) *(c)* above, in relation to Palestinians, desist from, and take all measures within its power including the rescinding of relevant orders, of restrictions and/or of prohibitions to prevent:

    *(a)* the expulsion and forced displacement from their homes;

    *(b)* the deprivation of:

        (i) access to adequate food and water;

        (ii) access to humanitarian assistance, including access to adequate fuel, shelter, clothes, hygiene and sanitation;

        (iii) medical supplies and assistance; and

    *(c)* the destruction of Palestinian life in Gaza.

(6) The State of Israel shall, in relation to Palestinians, ensure that its military, as well as any irregular armed units or individuals which may be directed, supported or otherwise influenced by it and any organizations and persons which may be subject to its control, direction or influence, do not commit any acts described in (4) and (5) above, or engage in direct and public incitement to commit genocide, conspiracy to commit genocide, attempt to commit genocide, or complicity in genocide, and insofar as they do engage therein, that steps are taken towards their punishment pursuant to Articles I, II, III and IV of the Convention on the Prevention and Punishment of the Crime of Genocide.

(7) The State of Israel shall take effective measures to prevent the destruction and ensure the preservation of evidence related to allegations of acts within the scope of Article II of the Convention on the Prevention and Punishment of the Crime of Genocide; to that end, the State of Israel shall not act to deny or otherwise restrict access by fact-finding missions, international mandates and other bodies to Gaza to assist in ensuring the preservation and retention of said evidence.

(8) The State of Israel shall submit a report to the Court on all measures taken to give effect to this Order within one week, as from the date of this Order, and thereafter at such regular intervals as the Court shall order, until a final decision on the case is rendered by the Court.

(9) The State of Israel shall refrain from any action and shall ensure that no action is taken which might aggravate or extend the dispute before the Court or make it more difficult to resolve."

    6. The Deputy-Registrar immediately communicated to the Government of Israel the Application containing the Request for the indication of provisional measures, in accordance with Article 40, paragraph 2, of the Statute of the Court and Article 73, paragraph 2, of the Rules of Court. He also notified the Secretary-General of the United Nations of the filing by South Africa of the Application and the Request for the indication of provisional measures.

- 5 -

7. Pending the notification provided for by Article 40, paragraph 3, of the Statute of the Court, the Deputy-Registrar informed all States entitled to appear before the Court of the filing of the Application and the Request for the indication of provisional measures by a letter dated 3 January 2024.

8. Since the Court included upon the Bench no judge of the nationality of either Party, each Party proceeded to exercise the right conferred upon it by Article 31 of the Statute of the Court to choose a judge *ad hoc* to sit in the case. South Africa chose Mr Dikgang Ernest Moseneke and Israel Mr Aharon Barak.

9. By letters dated 29 December 2023, the Deputy-Registrar informed the Parties that, pursuant to Article 74, paragraph 3, of its Rules, the Court had fixed 11 and 12 January 2024 as the dates for the oral proceedings on the request for the indication of provisional measures.

10. At the public hearings, oral observations on the request for the indication of provisional measures were presented by:

| | |
|---|---|
| *On behalf of South Africa:* | HE Mr Vusimuzi Madonsela, |
| | HE Mr Ronald Lamola, |
| | Ms Adila Hassim, |
| | Mr Tembeka Ngcukaitobi, |
| | Mr John Dugard, |
| | Mr Max du Plessis, |
| | Ms Blinne Ní Ghrálaigh, |
| | Mr Vaughan Lowe. |
| | |
| *On behalf of Israel:* | Mr Tal Becker, |
| | Mr Malcolm Shaw, |
| | Ms Galit Raguan, |
| | Mr Omri Sender, |
| | Mr Christopher Staker, |
| | Mr Gilad Noam. |

11. At the end of its oral observations, South Africa asked the Court to indicate the following provisional measures:

"(1) The State of Israel shall immediately suspend its military operations in and against Gaza.

(2) The State of Israel shall ensure that any military or irregular armed units which may be directed, supported or influenced by it, as well as any organisations and persons which may be subject to its control, direction or influence, take no steps in furtherance of the military operations referred to [in] point (1) above.

(3) The Republic of South Africa and the State of Israel shall each, in accordance with their obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to the Palestinian people, take all reasonable measures within their power to prevent genocide.

- 6 -

(4) The State of Israel shall, in accordance with its obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to the Palestinian people as a group protected by the Convention on the Prevention and Punishment of the Crime of Genocide, desist from the commission of any and all acts within the scope of Article II of the Convention, in particular:

  *(a)* killing members of the group;

  *(b)* causing serious bodily or mental harm to the members of the group;

  *(c)* deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and

  *(d)* imposing measures intended to prevent births within the group.

(5) The State of Israel shall, pursuant to point (4) *(c)* above, in relation to Palestinians, desist from, and take all measures within its power including the rescinding of relevant orders, of restrictions and/or of prohibitions to prevent:

  *(a)* the expulsion and forced displacement from their homes;

  *(b)* the deprivation of:

   (i) access to adequate food and water;

   (ii) access to humanitarian assistance, including access to adequate fuel, shelter, clothes, hygiene and sanitation;

   (iii) medical supplies and assistance; and

  *(c)* the destruction of Palestinian life in Gaza.

(6) The State of Israel shall, in relation to Palestinians, ensure that its military, as well as any irregular armed units or individuals which may be directed, supported or otherwise influenced by it and any organizations and persons which may be subject to its control, direction or influence, do not commit any acts described in (4) and (5) above, or engage in direct and public incitement to commit genocide, conspiracy to commit genocide, attempt to commit genocide, or complicity in genocide, and insofar as they do engage therein, that steps are taken towards their punishment pursuant to Articles I, II, III and IV of the Convention on the Prevention and Punishment of the Crime of Genocide.

(7) The State of Israel shall take effective measures to prevent the destruction and ensure the preservation of evidence related to allegations of acts within the scope of Article II of the Convention on the Prevention and Punishment of the Crime of Genocide; to that end, the State of Israel shall not act to deny or otherwise restrict access by fact-finding missions, international mandates and other bodies to Gaza to assist in ensuring the preservation and retention of said evidence.

(8) The State of Israel shall submit a report to the Court on all measures taken to give effect to this Order within one week, as from the date of this Order, and thereafter at such regular intervals as the Court shall order, until a final decision on the case is rendered by the Court, and that such reports shall be published by the Court.

