UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENSE FOR CHILDREN INTERNATIONAL-PALESTINE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, et al.,<br><br>Defendants. | Case No. 23-cv-05829-JSW<br><br>**ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 19, 38 |

Now before the Court is the motion for preliminary injunction filed by Plaintiffs Defense for Children International-Palestine, Al-Haq, Ahmed Abu Artema, Dr. Omar El-Najjar, Mohammed Ahmed Abu Rokbeh, Mohammad Herzallah, Laila Elhaddad, Waeil Elbhassi, Basim Elkarra, and A.N. (collectively "Plaintiffs"). Also before the Court is the motion to dismiss filed by the President and the Secretaries of Defense and State of the United States ("Defendants"). The Court has considered the parties' papers, oral argument, testimony, relevant legal authority, and the record in this case, and the Court HEREBY GRANTS Defendants' motion to dismiss and DENIES Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

On October 7, 2023, Hamas attacked Israel, killing approximately 1,200 people and taking 240 citizens hostage. Since that time, Israel has mounted a military campaign against Hamas in the Gaza Strip. During this military campaign, there have been roughly 26,000 people killed and over 63,000 wounded in Israeli attacks. Defendants, the United States President and his

Secretaries of Defense and State, as well as numerous other senior administration officials have been engaged in diplomatic discussions in the area, in addition to providing significant military and financial support for Israel.

On November 13, 2023, Plaintiffs filed this suit against the Defendants to "take all measures within their power to prevent Israel's commission of genocidal acts against the Palestinian people of Gaza." (Compl., Prayer for Relief.) Plaintiffs allege that Defendants violate their duties under Article I of the Genocide Convention by supporting Israel's military actions following the attacks of October 7, 2023. *See* Genocide Convention, art. 1, 78 U.N.T.S. at 280. Plaintiffs further allege that Defendants, by providing diplomatic, financial, and military support to Israel, are complicit in Israel's purported commission of genocide, in violation of Article III(e) and its implementing legislation, which makes genocide a federal crime. *See id.* at art. 111(e); 18 U.S.C. § 1091. Plaintiffs allege that Defendants have violated the duties of the United States under international law and, by its actions, is complicit in the ongoing genocide of the Palestinian people in Gaza.

In their motion for a preliminary injunction, Plaintiffs seek an "order enjoining Defendants and all persons associated with them from providing any further military or financial support, aid, or any form of assistance to Israel's attacks and maintenance of a total siege on Palestinians in Gaza, in accordance with their duty under federal and customary international law to prevent, and not further, genocide." (Dkt. No. 19, Motion for Preliminary Injunction at 1.) Further, Plaintiffs seek an order from this Court requiring Defendants to "exert influence over Israel to end its bombing of the Palestinian people of Gaza, … to lift the siege on Gaza, … [and to] prevent the 'evacuation' or forcible transfer and expulsion of Palestinians from Gaza." (Compl., Prayer for Relief.) Lastly, Plaintiffs seek to have this Court enjoin Defendants "from obstructing attempts by the international community, including at the United Nations, to implement a ceasefire in Gaza and lift the siege on Gaza." (*Id.*)

In its recent decision, the International Court of Justice ("ICJ") found that the "acts and omissions complained of … appear to be capable of falling within the provisions of the Genocide Convention." (Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.) The ICJ found that:

> the military operation being conducted by Israel following the attack of 7 October 2023 has resulted in a large number of deaths and injuries, as well as the massive destruction of homes, forcible displacement of the vast majority of the population, and extensive damage to civilian infrastructure. While figures relating to the Gaza Strip cannot be independently verified, recent information indicates that 25,700 Palestinians have been killed, over 63,000 injuries have been reported, over 360,000 housing units have been destroyed or partially damaged and approximately 1.7 million persons have been internally displaced.

(*Id.* at ¶ 46.)

Upon adoption of the Genocide Convention, the United Nations General Assembly defined genocide as

> a denial of the right of existence of entire human groups, as homicide is the denial of the right to live of individual human beings; such denial of the right of existence shocks the conscience of mankind, results in great losses in the form of cultural and other contributions represented by these human groups, and is contrary to moral law and to the spirit and aims of the United Nations.