(9) The State of Israel shall refrain from any action and shall ensure that no action is taken which might aggravate or extend the dispute before the Court or make it more difficult to resolve."

12. At the end of its oral observations, Israel requested the Court to

"(1) [r]eject the request for the indication of provisional measures submitted by South Africa; and

(2) [r]emove the case from the General List".

*

*     *

## I. INTRODUCTION

13. The Court begins by recalling the immediate context in which the present case came before it. On 7 October 2023, Hamas and other armed groups present in the Gaza Strip carried out an attack in Israel, killing more than 1,200 persons, injuring thousands and abducting some 240 people, many of whom continue to be held hostage. Following this attack, Israel launched a large-scale military operation in Gaza, by land, air and sea, which is causing massive civilian casualties, extensive destruction of civilian infrastructure and the displacement of the overwhelming majority of the population in Gaza (see paragraph 46 below). The Court is acutely aware of the extent of the human tragedy that is unfolding in the region and is deeply concerned about the continuing loss of life and human suffering.

14. The ongoing conflict in Gaza has been addressed in the framework of several organs and specialized agencies of the United Nations. In particular, resolutions have been adopted by the General Assembly of the United Nations (see resolution A/RES/ES-10/21 adopted on 27 October 2023 and resolution A/RES/ES-10/22 adopted on 12 December 2023) and by the Security Council (see resolution S/RES/2712 (2023) adopted on 15 November 2023 and resolution S/RES/2720 (2023) adopted on 22 December 2023), referring to many aspects of the conflict. The scope of the present case submitted to the Court, however, is limited, as South Africa has instituted these proceedings under the Genocide Convention.

- 8 -

## II. Prima facie jurisdiction

### 1. Preliminary observations

15. The Court may indicate provisional measures only if the provisions relied on by the applicant appear, prima facie, to afford a basis on which its jurisdiction could be founded, but it need not satisfy itself in a definitive manner that it has jurisdiction as regards the merits of the case (see *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, pp. 217-218, para. 24).

16. In the present case, South Africa seeks to found the jurisdiction of the Court on Article 36, paragraph 1, of the Statute of the Court and on Article IX of the Genocide Convention (see paragraph 3 above). The Court must therefore first determine whether those provisions prima facie confer upon it jurisdiction to rule on the merits of the case, enabling it — if the other necessary conditions are fulfilled — to indicate provisional measures.

17. Article IX of Genocide Convention provides:

"Disputes between the Contracting Parties relating to the interpretation, application or fulfilment of the present Convention, including those relating to the responsibility of a State for genocide or for any of the other acts enumerated in article III, shall be submitted to the International Court of Justice at the request of any of the parties to the dispute."

18. South Africa and Israel are parties to the Genocide Convention. Israel deposited its instrument of ratification on 9 March 1950 and South Africa deposited its instrument of accession on 10 December 1998. Neither of the Parties has entered a reservation to Article IX or any other provision of the Convention.

### 2. Existence of a dispute relating to the interpretation, application or fulfilment of the Genocide Convention

19. Article IX of the Genocide Convention makes the Court's jurisdiction conditional on the existence of a dispute relating to the interpretation, application or fulfilment of the Convention. A dispute is "a disagreement on a point of law or fact, a conflict of legal views or of interests" between parties (*Mavrommatis Palestine Concessions, Judgment No. 2, 1924, P.C.I.J., Series A, No. 2*, p. 11). In order for a dispute to exist, "[i]t must be shown that the claim of one party is positively opposed by the other" (*South West Africa (Ethiopia* v. *South Africa; Liberia* v. *South Africa), Preliminary Objections, Judgment, I.C.J. Reports 1962*, p. 328). The two sides must "'hold clearly opposite views concerning the question of the performance or non-performance of certain' international obligations" (*Alleged Violations of Sovereign Rights and Maritime Spaces in the Caribbean Sea (Nicaragua* v. *Colombia), Preliminary Objections, Judgment, I.C.J. Reports 2016 (I)*, p. 26, para. 50, citing *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, First Phase, Advisory Opinion, I.C.J. Reports 1950*, p. 74). To determine whether a dispute exists in the present case, the Court cannot limit itself to noting that one of the Parties maintains that the Convention applies, while the other denies it (see *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, pp. 218-219, para. 28).

20. Since South Africa has invoked as the basis of the Court's jurisdiction the compromissory clause of the Genocide Convention, the Court must also ascertain, at the present stage of the proceedings, whether it appears that the acts and omissions complained of by the Applicant are capable of falling within the scope of that convention *ratione materiae* (see *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 219, para. 29).

\*     \*

21. South Africa contends that a dispute exists with Israel relating to the interpretation, application and fulfilment of the Genocide Convention. It asserts that, prior to the filing of its Application, South Africa repeatedly and urgently voiced its concerns, in public statements and in various multilateral settings, including the United Nations Security Council and General Assembly, that Israel's actions in Gaza amount to genocide against the Palestinian people. In particular, as indicated in a media statement issued on 10 November 2023 by the Department of International Relations and Cooperation of South Africa, the Director General of the Department met with the Ambassador of Israel to South Africa on 9 November 2023 and informed him that, while South Africa "condemned the attacks on civilians by Hamas", it considered Israel's response to the attack of 7 October 2023 to be unlawful and it intended to refer the situation in Palestine to the International Criminal Court, calling for investigation of the leadership of Israel for war crimes, crimes against humanity and genocide. Furthermore, at the resumed 10th emergency special session of the United Nations General Assembly on 12 December 2023, at which Israel was represented, the South African representative to the United Nations stated specifically that "the events of the past six weeks in Gaza have illustrated that Israel is acting contrary to its obligations in terms of the Genocide Convention". The Applicant considers that the dispute between the Parties had already crystallized at that time. According to South Africa, Israel denied the accusation of genocide in a document published by its Ministry of Foreign Affairs on 6 December 2023 and updated on 8 December 2023, entitled "Hamas-Israel Conflict 2023: Frequently Asked Questions", stating in particular that "[t]he accusation of genocide against Israel is not only wholly unfounded as a matter of fact and law, it is morally repugnant". The Applicant also mentions that, on 21 December 2023, the Department of International Relations and Cooperation of South Africa sent a Note Verbale to the Embassy of Israel in Pretoria. It claims that, in this Note Verbale, it reiterated its view that Israel's acts in Gaza amounted to genocide and that South Africa was under an obligation to prevent genocide from being committed. The Applicant states that Israel responded by a Note Verbale dated 27 December 2023. It submits however that Israel, in that Note Verbale, failed to address the issues raised by South Africa.