(*Id.* at ¶ 65, citing resolution 96(I) of 11 December 1946.) The ICJ further observed that the Genocide Convention "'was manifestly adopted for a purely humanitarian and civilizing purpose', since 'its object on the one hand is to safeguard the very existence of certain human groups and on the other to confirm and endorse the most elementary principles of morality.'" (*Id.*) (citation omitted). The International Court found that it considered it "plausible [that the] rights in question in these proceedings, namely the right of Palestinians in the Gaza Strip to be protected from acts of genocide and related prohibited acts identified in Article III of the Genocide Convention, … are of such a nature that prejudice to them is capable of causing irreparable harm." (*Id.* at ¶ 66.) (citation omitted).

The ICJ further ruled that "Israel must, in accordance with its obligations under the Genocide Convention, in relation to Palestinians in Gaza, take all measures within its power to prevent the commission of all acts within the scope of article II of this Convention, in particular: *(a)* killing members of the group; *(b)* causing serious bodily or mental harm to members of the group; *(c)* deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; and *(d)* imposing measures intended to prevent births

within the group. … The Court further considers that Israel must ensure with immediate effect that its military forces do not commit any of the above-described acts." (*Id.* at ¶ 78.)

Similarly, the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide. (*See, e.g.,* Dkt. No. 19-6, Declaration of Drs. Cox, Sanford, and Trachtenberg, at ¶¶ 9-14.)

It is every individual's obligation to confront the current siege in Gaza, but it also this Court's obligation to remain within the metes and bounds of its jurisdictional scope.

## ANALYSIS

### A.  Legal Standard for Motion to Dismiss.[1]

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. A court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff cannot merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[1] Because the Court finds that it lacks subject matter jurisdiction to hear the case, Plaintiffs' motion for a preliminary injunction must be denied as well, without further analysis.

678 (2009) (citing *Twombly*, 550 U.S. at 556).

**B.     The Political Question Doctrine Bars Plaintiffs' Claims.**

The Court finds that the claims alleged here raise fundamentally non-justiciable political questions. At its core, the political question doctrine is concerned with the separation of powers between the separate branches of government, and limits jurisdiction of the courts to "cases and controversies." *See* U.S. Const. Art. III, § 2; *see also Powell v. McCormack*, 395 U.S. 486, 518 (1969); *Baker v. Carr*, 369 U.S. 186, 210 (1962). The political question doctrine "first found expression in Chief Justice Marshall's observation that '[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" *Corrie v. Caterpillar, Inc*, 503 F.3d 972, 980 (9th Cir. 2007) (citing *Marbury v. Madison*, 5 U.S. 1 (1 Cranch) 137, 170 (1803)); *see also Baker*, 369 U.S. at 210 (holding that the nonjusticiability of political questions is founded on the doctrine of separation of powers, whether a matter has been committed to another branch of government by the Constitution). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

According to Supreme Court jurisprudence, there are six criteria to determine whether a dispute presents a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. The presence of any one factor indicates the existence of a political question. *Id.* If any one of these factors is "'inextricable from the case,' the court should dismiss the case as non-justiciable because it involves a political question." *Id.* If a claim or issue

involves a nonjusticiable political question, courts will lack subject matter jurisdiction and cannot consider those claims. *See, e.g.*, *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1200 (9th Cir. 2017).

The most important considerations in reaching a determination that a question falls into the category of political questions are the first two outlined in *Baker*: "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination . . ." *Coleman v. Miller*, 307 U.S. 433, 454-55 (1939). Among the areas that the courts have traditionally deemed to involve political questions is that of foreign relations, which "is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918).