22. The Applicant further submits that at least some, if not all, of the acts committed by Israel in Gaza, in the wake of the attack of 7 October 2023, fall within the provisions of the Genocide Convention. It alleges that, in contravention of Article I of the Convention, Israel "has perpetrated and is perpetrating genocidal acts identified in Article II" of the Convention and that "Israel, its officials and/or agents, have acted with the intent to destroy Palestinians in Gaza, part of a protected group under the Genocide Convention". The acts in question, according to South Africa, include

killing Palestinians in Gaza, causing them serious bodily and mental harm, inflicting on them conditions of life calculated to bring about their physical destruction, and the forcible displacement of people in Gaza. South Africa further alleges that Israel "has . . . failed to prevent or to punish: genocide, conspiracy to commit genocide, direct and public incitement to genocide, attempted genocide and complicity in genocide, contrary to Articles III and IV of the Genocide Convention".

\*

23. Israel contends that South Africa has failed to demonstrate the prima facie jurisdiction of the Court under Article IX of the Genocide Convention. It first argues that there is no dispute between the Parties because South Africa did not give Israel a reasonable opportunity to respond to the allegations of genocide before South Africa filed its Application. Israel submits that, on the one hand, South Africa's public statements accusing Israel of genocide and the referral of the situation in Palestine to the International Criminal Court and, on the other hand, the document published by the Israeli Ministry of Foreign Affairs, which was not addressed directly or even indirectly to South Africa, are not sufficient to prove the existence of a "positive opposition" of views, as required by the Court's jurisprudence. The Respondent emphasizes that, in the Note Verbale from the Embassy of Israel in Pretoria to the Department of International Relations and Cooperation of South Africa, dated 27 December 2023, in response to South Africa's Note Verbale, dated 21 December 2023, Israel had suggested a meeting between the Parties to discuss the issues raised by South Africa, but argues that this attempt to open a dialogue was ignored by South Africa at the relevant time. Israel considers that South Africa's unilateral assertions against Israel, in the absence of any bilateral interaction between the two States prior to the filing of the Application, do not suffice to establish the existence of a dispute in accordance with Article IX of the Genocide Convention.

24. Israel further argues that the acts complained of by South Africa are not capable of falling within the provisions of the Genocide Convention because the necessary specific intent to destroy, in whole or in part, the Palestinian people as such has not been proved, even on a prima facie basis. According to Israel, in the aftermath of the atrocities committed on 7 October 2023, facing indiscriminate rocket attacks by Hamas against Israel, it acted with the intention to defend itself, to terminate the threats against it and to rescue the hostages. Israel adds moreover that its practices of mitigating civilian harm and of facilitating humanitarian assistance demonstrate the absence of any genocidal intent. Israel asserts that any careful review of the official decisions in relation to the conflict in Gaza made by the relevant authorities in Israel since the outbreak of the war, in particular the decisions made by the Ministerial Committee on National Security Affairs and the War Cabinet, as well as by the Operations Directorate of the Israel Defense Forces, shows the emphasis placed on the need to avoid harm to civilians and to facilitate humanitarian aid. In its view, it is thus clearly demonstrated that such decisions lacked genocidal intent.

\*      \*

- 11 -

25. The Court recalls that, for the purposes of deciding whether a dispute existed between the Parties at the time of the filing of the Application, it takes into account in particular any statements or documents exchanged between the Parties, as well as any exchanges made in multilateral settings. In so doing, it pays special attention to the author of the statement or document, its intended or actual addressee and its content. The existence of a dispute is a matter for objective determination by the Court; it is a matter of substance, and not a question of form or procedure (see *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine v. Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, pp. 220-221, para. 35).

26. The Court notes that South Africa issued public statements in various multilateral and bilateral settings in which it expressed its view that, in light of the nature, scope and extent of Israel's military operations in Gaza, Israel's actions amounted to violations of its obligations under the Genocide Convention. For instance, at the resumed 10th emergency special session of the United Nations General Assembly on 12 December 2023, at which Israel was represented, the South African representative to the United Nations stated that "the events of the past six weeks in Gaza have illustrated that Israel is acting contrary to its obligations in terms of the Genocide Convention". South Africa recalled this statement in its Note Verbale of 21 December 2023 to the Embassy of Israel in Pretoria.

27. The Court notes that Israel dismissed any accusation of genocide in the context of the conflict in Gaza in a document published by the Israeli Ministry of Foreign Affairs on 6 December 2023 which was subsequently updated and reproduced on the website of the Israel Defense Forces on 15 December 2023 under the title "The War Against Hamas: Answering Your Most Pressing Questions", stating that "[t]he accusation of genocide against Israel is not only wholly unfounded as a matter of fact and law, it is morally repugnant". In the document, Israel also stated that "[t]he accusation of genocide . . . is not just legally and factually incoherent, it is obscene" and that there was "no . . . valid basis, in fact or law, for the outrageous charge of genocide".

28. In light of the above, the Court considers that the Parties appear to hold clearly opposite views as to whether certain acts or omissions allegedly committed by Israel in Gaza amount to violations by the latter of its obligations under the Genocide Convention. The Court finds that the above-mentioned elements are sufficient at this stage to establish prima facie the existence of a dispute between the Parties relating to the interpretation, application or fulfilment of the Genocide Convention.

29. As to whether the acts and omissions complained of by the Applicant appear to be capable of falling within the provisions of the Genocide Convention, the Court recalls that South Africa considers Israel to be responsible for committing genocide in Gaza and for failing to prevent and punish genocidal acts. South Africa contends that Israel has also violated other obligations under the Genocide Convention, including those concerning "conspiracy to commit genocide, direct and public incitement to genocide, attempted genocide and complicity in genocide".