Foreign policy is constitutionally committed to the political branches of government, and disputes over foreign policy are considered nonjusticiable political questions. *See*, *e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("[T]he conduct of foreign relations … [is] exclusively entrusted to the political branches … [and] immune from judicial inquiry or interference."). "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936 (citation omitted); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("historical gloss on the 'executive power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (citation omitted). "[T]he nuances of the foreign policy of the United States … are much more the province of the Executive Branch and Congress than of this Court." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000). The foreign policy decision whether to provide military or financial support to a foreign nation is "a quintessential political question" and likely "inappropriate for judicial resolution." *See Abusharar v. Hagel*, 77 F. Supp. 3d 1005, 1006 (C.D. Cal. 2014); *Caterpillar*, 503 F.3d at 983. "If the court is being called upon to serve as a forum for considering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national

security, then the political-question doctrine is implicated, and the court cannot proceed." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 92 (D.D.C. 2016) (opinion by Ketanji Brown Jackson, J.).

Here, Plaintiffs' challenge to the appropriateness of providing financial and military aid to Israel is a challenge to the manner in which the President and Executive Branch officials conduct the foreign affairs of the United States. Plaintiffs' request to have this Court enjoin the government of the United States from providing military or financial assistance to Israel invokes matters are "intimately related to foreign policy and national security" and are "largely immune from judicial inquiry and interference." *Haig*, 453 U.S. at 292; *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). Both Congress and the President have determined that military and economic assistance to Israel is necessary at this time. *See, e.g., Dickson v. Ford*, 521 F.2d 234, 235–36 (5th Cir. 1975). Plaintiffs' claims fail the first *Baker* factor because the judiciary "cannot intrude into our government's decision to grant military assistance to Israel … [as] that foreign policy decision is committed under the Constitution to the legislative and executive branches." *Caterpillar*, 503 F.3d at 983.

"Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations." *Caterpillar*, 503 F.3d at 983. Where both "the Congress and the President have determined that military and economic assistance to the State of Israel is necessary," the question of "whether foreign aid to Israel is necessary at this particular time is a 'question uniquely demand[ing] single-voiced statement of the Government's views' and is therefore inappropriate for judicial resolution." *Id*. (citations omitted).

In *Caterpillar*, the Ninth Circuit relied on the political question doctrine and determined that the courts "cannot intrude into our government's decision to grant military assistance to Israel, even indirectly." *Id*. This Court is accordingly guided by the political question doctrine and finds that, having sued members of the Executive directly, ruling on Plaintiffs' request for an injunction would implicate several other *Baker* factors. For example, the judiciary is not equipped with the intelligence or the acumen necessary to make foreign policy decisions on behalf of the government. "[T]he very nature of executive decision as to foreign policy is political, not judicial … They are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor

7

responsibility and have long been held to belong to the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Airlines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

In addition, making such foreign policy determinations would require this Court to "implicitly question[], and even condemn[], United States foreign policy toward Israel" and would "potential[ly] … cause international embarrassment were a federal court to undermine foreign policy decisions in the sensitive context of the Israeli-Palestinian conflict." *Caterpillar*, 503 F.3d at 983-84. "We simply cannot square the primacy of the Executive in the conduct of foreign relations and the Executive Branch's lead role in foreign policy … with an injunction that compels the United States to" end support and exert influence over Israel. *Republic of Marshall Islands*, 865 F.3d at 1201.

Because any determination to challenge the decision of the executive branch of government on support of Israel is fraught with serious political questions, the claims presented by Plaintiffs here lie outside the Court's limited jurisdiction. *See Caterpillar*, 503 F.3d at 980 ("It is not the role of the courts to indirectly indict Israel for violating international law with military equipment the United States government provided and continues to provide"); *see also Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 215 (1974) ("[T]he concept of justiciability, which expresses the jurisdictional limits imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies … the political question doctrine.").

## CONCLUSION

There are rare cases in which the preferred outcome is inaccessible to the Court. This is one of those cases. The Court is bound by precedent and the division of our coordinate branches of government to abstain from exercising jurisdiction in this matter. Yet, as the ICJ has found, it is plausible that Israel's conduct amounts to genocide. This Court implores Defendants to examine the results of their unflagging support of the military siege against the Palestinians in Gaza.

The Court GRANTS Defendants' motion to dismiss without leave to amend and DENIES Plaintiffs' motion for a preliminary injunction. A separate judgment shall issue and the Clerk is

1 | instructed to close the case.

2 | **IT IS SO ORDERED.**

3 | Dated: January 31, 2024

_____
JEFFREY S. WHITE
United States District Judge