- 12 -

30. At the present stage of the proceedings, the Court is not required to ascertain whether any violations of Israel's obligations under the Genocide Convention have occurred. Such a finding could be made by the Court only at the stage of the examination of the merits of the present case. As already noted (see paragraph 20 above), at the stage of making an order on a request for the indication of provisional measures, the Court's task is to establish whether the acts and omissions complained of by the applicant appear to be capable of falling within the provisions of the Genocide Convention (cf. *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 222, para. 43). In the Court's view, at least some of the acts and omissions alleged by South Africa to have been committed by Israel in Gaza appear to be capable of falling within the provisions of the Convention.

### 3. Conclusion as to prima facie jurisdiction

31. In light of the foregoing, the Court concludes that, prima facie, it has jurisdiction pursuant to Article IX of the Genocide Convention to entertain the case.

32. Given the above conclusion, the Court considers that it cannot accede to Israel's request that the case be removed from the General List.

### III. STANDING OF SOUTH AFRICA

33. The Court notes that the Respondent did not challenge the standing of the Applicant in the present proceedings. It recalls that, in the case concerning the *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia* v. *Myanmar)* where Article IX of the Genocide Convention was also invoked, it observed that all the States parties to the Convention have a common interest to ensure the prevention, suppression and punishment of genocide, by committing themselves to fulfilling the obligations contained in the Convention. Such a common interest implies that the obligations in question are owed by any State party to all the other States parties to the relevant convention; they are obligations *erga omnes partes*, in the sense that each State party has an interest in compliance with them in any given case. The common interest in compliance with the relevant obligations under the Genocide Convention entails that any State party, without distinction, is entitled to invoke the responsibility of another State party for an alleged breach of its obligations *erga omnes partes*. Accordingly, the Court found that any State party to the Genocide Convention may invoke the responsibility of another State party, including through the institution of proceedings before the Court, with a view to determining the alleged failure to comply with its obligations *erga omnes partes* under the Convention and to bringing that failure to an end (*Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia* v. *Myanmar), Preliminary Objections, Judgment, I.C.J. Reports 2022 (II)*, pp. 516-517, paras. 107-108 and 112).

34. The Court concludes, prima facie, that South Africa has standing to submit to it the dispute with Israel concerning alleged violations of obligations under the Genocide Convention.

- 13 -

#### IV. THE RIGHTS WHOSE PROTECTION IS SOUGHT AND THE LINK BETWEEN SUCH RIGHTS AND THE MEASURES REQUESTED

35. The power of the Court to indicate provisional measures under Article 41 of the Statute has as its object the preservation of the respective rights claimed by the parties in a case, pending its decision on the merits thereof. It follows that the Court must be concerned to preserve by such measures the rights which may subsequently be adjudged by it to belong to either party. Therefore, the Court may exercise this power only if it is satisfied that the rights asserted by the party requesting such measures are at least plausible (see, for example, *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 223, para. 50).

36. At this stage of the proceedings, however, the Court is not called upon to determine definitively whether the rights which South Africa wishes to see protected exist. It need only decide whether the rights claimed by South Africa, and for which it is seeking protection, are plausible. Moreover, a link must exist between the rights whose protection is sought and the provisional measures being requested (*Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 224, para. 51).

\*      \*

37. South Africa argues that it seeks to protect the rights of the Palestinians in Gaza, as well as its own rights under the Genocide Convention. It refers to the rights of the Palestinians in the Gaza Strip to be protected from acts of genocide, attempted genocide, direct and public incitement to commit genocide, complicity in genocide and conspiracy to commit genocide. The Applicant argues that the Convention prohibits the destruction of a group or part thereof, and states that Palestinians in the Gaza Strip, because of their membership in a group, "are protected by the Convention, as is the group itself". South Africa also argues that it seeks to protect its own right to safeguard compliance with the Genocide Convention. South Africa contends that the rights in question are "at least plausible", since they are "grounded in a possible interpretation" of the Genocide Convention.

38. South Africa submits that the evidence before the Court "shows incontrovertibly a pattern of conduct and related intention that justifies a plausible claim of genocidal acts". It alleges, in particular, the commission of the following acts with genocidal intent: killing, causing serious bodily and mental harm, inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part, and imposing measures intended to prevent births within the group. According to South Africa, genocidal intent is evident from the way in which Israel's military attack is being conducted, from the clear pattern of conduct of Israel in Gaza and from the statements made by Israeli officials in relation to the military operation in the Gaza Strip. The Applicant also contends that "[t]he intentional failure of the Government of Israel to condemn, prevent and punish such genocidal incitement constitutes in itself a grave violation of the Genocide Convention".

- 14 -

South Africa stresses that any stated intention by the Respondent to destroy Hamas does not preclude genocidal intent by Israel towards the whole or part of the Palestinian people in Gaza.

\*

39. Israel states that, at the provisional measures stage, the Court must establish that the rights claimed by the parties in a case are plausible, but "[s]imply declaring that claimed rights are plausible is insufficient". According to the Respondent, the Court has also to consider the claims of fact in the relevant context, including the question of the possible breach of the rights claimed.

40. Israel submits that the appropriate legal framework for the conflict in Gaza is that of international humanitarian law and not the Genocide Convention. It argues that, in situations of urban warfare, civilian casualties may be an unintended consequence of lawful use of force against military objects, and do not constitute genocidal acts. Israel considers that South Africa has misrepresented the facts on the ground and observes that its efforts to mitigate harm when conducting operations and to alleviate hardship and suffering through humanitarian activities in Gaza serve to dispel — or at the very least, militate against — any allegation of genocidal intent. According to the Respondent, the statements of Israeli officials presented by South Africa are "misleading at best" and "not in conformity with government policy". Israel also called attention to its Attorney General's recent announcement that "[a]ny statement calling, inter alia, for intentional harm to civilians . . . may amount to a criminal offense, including the offense of incitement" and that "[c]urrently, several such cases are being examined by Israeli law enforcement authorities". In Israel's view, neither those statements nor its pattern of conduct in the Gaza Strip give rise to a "plausible inference" of genocidal intent. In any event, Israel contends, since the purpose of provisional measures is to preserve the rights of both parties, the Court must, in the present case, consider and "balance" the respective rights of South Africa and Israel. The Respondent emphasizes that it bears the responsibility to protect its citizens, including those captured and held hostage as a result of the attack that took place on 7 October 2023. As a consequence, it claims that its right to self-defence is critical to any evaluation of the present situation.

\*      \*

41. The Court recalls that, in accordance with Article I of the Convention, all States parties thereto have undertaken "to prevent and to punish" the crime of genocide. Article II provides that

"genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

*(a)* Killing members of the group;

- 15 -

*(b)* Causing serious bodily or mental harm to members of the group;

*(c)* Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

*(d)* Imposing measures intended to prevent births within the group;

*(e)* Forcibly transferring children of the group to another group".

42. Pursuant to Article III of the Genocide Convention, the following acts are also prohibited by the Convention: conspiracy to commit genocide (Article III, para. *(b)*), direct and public incitement to commit genocide (Article III, para. *(c)*), attempt to commit genocide (Article III, para. *(d)*) and complicity in genocide (Article III, para. *(e)*).

43. The provisions of the Convention are intended to protect the members of a national, ethnical, racial or religious group from acts of genocide or any other punishable acts enumerated in Article III. The Court considers that there is a correlation between the rights of members of groups protected under the Genocide Convention, the obligations incumbent on States parties thereto, and the right of any State party to seek compliance therewith by another State party (*Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia* v. *Myanmar), Provisional Measures, Order of 23 January 2020, I.C.J. Reports 2020*, p. 20, para. 52).

44. The Court recalls that, in order for acts to fall within the scope of Article II of the Convention,

"the intent must be to destroy at least a substantial part of the particular group. That is demanded by the very nature of the crime of genocide: since the object and purpose of the Convention as a whole is to prevent the intentional destruction of groups, the part targeted must be significant enough to have an impact on the group as a whole." (*Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina* v. *Serbia and Montenegro), Judgment, I.C.J. Reports 2007 (I)*, p. 126, para. 198.)

45. The Palestinians appear to constitute a distinct "national, ethnical, racial or religious group", and hence a protected group within the meaning of Article II of the Genocide Convention. The Court observes that, according to United Nations sources, the Palestinian population of the Gaza Strip comprises over 2 million people. Palestinians in the Gaza Strip form a substantial part of the protected group.

46. The Court notes that the military operation being conducted by Israel following the attack of 7 October 2023 has resulted in a large number of deaths and injuries, as well as the massive destruction of homes, the forcible displacement of the vast majority of the population, and extensive damage to civilian infrastructure. While figures relating to the Gaza Strip cannot be independently verified, recent information indicates that 25,700 Palestinians have been killed, over 63,000 injuries have been reported, over 360,000 housing units have been destroyed or partially damaged and approximately 1.7 million persons have been internally displaced (see United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Hostilities in the Gaza Strip and Israel — reported impact, Day 109 (24 Jan. 2024)).

47. The Court takes note, in this regard, of the statement made by the United Nations Under-Secretary-General for Humanitarian Affairs and Emergency Relief Coordinator, Mr Martin Griffiths, on 5 January 2024:

"Gaza has become a place of death and despair.

. . . Families are sleeping in the open as temperatures plummet. Areas where civilians were told to relocate for their safety have come under bombardment. Medical facilities are under relentless attack. The few hospitals that are partially functional are overwhelmed with trauma cases, critically short of all supplies, and inundated by desperate people seeking safety.

A public health disaster is unfolding. Infectious diseases are spreading in overcrowded shelters as sewers spill over. Some 180 Palestinian women are giving birth daily amidst this chaos. People are facing the highest levels of food insecurity ever recorded. Famine is around the corner.

For children in particular, the past 12 weeks have been traumatic: No food. No water. No school. Nothing but the terrifying sounds of war, day in and day out.

Gaza has simply become uninhabitable. Its people are witnessing daily threats to their very existence — while the world watches on." (OCHA, "UN relief chief: The war in Gaza must end", Statement by Martin Griffiths, Under-Secretary-General for Humanitarian Affairs and Emergency Relief Coordinator, 5 Jan. 2024.)

48. Following a mission to North Gaza, the World Health Organization (WHO) reported that, as of 21 December 2023:

"An unprecedented 93% of the population in Gaza is facing crisis levels of hunger, with insufficient food and high levels of malnutrition. At least 1 in 4 households are facing 'catastrophic conditions': experiencing an extreme lack of food and starvation and having resorted to selling off their possessions and other extreme measures to afford a simple meal. Starvation, destitution and death are evident." (WHO, "Lethal combination of hunger and disease to lead to more deaths in Gaza", 21 Dec. 2023; see also World Food Programme, "Gaza on the brink as one in four people face extreme hunger", 20 Dec. 2023.)

49. The Court further notes the statement issued by the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), Mr Philippe Lazzarini, on 13 January 2024:

"It's been 100 days since the devastating war started, killing and displacing people in Gaza, following the horrific attacks that Hamas and other groups carried out against people in Israel. It's been 100 days of ordeal and anxiety for hostages and their families.

- 17 -

In the past 100 days, sustained bombardment across the Gaza Strip caused the mass displacement of a population that is in a state of flux — constantly uprooted and forced to leave overnight, only to move to places which are just as unsafe. This has been the largest displacement of the Palestinian people since 1948.

This war affected more than 2 million people — the entire population of Gaza. Many will carry lifelong scars, both physical and psychological. The vast majority, including children, are deeply traumatized.

Overcrowded and unsanitary UNRWA shelters have now become 'home' to more than 1.4 million people. They lack everything, from food to hygiene to privacy. People live in inhumane conditions, where diseases are spreading, including among children. They live through the unlivable, with the clock ticking fast towards famine.

The plight of children in Gaza is especially heartbreaking. An entire generation of children is traumatized and will take years to heal. Thousands have been killed, maimed, and orphaned. Hundreds of thousands are deprived of education. Their future is in jeopardy, with far-reaching and long-lasting consequences." (UNRWA, "The Gaza Strip: 100 days of death, destruction and displacement", Statement by Philippe Lazzarini, Commissioner-General of UNRWA, 13 Jan. 2024.)

50. The UNRWA Commissioner-General also stated that the crisis in Gaza is "compounded by dehumanizing language" (UNRWA, "The Gaza Strip: 100 days of death, destruction and displacement", Statement by Philippe Lazzarini, Commissioner-General of UNRWA, 13 Jan. 2024).

51. In this regard, the Court has taken note of a number of statements made by senior Israeli officials. It calls attention, in particular, to the following examples.

52. On 9 October 2023, Mr Yoav Gallant, Defence Minister of Israel, announced that he had ordered a "complete siege" of Gaza City and that there would be "no electricity, no food, no fuel" and that "everything [was] closed". On the following day, Minister Gallant stated, speaking to Israeli troops on the Gaza border:

"I have released all restraints . . . You saw what we are fighting against. We are fighting human animals. This is the ISIS of Gaza. This is what we are fighting against . . . Gaza won't return to what it was before. There will be no Hamas. We will eliminate everything. If it doesn't take one day, it will take a week, it will take weeks or even months, we will reach all places."

On 12 October 2023, Mr Isaac Herzog, President of Israel, stated, referring to Gaza:

"We are working, operating militarily according to rules of international law. Unequivocally. It is an entire nation out there that is responsible. It is not true this rhetoric about civilians not aware, not involved. It is absolutely not true. They could have risen up. They could have fought against that evil regime which took over Gaza in a coup d'état. But we are at war. We are at war. We are at war. We are defending our

- 18 -

homes. We are protecting our homes. That's the truth. And when a nation protects its home, it fights. And we will fight until we'll break their backbone."

On 13 October 2023, Mr Israel Katz, then Minister of Energy and Infrastructure of Israel, stated on X (formerly Twitter):

"We will fight the terrorist organization Hamas and destroy it. All the civilian population in [G]aza is ordered to leave immediately. We will win. They will not receive a drop of water or a single battery until they leave the world."

53. The Court also takes note of a press release of 16 November 2023, issued by 37 Special Rapporteurs, Independent Experts and members of Working Groups part of the Special Procedures of the United Nations Human Rights Council, in which they voiced alarm over "discernibly genocidal and dehumanising rhetoric coming from senior Israeli government officials". In addition, on 27 October 2023, the United Nations Committee on the Elimination of Racial Discrimination observed that it was "[h]ighly concerned about the sharp increase in racist hate speech and dehumanization directed at Palestinians since 7 October".

54. In the Court's view, the facts and circumstances mentioned above are sufficient to conclude that at least some of the rights claimed by South Africa and for which it is seeking protection are plausible. This is the case with respect to the right of the Palestinians in Gaza to be protected from acts of genocide and related prohibited acts identified in Article III, and the right of South Africa to seek Israel's compliance with the latter's obligations under the Convention.

55. The Court now turns to the condition of the link between the plausible rights claimed by South Africa and the provisional measures requested.

\*     \*

56. South Africa considers that a link exists between the rights whose protection is sought and the provisional measures it requests. It contends, in particular, that the first six provisional measures were requested to ensure compliance by Israel with its obligations under the Genocide Convention, while the last three are aimed at protecting the integrity of the proceedings before the Court and South Africa's right to have its claim fairly adjudicated.

\*

57. Israel considers that the measures requested go beyond what is necessary to protect rights on an interim basis and therefore have no link with the rights sought to be protected. The Respondent contends, *inter alia*, that granting the first and second measures sought by South Africa (see

- 19 -

paragraph 11 above) would reverse the Court's case law, as those measures would be "for the protection of a right that could not form the basis of a judgment in exercise of jurisdiction under the Genocide Convention".

\*        \*

58. The Court has already found (see paragraph 54 above) that at least some of the rights asserted by South Africa under the Genocide Convention are plausible.

59. The Court considers that, by their very nature, at least some of the provisional measures sought by South Africa are aimed at preserving the plausible rights it asserts on the basis of the Genocide Convention in the present case, namely the right of the Palestinians in Gaza to be protected from acts of genocide and related prohibited acts mentioned in Article III, and the right of South Africa to seek Israel's compliance with the latter's obligations under the Convention. Therefore, a link exists between the rights claimed by South Africa that the Court has found to be plausible, and at least some of the provisional measures requested.

### V. RISK OF IRREPARABLE PREJUDICE AND URGENCY

60. The Court, pursuant to Article 41 of its Statute, has the power to indicate provisional measures when irreparable prejudice could be caused to rights which are the subject of judicial proceedings or when the alleged disregard of such rights may entail irreparable consequences (see, for example, *Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 226, para. 65).

61. However, the power of the Court to indicate provisional measures will be exercised only if there is urgency, in the sense that there is a real and imminent risk that irreparable prejudice will be caused to the rights claimed before the Court gives its final decision. The condition of urgency is met when the acts susceptible of causing irreparable prejudice can "occur at any moment" before the Court makes a final decision on the case (*Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 227, para. 66). The Court must therefore consider whether such a risk exists at this stage of the proceedings.

62. The Court is not called upon, for the purposes of its decision on the request for the indication of provisional measures, to establish the existence of breaches of obligations under the Genocide Convention, but to determine whether the circumstances require the indication of provisional measures for the protection of rights under that instrument. As already noted, the Court cannot at this stage make definitive findings of fact (see paragraph 30 above), and the right of each Party to submit arguments in respect of the merits remains unaffected by the Court's decision on the request for the indication of provisional measures.

\*        \*

- 20 -

63. South Africa submits that there is a clear risk of irreparable prejudice to the rights of the Palestinians in Gaza and to its own rights under the Genocide Convention. It asserts that the Court has repeatedly found that the criterion of irreparable prejudice is satisfied where serious risks arise to human life or other fundamental rights. According to the Applicant, daily statistics stand as clear evidence of urgency and risk of irreparable prejudice, with an average of 247 Palestinians being killed, 629 wounded and 3,900 Palestinian homes damaged or destroyed each day. Moreover, Palestinians in the Gaza Strip are, in the view of South Africa, at

> "immediate risk of death by starvation, dehydration and disease as a result of the ongoing siege by Israel, the destruction of Palestinian towns, the insufficient aid being allowed through to the Palestinian population and the impossibility of distributing this limited aid while bombs fall".

The Applicant further contends that any scaling up by Israel of access of humanitarian relief to Gaza would be no answer to its request for provisional measures. South Africa adds that, "[s]hould [Israel's] violations of the Genocide Convention go unchecked", the opportunity to collect and preserve evidence for the merits stage of the proceedings would be seriously undermined, if not lost entirely.

64. Israel denies that there exists a real and imminent risk of irreparable prejudice in the present case. It contends that it has taken — and continues to take — concrete measures aimed specifically at recognizing and ensuring the right of the Palestinian civilians in Gaza to exist and has facilitated the provision of humanitarian assistance throughout the Gaza Strip. In this regard, the Respondent observes that, with the assistance of the World Food Programme, a dozen bakeries have recently reopened with the capacity to produce more than 2 million breads a day. Israel also contends that it continues to supply its own water to Gaza by two pipelines, that it facilitates the delivery of bottled water in large quantities, and that it repairs and expands water infrastructure. It further states that access to medical supplies and services has increased and asserts, in particular, that it has facilitated the establishment of six field hospitals and two floating hospitals and that two more hospitals are being built. It also contends that the entry of medical teams into Gaza has been facilitated and that ill and wounded persons are being evacuated through the Rafah border crossing. According to Israel, tents and winter equipment have also been distributed, and the delivery of fuel and cooking gas has been facilitated. Israel further states that, according to a statement by its Defence Minister of 7 January 2024, the scope and intensity of the hostilities was decreasing.

*     *

65. The Court recalls that, as underlined in General Assembly resolution 96 (I) of 11 December 1946,

> "[g]enocide is a denial of the right of existence of entire human groups, as homicide is the denial of the right to live of individual human beings; such denial of the right of existence shocks the conscience of mankind, results in great losses to humanity in the form of cultural and other contributions represented by these human groups, and is contrary to moral law and to the spirit and aims of the United Nations".

- 21 -

The Court has observed, in particular, that the Genocide Convention "was manifestly adopted for a purely humanitarian and civilizing purpose", since "its object on the one hand is to safeguard the very existence of certain human groups and on the other to confirm and endorse the most elementary principles of morality" (*Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, Advisory Opinion, I.C.J. Reports 1951*, p. 23).

66. In view of the fundamental values sought to be protected by the Genocide Convention, the Court considers that the plausible rights in question in these proceedings, namely the right of Palestinians in the Gaza Strip to be protected from acts of genocide and related prohibited acts identified in Article III of the Genocide Convention and the right of South Africa to seek Israel's compliance with the latter's obligations under the Convention, are of such a nature that prejudice to them is capable of causing irreparable harm (see *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia* v. *Myanmar), Provisional Measures, Order of 23 January 2020, I.C.J. Reports 2020*, p 26, para. 70).

67. During the ongoing conflict, senior United Nations officials have repeatedly called attention to the risk of further deterioration of conditions in the Gaza Strip. The Court takes note, for instance, of the letter dated 6 December 2023, whereby the Secretary-General of the United Nations brought the following information to the attention of the Security Council:

"The health-care system in Gaza is collapsing . . .

Nowhere is safe in Gaza.

Amid constant bombardment by the Israel Defense Forces, and without shelter or the essentials to survive, I expect public order to completely break down soon due to the desperate conditions, rendering even limited humanitarian assistance impossible. An even worse situation could unfold, including epidemic diseases and increased pressure for mass displacement into neighbouring countries.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

We are facing a severe risk of collapse of the humanitarian system. The situation is fast deteriorating into a catastrophe with potentially irreversible implications for Palestinians as a whole and for peace and security in the region. Such an outcome must be avoided at all costs." (United Nations Security Council, doc. S/2023/962, 6 Dec. 2023.)

68. On 5 January 2024, the Secretary-General wrote again to the Security Council, providing an update on the situation in the Gaza Strip and observing that "[s]adly, devastating levels of death and destruction continue" (Letter dated 5 January 2024 from the Secretary-General addressed to the President of the Security Council, United Nations Security Council, doc. S/2024/26, 8 Jan. 2024).

69. The Court also takes note of the 17 January 2024 statement issued by the UNRWA Commissioner-General upon returning from his fourth visit to the Gaza Strip since the beginning of

- 22 -

the current conflict in Gaza: "Every time I visit Gaza, I witness how people have sunk further into despair, with the struggle for survival consuming every hour." (UNRWA, "The Gaza Strip: a struggle for daily survival amid death, exhaustion and despair", Statement by Philippe Lazzarini, Commissioner-General of UNRWA, 17 Jan. 2024.)

70. The Court considers that the civilian population in the Gaza Strip remains extremely vulnerable. It recalls that the military operation conducted by Israel after 7 October 2023 has resulted, *inter alia*, in tens of thousands of deaths and injuries and the destruction of homes, schools, medical facilities and other vital infrastructure, as well as displacement on a massive scale (see paragraph 46 above). The Court notes that the operation is ongoing and that the Prime Minister of Israel announced on 18 January 2024 that the war "will take many more long months". At present, many Palestinians in the Gaza Strip have no access to the most basic foodstuffs, potable water, electricity, essential medicines or heating.

71. The WHO has estimated that 15 per cent of the women giving birth in the Gaza Strip are likely to experience complications, and indicates that maternal and newborn death rates are expected to increase due to the lack of access to medical care.

72. In these circumstances, the Court considers that the catastrophic humanitarian situation in the Gaza Strip is at serious risk of deteriorating further before the Court renders its final judgment.

73. The Court recalls Israel's statement that it has taken certain steps to address and alleviate the conditions faced by the population in the Gaza Strip. The Court further notes that the Attorney General of Israel recently stated that a call for intentional harm to civilians may amount to a criminal offence, including that of incitement, and that several such cases are being examined by Israeli law enforcement authorities. While steps such as these are to be encouraged, they are insufficient to remove the risk that irreparable prejudice will be caused before the Court issues its final decision in the case.

74. In light of the considerations set out above, the Court considers that there is urgency, in the sense that there is a real and imminent risk that irreparable prejudice will be caused to the rights found by the Court to be plausible, before it gives its final decision.

### VI. CONCLUSION AND MEASURES TO BE ADOPTED

75. The Court concludes on the basis of the above considerations that the conditions required by its Statute for it to indicate provisional measures are met. It is therefore necessary, pending its final decision, for the Court to indicate certain measures in order to protect the rights claimed by South Africa that the Court has found to be plausible (see paragraph 54 above).

76. The Court recalls that it has the power, under its Statute, when a request for provisional measures has been made, to indicate measures that are, in whole or in part, other than those requested. Article 75, paragraph 2, of the Rules of Court specifically refers to this power of the Court. The Court has already exercised this power on several occasions in the past (see, for example, *Application of*

- 23 -

*the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia* v. *Myanmar), Provisional Measures, Order of 23 January 2020, I.C.J. Reports 2020*, p. 28, para. 77).

77. In the present case, having considered the terms of the provisional measures requested by South Africa and the circumstances of the case, the Court finds that the measures to be indicated need not be identical to those requested.

78. The Court considers that, with regard to the situation described above, Israel must, in accordance with its obligations under the Genocide Convention, in relation to Palestinians in Gaza, take all measures within its power to prevent the commission of all acts within the scope of Article II of this Convention, in particular: *(a)* killing members of the group; *(b)* causing serious bodily or mental harm to members of the group; *(c)* deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and *(d)* imposing measures intended to prevent births within the group. The Court recalls that these acts fall within the scope of Article II of the Convention when they are committed with the intent to destroy in whole or in part a group as such (see paragraph 44 above). The Court further considers that Israel must ensure with immediate effect that its military forces do not commit any of the above-described acts.

79. The Court is also of the view that Israel must take all measures within its power to prevent and punish the direct and public incitement to commit genocide in relation to members of the Palestinian group in the Gaza Strip.

80. The Court further considers that Israel must take immediate and effective measures to enable the provision of urgently needed basic services and humanitarian assistance to address the adverse conditions of life faced by Palestinians in the Gaza Strip.

81. Israel must also take effective measures to prevent the destruction and ensure the preservation of evidence related to allegations of acts within the scope of Article II and Article III of the Genocide Convention against members of the Palestinian group in the Gaza Strip.

82. Regarding the provisional measure requested by South Africa that Israel must submit a report to the Court on all measures taken to give effect to its Order, the Court recalls that it has the power, reflected in Article 78 of the Rules of Court, to request the parties to provide information on any matter connected with the implementation of any provisional measures it has indicated. In view of the specific provisional measures it has decided to indicate, the Court considers that Israel must submit a report to the Court on all measures taken to give effect to this Order within one month, as from the date of this Order. The report so provided shall then be communicated to South Africa, which shall be given the opportunity to submit to the Court its comments thereon.

\*

\*      \*

- 24 -

83. The Court recalls that its Orders on provisional measures under Article 41 of the Statute have binding effect and thus create international legal obligations for any party to whom the provisional measures are addressed (*Allegations of Genocide under the Convention on the Prevention and Punishment of the Crime of Genocide (Ukraine* v. *Russian Federation), Provisional Measures, Order of 16 March 2022, I.C.J. Reports 2022 (I)*, p. 230, para. 84).

\*

\*      \*

84. The Court reaffirms that the decision given in the present proceedings in no way prejudges the question of the jurisdiction of the Court to deal with the merits of the case or any questions relating to the admissibility of the Application or to the merits themselves. It leaves unaffected the right of the Governments of the Republic of South Africa and the State of Israel to submit arguments in respect of those questions.

\*

\*      \*

85. The Court deems it necessary to emphasize that all parties to the conflict in the Gaza Strip are bound by international humanitarian law. It is gravely concerned about the fate of the hostages abducted during the attack in Israel on 7 October 2023 and held since then by Hamas and other armed groups, and calls for their immediate and unconditional release.

\*

\*      \*

86. For these reasons,

THE COURT,

*Indicates* the following provisional measures:

(1) By fifteen votes to two,

The State of Israel shall, in accordance with its obligations under the Convention on the Prevention and Punishment of the Crime of Genocide, in relation to Palestinians in Gaza, take all measures within its power to prevent the commission of all acts within the scope of Article II of this Convention, in particular:

- 25 -

*(a)* killing members of the group;

*(b)* causing serious bodily or mental harm to members of the group;

*(c)* deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and

*(d)* imposing measures intended to prevent births within the group;

> IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judge* ad hoc Moseneke;

> AGAINST: *Judge* Sebutinde; *Judge* ad hoc Barak;

(2) By fifteen votes to two,

The State of Israel shall ensure with immediate effect that its military does not commit any acts described in point 1 above;

> IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judge* ad hoc Moseneke;

> AGAINST: *Judge* Sebutinde; *Judge* ad hoc Barak;

(3) By sixteen votes to one,

The State of Israel shall take all measures within its power to prevent and punish the direct and public incitement to commit genocide in relation to members of the Palestinian group in the Gaza Strip;

> IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judges* ad hoc Barak, Moseneke;

> AGAINST: *Judge* Sebutinde;

(4) By sixteen votes to one,

The State of Israel shall take immediate and effective measures to enable the provision of urgently needed basic services and humanitarian assistance to address the adverse conditions of life faced by Palestinians in the Gaza Strip;

> IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judges* ad hoc Barak, Moseneke;

> AGAINST: *Judge* Sebutinde;

(5) By fifteen votes to two,

The State of Israel shall take effective measures to prevent the destruction and ensure the preservation of evidence related to allegations of acts within the scope of Article II and Article III of the Convention on the Prevention and Punishment of the Crime of Genocide against members of the Palestinian group in the Gaza Strip;

IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judge* ad hoc Moseneke;

AGAINST: *Judge* Sebutinde; *Judge* ad hoc Barak;

(6) By fifteen votes to two,

The State of Israel shall submit a report to the Court on all measures taken to give effect to this Order within one month as from the date of this Order.

IN FAVOUR: *President* Donoghue; *Vice-President* Gevorgian; *Judges* Tomka, Abraham, Bennouna, Yusuf, Xue, Bhandari, Robinson, Salam, Iwasawa, Nolte, Charlesworth, Brant; *Judge* ad hoc Moseneke;

AGAINST: *Judge* Sebutinde; *Judge* ad hoc Barak.

Done in English and in French, the English text being authoritative, at the Peace Palace, The Hague, this twenty-sixth day of January, two thousand and twenty-four, in three copies, one of which will be placed in the archives of the Court and the others transmitted to the Government of the Republic of South Africa and the Government of the State of Israel, respectively.

*(Signed)*   Joan E. DONOGHUE,
President.

*(Signed)*   Philippe GAUTIER,
Registrar.

- 27 -

Judge Xᴜᴇ appends a declaration to the Order of the Court; Judge Sᴇʙᴜᴛɪɴᴅᴇ appends a dissenting opinion to the Order of the Court; Judges Bʜᴀɴᴅᴀʀɪ and Nᴏʟᴛᴇ append declarations to the Order of the Court; Judge *ad hoc* Bᴀʀᴀᴋ appends a separate opinion to the Order of the Court.

*(Initialled)*   J.E.D

*(Initialled)*   Ph.G.

_____